**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

| | |
|---|---|
| DOUGLAS FELLER; JEFFRY HEISE; JOSEPH MULL, individually and on behalf of all others similarly situated, | CASE NO. _____ |
| Plaintiff, | (JURY TRIAL DEMANDED) |
| v. | |
| ALLIANCE ENTERTAINMENT, LLC; and DIRECTTOU, LLC d/b/a Collectors' Choice Music, Critics' Choice Video, Movies Unlimited, DeepDiscount, and WOW HD | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Douglas Feller ("Plaintiff Feller"), Jeffry Heise ("Plaintiff Heise"), and Joseph Mull ("Plaintiff Mull") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to themselves or their counsel, which are based on personal knowledge.

### NATURE OF THE CASE

1.     Plaintiffs bring this action to redress Defendants' practices of selling, renting, transmitting, and/or otherwise disclosing, to various third parties, records containing the personal information (including names and addresses) of each of their customers, along with detailed information revealing the titles and subject matter of the videos and other audiovisual materials purchased by each customer (collectively "Personal Viewing Information") in violation of the Video Privacy Protection Act, 18 U.S.C. §2701et. seq. ("VPPA").

2.      Defendants violate the VPPA with respect to their disclosure of Plaintiffs' and putative classes' Personal Viewing Information in two ways.

3.      First, Defendants disclose their customers' Personal Viewing Information to various third-party recipients, which then append that information to a myriad of other categories of personal and demographic data pertaining to those customers.  Defendants re-sell that Personal Viewing Information (enhanced with the appended demographic information) to other third parties on the open market.

4.      Second, Defendants have systematically transmitted (and continue to transmit today) their customers' personally identifying video viewing information to Meta Platforms, Inc. ("Meta") using a snippet of programming code called the "Meta Pixel," which Defendants chose to install on their websites.

5.      The information Defendants disclosed (and continues to disclose) to Meta via the Meta Pixel it installed on their websites includes the Facebook ID ("FID") and the title of the specific prerecorded video material that each of their customers purchased on their website. An FID is a unique sequence of numbers linked to a specific Meta profile.  A Meta profile, in turn, publicly identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person.  In the simplest terms, the Meta Pixel installed by Defendants captures and discloses to Meta information that reveals the specific videos that a particular person purchased on Defendants' websites (hereinafter, "Private Viewing Information").

6.      By these means Defendants disclosed and continue to disclose their customers'
Private Viewing Information to third parties without asking for, let alone obtaining, their consent
to these practices.

7.      The VPPA clearly prohibits what Defendants have done.  Subsection (b)(1) of the
VPPA provides that, absent the consumer's prior informed, written consent, any "video tape
service provider who knowingly discloses, to any person, personally identifiable information
concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C.
§ 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

8.      Thus, while Defendants profit handsomely from their unauthorized disclosure of
their customers' Personal Viewing Information to third parties without providing prior notice to
or obtaining the requisite consent from any of these customers, they do so at the expense of their
customers' privacy and their statutory rights under federal law.

9.      Defendants' practice of disclosing their customers' Personal Viewing Information
in violation of the VPPA has invaded Plaintiffs' and the other unnamed Class members' privacy
and resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes.
Defendants' disclosures are also dangerous because they allow for the targeting of particularly
vulnerable members of society.  For example, as a result of Defendants' disclosures of Personal
Viewing Information, any person or entity could buy a list with the names and addresses of all
women residing in Connecticut who have spent more than $75.00 purchasing DVD or Blu-ray
movies featuring Burt Lancaster from the Defendants during the past 12 months.  Such a list is
available for sale for approximately $158.00 per thousand customers listed.

10.     In an era when the collection and monetization of consumer data proliferates on an
unprecedented scale, it's important that companies are held accountable for the exploitation of

their customers' sensitive information. Defendants chose to disregard Plaintiffs' and thousands of other consumers' statutorily protected privacy rights by (a) releasing their Private Viewing Information into the data-aggregation and brokerage marketplace and (b) directly disseminating such information from their websites to Meta via the Meta Pixel.  Accordingly, on behalf of themselves and the putative Class members defined below, Plaintiffs bring this Class Action Complaint against Defendants for intentionally and unlawfully disclosing their Personal Viewing Information.

