**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION**

DOUGLAS FELLER; JEFFRY HEISE;
JOSEPH MULL, individually and on behalf
of all others similarly situated,

          Plaintiffs,

      v.

ALLIANCE ENTERTAINMENT, LLC;
and DIRECTTOU, LLC d/b/a Collectors'
Choice Music, Critics' Choice Video,
Movies Unlimited, DeepDiscount, and
WOW HD,

          Defendants.

Case No. 0:24-CV-61444-RAR

Hon. Rodolfo A. Ruiz II

---

**MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT
AND INCORPORATED MEMORANDUM OF LAW**

**Claim of Unconstitutionality**

    Defendants Alliance Entertainment, LLC ("Alliance") and DirectToU, LLC ("DirectToU";

and together with Alliance, "Defendants"), by and through their undersigned counsel, hereby

respectfully move this Court to dismiss the Class Action Complaint ("Complaint") filed by

Plaintiffs Douglas Feller, Jeffry Heise, and Joseph Mull (collectively, "Plaintiffs") with prejudice.

In support of thereof, Defendants state as follows:

**INTRODUCTION**

    Defendants operate websites that offer music, movies, games, consumer electronics, and

related products for purchase. Plaintiffs allege that they each purchased prerecorded video material

from a website operated by Defendants and that Defendants shared their information with various

third parties, allegedly in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C.

§§ 2710, *et seq.* The VPPA, however, cannot withstand First Amendment scrutiny, and even if it

could, Plaintiffs have not sufficiently alleged that Defendants' conduct violated the VPPA. Thus, the Complaint should be dismissed with prejudice.

## <u>BACKGROUND</u>

Plaintiffs allege that Alliance "is engaged in the business of wholesale, retail, and direct-to-consumer distribution and fulfillment of home entertainment products, including music, movies, games, and consumer electronics" and that DirectToU, an affiliate of Alliance, "operates as a wholesale distribution and retail sales business involving the sale of entertainment products, including music, movies, video games, electronics, toys, and other prerecorded video materials." (Compl. ¶¶ 38-39.) Plaintiffs further allege that "Defendants sell a wide variety of prerecorded video materials, including movies and television shows on DVD and Blu-Ray, to consumers on their network of websites, which include websites belonging to the following brands: Collectors' Choice Music (ccmusic.com), Critics' Choice Video (ccvideo.com), Movies Unlimited (moviesunlimited.com), DeepDiscount (deepdiscount.com), and WOW HD (wowhd.co.uk)." (*Id.* at ¶ 75.)

Plaintiff Douglas Feller alleges that he "purchased prerecorded video material from Defendants' online catalog by requesting and paying for such material on Defendants' website Critic's Choice (located at ccvideo.com)." (*Id.* at ¶ 13.) Plaintiff Jeffrey Heise alleges that he "purchased prerecorded video material from Defendants' online catalog by requesting and paying for such material on Defendants' website, Critics' Choice." (*Id.* at ¶ 22.) Plaintiff Joseph Mull alleges that he "purchased prerecorded video material from Defendants' online catalog by requesting and paying for such material on Defendants' Movies Unlimited website (located at moviesunlimited.com)." (*Id.* at ¶ 31.) Plaintiffs further allege that they each have Facebook accounts with unique Facebook IDs. (*Id.* at ¶¶ 12, 21, 30.)

The Complaint alleges a single cause of action for violation of the VPPA. Specifically, Plaintiffs allege that Defendants violated the VPPA by: (1) disclosing Plaintiffs' names, postal addresses, e-mail addresses, gender, ages, and incomes and the specific titles of the video materials they purchased "to data miners, data appenders, data aggregators, marketing companies, and/or other third parties"; and (2) sharing Plaintiffs' Facebook IDs, the titles of the video materials they purchased, and the URL where the video is available for purchase, which they claim is personally identifiable information. (*Id.* at ¶¶ 17, 26, 35.) Plaintiffs allege this conduct violates the VPPA because Defendants allegedly did not receive Plaintiffs' consent allowing the disclosure of Plaintiffs' personally identifiable information to third parties. (*Id.* at ¶¶ 99-100.) Plaintiffs seek to assert their claims on behalf of two putative classes. (*Id.* at ¶ 85.)