## PARTIES

### I.       Plaintiff Feller

11.     Plaintiff Feller is, and at all times relevant hereto was, a citizen and resident of Indianapolis, Indiana.

12.     Plaintiff Feller is, and at all times relevant hereto was, a user of Meta with a Facebook account which was assigned a unique FID.

13.     On or about February 21, 2024, Plaintiff Feller purchased prerecorded video material from Defendants' online catalog by requesting and paying for such material on Defendants' website Critic's Choice (located at ccvideo.com), and by providing his name, email address, and home address for shipment of such material.  Defendants completed their sales of goods to Plaintiff Feller by shipping the prerecorded video material he purchased to the address he provided in his order.  Accordingly, Plaintiff Feller requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendants on their website.

14.     At all times relevant hereto, including when purchasing prerecorded video material from Defendants on their website, Plaintiff Feller had a Meta account, a Meta profile, and an FID associated with such profile.

15.     When Plaintiff Feller purchased prerecorded video material from Defendants on their website, Defendants disclosed to Meta Plaintiff Feller's FID coupled with the specific title of the video or videos he purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff Feller and the device on which he used to make the purchase.

16.     Prior to and at the time he purchased prerecorded video material from Defendants, Defendants did not notify Plaintiff Feller that they would disclose the Personal Viewing Information of their customers generally or of Plaintiff Feller in particular, and Plaintiff Feller has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to third parties.  Plaintiff Feller has never been provided any written notice that Defendants sell, rent, license, exchange, or otherwise disclose their customers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information.

17.     Defendants nonetheless sold, rented, transmitted and/or otherwise disclosed, either directly or through an intermediary or intermediaries, Plaintiff Feller's Personal Viewing Information – his FID coupled with the specific title of the video he purchased (as well as the URL where such video is available for purchase) to Meta and Plaintiff Feller's name, postal address, e-mail address, gender, age, and income, as well as the particular audio-visual product(s) Plaintiff Feller purchased from Defendants (i.e., the titles of the prerecorded video material purchased) and the amount of money spent by Plaintiff Feller on those purchases – to data miners, data appenders, data aggregators, marketing companies, and/or other third parties, including without limitation NextMark, during the relevant time period.

18.     Plaintiff Feller has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to Meta or any third party.  In fact, Defendants never even provided Plaintiff Feller with written notice of their practices of disclosing their customers' Personal Viewing Information to Meta or any other third party.

19.     Because Defendants disclosed Plaintiff Feller's Personal Viewing Information (including his FID, the title of the prerecorded video material he purchased from Defendants' website, and the URL where such video is available for purchase) and to Meta and other third parties without prior notice or consent during the applicable statutory period, Defendants violated Plaintiff Feller's rights under the VPPA by invading his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

**II.     Plaintiff Heise**

20.     Plaintiff Heise is, and at all times relevant hereto was, a citizen and resident of Coldwater, Michigan.

21.     Plaintiff Heise is, and at all times relevant hereto was, a user of Meta with a Facebook account which was assigned a unique FID.

22.     On or about April 4, 2023, Plaintiff Heise purchased prerecorded video material from Defendants' online catalog by requesting and paying for such material on Defendants' website, Critics' Choice, and by providing his name, email address, and home address for shipment of such material.  Defendants completed their sales of goods to Plaintiff Heise by shipping the prerecorded video material he purchased to the address he provided in his order.  Accordingly, Plaintiff Heise requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendants on their website.

23.     At all times relevant hereto, including when purchasing prerecorded video material from Defendants on their website, Plaintiff Heise had a Meta account, a Meta profile, and an FID associated with such profile.

24.     When Plaintiff Heise purchased prerecorded video material from Defendants on their website, Defendants disclosed to Meta Plaintiff Heise's FID coupled with the specific title of the video he purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff Heise and the device on which he used to make the purchase.

25.     Prior to and at the time he purchased prerecorded video material from Defendants via their catalogs, Defendants did not notify Plaintiff Heise that they would disclose the Personal Viewing Information of their customers generally or of Plaintiff Heise in particular, and Plaintiff Heise has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to third parties.  Plaintiff Heise has never been provided any written notice that Defendants sell, rent, license, exchange, or otherwise disclose their customers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information.