## ARGUMENT

Plaintiffs' claim for violation of the VPPA fails both because the VPPA places an unconstitutional burden on free speech and because the Complaint does not sufficiently state a claim upon which relief can be granted.

## I.      The VPPA Violates The First Amendment.

The Complaint should be dismissed because it seeks to enforce a statute that violates the First Amendment. Laws that "burden" speech are unconstitutional unless they satisfy First Amendment scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011). The VPPA imposes severe speech restrictions that cannot be justified.

### A.      The VPPA Imposes Suspect Burdens.

To begin, the VPPA triggers First Amendment scrutiny because it places speaker- and content-based restrictions on the dissemination of information. *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1307-08 (11th Cir. 2017). A burden is speaker-based if it applies only to some classes of speakers (such as "doctors and medical professionals") and content-based if its

application turns on the message of regulated speech (such as if it applies "only on the topic of firearm ownership"). *Id.*

Here, the VPPA applies only to a "video tape service provider" and prohibits only the disclosure of "personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). Its dictates are speaker-based because they "target[s] those speakers" within their gateway definitions and no others, *Sorrell*, 564 U.S. at 565, and content-based because its applicability "depend[s] entirely on the communicative content of the" disclosures. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015). The Supreme Court in *Sorrell* held that a Vermont law restricting "the sale, disclosure, and use of prescriber-identifying information," which pharmacies receive when processing prescriptions, was both content- and speaker-based and triggered "heightened scrutiny." 564 U.S. at 571. The VPPA likewise forbids specified speakers from disclosing information that can be identified only by its content. First Amendment scrutiny applies.

### B.  The VPPA Fails First Amendment Scrutiny.

First Amendment scrutiny is not satisfied. As an initial matter, strict scrutiny is the applicable standard. Although *Sorrell* declined to decide whether that standard or the intermediate standard under *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980), applies to content- and speaker-based commercial speech, 564 U.S. at 571, the Court more recently applied strict scrutiny to a ban on robocalls, reasoning that, under its "precedents, a 'law that is content based' is 'subject to strict scrutiny.'" *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 621 (2020) (quoting *Reed*, 576 U.S. at 165).

In any event, a court "need not decide whether strict scrutiny applies," if a law does not survive constitutional scrutiny under either standard. *See Wollschlaeger*, 848 F.3d at 1308. That is the case here. "Under a commercial speech inquiry" it must be shown "at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that

interest." *Sorrell*, 564 U.S. at 572. This test is often expressed in four inquiries: (1) whether the speech at issue concerns "lawful activity" and is not "misleading," (2) whether the government interest in burdening speech is "substantial," (3) whether "the regulation directly advances the asserted government interest," and (4) whether the regulation is "more extensive than is necessary to serve that interest." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). The VPPA fails each inquiry.

First, it does not prevent misleading speech or address illegal businesses.

Second, no substantial interest supports the severe speech prohibitions. "[T]he government cannot satisfy the second prong of the *Central Hudson* test by merely asserting a broad interest in privacy," but must also "specify the particular notion of privacy and interest served" and demonstrate "that the state has considered the proper balancing of the benefits and harms of privacy." *U.S. W., Inc. v. F.C.C.*, 182 F.3d 1224, 1234-35 (10th Cir. 1999). Congress's record for the VPPA specified that the statute protect protects the notion of privacy defined by the First and Fourth Amendments. S. Rep. No. 100-599, at 4-5 (1988), *as re-printed in* 1988 U.S.C.C.A.N. 4342-4. But both Amendments constrain only state action. *See United States v. Sparks*, 806 F.3d 1323, 1334 (11th Cir. 2015); *Wooten v. La Salle Corr.*, No. 7:22-CV-000148 (WLS), 2024 WL 4132331, *6 (M.D. Ga. Sept. 10, 2024). So the VPPA, which burdens private businesses, does not "extend" their rights, S. Rep. No. 100-599 at 2. And the choice to prohibit private speech in the name of "intellectual freedom," *id.* at 4, makes little sense.