26.     Defendants nonetheless sold, rented, transmitted and/or otherwise disclosed, either directly or through an intermediary or intermediaries, Plaintiff Heise's Personal Viewing Information – his FID coupled with the specific title of the video or videos he purchased (as well as the URL where such video is available for purchase) to Meta and Plaintiff Heise's name, postal address, e-mail address, gender, age, and income, as well as the particular audio-visual product(s) Plaintiff Heise purchased from Defendants (i.e., the titles of the prerecorded video material purchased) and the amount of money spent by Plaintiff Heise on those purchases – to data miners,

data appenders, data aggregators, marketing companies, and/or other third parties, including without limitation NextMark, during the relevant time period.

27.    Plaintiff Heise has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to Meta.  In fact, Defendants never even provided Plaintiff Heise with written notice of their practices of disclosing their customers' Personal Viewing Information to Meta or any other third party.

28.    Because Defendants disclosed Plaintiff Heise's Personal Viewing Information (including his FID, the title of the prerecorded video material he purchased from Defendants' website, and the URL where such video is available for purchase) to Meta and other third parties without prior notice or consent during the applicable statutory period, Defendants violated Plaintiff Heise's rights under the VPPA by invading his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

III.    **Plaintiff Mull**

29.    Plaintiff Mull is, and at all times relevant hereto was, a citizen and resident of Arenzville, Illinois.

30.    Plaintiff Mull is, and at all times relevant hereto was, a user of Meta with a Facebook account that was assigned a unique FID

31.    On or about July 11, 2024, Plaintiff Mull purchased prerecorded video material from Defendants' online catalog by requesting and paying for such material on Defendants' Movies Unlimited website (located at moviesunlimited.com) and by providing his name, email address, and home address for shipment of such material.  Defendants completed their sales of goods to Plaintiff Mull by shipping the prerecorded video material he purchased to the address he

provided in his order.  Accordingly, Plaintiff Mull requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendants on their website.

32.    At all times relevant hereto, including when purchasing prerecorded video material from Defendants on their website, Plaintiff Mull had a Meta account, a Meta profile, and an FID associated with such profile.

33.    When Plaintiff Mull purchased prerecorded video material from Defendants on their website, Defendants disclosed to Meta Plaintiff Mull's FID coupled with the specific title of the video or videos he purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff Mull and the device on which he used to make the purchase.

34.    Prior to and at the time he purchased prerecorded video material from Defendants via their catalogs, Defendants did not notify Plaintiff Mull that they would disclose the Personal Viewing Information of their customers generally or of Plaintiff Mull in particular, and Plaintiff Mull has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to third parties.  Plaintiff Mull has never been provided any written notice that Defendants sell, rent, license, exchange, or otherwise disclose their customers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information.

35.    Defendants nonetheless sold, rented, transmitted and/or otherwise disclosed, either directly or through an intermediary or intermediaries,   Plaintiff Mull's Personal Viewing Information – his FID coupled with the specific title of the video he purchased (as well as the URL where such video is available for purchase) to Meta and Plaintiff Mull's name, postal address, e-mail address, gender, age, and income, as well as the particular audio-visual product(s) Plaintiff

Mull purchased from Defendants (i.e., the titles of the prerecorded video material purchased) and the amount of money spent by Plaintiff Mull on those purchases – to data miners, data appenders, data aggregators, marketing companies, and/or other third parties, including without limitation NextMark, during the relevant time period.

36.     Plaintiff Mull has never consented, agreed, authorized, or otherwise permitted Defendants to disclose his Personal Viewing Information to Meta.  In fact, Defendants never even provided Plaintiff Mull with written notice of their practices of disclosing their customers' Personal Viewing Information or Private Purchase Information to third parties such as Meta and other third parties.