The legislative history also cites an incident "when a weekly newspaper in Washington published a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store" and one other incident where "the attorney for a women in a child custody proceeding made an informal request for the records of every film rented by her husband in an

effort to show that, based on his viewing habits, he was an unfit father." *Id.* at 5-6. But simply reciting two incidents—out of innumerable video rentals nationwide—does not "show that the dissemination of the information desired to be kept private would inflict specific and significant harm on individuals." *U.S. West*, 182 F.3d at 1235. In neither incident did any harm arise. Judge Bork's Supreme Court nomination failed because of his judicial philosophy, not his video rentals, and there is no evidence that the attorney in the custody proceeding obtained the film records.[1] Simply put, the legislative history cites not one incident of harm arising from disclosure of video rentals. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (explaining that the burden "is not satisfied by mere speculation or conjecture") (quotation marks omitted).

Third, even if a privacy interest were sufficient, the VPPA does not "directly advance[]" it. *Sorrell*, 564 U.S. at 572. "There must be a 'fit between the legislature's ends and the means chosen to accomplish those ends.'" *Id.* The VPPA is unconstitutionally underinclusive. *See Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999). "While surprising at first glance, the notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (footnote omitted). Underinclusive laws present "risks of viewpoint and content discrimination," and "[t]hey may diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* at 52.

The VPPA protects privacy in the most selective and irrational of ways. It protects only "video" purchases, rentals, or deliveries, 18 U.S.C. § 2710(a)(3), but not books, magazines, music, and pictures. "The failure to prohibit the disclosure of" purchases of such materials "makes no rational sense if the Government's true aim is to" protect intellectual privacy or guard against

---

[1] Given substantial amounts of private information are exchanged daily in litigation discovery, it is hard to see what a litigation incident could say about an important privacy interest.

embarrassment from public disclosure of information people consume at home. *Rubin*, 514 U.S. at 488. Under the statute, renting *Lassie* activates fulsome statutory penalties if that rental is disclosed, but books, magazines, and photographs with sexual content (or any content) receive no protection. Likewise, because the statutes protect only "prerecorded" materials, 18 U.S.C. § 2710(a)(4), someone who watches livestreamed video content (no matter how embarrassing) receives none of the rights provided to those who watch prerecorded content (no matter how innocuous). The *same* video content will be unprotected on a first, live showing but may be protected on later showings. The VPPA is also selective in its application to some businesses, but not others. The statute applies to a video obtained from a business having "a focus" of video rental (e.g., Netflix) but not to the *same video* from a business without that focus (e.g., Target). *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221-22 (C.D. Cal. 2017). And it selectively reaches renters, purchasers, and subscribers, but no one else. *Tawam v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056, 1061 (S.D. Cal. 2023). This burdens some speakers, but not others, for no reason whatsoever.

Finally, Congress could have passed a privacy law that protects privacy in a rational manner without this selectivity, *see Gale Force Roofing & Restoration, LLC v. Brown*, 548 F. Supp. 3d 1143, 1160 (N.D. Fla. 2021), such as by applying directives to all content for which an intellectual-privacy interest might reasonably attach, and all suppliers of that content. Instead, Congress picked out the case of a single judicial nominee, drew up a law to prevent *that* case from reoccurring, and protected practically nothing else. This is so irrational that the VPPA will not even do that: if all internet images a future judicial nominee ever viewed are made public, the statutes invoked here will say nothing about that—even though that would be no different from the Bork incident that inspired the VPPA. That is no way to protect privacy, and it does not justify severe speech burdens.

**II.     Alternatively, The Complaint Fails To Sufficiently Allege A VPPA Claim.**

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. The Complaint fails to state a claim for two reasons: (1) Plaintiffs do not allege they suffered any actual damages; and (2) Plaintiffs do not sufficiently allege Defendants knowingly disclosed Plaintiffs' personally identifiable information as required to state a claim under the VPPA.