37.     Because Defendants disclosed Plaintiff Mull's Personal Viewing Information (including his FID, the title of the prerecorded video material he purchased from Defendants' website, and the URL where such video is available for purchase) to Meta and other third parties without prior notice or consent during the applicable statutory period, Defendants violated Plaintiff Mull's rights under the VPPA by invading his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

## IV.     Defendants

38.     Defendant Alliance Entertainment, LLC is a Delaware corporation that maintains its headquarters in Plantation, Florida. Defendant Alliance Entertainment, LLC is engaged in the business of wholesale, retail, and direct-to-consumer distribution and fulfillment of home entertainment products, including music, movies, games, and consumer electronics. Defendant Alliance Entertainment, LLC describes itself as the largest wholesale distributor of home entertainment audio and video software in the United States and operates as a one-stop shop for entertainment products and prerecorded video materials for consumers.

39.     Defendant DirectToU, LLC is a Delaware corporation that maintains its headquarters in Plantation, Florida. Defendant DirectToU, LLC is a subdivision of Alliance Entertainment Holding Corporation, an affiliate of Defendant Alliance Entertainment, LLC, and operates as a wholesale distribution and retail sales business involving the sale of entertainment products, including music, movies, video games, electronics, toys, and other prerecorded video materials. Defendant DirectToU, LLC operates the direct-to-consumer brands Collectors' Choice Music, Critics' Choice Video, Movies Unlimited, DeepDiscount, and WOW HD.

## JURISDICTION AND VENUE

40.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

41.      Personal jurisdiction and venue are proper because Defendants maintain their headquarters and principal places of business in Plantation, Florida, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

42.     Generally speaking, the VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta) information that personally identifies consumers (like Plaintiffs) as having viewed particular videos or other audio-visual materials.

43.     Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), and defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable

information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

44.     Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.*  Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

45.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988).  As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id*.

46.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act:

Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

47.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

48.     In this case, however, Defendants deprived Plaintiffs and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Personal Viewing Information to Meta and other third parties, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.     Consumers' Personal Information Has Real Market Value

49.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting

---

[1]     The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[2]     Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, frank.senate.gov (Jan. 31, 2012).

and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

50.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

51.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[5]

52.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

53.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight,

---

[3]     FCC, *The Information Marketplace* (Mar. 13, 2001), at 8-11, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[4]     *See Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.

[5]     Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.
[6]     *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/.

height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

54.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

55.     Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

56.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[10] including

---

[7]     N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of- consumer-database-marketing.html.

[8]     Letter from Sen. J. Rockefeller IV, Sen. Cmtee. on Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

[9]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.
[10]     *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Defendants share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

57.     Disclosures like Defendants' are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]  The FTC notes that "[t]she elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

58.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Defendants' are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

---

[11]     *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[12]     *Id.*

[13]     *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf.

[14]     *Id.*

59.     Defendants is not alone in violating their customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice.  Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

60.     As the data aggregation industry has grown, so has consumer concerns regarding personal information.

61.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

62.     Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

---

[15]     *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited May 13, 2019).

[16]     *Id.*

63.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

64.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

65.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

### III.     Defendants Unlawfully Sells, Rents, Transmits, And Otherwise Discloses Their Customers' Personal Viewing Information

66.     Defendants maintains a vast digital database comprised of their customers' Personal Viewing Information, including the names and addresses of each customer and

---

[17]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited May 13, 2019).
[18]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited May 13, 2019).

[19]     *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct.        2003)        at        2,        *available        at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf    (last visited May 13, 2019) ("It is obvious that people value online privacy.").

information reflecting the titles of all video and other audio-visual products that each of their customers have purchased.

67.     During the time period relevant to this action, Defendants has monetized this database by renting, selling, or otherwise disclosing their customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties.

68.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, the Personal Viewing Information of 384,538 American consumers who purchased Defendants' video products is offered for sale on the website of NextMark, Inc. ("NextMark") – one of many traffickers of this type of Personal Viewing Information – at a base price of "$105.00/M [per thousand records]" (10.5 cents each):