**A.     Plaintiffs Fail to Allege Actual Damages.**

Under the VPPA, a court may award "actual damages but not less than liquidated damages in an amount of $2,500." 18 U.S.C. 2710(c). While the Eleventh Circuit has addressed whether a procedural violation of the VPPA is sufficient to constitute an injury-in-fact for purposes of Article III standing, *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017), it has not considered whether a plaintiff is required to prove actual damages to be entitled to statutory minimum damages under the statute. The plain language of the VPPA indicates that Congress only intended to compensate for actual injury, and thus, when, as here, the Plaintiffs do not allege any actual damages, their Complaint should be dismissed for failure to state a claim upon which relief can be granted.

The remedial provision of the VPPA provides:

(c) Civil action.--(1) Any person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court.

(2) The court may award—

> (A) actual damages but not less than liquidated damages in an amount of $2,500;
>
> (B) punitive damages;
>
> (C) reasonable attorneys' fees and other litigation costs reasonably incurred; and
>
> (D) such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2710(c). When read in context, it is apparent that the language "but not less than liquidated damages in an amount of $2,500" is intended to limit the phrase actual damages. *See Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022) ("According to the rule of the last antecedent, a 'limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows.'"). Indeed, similar language found in the Privacy Act of 1974 has been held to require proof of actual damages. *Fanin v. U.S. Dep't of Veterans Affs.*, 572 F.3d 868, 872 (11th Cir. 2009) ("Obtaining monetary damages under § 552a(g)(4) requires proof of 'actual damages.'"); *see also* 5 U.S.C. § 552a(g)(4) ("[T]he United States shall be liable to the individual in an amount equal to the sum of—(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; . . . ."). To read the VPPA as permitting an award of $2,500 in the absence of actual damages requires substituting the conjunction "or" in the place of the phrase "but not less than." *See Dacostagomez-Aguilar v. U.S. Att'y Gen.*, 40 F.4th 1312, 1316 (11th Cir. 2022) ("The use of the disjunctive 'or' indicates alternatives and requires that those alternatives be treated separately.") (internal quotation marks omitted). Such an interpretation is at odds with the plain language.[2]

---

[2] While the Eleventh Circuit has not squarely addressed the meaning of the remedial provision of the VPPA, it previously addressed the meaning of a similar remedial provision found in the Driver's Privacy Protection Act. *See Kehoe v. Fid. Fed. Bank & Tr.*, 421 F.3d 1209, 1212-13 (11th Cir. 2005) (interpreting language providing, "(a) Cause of action.—A person who knowingly

Here, Plaintiffs have not alleged any actual damages that can open the door to the VPPA's statutory minimum damages. The phrase "actual damages" is not defined in the VPPA. But the Eleventh Circuit has interpreted "actual damages" as permitting "recovery only for proven pecuniary losses and not for generalized mental injuries, loss of reputation, embarrassment or other non-quantifiable injuries." *Fanin*, 572 F.3d at 872-73. The *Black's Law Dictionary* definition from the time the VPPA was enacted further supports this conclusion. *See United States v. Dawson*, 64 F.4th 1227, 1236 (11th Cir. 2023) (explaining that courts "look to the plain and ordinary meaning of the statutory language as it was understood at the time the law was enacted," which can be determined "by looking at dictionaries in existence around the time of enactment"). The applicable edition of *Black's Law Dictionary* defines "actual damages" as follows: "Real, substantial and just damages, or the amount awarded to a complainant in compensation for his actual and real loss or injury, as opposed on the one hand to 'nominal' damages, and on the other to 'exemplary' or 'punitive' damages. Synonymous with 'compensatory damages' and with 'general damages.'" *Damages*, *Black's Law Dictionary* (5th ed. 1979). The Complaint alleges nothing more than mere disclosure of Plaintiffs' information, which is a non-quantifiable injury, and thus, does not satisfy the "actual damages" requirement. (Compl. ¶¶ 19, 28, 37.) *See Fanin*, 572 F.3d at 870, 875 (holding that plaintiffs who names, social security numbers, birth dates, and healthcare files were contained on a stolen hard drive could not recover statutory damages under the Privacy Act of