# ALLIANCE ENTERTAINMENT MUSIC & DVD MASTERFILE Mailing List

Alliance Entertainment Masterfile provides an unduplicated file comprised of Collectors' Choice Music, Critics Choice Video and DVD, and Movies Unlimited. These buyers have purchased CD's and DVD's that cater to a very diverse audience through Alliance Entertainment's various catalogs.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | COUNTS THROUGH 11/30/2019 | |
|---|---|---|
| 384,538 TOTAL UNIVERSE / BASE RATE | $105.00/M | |
| 238,582 12 MONTH BUYERS | + $10.00/M | |
| 151,913 6 MONTH BUYERS | + $15.00/M | |
| 101,799 3 MONTH BUYERS | + $20.00/M | |
| 48,957 1 MONTH BUYERS | + $25.00/M | |
| FUNDRAISER RATE | $70.00/M | |
| PUBLISHER RATE | $85.00/M | |
| COMPETITIVE OFFERS | + $16.00/M | |
| FACEBOOK MATCH & TARGET | + $25.00/M | |
| FACEBOOK DIGITAL DISPLAY | $55.00/M | |

| POPULARITY: | ••••• 99 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | 📧 |
| SOURCE: | 80% DMS |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | STANDARD PROVIDER |
| GEO: | USA |
| GENDER: | 42% FEMALE 49% MALE |
| SPENDING: | $55.00 AVERAGE ORDER |

## DESCRIPTION

Alliance Entertainment Masterfile provides an unduplicated file comprised of Collectors' Choice Music, Critics Choice Video and DVD, and Movies Unlimited. These buyers have purchased CD's and DVD's that cater to a very diverse audience through Alliance Entertainment's various catalogs.

** Heartland Music Catalog is no longer mailing. The names and products have been added to the Critics Choice Video & DVD Catalog. **

Alliance Entertainment offer music collectors that desire to purchase new music, imports, re-issues and hard-to-find music in all genres that include: oldies, rock, folk, country, big band, nostalgic soul, R&B, gospel and blues.  Additionally,  they sell a carefully-edited selection of high-quality home video titles, from hundreds of suppliers, with the latest Video/DVD releases which include classics, musicals, documentaries, action movies, family, British, horror, war and special interest movie titles.

Alliance Entertainment Masterfile will work well for the following offers: regional and national fundraising appeals, regional and national publication offers, stationery, apparel, collectibles, sweepstakes, housewares, general merchandise, insurance, African American, food, craft, children's offers, credit offers, health, travel and more.

Average Age: 55

Average Income: $70,000

Dollar Selects: Cummulative

* All selections can be combined with lifestyle, age and income data.

| SELECTS | |
|---|---|
| $100+ BUYERS | $26.00/M |
| $25+ BUYERS | $11.00/M |
| $50+ BUYERS | $16.00/M |
| $75+ BUYERS | $21.00/M |
| 1 MONTH HOTLINE | $25.00/M |
| 12 MONTH HOTLINE | $10.00/M |
| 3 MONTH HOTLINE | $20.00/M |
| 6 MONTH HOTLINE | $15.00/M |
| AGE | |
| DOLLAR COUNTS | |
| FACEBOOK DIGITAL DISPLAY | $55.00/M |
| FACEBOOK MATCH & TARGET | $25.00/M |
| GENDER/SEX | $8.00/M |
| INCOME | |
| LIFESTYLE | |
| MULTI-BUYERS | $10.00/M |
| MUSIC CATEGORIES | |
| PRODUCT | $16.00/M |
| SCF | $8.00/M |
| STATE | $8.00/M |
| VIDEO CATEGORIES | |
| ZIP | $8.00/M |
| ZIP TAPE | $8.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $5.00/M |
| EMAIL | $75.00/F |
| FTP | $75.00/F |

## RELATED LISTS

- OLDIES.COM (FORMERLY NINA'S DISCOUNT OLDIES)
- BETTY'S ATTIC
- BILLBOARD MAGAZINE CONSUMER POSTAL FILE
- HEARTLAND AMERICA
- AMERICAN MINT
- MUSIC TRENDS CLASSIC ROCK
- CRITICS CHOICE VIDEO & DVD
- COLLECTORS CHOICE MUSIC CATALOG BUYERS
- ANNIE'S - GOOD OLD DAYS MAGAZINE
- AMERICAN SCIENCE AND SURPLUS

*See* **Exhibit A** hereto.