---

obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter [18 U.S.C. §§ 2721 *et seq.*] shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court. (b) Remedies.—The court may award—(1) actual damages, but not less than liquidated damages in the amount of $2,500; . . . ."). *Kehoe* is distinguishable because, unlike the VPPA, the subject statute did not include any requirement that an individual bringing a claim be "aggrieved by any act of a person in violation of" the VPPA, 18 U.S.C. § 2710(c), but rather provides an action may be brought by anyone whose personal information was knowingly obtained, disclosed, or used in violation of the Driver's Privacy Protection Act. *Kehoe*, 421 F.3d at 1212-13. To the extent *Kehoe* and *Fanin* are in tension, *Fanin*, which was decided several years after *Kehoe*, presents the better approach.

1974 because they failed to show any pecuniary loss). Thus, Plaintiffs are not entitled to the statutory minimum damages, and their Complaint fails to state a claim.

**B.      Plaintiffs Fail To Allege Defendants Knowingly Disclosed Plaintiffs' PII.**

To state a claim under the VPPA, plaintiffs must allege that defendant (1) is a video tape service provider ("VTSP"); (2) who knowingly disclosed to any person; (3) personally identifiable information ("PII"); (4) concerning any consumer. *See* 18 U.S.C. 2710(b)(1). Here, Plaintiffs fail to allege that Defendants knowingly disclosed Plaintiffs' PII.

Unless a VTSP has provided notice and obtained consent, it is prohibited from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015); 18 U.S.C. § 2710(b)(1). PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). "[T]he information disclosed by a video tape service provider must, at the very least, identify a *particular person*—not just an anonymous individual—and connect this particular person with his or his viewing history." *Robinson*, 152 F. Supp. 3d at 179. The Complaint fails to allege the disclosure of Plaintiffs' information sufficient to satisfy the VPPA's definition and fails to allege that Defendants acted knowingly. Thus, the Complaint should be dismissed for failure to sufficiently allege a claim for violation of the VPPA.

**1.      Plaintiffs Do Not Allege That Their Video Watching Behavior Was Disclosed Together With Any Information Linked Directly To Them.**

The most basic requirement of a VPPA claim is disclosure of "the kind of information that would ***readily permit an ordinary person*** to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 267 (3d Cir. 2016) (emphasis added) ("*Nickelodeon*"); *see also Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297

(N.D. Fla. 2023) (dismissing VPPA claim because, among other reasons, the complaint did not plausibly allege how the information allegedly transmitted by the pixel would "'readily permit[] *an ordinary person* to identify' Plaintiffs' video-watching behavior . . . or how Facebook can do that without 'unforeseeable detective work.'"). PII "is that which, in its own right, without more, 'link[s] an actual person to actual video materials.'" *Ellis v. Cartoon Network, Inc.*, No. 1:14-CV-484-TWT, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014); *see also Perry v. Cable News Network, Inc.*, No. 1:14-CV-02926-ELR, 2016 WL 4373708, at *4 (N.D. Ga. Apr. 20, 2016) (dismissing VPPA claim alleging defendants disclosed plaintiff's "MAC address along with the viewing history tied to that address" because, among other reasons, the complaint did not "pled any facts to establish that the video history and MAC address were tied to an actual person and disclosed by Defendants").[3]

Plaintiffs' first theory is that Defendants disclosed Plaintiffs' names, postal addresses, e-mail addresses, gender, ages, and incomes and the specific titles of the video materials they purchased "to data miners, data appenders, data aggregators, marketing companies, and/or other third parties." (Compl. ¶¶ 17, 26, 35.) But the "publicly available evidence" submitted by Plaintiffs contradicts these allegations. (*Id.* at 68.) Exhibit A references customer mailing lists—it does not state that the actual purchases of the individuals are included with the mailing lists. (*See* Compl, Ex. A.) Indeed, it states that "selections can be combined with lifestyle, age and income data,"