69.     The "ALLIANCE ENTERTAINMENT MUSIC & DVD MASTERFILE" list offered for sale by NextMark, shown in the screenshot above, contains Personal Viewing Information for each of the 384,538 American consumers whose information appears on the list, including each person's name, postal address, e-mail address, gender, age, and income, as well as the particular audio-visual product(s) they purchased from Defendants (i.e., the titles of the DVD and Blu-ray videos purchased) and the amount of money they spent on those purchases.

70.     As a result of Defendants' data compiling and sharing practices, companies have obtained and continue to obtain the Personal Viewing Information of Defendants' customers, together with additional sensitive personal information that has been appended thereto by data appenders and others.

71.     Plaintiffs are informed and believe, and thereupon allege, that numerous of the third parties to whom Defendants has transmitted and/or otherwise disclosed their customers' Personal Viewing Information, either directly or indirectly through an intermediary or intermediaries, have in turn sold, rented, transmitted, or otherwise disclosed that Personal Viewing Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

72.     Defendants' disclosures of Personal Viewing Information have put their customers at risk of serious harm from scammers.  For example, as a result of Defendants' disclosures of Personal Viewing Information, any person or entity could obtain a list with the names and addresses of all women residing in Connecticut who have spent more than $75.00 purchasing DVD

or Blu-ray movies featuring Burt Lancaster from the Defendants during the past 12 months.  Such a list is available for sale for approximately $158.00 per thousand customers listed.

73.     Defendants did not seek Plaintiffs and other their customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and their customers remain unaware that their Personal Viewing Information and other sensitive data is being sold, rented and exchanged on the open market.

IV.     **Defendant Knowingly Uses the Meta Pixel to Transmit the Private Viewing Information of its Customers to Meta**

74.     Separately from, and in addition to, transmitting Plaintiffs and the Class members' Private Viewing Information to data brokers and data appenders, Defendants violated the VPPA by transmitting Plaintiffs' and the class members' Private Viewing Information to Meta.

75.     Defendants sell a wide variety of prerecorded video materials, including movies and television shows on DVD and Blu-Ray, to consumers on their network of websites, which include websites belonging to the following brands: Collectors' Choice Music (ccmusic.com), Critics' Choice Video (ccvideo.com), Movies Unlimited (moviesunlimited.com), DeepDiscount (deepdiscount.com), and WOW HD (wowhd.co.uk).

76.     To make a purchase of prerecorded video material from Defendants' websites, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

77.     Whenever a person with a Meta account purchases prerecorded video material from Defendants on their websites, Defendants use – and have used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).

78.     In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendants intentionally programmed its websites (by following step-by-step instructions from Meta's website) to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material on one of Defendants' websites, along with the specific title of the prerecorded video material that the person purchased.

79.     With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendants on on of their websites—all of which Defendants knowingly and systematically provide to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained).   This can be accomplished simply by accessing the URL www.facebook.com/ and inserting the person's FID.

80.     Defendants' practices of disclosing the Private Viewing Information of its customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.   At all times relevant hereto, whenever one of the Plaintiffs or any other person purchased prerecorded video material from Defendants on their websites, Defendants disclosed to Meta (*inter alia*) the specific title of the video material that was purchased (including the URL where such material is available for purchase), along with the FID of the person who purchased it (which, as discussed above, uniquely identified the person).

81.     At all times relevant hereto, Defendants knew that the Meta Pixel was disclosing its customers' Private Viewing Information to Meta.

82.     Although Defendants could easily have programmed its website so that none of its

customers' Private Viewing Information is disclosed to Meta, Defendants instead chose to program its website so that all of its customers' Private Viewing Information is disclosed to Meta.

83.     Before transmitting its customers' Private Viewing Information to Meta, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

84.     By intentionally disclosing to Meta each of the Plaintiffs' and its other customers' FIDs together with the specific video material that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

## CLASS ACTION ALLEGATIONS

85.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and seek to represent two classes of similarly situated persons (the "Classes"), defined as follows:

> **(a)     The Data Brokerage Class:** All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from Defendants and had their Private Viewing Information disclosed to a third-party by Defendant.
>
> **(b)     The Meta Pixel Class:** All persons in the United States who, during the two years preceding the filing of this action purchased prerecorded video material from Defendants' website while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

86.     Excluded from the Classes are any entity in which Defendants have a controlling interest, and officers or directors of Defendants.