---

[3] *See also Nickelodeon*, 827 F.3d at 285 ("We also hold that the Act's prohibition on the disclosure of personally identifiable information applies only to the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."); *Robinson*, 152 F. Supp. 3d at 182 ("the most natural reading of PII suggests that it is the information actually 'disclos[ed]' by a 'video tape service provider,' 18 U.S.C. § 2710(b)(1), **which must itself do the identifying** that is relevant for purposes of the VPPA (literally, 'information which identifies')— **not information disclosed by a provider, plus other pieces of information** collected elsewhere by non-defendant third parties.") (emphasis added); *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *8 (N.D. Cal. Apr. 28, 2014) ("The plain language of the statute suggests, and the Senate Report confirms, that the statute protects personally identifiable information that identifies a specific person and ties that person to particular videos that the person watched.").

none of which ties the information to the customer's video history, as required to state a claim under the VPPA. Importantly, Exhibit A does not state that purchase information can be combined with any mailing lists, which would be necessary to tie the purchase to a particular person. (*Id.*)

Plaintiffs' second theory is that Defendants' shared Plaintiffs' Facebook IDs, the titles of the video materials they purchased, and the URL where the video is available for purchase with Meta. (Compl. ¶¶ 17, 26, 35.) But the information allegedly transmitted required "more" to link "an actual person to actual video materials," which the Complaint acknowledges. *See Ellis*, 2014 WL 5023535, at *3. (Compl. ¶ 79.) Facebook IDs are merely static digital identifiers, which are not PII.[4] (*See* Compl. ¶ 79.) Static digital identifiers include such things as a unique device identifier that is "randomly generated when a user initially sets up his device and should remain constant for the lifetime of the user's device." *Nickelodeon*, 827 F.3d at 282 n.124 (citing *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015)). These random strings of numbers, when viewed by an ordinary person, do not identify who that person is. Rather, static digital identifiers "fall[] even further down the spectrum [of identifiable information]" because "[t]o an average person, an IP address or ***a digital code in a <u>cookie file</u> would likely be of little help in trying to identify an actual person.***" *Nickelodeon*, 827 F.3d at 283 (emphasis added). Although some courts have since held Facebook ID is PII because it can be plugged into a Facebook URL and PII *may* be found on the resulting Facebook profile, this multi-step investigative process does not make the Facebook ID, shared through the "c_user" cookie, PII, as explained by the *Nickelodeon* court and multiple district courts in this circuit.

---

[4] The *Nickelodeon* court noted "[m]ost [courts] have followed the rule adopted in *In re Hulu Privacy Litigation*" and "concluded that static digital identifiers that could, in theory, be combined with other information to identify a person do not count as 'personally identifiable information' under the Act, at least by themselves." 827 F.3d at 283 (collecting cases, including *Robinson*, 152 F. Supp. 3d at 182-83; *Eichenberger v. ESPN, Inc.*, No. 14–cv–463 (TSZ), 2015 WL 7252985, at *4-5 (W.D. Wash. May 7, 2015); *Ellis*, 2014 WL 5023535, at *3).

In *Nickelodeon*, the type of information at issue was plaintiff's IP address, a user's browser and operating system settings, and a computing device's unique device identifier. *Id*. at 281-82. The court held "the expansion of privacy laws since the Video Privacy Protection Act's passage demonstrates that, whatever else 'personally identifiable information' meant in 1988, it did not encompass" such static digital identifiers. *Id*. at 286.[5] And unlike other statutes which "gave the FTC authority to expand the types of information that count as personally identifying under that law," "***[t]he Video Privacy Protection Act . . . does not empower an administrative agency to augment the definition of 'personally identifiable information' in light of changing circumstances or new technologies***. The meaning of that phrase in the Act is, it would appear, ***more static.***" *Id*. (emphasis added.) Further, and more importantly, *Nickelodeon* explained Congress's subsequent 2013 amendment of the VPPA demonstrates Congress "was keenly aware of how technological changes have affected the original Act" and "***[d]espite this recognition, Congress did not update the definition of personally identifiable information in the statute.***" *Id*. (emphasis added). "What's more, it chose not to do so despite . . . submitted written testimony that" specifically argued for "the addition of Internet Protocol (IP) Addresses and ***account identifiers*** to the definition of [personally identifiable information]." *Id*. at 288 (emphasis added).