87.     Class members are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in at least the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs

at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

88.    Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to (a) whether Defendants knowingly disclosed Plaintiffs' and Class members' Private Viewing Information to a third party;  (b) whether the Defendants embedded Meta Pixel on their websites that monitors and tracks actions taken by visitors to their websites; (c) whether the Defendants report the actions and information of visitors to Meta; and (d) whether Defendant knowingly disclosed Plaintiffs' and Class members' Private Viewing Information to Meta; (e) whether Defendants' conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; (f) whether each of the Plaintiffs and Class members is entitled to a statutory damage award of $2,500, as provided by the VPPA.

89.    The named Plaintiffs' claims are typical of the claims of the Classes in that the named Plaintiffs and the Class members suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendants' uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to third parties.

90.    Plaintiffs are adequate representatives of the Classes because their interests do not conflict with those of the Class members they seek to represent; they have retained competent counsel experienced in prosecuting class actions and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members.

91.    The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims.  Each individual member of the Classes may lack the

resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefit of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATION OF THE VPPA (18 U.S.C. § 2710)

92.     Plaintiffs repeat the allegations asserted in the preceding paragraphs as if fully set forth herein.

93.     The VPPA prohibits each Defendant, a "video tape service provider," from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

94.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendants are "video tape service providers" as defined in 18 U.S.C. § 2710(a)(4) because they engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

95.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiffs and Class members are each a "consumer" within the meaning of the VPPA because they each purchased prerecorded video material from Defendants' websites that was sold and delivered to them by Defendants.

96.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Private Viewing Information that Defendants transmitted to third parties, including Meta, constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified each of the Plaintiffs and Class members as an individual who purchased, and thus "requested or obtained," specific prerecorded video material from Defendants via their websites.

97.     Defendants knowingly disclosed Plaintiffs' and the members of the Data Brokerage Class's Private Viewing Information to data aggregators, data brokers, data appenders, and the like because Defendants knowingly rented, sold, or otherwise disclosed their customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties.

98.     Further, Defendants knowingly disclosed Plaintiffs' the members of the Meta Pixel Class's Private Viewing Information to Meta via the Meta Pixel technology because Defendants intentionally installed and programmed the Meta Pixel code on its website, knowing that such code would transmit to Meta the titles of the video materials purchased by its customers coupled with its customers' unique identifiers (including FIDs).

99.     Defendants failed to obtain informed written consent from any of the Plaintiffs or

Class members authorizing them to disclose their Private Viewing Information to Meta or any other third party. More specifically, at no time prior to or during the applicable statutory period did Defendants obtain from any person who purchased prerecorded video material on its website (including any of the Plaintiffs or members of the classes) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendants provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

100. By disclosing Plaintiffs' and Class members' Private Viewing Information, Defendants violated their statutorily protected right to privacy in their Private Viewing Information.

101. Consequently, Defendants are liable to each of the Plaintiffs and the members of the Classes for damages in the statutorily set sum of $2,500. *See* 18 U.S.C. § 2710(c)(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendants Alliance Entertainment, LLC and DirectToU, LLC. as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B. For an order declaring that Defendant's conduct as described herein violated the VPPA;

C. For an order finding in favor of Plaintiffs and the Class and against Defendant on all counts asserted herein;

D.   For an award of $2,500.00 to the Plaintiffs and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c);

E.   For an order permanently enjoining Defendant from disclosing the Private Viewing Information of its subscribers to third parties in violation of the VPPA.

F.   For prejudgment interest on all amounts awarded; and

G.   For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiffs and the Class under Rule 23 and 18 U.S.C. § 2710(c).

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Class Members, hereby demand a trial by jury on all claims so triable.

Dated: August 8, 2024                    Respectfully submitted,

By: /s/ Frank S. Hedin

**HEDIN LLP**
FRANK S. HEDIN (FBN: 109698)
ARUN G. RAVINDRAN (FBN: 66247)
ELLIOT O. JACKSON (FBN: 1034536)
1395 Brickell Ave, Suite 610
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-Mail: fhedin@hedinllp.com
          aravindran@hedinllp.com
          ejackson@hedinllp.com

*Counsel for Plaintiffs and the Putative Class*