This Court should follow the detailed reasoning set forth by *Nickelodeon*, and recently adopted by *Edwards*, to hold the Facebook IDs Plaintiffs allege were disclosed are ***not*** PII because they are merely static digital identifiers automatically sent through a cookie file to a single

---

[5] The court compared the VPPA to the Children's Online Privacy Protection Act ("COPPA"), which was amended once by FTC rules in 2000 to define personal information to include "a persistent identifier, such as a customer number held in a cookie or a processor serial number, where such identifier is associated with individually identifiable information" and a second time in 2013 to expand the definition to include "'*any persistent identifier that can be used to recognize a user over time and across different Web sites or online services*,' including but not limited to '*a customer number held in a cookie*, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier.'" *Id*. at 287 (emphasis added).

company, which is nothing like the purposeful and public disclosures of actual names with video

viewing history to the public at large. *See id.* at 286; *Edwards*, 2023 WL 8544765, at *8.[6] For

similar reasons, the Court should also hold that the mailing lists are not PII because they were not

being offered for sale combined with video viewing history. Indeed, "[t]he classic example will

always be a video clerk leaking an individual customer's video rental history," and "every step

away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim."

*Nickelodeon*, 827 F.3d at 286.

        **2.**      **Plaintiffs Fail To Allege Defendants Knowingly Disclosed Their Information.**

Beyond Plaintiffs' failure to allege Defendants disclosed PII at all, they also do not allege

Defendants knowingly disclosed their PII.

With respect to the first theory, Plaintiffs do not allege the third parties were able to

somehow compile the mailing lists with purchase information to link Plaintiffs to actual video

materials, but even if the third parties were able to do so, the Complaint also fails to allege that

Defendants knew the third parties could do so. To the contrary, Exhibit A states that mailing lists

"can be combined with lifestyle, age and income data," not purchase information. (Compl., Ex A.)

With respect the second theory, Plaintiffs do not allege Defendants had any way to know

whether they, or any other user, had a Facebook ID, much less what those Facebook IDs were, or

whether Plaintiffs set their browser to allow Facebook cookies. Moreover, "even being

---

[6] Plaintiffs do not allege that their own public Facebook profiles actually contain PII. *See Heerde v. Learfield Commc'ns, LLC*, No. 2:23-CV-04493-FLA (MAAX), 2024 WL 3573874, at *4 (C.D. Cal. July 19, 2024) ("Here, Plaintiffs fail to allege their PII was disclosed because they do not identify what information on their Facebook pages, if any, was viewable and could be used to identify them."); *see also Ghanaat v. Numerade Labs, Inc.*, No. 23-CV-00833, 2023 WL 5738391, at *4 (N.D. Cal. Aug. 28, 2023) ("plaintiffs' allegations are inadequate because they do not allege their Facebook pages contain any personal information, such as their names or email addresses"); *accord Solomon v. Flipps Media, Inc.*, No. 22CV5508JMAJMW, 2023 WL 6390055, at *3 (E.D.N.Y. Sept. 30, 2023).

simultaneously logged in to Facebook is still not enough to necessarily prompt a Pixel transmission: a subscriber must also have accessed the prerecorded video on [Defendants'] website through the *same web browser and device* through which the subscriber (and not another user) was logged into Facebook." *Martinez v. D2C, LLC*, No. 23-21394-CIV, 2024 WL 4367406, at \*7 (S.D. Fla. Oct. 1, 2024) (emphasis added). Even more importantly, the Complaint alleges that Plaintiffs' own browsers disclose the information, not Defendants, which is how cookies generally work.

For example, *In re Facebook, Inc. Internet Tracking Litig.* explains that "[w]hen a user creates a Facebook account, more than ten Facebook cookies are placed on the user's browser. These cookies store the user's login ID [Facebook ID], and they capture, collect, and compile the referer headers from the web pages visited by the user" and "continued to capture information after a user logged out of Facebook and visited other websites." 956 F.3d 589, 596 (9th Cir. 2020); *see also In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580, 2022 WL 17869218 at \*4 (Dec. 22, 2022, N.D. Cal. 2022) ("Cookies are 'small pieces of text used to store information on web browsers.'"); *Mount v. PulsePoint, Inc.*, No. 13 CIV. 6592 (NRB), 2016 WL 5080131, at \*1-2 (S.D.N.Y. Aug. 17, 2016) ("Persistent cookies, commonly called 'tracking cookies,' are designed to remain after the user moves on to a different website or even after the browser is closed. Persistent cookies are set by third parties, including advertising companies that have placed ads on the first-party website."). The dictionary defines "cookie" as "a small file or part of a file ***stored on a World Wide Web user's computer,*** created and subsequently read by a website server, and containing personal information (such as a user identification code, customized preferences, or a record of pages visited)." *See* "Cookie" (df. 3) https://www.merriam-webster.com/dictionary/cookie (emphasis added).

Plaintiff's own allegations, the dictionary definition of "cookie," and case law on third-party Facebook cookies make clear Plaintiff's FID is stored **on Plaintiff's computer**—not by Defendants—and subsequently transmitted to Facebook and Meta **by Plaintiff's own browser**. Therefore, even if this Court were to find that FIDs are PII (which they are not), Defendants is not the one that transmits the FID to Meta. The VPPA only applies to an entity that "discloses" PII, 18 U.S.C. § 2710(b)(1), and Defendants cannot possibly "disclose" something it never possesses in the first place. Therefore, the Complaint does not and cannot plausibly assert that Defendant *knowingly* disclosed Plaintiffs' Facebook IDs, let alone their PII, to Facebook.

## CONCLUSION

For the foregoing reasons, Defendants Alliance Entertainment, LLC and DirectToU, LLC respectfully request that this Court dismiss Plaintiffs' Class Action Complaint with prejudice.[7]

## REQUEST FOR HEARING

Defendants believe that a hearing would assist the Court in evaluating this motion, which raises significant issues about the constitutionality and reach of the VPPA. Defendants respectfully request that the Court schedule a one-hour hearing on this motion.

Dated:  November 1, 2024                                   Respectfully submitted,

                                                          */s/ Joel Griswold*
                                                          Joel Griswold (Florida Bar No. 1008827)
                                                          Bonnie Keane DelGobbo (*pro hac vice*)
                                                          Baker & Hostetler LLP
                                                          One N. Wacker Dr., Ste. 3700
                                                          Chicago, Illinois 60606
                                                          T: (312) 416-6200
                                                          F: (312) 416-6201
                                                          jcgriswold@bakerlaw.com
                                                          bdelgobbo@bakerlaw.com

---

[7] Defendants filed an Expedited Motion to Stay Pending Preliminary Approval on October 24, 2024, which remains pending. (ECF No. 36.) Defendants are filing this Motion to Dismiss today in compliance with existing court deadlines pending ruling on the Motion to Stay.

*Attorneys for Defendants Alliance*
*Entertainment, LLC and DirectToU, LLC,*
*d/b/a Collectors' Choice Music*

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that on November 1, 2024, the foregoing document was filed with the Clerk of the Court via the CM/ECF system, which will provide notice of such filing to all parties of record. The undersigned attorney further certifies that on November 1, 2024, the foregoing document was sent via U.S. Certified Mail, Return Receipt Requested, to:

U.S. Attorney General
Merrick B. Garland
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*/s/ Joel Griswold*
Joel Griswold