# Exhibit 1

JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 601-6766 (Tel.)
(310) 295-2385 (Fax)

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JONATHAN HOANG TO,** individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**DIRECTTOU, LLC,** a Delaware Limited Liability Company,<br><br>Defendant. | Case No. 3:24-CV-06447-WHO<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Judge: Hon. William H. Orrick<br>Courtroom: 2<br>Hearing Date: December 18, 2024<br>Hearing Time: 2:00 p.m. |

# **TABLE OF CONTENTS**

NOTICE OF MOTION ...................................................................................................... i

STATEMENT OF THE ISSUES TO BE DECIDED .................................................... I

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.   INTRODUCTION ................................................................................................ 1

II.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ......................... 2

    A.   Brief Summary of the Litigation ................................................ 2

    B.   Summary of Research, Investigation, Discovery and the Parties' Settlement Efforts ............................................................................................ 3

III. SUMMARY OF THE PROPOSED SETTLEMENT .......................................... 4

    A.   The Settlement Provides Substantial Relief to the Class Members ................. 4

    B.   The Allocation of Relief Among Settlement Class Members ....................... 4

    C.   The Settlement Class Definition Differs Only Slightly from the Class and Subclass Defined in the Operative Complaint ........................................... 6

    D.   The Settlement's Release ................................................................ 7

    E.   The Settlement Agreement Allows Counsel to Seek Fees and Costs and the Settlement Class Representative to Seek an Incentive Award ............................. 7

IV.  THE COURT SHOULD CERTIFY THE SETTLEMENT CLASSES .................... 8

    A.   The Settlement Classes Satisfy the Rule 23(a) Prerequisites ....................... 8

        1.   Numerosity ........................................................................... 9

        2.   Commonality ......................................................................... 9

        3.   Typicality ............................................................................. 9

        4.   Adequacy ............................................................................ 10

    B.   The requirements of Rule 23(b)(3) are satisfied ...................................... 11

        1.   Common issues of law and fact predominate ....................................... 11

        2.   Class treatment of Plaintiff's claims is superior ................................... 12

V.   SETTLEMENT APPROVAL IS WARRANTED ................................................ 13

    A.   The Strengths and Risks of Plaintiff's Case ......................................... 14

        1.   Defendant's Affirmative Defenses ................................................... 14

        2.   Comparing the Strengths and Risks of Plaintiff's VPPA Claim ................... 16

        3.   Comparing the Strengths and Risks of Plaintiff's Claim Under California Civil Code § 1799.3 ........................................................................... 19

        4.   Comparing the Strengths and Risks of Plaintiff's UCL Claim .................... 20

        5.   Summary of Plaintiff's Realistic Exposure Analysis ............................... 20

B.      FURTHER LITIGATION WOULD BE RISKY, EXPENSIVE, COMPLEX, AND LENGTHY ................ 20

C.      THE RISKS ASSOCIATED WITH CERTIFYING THE CLASS AND MAINTAINING THE CASE AS A CLASS ACTION THROUGH TRIAL ......................................................................... 21

D.      THE RELIEF OFFERED IN THE SETTLEMENT IS MORE THAN ADEQUATE............................. 21

     1.    The Relief is Fair, Adequate, and Reasonable............................................ 21

     2.    The Plan of Allocation is Reasonable ....................................................... 23

E.      THE SETTLEMENT IS INFORMED BY SUFFICIENT INFORMAL DISCOVERY TO PERMIT AN INFORMED DECISION........................................................................................... 23

F.      COUNSEL BELIEVES THE SETTLEMENT IS AN OUTSTANDING RESULT ................................ 24

G.      GOVERNMENTAL PARTICIPATION IS NOT AT ISSUE HERE .............................................. 25

H.      THE SETTLEMENT ALSO SATISFIES THE BLUETOOTH FACTORS ....................................... 25

VI.      THE PROPOSED NOTICE PROGRAM, SETTLEMENT ADMINISTRATOR, AND PROCESS FOR CLAIMS, OPT-OUTS, AND OBJECTIONS SHOULD BE APPROVED ............... 26

A.      THE PROPOSED NOTICE PLAN ................................................................................. 26

     1.    Class Notice ............................................................................................. 26

     2.    CAFA Notice ........................................................................................... 27

B.      THE SETTLEMENT ADMINISTRATOR......................................................................... 27

C.      OPT-OUTS AND OBJECTIONS: TIMELINE AND INSTRUCTIONS ........................................ 27

D.      THE CLAIMS PROCESS .......................................................................................... 28

     1.    The Claim Form ...................................................................................... 28

     2.    The Estimated Claim Rate ....................................................................... 28

VII.      OTHER CASES AFFECTED ......................................................................................... 29

VIII.      THE PROPOSED FINAL APPROVAL HEARING SCHEDULE ........................................ 30

IX.      CONCLUSION................................................................................................................ 31

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...................................................... 9, 11, 12

*Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245 (N.D. Cal. 2015) ............................. 24

*Bertoia v. Randstad US, L.P.*, No. 15-cv-03646-EMC, 2017 WL 1278758 (N.D. Cal. Apr. 6, 2017) . 25

*Briseno v. Henderson*, 998 F.3d 1014 (9th Cir. 2021) ......................................................... 25

*Campbell v. Facebook, Inc.*, No. 13-cv-05996-PJH, 2017 WL 3581179 (N.D. Cal. Aug. 18, 2017),
*aff'd*, 951 F. 3d 1106 (9th Cir. 2020) ............................................................................... 22

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ........................................ 14

Class Pls. v. City of Seattle, 955 F.2d 1268 (9th Cir. 1992)). .............................................. 5

*Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030 (N.D. Cal. 2016) ................................................. 2

*Eddings v. D.S. Services of America, Inc.*, No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May
20, 2016) ............................................................................................................................... 2

*Edwards v. Nat'l Milk Producers Fed'n*, No. 11-CV-04766-JSW, 2017 WL 3623734 (N.D. Cal. June
26, 2017) ............................................................................................................................. 26

*Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981)
............................................................................................................................................. 24

*Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638
F. App'x 594 (9th Cir. 2016) ...................................................................................... 18, 22

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) ...................................................... 13

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................... 10, 12, 13

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) .............................................. 10

*Hunt v. VEP Healthcare, Inc.*, No. 16-cv-04790-VC, 2017 WL 3608297 (N.D. Cal. Aug. 22, 2017) ... 2

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F. 3d 935 (9th Cir. 2011) ............................... 8, 25, 26

*In re Facebook, Inc. Internet Tracking Litigation*, No. 22-16903, 2024 WL 700985 (9th Cir. Feb. 21,
2024) .................................................................................................................................... 18

*In re Google LLC St. View Elec. Commc'ns Litig.*, No. 10-MD-02184-CRB, 2020 WL 1288377 (N.D.
Cal. Mar. 18, 2020) ........................................................................................................... 22

*In re Google Plus Profile, Litig.*, No. 18-CV-06164-EJD-VKD, 2021 WL 242887 (N.D. Cal. Jan. 25,
2021) ............................................................................................................................ 18, 22

*In re Google Referrer Header Priv. Litig.*, No. 10-CV-04809-EJD, 2023 WL 6812545 (N.D. Cal. Oct.
16, 2023) ............................................................................................................................. 22

*In re HighTech Emp. Antitrust Litig.*, 985 F.Supp.2d 1167 (N.D. Cal. 2013 ........................ 13

*In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539 (9th Cir. 2019) (en banc) ............................ 21

*In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112 (E.D. La. 2013) ....................... 14

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) .......................... 5, 23

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) ............................... 14

In re Oracle Sec. Litig., No. C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) ......... 5, 23

*In re Vizio, Inc., Consumer Privacy Litig.*, 16-ml-02693-JLS-KES, 2019 WL 12966639 (C.D. Cal. July 31, 2019)............................................................................................................................. 18

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 15-md-02672-CRB, 2017 WL 2212783 (N.D. Cal. May 17, 2017) ................................................................... 14

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020), *aff'd*, No. 20-16633, 2022 WL 2304236 (9th Cir. June 27, 2022) .......... 10

*Jabbari v. Farmer,* 965 F.3d 1001 (2020) ................................................................................ 21

*Linney v. Cellular Alaska P'ship,* 151 F.3d 1234 (9th Cir.1998)........................................................ 24

*Martin v. Sysco Corp.*, No. 1:16-cv-00990-DAD-SAB, 2019 WL 3253878 (E.D. Cal. July 19, 2019) 25

*McDonald, et al. v. Kiloo A/S, et al.,* No. 3:17-cv-04344-JD, ECF. No. 406 (N.D. Cal. Apr. 12, 2021) ................................................................................................................................................... 22

*McKenzie v. Fed. Exp. Corp.*, 275 F.R.D. 290 (C.D. Cal. 2011)................................................. 13

*Newton v. AM. Debt. Servs.,* 854 F. Supp. 2d 712 (N.D. Cal. 2012) .......................................... 15

*Ontiveros v. Zamora*, 303 F.R.D. 356 (E.D. Cal. 2014) ............................................................. 24

*Poertner v. The Gillette Co.*, No. 12-v-00803-GAP-DAB, Dkt. 168 (M.D. Fla. Aug. 21, 2014) ......... 22

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) .................................................... 14

*Slaven v. BP Am., Inc.*, 190 F.R.D. 649 (C.D. Cal. 2000) ........................................................... 9

*Smith v. Cardinal Logistics Mgmt. Corp.,* No. 07-cv-02104-SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ................................................................................................................................... 13

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .......................................................................... 16

*St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919) ....................................................... 18

*Staton v. Boeing Co.*, 327 F.3d 938 (2003) .............................................................................. 10

*TransUnion LLC v. Ramirez,* 594 U.S. 413, 427 (2021) ............................................................. 16

*Valliere v. Tesoro Refin. & Mktg. Co. LLC*, No. 17-cv-00123-JST, 2020 WL 13505042 (N.D. Cal. June 26, 2020)......................................................................................................................... 10

*Wakefield v. ViSalus, Inc.,* 51 F. 4th 1109 (9th Cir. 2022) ........................................................ 18

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................................... 9

*Wolf v. Permanente Medical Group, Inc.*, No. 17-cv-05345-VC, 2018 WL 5619801 (N.D. Cal. Sept 14, 2018) .................................................................................................................................. 8

## STATUTES

15 U.S.C. § 15(a) ......................................................................................................................... 14

18 U.S.C. § 2710 *et seq*............................................................................................................... 1, 2

18 U.S.C. § 2710(a)(3) ................................................................................................................. 16

18 U.S.C. § 2710(a)(4) ................................................................................................................. 16

18 U.S.C. § 2710(b)(2)(B) ............................................................................................................ 16

18 U.S.C. § 2710(b)(2)(B)(i)-(iii) ...................................................................................... 17

18 U.S.C. § 2710(c)(2)(B) ................................................................................................. 14

Cal. Business & Professions Code § 17200 *et seq* .......................................................... 5

Cal. Civ. Proc. § 1799.3(c) ............................................................................................... 19

Cal. Civil Code § 1799.3 ............................................................................................ passim

Fed. R. Civ. P. 23(a) ................................................................................................... passim

Fed. R. Civ. P. 23(a)(3) .................................................................................................... 10

Fed. R. Civ. P. 23(b) .................................................................................................. 11, 12

Fed. R. Civ. P. 23(b)(3) .............................................................................................. 11, 12

Fed. R. Civ. P. 23(e)(2) .................................................................................................... 13

**TREATISES**

7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 (3d ed. 2005) ........................................................................................................................ 12

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97 (2009) ........................................................................................................................................ 9

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) ........................................... 12

**OTHER AUTHORITIES**

Federal Judicial Center, Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide 2010 ........................................................................................................ 26

## NOTICE OF MOTION

### TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

**PLEASE TAKE NOTICE THAT** on December 11, 2024, at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable William H. Orrick in Courtroom 2, United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiff Jonathan Hoang To ("Plaintiff"), on behalf of himself and the putative Class, by and through his Counsel, shall and hereby does, respectfully move the Court for entry of an Order, pursuant to Federal Rule of Civil Procedure 23(e), in the above-captioned action (the "Action"):

1. Certifying the proposed Class for purposes of settlement;

2. Provisionally appointing Plaintiff Jonathan Hoang To as Class Representative of the Settlement Class, and HammondLaw, P.C. as Class Counsel for purposes of settlement;

3. Granting preliminary approval of the proposed class action settlement between Plaintiff and Defendant DirectToU, LLC ("Defendant" or "DirectToU") as fair, adequate, and reasonable, based upon the terms set forth in the Parties' Class Action Settlement Agreement ("Settlement Agreement"),[1] including payment by Defendant of a non-reversionary cash settlement of **$1,750,000** for the benefit of the Settlement Class;

4. Approving the allocation of the Settlement Fund as contemplated in the Settlement Agreement;

5. Approving the form and substance of the proposed email Notice of Proposed Settlement of Class Action ("E-Mail Class Notice"), Notice to be provider on the Settlement Website ("Website Notice"), and Claim Form ("Claim Form"); the manner and timing of disseminating notice to the Class (the "Notice Plan"); and the selection of Angeion Group as the Settlement Administrator;

---

[1] Capitalized terms shall have the same meaning as set forth in the Class Action Settlement Agreement dated October 23, 2024, attached as **Exhibit 1** to the Declaration of Julian Hammond in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement ("Hammond Decl."). In addition, these terms have the following meaning as used herein: (1) "Hoang To Decl." means the Declaration of Plaintiff Jonathan Hoang To in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement; (2) "Weisbrot Decl." means the Declaration of Steven Weisbrot of Angeion Group Re: Proposed Notice Plan; and (3) "Walker Decl." means the Declaration of Jeffrey Walker, in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement.

6.  Setting deadlines for Class Members to exercise their rights in connection with the proposed Settlement; and

7.  Scheduling a hearing date for final approval of the Settlement and application for attorneys' fees and expenses, and service award.

This Motion is based on: the Memorandum of Points and Authorities below and the exhibits thereto; the Declaration of Julian Hammond and the exhibits thereto, including the Settlement Agreement and exhibits thereto; the Declaration of Steven Weisbrot of Angeion Group Re: Proposed Notice Plan; the Declaration of Jeffrey Walker; the Declaration of Plaintiff Jonathan Hoang To; the Court's record in this matter; and such oral and documentary evidence as may be presented at or before the hearing on this matter.

## STATEMENT OF THE ISSUES TO BE DECIDED

The issues to be decided on this Motion are:

1. Whether the proposed Settlement on the terms and conditions set forth in the Settlement Agreement warrants preliminary approval;

2. Whether to certify this Action as a class action for purposes of settlement;

3. Whether the Court should approve the form and substance of the proposed E-Mail Class Notice, Website Notice, and Claim Form;

4. Whether the Court should approve the deadlines proposed for Class Members to exercise their rights under the proposed Settlement; and

5. Whether the Court should schedule a Final Approval Hearing to determine whether the Settlement, and the forthcoming application for attorneys' fees and expenses and service award for the Class Representative should be finally approved.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff's operative Complaint alleges, on behalf of a putative nationwide class, with a putative subclass of California consumers, that Defendant unlawfully disclosed to third parties, information which identifies its customers as having requested or obtained specific video materials or services, in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq*. (the "VPPA") and California laws.

Plaintiff has achieved a $1,750,000 non-reversionary cash settlement for the benefit of the Settlement Class. The proposed Settlement is an excellent result for Settlement Class Members. Plaintiff has achieved a gross per-Class Member monetary settlement of $6.01, which, as discussed in more detail below, sits comfortably toward the higher end of recent comparable VPPA settlements. *See infra* Part V.D; Hammond Decl. ¶¶ 4, 45. Assuming a claims rate of 5%, the gross share of the cash settlement fund available to each Settlement Class Member submitting a valid claim will be approximately $120.22, and their net share of the cash settlement fund (after the payment of court-approved attorneys' fees and costs, Class Representative Service Award, and Settlement Administration Costs) will be $80.21. Hammond Decl. ¶ 45. In addition, as described in more detail below, the Settlement Agreement requires Defendant, within 45 days of preliminary approval, to modify the Facebook Pixel settings on its website such that specific product information is not shared with Facebook, to remove all other third-party tracking tools, and will prospectively prohibit DirectToU from engaging in the conduct that underlies Plaintiff's claims in the instant case. Settlement Agreement, ¶ 2.2.  Plaintiff is pleased to report that Defendant has removed the Facebook Pixel and the Facebook like button (another tracking tool Plaintiff's expert located on Defendant's website) several days after entering into the Settlement Agreement. Hammond Decl. ¶ 46. Plaintiff has also confirmed that Defendant has removed its customers' information from any list available on Next Mark and that information is no longer available to any data brokers. *Id.*

The amount of the recovery is particularly impressive given the material risk that Defendant would have been able to successfully move to compel individual arbitration of each of Plaintiff's claims on the basis of arbitration provisions in the Terms of Use associated with Defendant's service. Plaintiff

disputes the enforceability of the arbitration provisions but acknowledges the substantial risk of being compelled to individual arbitration. *Id*. ¶¶ 25-26. In addition, Defendant would have challenged Plaintiff's standing and would have argued that Plaintiff's and other Settlement Class Members' respective recoveries are contractually limited to the total amounts they spent purchasing goods and services from Defendant. These risks are in addition to Defendant's likely merits-based arguments, including that its users consented to the practices at issue, that customers' personal information was not actually disclosed, and that the putative class suffered no actual damages.

In reviewing the proposed Settlement, the Court must determine "whether the settlement is 'fair, reasonable, and adequate,' under Rule 23(e), based on any information the district court receives from the parties or can obtain through its own research." *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016); *see also Hunt v. VEP Healthcare, Inc.*, No. 16-cv-04790-VC, 2017 WL 3608297 (N.D. Cal. Aug. 22, 2017); *Eddings v. D.S. Services of America, Inc.*, No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016). Balancing the risks against the substantial attendant benefits, the Court should find that the Settlement Agreement more than meets the applicable standard. Accordingly, Plaintiff hereby moves the Court for preliminary approval.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    Brief Summary of the Litigation

On August 12, 2024, Plaintiff Hoang To filed this putative class action lawsuit in the Superior Court for the State of California, County of Alameda, alleging, on behalf of Plaintiff and a putative class of California consumers, that Defendant unlawfully disclosed to third parties, information which identifies its customers as having requested or obtained specific video materials or services, allegedly without permission in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq*. (the "VPPA") and California laws. Initial Complaint, Dkt. 1, ¶¶ 1-15. Defendant removed this case on September 12, 2024. Dkt. 1. On September 18, 2024, the Court granted Defendant's Motion for Extension of Time to Answer. Dkt. 9. On October 1, 2024, Plaintiff filed his First Amended Complaint which retained Plaintiff's allegations but which proposed a nationwide class with a California subclass. Dkt. 10. On October 16, 2024, the Parties filed a stipulation seeking to extend the Defendant's deadline to file a responsive pleading. Dkt. 12.

On October 23, 2024, the Parties executed the Class Action Settlement Agreement.  On October 28, 2024, Counsel for Plaintiffs in *Feller, et al. v. Alliance Entertainment, LLC, et al.*, No. 24-cv-61444-RAR (S.D. Fla.), filed a Motion to Intervene in the instant case. On that same day, the Parties in the instant case notified the Court that they had reached a settlement. Dkt. 16.

On October 29, 2024, the Parties filed a Joint Stipulation to Remand. Dkt. 18.  On November 1, 2024, in light of the fact that the Court had not granted the Parties' Stipulation to Remand, Plaintiff filed the Second Amended Complaint (Dkt. 23), pursuant to the parties' stipulation (Dkt. 22) in order to conform to the settlement.

**B.      Summary of Research, Investigation, Discovery and the Parties' Settlement Efforts**

The Settlement is a product of informed, arm's-length negotiations. Hammond Decl. ¶ 7. As set out in detail in Hammond Declaration, Plaintiff's counsel conducted extensive research and investigation prior to and after the filing of the Complaint, including analyzing the presence of tracking tools on Defendant's websites, and retaining an expert to confirm their findings. *Id.* ¶¶ 15, 17.  Plaintiff's counsel also analyzed the sign up and purchase process and Defendant's Terms of Use and the Privacy Policy. *Id.* ¶¶ 14-17.  In addition, Plaintiff analyzed changes to the sign up and purchases process and to the Terms of Use and the Privacy Policy through information by accessing historic screenshots of website available on the Wayback Machine.  *Id.* ¶ 15. Plaintiff's Counsel also analyzed dozens of orders on motions to dismiss and summary judgment motions in other VPPA cases to assess the strengths and weaknesses of Plaintiff's claims.  *Id.*

Shortly after Defendant removed the case to this Court, the parties began to engage in settlement discussion and Defendant provided data and documents as part of informal discovery, including an estimate of the Class size (and the size of the California Subclass).  *Id.* ¶ 21.  Over the next several days, the Parties exchanged a number of offers and counteroffers and continued to negotiate over the details of a potential settlement, including a potential monetary payment by Defendant. *Id.* On October 19, 2024, the Parties reached an agreement in principle and thereafter continued to engage in discussions to resolve numerous important details associated with finalizing the details of the Settlement, including the Notice Plan, the appropriate allocation of the Settlement Fund among Class Members, the claims process, and the distribution plan. *Id.* Ultimately, on October 23, 2024, the Parties executed the Class

Action Settlement Agreement ("Settlement Agreement"), which is now presented to the Court for approval. *Id.* ¶ 22.

## III.     SUMMARY OF THE PROPOSED SETTLEMENT

### A.     The Settlement Provides Substantial Relief to the Class Members

The Settlement Agreement creates a non-reversionary Settlement Fund for the benefit of the Settlement Class in the amount of **$1,750,000**. Settlement Agreement ¶ 1.31(a). The Settlement Fund, less a court-approved Attorneys' Fees and Expenses Award, court-approved Incentive Award to the Class Representative, and Notice and Administration Expenses, will be allocated among Settlement Class Members who submit a valid claim form in accordance with the plan of allocation set out in the Settlement Agreement, and discussed immediately below in Part III.B. *Id.* ¶ 2.1(b). The gross per-Class Member share of the Settlement Fund will be approximately $6.01. Hammond Decl. ¶¶ 4, 45. The net per-Class Member share will be approximately $4.01. *Id*. Assuming a claims rate of 5%, Plaintiff estimates that the average Authorized Claimant's gross share of the Settlement Fund will be $120.22, and the average Authorized Claimant's net share of the Settlement Fund will be $ 80.21. *Id*. This represents significant monetary relief for Settlement Class Members; well above the average recovered in comparable cases. *See infra* Part V.D; Hammond Decl. ¶¶ 4, 45.

In addition to the cash payment to be made by Defendant, the Settlement Agreement requires Defendant to modify the Meta Pixel settings on its website so that specific product information is not shared with Facebook. Settlement Agreement ¶ 2.2. Additionally, Defendant will not knowingly share information which identifies a person as having requested or obtained specific video materials or services with third parties, except as permitted by the VPPA. *Id*.

### B.     The Allocation of Relief Among Settlement Class Members

The Settlement Fund, less a court-approved Attorneys' Fees and Expenses Award, court-approved Incentive Award to the Class Representative, and Notice and Administration Expenses, will be allocated according to the plan of allocation set out in the Settlement Agreement among those Settlement Class Members who complete and submit a simple claim form. Hammond Decl. ¶¶ 4, 45; Settlement Agreement, ¶ 2.1. Under the Settlement Agreement, Settlement Class Members who submit Approved Claims will be entitled to a *pro rata* share of the Settlement Fund. *Id.* ¶ 2.1(b).

"Approval of a plan of allocation of settlement proceeds in a class action ... is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Oracle Sec. Litig.,* No. C-90-0931-VRW, 1994 WL 502054, at *1-2 (N.D. Cal. June 18, 1994) (citing *Class Pls. v. City of Seattle,* 955 F.2d 1268, 1284-85 (9th Cir. 1992)). Here, Plaintiff's proposed Plan of Allocation is fair, reasonable, and adequate because it attempts to "allocate the settlement funds to class members based on . . . the strength of their claims on the merits." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) (citing *In re Oracle Sec. Litig.,* 1994 WL 502054, *1-2 (other internal citation omitted)).

Given the strengths of the VPPA claim in the instant case, Plaintiff believes it appropriate and fair to allocate an equal *pro rata* share of the portion of the Settlement Fund available for distribution to Settlement Class Members to each Class Member submitting an Approved Claim. Settlement Agreement, ¶ 2.1(b). Plaintiff has brought one claim on behalf of a nationwide class, with two further claims on behalf of a California sub-class. Given the strength of the nationwide claim, which covers identical conduct to both the California Civil Code § 1799.3 claim and the derivative California Business & Professions Code § 17200 *et seq.* ("UCL") claim, Plaintiff does not believe it would be appropriate for members of the California subclass to receive more than other members of the nationwide Settlement Class.

Should there be any checks that are not cashed within 180 days of issuance of payment, or there remain residual funds from failed electronic payments, the Settlement Agreement provides that such residual funds shall be redistributed on a *pro rata* basis to Settlement Class Members who cashed their initial checks or received their initial electronic payment. Settlement Agreement, ¶ 2.1(d). If the amount to be received by each Settlement Class Member in the secondary distribution is less than $10.00, or the secondary distribution is otherwise infeasible, residual funds shall, subject to Court approval, revert to a cy pres. *Id.* The Parties have selected the Electronic Privacy Information Center as the intended recipient of any *cy pres* award and respectfully request that the Court approve that selection. Hammond Decl. ¶¶ 70-73; Walker Decl. ¶ 2.

///

///

### C. The Settlement Class Definition Differs Only Slightly from the Class and Subclass Defined in the Operative Complaint

Plaintiff's operative Second Amended Complaint contains a putative nationwide class with a putative California subclass. The putative nationwide class is defined as:

> All natural persons residing in the United States who purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party, including, but not limited to, Meta.

The putative California subclass is defined as:

> All natural persons residing in California who purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party, including, but not limited to, Meta.

The Settlement Agreement defines a single Settlement Class as follows:

> "Settlement Class" means all persons who reside in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval. Also included in the "Settlement Class" are all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval.

Settlement Agreement, ¶ 1.30.

The differences between the definition of the Settlement Class and the definitions of the Class and Subclass proposed in the Second Amended Complaint are minimal. Aside from the fact that the Settlement Class combines the definitions of the Class and Subclass in the Second Amended Complaint, the material difference is that the Settlement Class is limited to persons residing in California about whom information "may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval," and persons residing elsewhere in the United States about whom information "may have been disclosed to a third party between August 8, 2022 and the date of Preliminary

Approval." In the Second Amended Complaint, Plaintiff alleges that the relevant statutes of limitation should be tolled. Comp. ¶¶ 59-68. In reaching the Settlement Agreement, the Parties agreed to limit the relevant time period to the beginning August 8, 2022, for non-California Class Members. The Settlement Class definition extends back a further two years for California Class Members because of the UCL's four-year statute of limitations.

### D. The Settlement's Release

In exchange for the benefits to be provided to the Settlement Class, the Settlement Agreement proposes to release specific parties, including DirectToU and its current, former and/or future parents, subsidiaries, divisions, and/or affiliates, from all claims "arising out of any facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures relating to or arising out of the collection of information and/or the sharing of information with third parties which identifies a person as having requested or obtained specific video materials or services, including all claims that were alleged or brought or could have been alleged or brought in the Action." Settlement Agreement, ¶¶ 1.25-1.26. Thus, the claims released by the Settlement Agreement are those based on the same conduct regarding the alleged sharing of personally identifiable information relating to video materials or services that underlies the claims pled in the Second Amended Complaint, although not limited to the claims actually pled. Plaintiff believes this difference is appropriate given the Parties desire to resolve all issues relating to Defendant's alleged disclosure of personally identifiable information within the meaning of the VPPA.

### E. The Settlement Agreement Allows Counsel to Seek Fees and Costs and the Settlement Class Representative to Seek an Incentive Award

Plaintiff will seek fees for his Counsel in an amount not exceeding a total of 25% of the Settlement Fund; the total fees Counsel may request is $437,500. Settlement Agreement, ¶ 8.1. Should the Court award less than the amount sought by Class Counsel, the difference between the amount sought and the amount ultimately awarded by the Court shall remain in the Settlement Fund for distribution to eligible Settlement Class Members. *Id*.

Plaintiff's Counsel engaged in substantial work investigating Plaintiff's claims prior to filing this case and has continued to spend significant time investigating and pursuing the instant action, including

drafting two amended Complaints, including the operative Second Amended Complaint, since filing Plaintiff's initial complaint in state court. In total, Plaintiff's Counsel has spent over 200 hours thus far, resulting in a lodestar of more than $140,000, and will expand additional time before final approval is granted. Hammond Decl. ¶ 61. This is well within the range of multipliers commonly awarded. *See Wolf v. Permanente Medical Group, Inc.*, No. 17-cv-05345-VC, 2018 WL 5619801, at *2 (N.D. Cal. Sept 14, 2018) (approving multiplier of 2.75-3.0 and citing cases). Moreover, 25% of the settlement amount is the benchmark percentage for a reasonable fee in this Circuit. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F. 3d 935, 942 (9th Cir. 2011). Thus, the fee request is eminently reasonable under either a "percentage of the common fund method," or the "lodestar method." *Wolf*, 2018 WL 5619801, at *2. The enforceability and effectiveness of the Settlement Agreement is not contingent upon approval of Plaintiffs' fee request. *Id.* ¶¶ 6.4, 8.1.

The Settlement Agreement also provides that Settlement Class Counsel may apply to the Court for up to $20,000 for reimbursement of litigation costs and expenses. Settlement Agreement, ¶ 8.1. Currently, proposed Settlement Class Counsel have incurred a total of $9,275.95 in litigation costs and expenses to date, including filing and service fees, fees charged by consulting experts, and research costs. Hammond Decl. ¶ 63.

Finally, as set forth in the Settlement Agreement, Plaintiff will ask for appointment as Settlement Class Representative and seek approval of a service award of up to $5,000. Settlement Agreement, ¶ 8.3. As with Plaintiff's fee request, the enforceability and effectiveness of the Settlement Agreement does not depend upon the amount of the Service/Incentive Award paid to Plaintiff. Settlement Agreement, ¶¶ 6.4, 8.3.

## IV. THE COURT SHOULD CERTIFY THE SETTLEMENT CLASSES

### A. The Settlement Classes Satisfy the Rule 23(a) Prerequisites

Although the Parties have settled, the Court must nevertheless certify that the proposed Settlement Class satisfies Rule 23. Rule 23(a) requires: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). In addition, the Class must satisfy one of the three subsections of Rule 23(b). However, when "[c]onfronted with a request for a settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable

management problems . . . for the proposal is that there [will] be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

### 1. Numerosity

Here, numerosity is met. The Class consists of an estimated 291,128 individuals dispersed throughout the United States. Settlement Agreement, ¶ 1.31(a). This includes a California Subclass that consists of approximately 35,247 individuals. Hammond Decl. ¶ 6. Numerosity is generally satisfied when a class exceeds forty members. *See, e.g., Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000).

### 2. Commonality

Here, commonality is met. The commonality requirement is satisfied where a plaintiff asserts claims that "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 389-90 (2011).

In the instant case, the class claims derive from Plaintiff's allegations that Defendant disclosed his and other Class Members' Personally Identifiable Information (i.e., personal identifiers and details of the video and videogame purchasing activities) to third parties, without consent. Comp., ¶¶ 1-3, 22-58. This common conduct raises common questions, resolution of which will generate common answers "apt to drive the resolution of the litigation" for the Class as a whole. *Wal-Mart Stores, Inc.,* 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

### 3. Typicality

Typicality is also met. Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

In the instant case, the experiences of the Plaintiff – the proposed Settlement Class Representative - matches the experiences of the other Settlement Class Members that he seeks to

represent. The proposed Settlement Class Representative has suffered the same alleged privacy violations, and allegedly had his personal identifiers and video-viewing habits and information shared in the same manner as Members of the Settlement Class and the California Subclass.

Because the Settlement Class Representative's allegations involve the "same course of conduct," which is "not unique to the named plaintiffs," typicality is satisfied here. *Valliere v. Tesoro Refin. & Mktg. Co. LLC*, No. 17-cv-00123-JST, 2020 WL 13505042, at *5 (N.D. Cal. June 26, 2020) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d at 508). Moreover, Plaintiff and the putative Settlement Class Members he seeks to represent all seek the same remedies. Accordingly, the typicality requirement of Rule 23(a) is satisfied.

### 4. Adequacy

Finally, adequacy too, is met. The fourth and final Rule 23(a) requirement is "adequacy of representation," Fed. R. Civ. P. 23(a)(4), which has two components: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (2003) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

The proposed Class Representative's interests in this case are aligned with, and not antagonistic to, the Class he seeks to represent. *See, e.g., In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL 4212811, at *4-5 (N.D. Cal. July 22, 2020), *aff'd,* No. 20-16633, 2022 WL 2304236 (9th Cir. June 27, 2022); Hammond Decl. ¶ 68; Hoang To Decl. ¶ 6. Moreover, the proposed Class Representative and Settlement Class Members, share the same interest in seeking relief based on Defendant's alleged sharing and disclosure of information regarding their private video-viewing activities and in protecting their privacy.

The proposed Class Representative also fully understands his duties as class representative, will protect the interests of absent Settlement Class Members, and has actively participated in this Action and the Parties' efforts in reaching this Settlement. Hoang To Decl. ¶¶ 3-9. He has provided his counsel with necessary factual information, has reviewed and approved the Settlement Agreement, and has communicated with counsel regarding various issues pertaining to this case, and is committed to

1   continuing to do so until this case closes. Hammond Decl. ¶¶ 67-68; Hoang To Decl. ¶¶ 3-12.

2        With respect to Class Counsel, Plaintiff is represented by qualified and competent counsel who

3   are highly experienced in class actions generally and in consumer privacy litigation, in particular.

4   Proposed Class Counsel have successfully investigated, commenced, and prosecuted many complex

5   class actions, including the instant action. *See* Hammond Decl. ¶¶ 49-59 and Ex. 4 thereto. Proposed

6   Class Counsel is also currently pursuing several VPPA cases and is intimately familiar with both the

7   issues involved in prosecuting VPPA claims and the range and nature of settlements reached in such

8   cases. *Id.* ¶¶ 20, 50. Despite a significant risk of no recovery, they have devoted substantial time and

9   resources to this case. See *Id.* ¶¶ 61, 63. And their capable representation has been critical in driving this

10  litigation towards settlement.

11       Accordingly, the adequacy of representation requirement of Rule 23(a) is satisfied.

12  **B.**    **The requirements of Rule 23(b)(3) are satisfied**

13       Plaintiff seeks certification of the Settlement Class under Rule 23(b)(3) . Accordingly, he must

14  also show: (1) that common questions of law or fact predominate over questions affecting only

15  individual class members; and (2) that a class action is superior to other methods of resolving the

16  controversy. Fed. R. Civ. P. 23(b)(3). Both requirements are easily satisfied by the proposed Class.

17            ***1.  Common issues of law and fact predominate***

18       The predominance requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently

19  cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. at 623.

20  This requirement is satisfied in the instant case because the numerous common questions "present a

21  significant aspect of the case and . . . can be resolved for all members of the class in a single

22  adjudication," and, thus, "there is clear justification for handling the dispute on a representative rather

23  than on an individual basis." *Hanlon*, 150 F. 3d at 1022 (citations and quotations omitted).

24       Here, common issues unquestionably predominate. Because each claim alleged comes from a

25  core set of factual allegations that do not differ between Class Members, the most important issues in

26  this case can all be resolved on a classwide basis. In addition, the Court need not concern itself with

27  questions of the manageability of a trial because the settlement disposes of the need for a trial. The

28  Supreme Court has explained that the "predominance" inquiry is relaxed in the settlement context:

"Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem Prods., Inc.*, 521 U.S. at 620 (discussing manageability, which is a subpart of Rule 23(b)(3) predominance).

### 2. Class treatment of Plaintiff's claims is superior

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon,* 150 F.3d at 1023. Rule 23(b)(3) provides four factors that a court must consider in determining whether a class action is superior to other methods of adjudication. These factors are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "'[T]he purpose of the superiority requirement is to assure that the class is the most efficient and effective means of resolving the controversy.'" *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 at p. 174 (3d ed. 2005)).

In the instant case, there is no question that class treatment is superior to the litigation of close to three hundred thousand individual claims. First, "[f]rom either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Hanlon,* 150 F.3d at 1023. The damages sought by each Settlement Class Member, when weighed against their risks, are not so large as to counsel against certification. *See Smith v. Cardinal Logistics Mgmt. Corp.,* No. 07-cv-02104-SC, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008).

Second, as described below in Part VII, there is only one other pending action against Defendant related to the claims at issue in the instant case; *Feller, et al. v. Alliance Entertainment, LLC, et al.*, No. 24-cv-61444-RAR (S.D. Fla.). The existence of that case does not mean that treatment of the instant

case as a class action is not superior to individual adjudication of all Class Members' claims.

Third, concentrating litigation in this district is desirable because two of the three claims are brought under California law on behalf of a subclass composed of California residents. *See McKenzie v. Fed. Exp. Corp.*, 275 F.R.D. 290, 302 (C.D. Cal. 2011) ("Here, there is no reason to believe that concentrating this action in this Court is undesirable, especially considering that the challenge is under California law, and the proposed class is composed of only hourly employees in California.").

Finally, the fourth factor, which concerns the difficulty of managing a class action, depends largely on whether Plaintiff's case "rises and falls [on] common evidence." *In re HighTech Emp. Antitrust Litig.*, 985 F.Supp.2d 1167, 1228 (N.D. Cal. 2013). This factor overlaps with the requirements of commonality, typicality, and predominance, discussed above. Because Plaintiff easily satisfies those three requirements, the fourth superiority factor weighs in favor of certification.

The resolution of all claims of all Settlement Class Members in a single proceeding also promotes judicial efficiency and avoids inconsistent decisions. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (noting "the class-action device saves the resources of both the courts and the parties be permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23."). Accordingly, the superiority requirement is satisfied, and the Court should provisionally certify the Settlement Class for purposes of settlement.

## V. SETTLEMENT APPROVAL IS WARRANTED

Rule 23 requires the Court to determine whether the Settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To assess the fairness of a class settlement, Ninth Circuit courts consider factors including:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of future litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.[2]

*In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 944 (9th Cir. 2015) (quoting *Churchill Vill., LLC v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004)). As explained below, these factors strongly favor

---

[2] This final factor cannot be addressed now because Class Members have not yet had the chance to react.

preliminary approval.

## A. The Strengths and Risks of Plaintiff's Case

Plaintiff believes his claims are meritorious and he intended to pursue them aggressively through litigation and, if necessary, trial. Nevertheless, Plaintiff acknowledges that he faces a number of procedural and merits-based risks which threaten his ability to recover. Below, Plaintiff provides an analysis of the substantive strengths and risks of his claims, provides an estimate of potential realistic exposure on each claim, and explains the discounts he has applied to that exposure for settlement purposes.[3]

### 1. Defendant's Affirmative Defenses

Defendant has raised with Plaintiff, and, were litigation to continue, would almost certainly raise, a number of affirmative defenses which, if successful, could preclude Plaintiff from bringing his claims in Court, could limit Plaintiff's ability to recover more than the amounts actually paid by Plaintiff and Class Members to Defendant, and could preclude Plaintiff from bringing his claims on a class basis. Success on even one of these defenses would dramatically reduce Plaintiff's potential recovery.

a. Risk that Plaintiff is Compelled to Arbitrate His Claims on an Individual Basis

The most significant risk faced by Plaintiff and the Settlement Class Members in this litigation is that Defendant would successfully move to compel individual arbitration of Plaintiff's claims. Customers whether signing up for an account with Defendant or purchasing videos or videogames from Defendant as a guest, execute what Defendant will argue is a "click-wrap" agreement which purports to signify agreement by the customer with the Terms of Use of the respective website used by each

---

[3] Plaintiff does not analyze punitive damages here, even though some of the claims allow their recovery. *See, e.g.,* 18 U.S.C. § 2710(c)(2)(B). Plaintiff would seek such damages, where available, at trial. However, even in an antitrust class action, where treble damages are automatic, see 15 U.S.C. § 15(a), "courts generally determine fairness . . . based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009). Unlike treble antitrust damages, punitive damages are inherently unpredictable and discretionary. For that reason, they typically play a limited role in determining the fairness of a settlement. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 15-md-02672-CRB, 2017 WL 2212783, at *24 (N.D. Cal. May 17, 2017) (explaining that, because "any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award" (quoting *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 155 (E.D. La. 2013)).

customer. The Terms of Use for each of Defendant's websites contain an arbitration provision which purports to require individual arbitration of any claim Plaintiff might bring against Defendant. Hammond Decl. ¶ 25. To be clear, the arbitration provisions in each Terms of Use contain a class action waiver which would preclude even a class arbitration. *Id*. Were Defendant to prevail on a motion to compel arbitration, it would eviscerate Plaintiff's classwide claims.

Plaintiff considers it a substantial, concrete, and material risk that Defendant would be able to compel individual arbitration of Plaintiff's claims. Accordingly, Plaintiff believes that a substantial discount is required for all claims based on Defendant's arbitration defense. Hammond Decl. ¶ 26.

b. Risk that Damages Are Limited to the Amounts Paid by Class Members

An additional litigation risk is that the Court may enforce the damages limitation clause contained in the Terms of Use applicable to each of Defendant's websites. This clause purports to limit Plaintiff's and Class Members' recovery from Defendant to the purchase price of goods purchased by each respective Class Member from Defendant. Hammond Decl. ¶ 27.

Plaintiff believes that the Court or Arbitrator (if a claim was to be arbitrated) would find such a limitation substantively unconscionable and, thus, liable to be severed or otherwise unenforceable as part of an unconscionable contract, because it deprives Plaintiff and Class Members of the relief to which they are entitled. *See Newton v. AM. Debt. Servs.,* 854 F. Supp. 2d 712, 725 (N.D. Cal. 2012) (finding substantively unconscionable a provision limiting plaintiff to amount of fees paid for the service under the agreement because a customer, like plaintiff, was entitled to greater recovery under relevant statutes). Hammond Decl. ¶ 28. Nevertheless, Plaintiff acknowledges that there is a litigation risk that the Court might find that Plaintiff's and Class Members' recovery is limited as Defendant could argue. Were Defendant to prevail on this argument, it would, most importantly, preclude recovery of statutory damages, and would, thus, dramatically reduce Defendant's potential exposure. Plaintiff, therefore, has applied a discount based on this risk. *Id.*

c. Risk that Defendant May Be Able to Defeat Class Certification

Plaintiff notes that the Court has not certified the class proposed in Plaintiff's Second Amended Complaint. Plaintiff believes that the Class, and the California Subclass, should be certified, nevertheless, as discussed in detail below, there are litigation risks associated with certifying this Class

and Subclass for litigation purposes. *See infra* Part V.C.

### d. Risk that the Court Finds Plaintiff Does Not Have Article III Standing

Were litigation to continue, Defendant would also argue that Plaintiff lacks Article III standing. In *TransUnion LLC v. Ramirez*, the Supreme Court held that, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." 594 U.S. 413, 427 (2021) (emphasis in original). Thus, "under Article III, an injury in law is not an injury in fact." *Id.* On this basis, Defendant would challenge Plaintiff's standing; arguing that Plaintiff suffered only a "statutory" harm rather than an injury-in fact. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016) (A plaintiff establishes injury in fact when he has suffered an invasion of a legally protected interest that is "concrete and particularized," meaning the injury must "actually exist" and "must affect the plaintiff in a personal and individual way."). Plaintiff disagrees strongly with the suggestion that he cannot establish standing, but acknowledges that this poses another risk to recovery should litigation continue.  Hammond Decl. ¶¶ 30-31.

### 2. Comparing the Strengths and Risks of Plaintiff's VPPA Claim

#### a. Strength and Weaknesses

Because it is, "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), Defendant is prohibited from disclosing "information which identifies a person as having requested or obtained specific video materials or services from [it]," § 2710(a)(3), without informed, written consent of the consumer, § 2710(b)(2)(B). Plaintiff believes that the evidence would show that Defendant made impermissible disclosures without the written consent of Class Members and without any potential authorization under state or federal law.

Defendant could argue that Class Members consented to the disclosure of their Personally Identifiable Information - i.e., their personal identifiers and records of their video-viewing activity – when they, purportedly, consented to Defendant's Privacy Policy applicable to each of Defendant's websites. Hammond Decl. ¶ 33. Plaintiff believes this argument would fail; he sees no prospect that any written consent given by Class Members could meet the various requirements for written consent under the VPPA including that: (1) the written consent must be "in a form distinct and separate from any form

setting forth other legal or financial obligations of the consumer;" (2) "at the election of the consumer" the consent must be either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner;" and (3) the video tape service provider must provide "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B)(i)-(iii). Hammond Decl. ¶ 33.

Plaintiff believes that Defendant's primary defenses would center on the potential difficulties Plaintiff would encounter in establishing whether any specific Class Member's Personally Identifiable Information was disclosed via tracking tools, including the Meta Pixel, or was sold or otherwise disclosed to data brokers and other third parties. Counsel for Plaintiff has experience with the challenges of obtaining discovery from Meta and other third parties that use tracking tools and is mindful of the similar challenges faced when seeking to obtain information data brokers. Although, Plaintiff believes he could overcome these challenges, he recognizes them as posing substantive risk to recovery on this claim. Hamond Decl. ¶ 34.

### b. Realistic Exposure and Discounts Applied

Pursuant to 18 U.S.C. § 2710(c), Plaintiff, on behalf of the putative nationwide Class, seeks actual damages but not less than liquidated damages in an amount of $2,500 per Class Member.

Based on the approximately 291,128 Settlement Class Members, the total maximum exposure on this claim is close to $727,820,000. Hammond Decl. ¶ 35. Plaintiff expects that such a figure would be subject to a due process challenge. *Id.* ¶ 36. The Ninth Circuit recently held in *Wakefield v. ViSalus, Inc.* that "aggregated statutory damages . . . are subject to constitutional limitation in extreme situations – that is, when they are 'wholly disproportioned' and 'obviously unreasonable' in relation to the goals of the statute and the conduct the statute prohibits." 51 F. 4th 1109, 1123 (9th Cir. 2022) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919)); *see also In re Facebook, Inc. Internet Tracking Litigation*, No. 22-16903, 2024 WL 700985, *1 (9th Cir. Feb. 21, 2024) ("With 124 million potentially affected Facebook users in the United States, the district court properly rejected the $1.24 trillion in statutory damages proposed by Objectors as an unreasonable baseline that would violate due process. *See Wakefield v. ViSalus, Inc.*, 51 F.4th at 1121–22. As a court in this district concluded in

another class settlement involving statutory damages, "[g]iven the class size, it is not plausible that class members could recover the full amount of the statutory penalties in any event." *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016).

In addition, Defendant could also argue that damages under the VPPA are discretionary. *See* 18 U.S.C. § 2710(c)(2)(A) (A "court *may* award actual damages but not less than liquidated damages in an amount of $2,500." (emphasis added)). Hammond Decl. ¶ 36.

For settlement purposes only, Plaintiff suggests that a fair estimate of the damages recoverable by each Class Member can be derived from the value of the data allegedly disclosed. In *In re Vizio, Inc., Consumer Privacy Litig.*, the court cited to expert opinion valuating personally identifiable video viewing data as worth approximately $4.76 per individual. 8:16-ml-02693-JLS-KES, 2019 WL 12966639, at *9 (C.D. Cal. July 31, 2019). This figure is consistent with other estimates for the value of personally identifiable confidential information in other cases. *See, e.g., In re Google Plus Profile, Litig.,* No. 18-CV-06164-EJD-VKD, 2021 WL 242887, at *5 (N.D. Cal. Jan. 25, 2021) (citing to expert opinion valuing exposed personal information of Google+ users, including users' profile information, including users' names, genders, and email addresses, as well as additional profile fields, such as occupation and places lived, at between $0.20 to $29.60, depending on the information type disclosed, with an average of $2.50 per individual). Similarly, in a paper presented to PrivacyCon 2020, hosted by the Federal Trade Commission, the authors reported that U.S. consumers they surveyed would require, on average, $5 per month in order for a financial institution to have the right to share information on their respective account balances with any company or individual willing to pay for it. Hammond Decl. ¶ 37 and Exhibit 2.

Even if one assumes a value of $20 per Class Member as the appropriate measure of damages, then Defendant's exposure is $5,822,560. Hammond Decl. ¶ 37. Plaintiff suggests this is a far more reasonable figure for Defendant's exposure than $727 million. *Id.* ¶ 38. This figure would then be subject to appropriate discounts for the risks of being compelled to arbitration, the risk of recovery being limited to amounts paid by Class Members, the risk of no class being certified on this claim, and further discounts based on the merits-risks discussed immediately above. *Id.* Assigning a 50% discount on the

basis of these risks, combined, Plaintiff estimates Defendant's realistic exposure on this claim at $2,911,280. *Id*.

### 3. Comparing the Strengths and Risks of Plaintiff's Claim Under California Civil Code § 1799.3

#### a. Strengths and Weaknesses

The analysis of the strengths and weaknesses of Plaintiff's § 1799.3 claim is similar to that of the VPPA, except that Defendant's liability under § 1799.3 is for "willful violation[s]" of the section, whereas the VPPA prohibits a video tape service provider from "knowingly disclos[ing]" personally identifiable information. Compare § 1799.3(c) with 18 U.S.C. § 2710(b). Accordingly, Defendant has an additional potential defense against Plaintiff's § 1799.3 claim, in addition to those discussed above with respect to Plaintiff's VPPA claim.

#### b. Realistic Exposure and Discounts Applied

Similarly to Plaintiff's claim under the VPPA, the potentially recoverable amount, prior to any discounts, and without considering due process, is massive. Pursuant to Cal. Civ. Code § 1799.3(c), for each willful violation, a Class Member can recover a civil penalty of $500. Even assuming that each Class Member can recover only $500 (rather than $500 for each purchase from Defendant or for each time his or her PII was disclosed), Defendant's theoretical exposure is $17,623,500. Hammond Decl. ¶ 40.[4] Defendant would likely argue that this figure too raises significant due process concerns. Thus, Plaintiff, again, suggests that a reasonable estimate can be generated by applying the figure of $20 for each California sub-class Member. This results in an estimated maximum recovery of $704,940. *Id*.

And, the potentially recoverable amount on this claim is subject to discounts for the risk of being compelled to arbitration, the risk of recovery being limited to the amounts paid by Class Members, the risk of no class being certified on this claim, and further discounts based on the merits-risks discussed immediately above. Assigning a 50% discount on the basis of these risks, combined, Plaintiff estimates Defendant's realistic exposure on this claim at $352,470. Hammond Decl. ¶ 41. In addition, a discount is warranted because the Court might not permit a substantial recovery under both the VPPA and § 1799.3. *Id*. ¶ 42.

---

[4] $500 x. 35,247 Californian Class Members.

#### 4. *Comparing the Strengths and Risks of Plaintiff's UCL Claim*

Plaintiff's UCL claim is derivative of his other claims. Moreover, given the strengths of the VPPA claim, and the § 1799.3 claim for members of the California Subclass, Plaintiff thinks that his UCL claim would likely only entitle him to the same or similar monetary relief that he would obtain pursuant to those claims. Accordingly, Plaintiff ascribes *de minimus* value to this claim. Hammond Decl. ¶ 42, fn. 2. Plaintiff notes, however, that, while the Settlement Class extends back to include non-Californian Class Members whose PII may have been disclosed on or after August 8, 2022, on the basis of the VPPA's two-year statute of limitations, the Settlement Class extends back to include Californian Class Members whose PII may have been disclosed on or after August 8, 2020, on the basis of the UCL's four-year statute of limitations. *Id.*

#### 5. *Summary of Plaintiff's Realistic Exposure Analysis*

Plaintiff brings one claim on behalf of a nationwide class under the VPPA. Plaintiff estimates Defendant's realistic exposure under this claim to be $2,911,280. Hammond Decl. ¶ 38. Plaintiff brings a further two claims on behalf of Members of the California Subclass. For his Civil Code § 1799.3 claim, Plaintiff estimates Defendant's realistic exposure to be $352,470. *Id.* ¶ 41. Plaintiff assigns *de minimus* value to his UCL claim. *Id.* ¶ 43, fn. 1. However, because of the strength of the VPPA claim, and because the other two claims seek to recover on the basis of the same underlying conduct as the VPPA, and because the § 1799.3 claim seeks a civil penalty akin to the liquidated damages available under the VPPA, Plaintiff considers Defendant's realistic aggregate exposure on all three claims to be similar to, and dependent on, Defendant's exposure to Plaintiff's VPPA claim. *Id.* ¶ 42.

### B. Further Litigation Would be Risky, Expensive, Complex, and Lengthy

As detailed above, there are a number of risks which, combined, mean that there is no certainty that Plaintiff and Settlement Class Members would recover anything from this case should it proceed in litigation. Moreover, even were Plaintiff and a certified class to prevail at trial, Defendant would likely appeal. Thus, absent this Settlement, this Action could have taken many years to be finally resolved. Hammond Decl. ¶¶ 43-44.

///

///

## C. The Risks Associated with Certifying the Class and Maintaining the Case as a Class Action Through Trial

In assessing the likelihood that the Class and Subclass proposed in Plaintiffs' Second Amended Complaint would be certified by this Court and then upheld on appeal, Plaintiff understands that Defendant is prepared to present arguments that individualized inquiries abound. For example, some customers may have used browsers and other tools which prohibited or limited the disclosure of their PII to Meta and other third parties. While Plaintiff believes that he would have been able to certify the Settlement Class, such issues, which could vary from Class Member to Class Member, would have resulted in a contested motion for class certification. Hammond Decl. ¶ 29.

Notably, however, while these individualized issues may have weighed against certifying the proposed Class and/or some of Plaintiff's claims for litigation purposes, they do not weigh against certification of the Class and claims for settlement purposes. "A class that is certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable." *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) (en banc); *see also Jabbari v. Farmer*, 965 F.3d 1001, 1005–06 (2020).

## D. The Relief Offered in the Settlement is More Than Adequate

### 1. The Relief is Fair, Adequate, and Reasonable

The Settlement Agreement creates a cash settlement of $1,750,000. The monetary relief offered to Settlement Class Members is more than fair, adequate, and reasonable. The gross per-Class Member share of the Settlement Fund will be approximately $6.01. Hammond Decl. ¶¶ 4, 45. The net per-Class Member share will be approximately $4.01. *Id*. Assuming a claims rate of 5%, Plaintiff estimates that the average Authorized Claimant's gross share of the Settlement Fund will be $120.22, and the average Authorized Claimant's net share of the Settlement Fund will be $ 80.21. *Id*.

These figures compare very favorably to the total relief available to claimants in consumer class actions, in general.[5] *See, e.g., In re Google Referrer Header Priv. Litig.*, No. 5:10-CV-04809-EJD, 2023

---

[5] Plaintiffs further note that privacy damages are particularly uncertain and numerous privacy class actions have been settled for non-monetary relief only. *See, e.g., Campbell v. Facebook, Inc.*, No. 13-cv-05996-PJH, 2017 WL 3581179, at *8 (N.D. Cal. Aug. 18, 2017) (granting final approval of declaratory and injunctive relief settlement in litigation alleging Facebook engaged in user privacy violations), *aff'd*, 951 F. 3d 1106 (9th Cir. 2020); *In re Google LLC St. View Elec. Commc'ns Litig.*, No.

WL 6812545, at *2 (N.D. Cal. Oct. 16, 2023) (Showing estimated "average recovery of approximately $7.16," actual amount of payment made to each settlement class member was $7.70); *In re Google Plus Profile Litig.*, No. 5:18-cv06164-EJD (VKD), Dkt. 96 at 5-6 (N.D. Cal. Oct. 15, 2020) ($12 or $6 payments per class member); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d at 943, *aff'd sub nom*; *Fraley v. Batman*, 638 F. App'x 594 ($15 payment per class member); *Poertner v. The Gillette Co.*, No. 6:12-v-00803-GAP-DAB, Dkt. 168 at 3 (M.D. Fla. Aug. 21, 2014) ($6-$12 payments per class member); *In re: Vizio, Inc., Consumer Privacy Litig.*, No. 8:16-ml02693-JLS-KES, 2019 WL 12966638, at *4 (C.D. Cal. July 31, 2019) (approving settlement in VPPA case that provided each claimant with an estimated $16.50 at a claims rate of 4.1%).

With respect to VPPA cases in particular, the monetary relief offered places this Settlement towards the high end of the range of court-approved settlements in similar cases. *See* Hammond Decl. ¶ 45. A table of comparable VPPA cases is attached as <u>Exhibit 3</u> to the Hammond Declaration. The per Class Member monetary settlement value in the eight cases included in Counsel for Plaintiff's table ranges from $0.82 to $8.40, with an average of $4.08. Even excluding the *Sony Pictures* settlement (which has the largest class size and the lowest per Class Member value), the average is $4.63. The Parties' Settlement Agreement, in the instant case, provides for an average of $6.01 per Class Member, placing it towards the high end of the range. *Id.* ¶¶ 4, 45.

In addition to monetary relief, the Settlement requires Defendant to comply with the VPPA and § 1799.3 moving forward. Specifically, the Settlement Agreement requires Defendant to "modify the Facebook Pixel settings on Defendant's Website so that specific product information is not shared with Facebook. Additionally, Defendant will not knowingly share information which identifies a person as having requested or obtained specific video materials or services with third parties, except as permitted by the VPPA." Settlement Agreement, ¶ 2.2. Under the Settlement, Defendant must implement these business-practice changes within 45 days of the entry of the Preliminary Approval Order. *Id.* Notably,

---

10-MD-02184-CRB, 2020 WL 1288377, at *16 (N.D. Cal. Mar. 18, 2020) (granting final approval of settlement providing class with injunctive relief and creating a non-distributable *cy pres* settlement fund in litigation alleging Google violated privacy by illegally gathering Wi-Fi network data); *McDonald, et al. v. Kiloo A/S, et al.,* No. 3:17-cv-04344-JD, ECF No. 406 (N.D. Cal. Apr. 12, 2021) (granting final approval of 16 injunctive relief-only settlements in related privacy class actions accusing defendants of violating child privacy protection laws by collecting and selling PII of children).

Defendant has already completely removed the Facebook Pixel from its website, as well as the Facebook like button. And, Defendant has also ensured that its customers' information is no longer available for purchase on Next Mark's website and that data is no longer available to data brokers or data aggregators. Hammond Decl. ¶¶ 5, 47. This is similar to the non-monetary relief achieved in other VPPA settlements. *See* Hammond Decl. ¶ 5 and Ex. 3.

### 2. The Plan of Allocation is Reasonable

The proposed Plan of Allocation, set out in the Settlement Agreement, as described above in Part III.B, provides for each Settlement Class Member who submits an Approved Claim to receive a "*pro rata* portion of the Settlement Fund . . . after deducting the Settlement Administration Expenses, any Fee Award and any Incentive Award." Settlement Agreement, ¶ 2.1.

The Plan of Allocation is fair, reasonable, and adequate because it attempts to achieve the appropriate ratio of distribution between members of the Settlement Class and members of the California Subclass. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at 1045 (Plan of Allocation fair, reasonable, and adequate where it attempted to "allocate the settlement funds to class members based on . . . the strength of their claims on the merits." (citing *In re Oracle Sec. Litig.,* 1994 WL 502054, *1-2 (other citation omitted)).

As described above, *see supra* Part III.B, given the strength of the VPPA claim brought on behalf of the entire Settlement Class, and the fact that this claim covers identical conduct to both the § 1799.3 claim and the derivative California UCL claim, Plaintiff does not believe it would be appropriate for members of the California subclass to receive more than other members of the nationwide Settlement Class. Plaintiff also considered the fact that Settlement Class Members from several states other than California may have been able to pursue state law causes of action analogous or similar to the § 1799.3 and UCL claims; another reason it would not be fair to offer greater relief to California Subclass members.

### E. The Settlement is Informed by Sufficient Informal Discovery to Permit an Informed Decision

"In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, 'formal discovery is not a necessary ticket to the bargaining table.'" *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 257 (N.D. Cal. 2015) (quoting *Linney v.*

*Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir.1998)). "Rather, the court's focus is on whether 'the parties carefully investigated the claims before reaching a resolution.'" *Id.* (quoting *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014) (citation omitted)).

In the instant case, as described in detail in the Hammond Declaration, Settlement Class Counsel engaged in extensive factual and legal research, investigation, and analysis of the Settlement Class' claims before filing Plaintiff's initial complaint. After initiating the instant case, Settlement Class Counsel continued to investigate in order to form a complete picture of the merits of the Settlement Class' claims, and has obtained informal discovery from Defendant including information about the size of the Settlement Class, information about the nature of Defendant's disclosure of customers' information to data brokers and other unauthorized third parties, and information about the configuration of the Meta Pixel on Defendant's websites during the relevant period. Hammond Decl. ¶¶ 14-19. In sum, the information obtained by Plaintiff was more than sufficient for Plaintiff to make an informed decision about the adequacy and desirability of the Settlement.

Additionally, Plaintiff engaged in confirmatory discovery, including directing his expert to test Defendant's websites to ensure that the tracking tools had been removed, and confirming that customers' information was no longer available on Next Mark. Hammond Decl. ¶¶ 5, 19.

### F. Counsel Believes the Settlement is an Outstanding Result

Courts recognize that the opinion of experienced counsel supporting settlement after arm's length negotiations is entitled to considerable weight. *Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D. Cal. 1980), aff'd, 661 F.2d 939 (9th Cir. 1981) ("[T]he fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight.").

Here, as described above, Counsel for Plaintiff conducted an extensive investigation into the Settlement Class' claims prior to filing the instant case. Since initiating the case, Counsel for Plaintiff has amended Plaintiff's complaint twice, has continued to investigate in order to form a complete picture of the merits of the Settlement Class' claims, and has obtained informal discovery from Defendant. Counsel for Plaintiff consider the Settlement to be an outstanding result. It is particularly so, considering that no Class has been certified, Defendant has a number of class-wide defenses, and a number of Plaintiff's claims rest on novel theories or unsettled areas of law. Hammond Decl. ¶ 48.

### G. Governmental Participation is Not at Issue Here

This factor is not at issue because there is no government participation in this case. *Bertoia v. Randstad US, L.P.*, No. 15-cv-03646-EMC, 2017 WL 1278758, at *9 (N.D. Cal. Apr. 6, 2017); *see also Martin v. Sysco Corp.*, No. 1:16-cv-00990-DAD-SAB, 2019 WL 3253878, at *6 (E.D. Cal. July 19, 2019).

### H. The Settlement Also Satisfies the *Bluetooth* Factors

Prior to class certification, class settlements must withstand a "higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth,* 654 F.3d at 946. The Court must be satisfied that "the settlement is not the product of collusion among the negotiating parties." *Id.* at 946-47. The Ninth Circuit has identified three "signs" of possible collusion:

> (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (quoting *In re Bluetooth*, 654 F.3d at 947). Evaluation of the *Bluetooth* factors assists the Court in determining whether Plaintiffs' Counsel have "allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F. 3d at 947. Here, this evaluation militates strongly in favor of granting preliminary approval.

First, the settlement does not provide that Plaintiffs' Counsel should "receive a disproportionate distribution of the settlement." *Bluetooth*, 654 F. 3d at 947. Rather, as set forth in the Settlement Agreement, proposed Class Counsel may request no more than 25% of the Settlement Fund. Settlement Agreement, ¶ 8.1. Second, the Agreement merely provides that: "Defendant agrees that Class Counsel shall be entitled to an award of reasonable attorneys' fees of up to 25% of the Settlement Fund, and costs of up to $20,000, subject to Court approval." Settlement Agreement, ¶ 8.1. Thus, Defendant has agreed that Plaintiff is entitled to *some* attorneys' fees, but has not agreed not to challenge any amount of attorneys' fees sought by Plaintiff. *Id.* Moreover, the actual attorneys' fees award will be determined by the Court. *Id.* And, third, there is no reversion of any amount of unawarded fees to the Defendant. *See*

*Bluetooth*, 654 F. 3d at 947. The Settlement Agreement establishes that the Settlement Fund is a non-reversionary settlement fund whereby none of that amount, including any attorneys' fees and costs sought by Settlement Class Counsel but not awarded by the Court, will revert to Defendant. Settlement Agreement, ¶¶ 1.31(a), 8.1.

## VI. THE PROPOSED NOTICE PROGRAM, SETTLEMENT ADMINISTRATOR, AND PROCESS FOR CLAIMS, OPT-OUTS, AND OBJECTIONS SHOULD BE APPROVED

### A. The Proposed Notice Plan

#### 1. Class Notice

The proposed notice plan is described in extensive detail by the Weisbrot Declaration at paragraphs 18-33. It will include direct email notice (followed, where necessary, by mail notice), a settlement website, and a toll-free telephone number. *Id.* The Settlement Administrator estimates that the email and mail notice program ("direct notice") will likely reach in excess of 70% of the Settlement Class. *Id.* ¶ 41. This is consistent with other court-approved, best-practicable notice programs and far exceeds the reach characterized as the "norm" and a "high percentage" by the Federal Judicial Center Guidelines. *See Edwards v. Nat'l Milk Producers Fed'n,* No. 11-CV-04766-JSW, 2017 WL 3623734, at *4 (N.D. Cal. June 26, 2017) (citing Federal Judicial Center, *Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide* 2010 ("The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%.").

As this District's guidance recommends, the draft notices include contact information for class counsel; the address for the settlement website (which will contain a summary of the Settlement; enable online Claim Form filing; allow Settlement Class Members to contact the Settlement Administrator with any questions or changes of address; provide notice of important dates (such as the Final Approval Hearing, Claims Submission Deadline, Objection Deadline, Opt-Out Deadline); provide Settlement Class Members who file Claim Forms an online the opportunity to select an electronic payment method (including Venmo, Zelle, PayPal, e-Mastercard), or payment by check; and, contain relevant case documents including the Operative Complaint, the Settlement Agreement, the Long-Form Notice, Plaintiffs' motion for preliminary approval, and the Preliminary Approval Order); the date and time of

the final approval hearing, clearly stating that the date may change without further notices to the Classes; and a note to Class Members to check the settlement website or the court docket to confirm the date. Settlement Agreement, Ex. B (Email Notice), Ex. C (Notice Posted on Settlement Website).

### 2. CAFA Notice

The Settlement Administrator will provide notice pursuant to the Class Action Fairness Act within ten days of the filing of the Settlement Agreement. Weisbrot Decl. ¶ 34.

### B. The Settlement Administrator

The parties propose Angeion Group ("Angeion") as the settlement administrator. Hammond Decl. ¶ 64; Proposed Order (filed concurrently herewith). The parties obtained competing bids from two prospective settlement administrators. Hammond Decl. ¶ 64. They each concerned generally similar notice and claims processes to the one the parties ultimately selected. *Id.* Counsel for both parties independently evaluated each proposal and conferred with each other regarding the selection of the settlement administrator. *Id.* ¶ 65. Then parties then agreed to choose Angeion. *Id.*

Angeion has experience as an appointed settlement administrator in large class-action settlements, including those involving privacy concerns. Weisbrot Decl. ¶ 12. Angeion's proposal also highlighted its robust data security standards, which comply with industry-recognized standards and include redundancies to ensure data integrity and business continuity, and procedures for handling claimant data, which are of critical importance to the Parties. Weisbrot Decl. ¶¶ 13-17. Angeion also maintains a comprehensive insurance program, including sufficient Errors & Omissions coverage. Weisbrot Decl. ¶ 17. The Parties would not have selected Angeion if they were not comfortable with its data handling practices.

Angeion has estimated the costs of issuing notice and administering the Settlement as less than the $125,000 provided for under the Settlement Agreement. Weisbrot Decl. ¶ 39. These costs will be paid out of the Settlement Fund. Settlement Agreement ¶ 1.28. The estimated costs of notice and administration are reasonable when compared to the value of the Settlement and in light of the size of the Settlement Classes. The estimated costs are less than 7.14% of the Settlement Fund.

### C. Opt-outs and Objections: Timeline and Instructions

Settlement Class Members have 60 days from the date the Notice is mailed to opt out of or object to the Settlement. Plaintiff's Counsel will also file the motion for fees and costs at least 14 days prior to the deadline to objection. Settlement Agreement, ¶¶ 1.19-1.20; Proposed Order, filed concurrently herewith. Instructions for opting-out and objecting are in plain language and clearly prompt those who wish to opt-out or to object to provide the specific information each action requires. Settlement Agreement, Exs. B & C. The notice clearly informs class members of the opt-out deadline and how to opt out, and requires that they supply only the information needed to opt out of the settlement. *Id.* Exs. B & C. Similarly, the notice informs class members of the objection deadline and instructs them to send their written objections to the Court, and clearly identifies the objection deadline. *Id*.

### D.    The Claims Process

#### 1. *The Claim Form*

It is necessary to require submission of a claim form in order for a Settlement Class Member to receive a monetary payment for several reasons. First, by allowing Settlement Class Members to choose a payment option, rather than simply mailing checks, the use of a claim form makes it more likely that a greater proportion of the settlement funds distributed will actually be received and redeemed by Class Members. Hammond Decl. ¶ 4, fn. 1. Second, and relatedly, the use of a claims form, and the corresponding expected use of electronic means of receiving payment by the majority of Authorized Claimants will help reduce the likelihood of fraud in the receipt of settlement funds. *Id.* Third, the use of a claim form allows monetary payments to be provided by means that are significantly less expensive than writing and mailing checks. *Id.*

#### 2. *The Estimated Claim Rate*

The Settlement Administrator estimates that the claims rate will be approximately 5%. Weisbrot Decl. ¶¶ 37-38. As Angeion explains, this is "around the 5% average Angeion has seen in past privacy settlements it has administered. *Id.* Plaintiff's Counsel also considers this to be a reasonable estimate. One broad analysis of 149 consumer class actions conducted by the Federal Trade Commission concluded that "[a]cross all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (i.e., cases weighted by the number of notice recipients) was 4%." *See* Fed. Trade Comm'n, Consumers & Class Actions: A Retrospective & Analysis of Settlement

Campaigns, p. 11 (Sept. 2019) ("FTC Report").[6] And, in the instant case, the Settlement Administrator will send a reminder notice 30 days prior to the Claims Deadline and a second reminder notice 7 days prior to the Claims Deadline, to all Settlement Class Members for whom a valid email address is available in the Class List. Settlement Agreement, ¶ 4.1(c). Because Defendant has email addresses for the substantial majority of Settlement Class Members, these reminder notices will be sent to the substantial majority of Settlement Class Members. *See* Hammond Decl. ¶ 64.

## VII.   OTHER CASES AFFECTED

Plaintiff is aware of one other pending case that would be affected by the proposed Settlement: *Feller, et al. v. Alliance Entertainment, LLC, et al.*, No. 24-cv-61444-RAR (S.D. Fla.). Plaintiff's understanding is that all of the claims in *Feller* will be released if the proposed Settlement in the instant case is approved. The classes proposed in *Feller* are a "Data Brokerage Class" defined as:

> All persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from Defendants and had their Private Viewing Information disclosed to a third-party by Defendant.

And, a "Meta Pixel Class" defined as:

> All persons in the United States who, during the two years preceding the filing of this action purchased prerecorded video material from Defendants' website while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

However, no class has been certified in that case, thus it is only individual claims that would be released.

On October 28, 2024, the plaintiffs in *Feller* filed a motion to intervene in the instant case. Dkt. 14. In that motion they leveled a number of unfounded and highly-offensive accusations at Defendant and Counsel for Plaintiff in the instant case: that the settlement in the instant case was the result of a "reverse auction"; that Plaintiffs, in the instant case, brought a duplicative, copy-cat case; and that Plaintiff, in the instant case, has "conducted no discovery, engaged in no meaningful litigation, and does not appeal to have participated in . . . any other arm's-length settlement negotiations with the Defendants." Dkt. 14, 1:7-2:15. These inflammatory accusations are completed inaccurate and do no justice to the considerable time and effort, described in this Motion, that Counsel for Plaintiff has

---

[6] This report is available at https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf (last accessed October 29, 2024).

invested in investigating Defendant's conduct before filing the instant case, pursuing the instant action, and reaching what is an outstanding settlement for the Settlement Class. To be clear, the Parties agreed to the Settlement Agreement now proposed to the Court without ever discussing any settlement negotiations between Defendant and any other party. Hammond Decl. ¶ 23. Counsel for Plaintiff began investigating Defendant's conduct several months before Plaintiff's initial complaint was filed (on August 12, 2024), and Plaintiff's initial complaint was only filed two court days later than the complaint in *Feller* (August 8, 2024). Plaintiff's case is, then, no copy-cat. It represents the culmination of a serious, independent, investigation by Counsel for Plaintiff. The excellent settlement achieved is a result of the high-quality hard work of Counsel for Plaintiff, assisted by Plaintiff, himself, and owes nothing to plaintiffs' counsel in the *Feller* action.

To state the obvious, plaintiffs' counsel in *Feller* did not participate in the settlement negotiations in the instant case, and there is no ongoing communication between Counsel for Plaintiffs in the instant case and plaintiffs' counsel in *Feller*, nor is there any arrangement or agreement between those two sets of attorneys. Hammond Decl. ¶ 23.

Plaintiff understands that, in *Feller*, on or about October 27, 2024, counsel for plaintiffs filed a motion for appointment as interim class counsel after on October 24, 2024, defendants filed a motion to stay based on the Settlement in the instant case. On November 1, 2024, defendant also filed a motion to dismiss.

## VIII.   THE PROPOSED FINAL APPROVAL HEARING SCHEDULE

Plaintiff's [Proposed] Order Granting Preliminary Approval of Class Action Settlement filed herewith, includes the following proposed schedule for the approval process:

///

///

///

| EVENT | PROPOSED DEADLINE |
|---|---|
| **Preliminary Approval Order** | TBD |
| **Class List due to Administrator** | 14 days after entry of the Preliminary Approval Order |
| **Notice Date** | Not later than 60 days after entry of the Preliminary Approval Order |
| **Motion for Attorneys' Fees** | 14 days before the Objection/Opt Out Deadline |
| **Opposition to Motion for Attorneys' Fees** | No more than 30 days after the Motion for Attorneys' Fees |
| **Objection Deadline** | 60 days after Notice Date |
| **Reply in Support of Motion for Attorneys' Fees** | 14 days after Opposition due date |
| **Opt-Out Deadline** | 60 days after Notice Date |
| **Claim Deadline** | 60 days after Notice Date |
| **Motion for Final Approval** | 90 days after Notice Date |
| **Reply in Support of Final Approval Motion and Update Regarding Notice Administration** | 14 days after Motion for Final Approval due date |
| **Final Approval Hearing** | TBD |

## IX. CONCLUSION

For these reasons, Plaintiff respectfully requests that his motion for preliminary approval of the Parties' class action Settlement be granted.

DATED:  November 4, 2024

Respectfully submitted,

/s/ Julian Hammond
Julian Hammond
*Attorneys for Plaintiff and Proposed Class Counsel*

JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pbrandler@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Tel. (310) 601-6766
Fax (310) 295-2385

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT

| | |
|---|---|
| **JONATHAN HOANG TO,** individually and on behalf of all others similarly situated, | ) Case No. 3:24-CV-06447-WHO<br>)<br>) **PLAINTIFF'S NOTICE OF MOTION** |
| Plaintiff, | ) **AND MOTION FOR PRELIMINARY**<br>) **APPROVAL OF CLASS ACTION**<br>) **SETTLEMENT** |
| vs. | )<br>) |
| **DIRECTTOU, LLC,** a Delaware Limited Liability Company, | ) Judge:          Hon. William H. Orrick<br>) Courtroom:    2<br>) Hearing Date:  December 18, 2024 |
| Defendant. | ) Hearing Time: 2:00 p.m.<br>)<br>)<br>) |

I, Julian Hammond, declare as follows:

1. I am a member in good standing of the Bar of the State of California and counsel of record for the Plaintiff in the above-captioned matter and the putative Settlement Class. I make this declaration based on personal knowledge and, if called as a witness, I could and would testify competently to the matters set forth herein.

2. I submit this declaration in support of Plaintiff's Motion for Preliminary Approval of the Class Action Settlement. A true and correct copy of the Settlement Agreement, which has been executed by the parties, is attached hereto as **Exhibit 1**. Annexed as exhibits to the Settlement Agreement are the following documents:

- Exhibit A – Claim Form
- Exhibit B – Email Notice
- Exhibit C – Long-Form (Settlement Website) Notice
- Exhibit D – Proposed Preliminary Approval Order
- Exhibit E – Proposed Final Approval Order

## I. INTRODUCTION

3. Plaintiff has achieved an impressive result in this case less than three months after filing his lawsuit, despite facing risks of having his claims be compelled to individual arbitration, risks of losing on class certification, as well as risks on the merits based on Defendant's arguments, including that users consented to the practice at issue, that customers' personal information was not actually disclosed, and that the putative class member sugared no actional damages.

4. Defendant has agreed to pay $1,750,000 to resolve this action. The $1,750,000 cash settlement, after deduction of Court-approved attorneys' fees and costs, administration expenses, and service award, will be allocated pro rata to all Class Members who submit a valid Claim Form.[1] The cash settlement represents an average per-Class Member monetary settlement of $6.01 gross and $4.01

---

[1] The use of the Claim Form makes it more likely that a greater proportion of the settlement funds distributed will actually be received and redeemed by the Class Members. And, the use of the Claim Form allows the use of electronic payments (through selection of electronic payment and provision of required information for e-payment on the Claim Form), which will likely help reduce fraud in the receipt of settlement funds through the mail and allow for means of distribution that are less expensive than printing and mailing a physical check.

net and, assuming a 5% claims rate anticipated by the Plaintiff and the proposed Settlement Administrator, the average recovery per Settlement Class Member who submits a claim will be $120.22 gross, and $80.21 net. This represents significant monetary relief for Settlement Class Members, and is well above the average recovered in comparable cases.

5.     In addition, Plaintiff also obtained key non-monetary relief for the benefit of the Class (and all future customers of Defendant) by getting Defendant to remove all tracking tools from its websites, including the Meta Pixel and the "Facebook like button", days after entering into the Settlement Agreement (even before preliminary approval), and by getting Defendant to agree, in the Settlement Agreement, to cease sharing its customers' personal viewing information, except as permitted under the VPPA and/or California law. Through confirmatory discovery Plaintiff was able to confirm that its customers' information is no longer available for purchase on Next Mark's website and that data is no longer available to data brokers or data aggregators. This prospective relief is also similar to the non-monetary relief achieved in other VPPA cases.

6.     The Settlement Class consists of an estimated 291,128 individuals who are "all persons who reside in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval." The "Settlement Class" also includes 35,247 California subclass members who are "all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval."

7.     The settlement is a product of arm's-length settlement negotiations and is informed by extensive investigation and research on the part of Plaintiff's Counsel, data and information obtained as part of informal discovery, Plaintiff's counsel's experience in litigating and settling similar privacy cases, and Plaintiff's counsel's analysis of similar VPPA settlements. Based on their experience,

analysis, research and investigation, Plaintiff's counsel consider this Settlement to offer a very substantial benefit to the Settlement Class and to be overall an excellent result.

## II. SUMMARY OF THE LITIGATION

8.     On August 8, 2024, Plaintiff To filed this putative class action lawsuit in the Superior Court for the County of Alameda, alleging that Defendant secretly disclosed its California customers' confidential video purchase information to Meta Platforms, Inc. ("Meta" or "Facebook"), an unauthorized third party without its customers' written informed consent.  Plaintiff alleged that Defendant's customers were shown no disclaimer or warning that their confidential information would be disclosed to any unauthorized third party, had no idea that their confidential information was being collected and transmitted to an unauthorized third party because the tracking tools embedded on Defendant's website were not visible to the customers, and never consented to Defendant's conduct. Plaintiff alleges that DirectToU secretly transmitted their data to Meta for economic gain because there is a well-established national and international market for consumers' confidential information.

9.     Defendant removed the case to this Court on September 12, 2024.

10.     On October 1, 2024, Plaintiff filed a First Amended Complaint, which retained Plaintiff's allegations and added a national Class.

11.     Defendant's deadline to respond was extended first by motion and subsequently by a stipulation of the parties.

12.     On October 23, 2024, the parties reached an agreement in principle to resolve Plaintiff's class claims.

13.     On November 1, 2024, Plaintiff filed a Second Amended Complaint to conform to the terms of the Settlement Agreement, pursuant to the parties' stipulation.

## III.  SUMMARY OF RESEARCH, INVESTIGATION, AND INFORMAL DISCOVERY

14.     As briefly discussed above, prior to filing this lawsuit Plaintiff's counsel conducted extensive and thorough investigation into the factual and legal basis of this lawsuit, and Plaintiff's counsel continued to investigate the case, including through obtaining data and information from Defendant as part of informal discovery.

15.     Specifically, Plaintiff Jonathan Hoang To first discussed this case with Plaintiff's counsel and agreed to represent the Class in April 2024. Prior to filing the complaint, Plaintiff's counsel spent many hours thoroughly researching and considering the relevant facts and law. Plaintiff's counsel analyzed Defendant's websites (www.deepdiscount.com, www.ccvideo.com, www.moviesunlimited.com) for presence of tracking tools, reviewed the steps consumers were required to take to sign up for an account with Defendant and/or make purchases, as well as other information available on Defendant's websites. Plaintiff's counsel also reviewed information provided by Plaintiff about his purchases and reviewed changes to Defendant's website over time including changes to Defendant's Terms of Use and Privacy Policy and changes to how the Facebook/Meta Pixel was configured throughout the relevant period, by reviewing historic versions of Defendant's website available on the internet archive known as the "Wayback Machine." Plaintiff's counsel analyzed dozens of orders on motions to dismiss and summary judgment motions in VPPA cases both in and outside this district.

16.     As part of their analysis of Defendant's website, Plaintiff prepared screenshots using the "Meta Pixel Helper" that showed the sharing of Defendant's customer's video DVD and Blu-ray purchase data with Meta.

17.     Plaintiff's counsel subsequently retained an expert to confirm their findings concerning the presence of tracking tools on Defendant's website and the configuration of the tracking tools, and provided their findings and analysis to Plaintiff's Counsel. Plaintiff's expert also prepared HAR files that evidenced the sharing of Defendant's customers' DVD and Blu-ray purchase data with Meta.

18.     Finally, Plaintiff obtained key information and data as part of informal discovery, including the size of the national Class and the California subclass, information about when the pixel was first installed on Defendant's websites.

19.     Following settlement, Plaintiff obtained agreement from Defendant to remove all tracking tools, including the Facebook Pixel and the Facebook like button from its websites (www.deepdiscounts.com, www.ccvideo.com, www.unlimitedmovies.com), before preliminary approval (and before the time required by the Settlement Agreement). Plaintiff's counsel then directed their expert to test Defendant's websites to confirm that Defendant had removed tracking tools.

Plaintiff's expert confirmed to Plaintiff's counsel that Defendant has removed both the Meta Pixel and the Facebook like button from its websites. Plaintiff also ascertained through confirmatory discovery that the lists containing Defendant's customer information had been removed from www.nextmark.com and are not available to any data brokers.

## IV.  SETTLEMENT WAS A PRODUCT OF INFORMED, ARMS'-LENGTH NEGOTIATIONS

20.     Plaintiff's counsel was well-informed of the strength and weaknesses of Plaintiff's claims and well prepared to negotiate the settlement based on their legal and factual research and investigation in this case, their experience in litigating and settling similar privacy cases, and analysis of dozens of VPPA settlements.

21.     Shortly after Defendant removed the case to this Court, the parties began to engage in settlement discussions.  As part of engaging in settlement discussions Defendant provided data and documents, including the estimated size of the Class and of the California Subclass.  Settlement negotiations were arms'-length.  The parties exchanged a number of offers and counteroffers that included both monetary relief and the terms of prospective relief.  On October 19, 2024, the Parties reached a settlement in principle and then continued to negotiate and resolve numerous details associated with finalizing the Settlement, including the Notice Plan, the appropriate allocation of the Settlement Fund among Class Members, the claims process, and the distribution plan.

22.     On October 23, 2024, the Parties executed the Class Action Settlement Agreement, which is now presented to this Court for approval.

23.     The Parties agreed to the Settlement Agreement without ever discussing any settlement negotiations between Defendant and any other party, including plaintiffs in the *Feller, et al. v. Alliance Entertainment, LLC, et al.*, No. 0:24-cv-61444-RAR (S.D. Fla.) case.  There is no arrangement between Plaintiff's counsel in this case and the counsel for plaintiffs in the *Feller* case.

## V.     THE STRENGTH AND RISKS OF PLAINTIFF'S CASE

24.     Plaintiff believes his claims have merit and that he would prevail at trial. Nevertheless, Plaintiff acknowledged that he faced a number of risks, including the risk that his claims would be compelled to individual arbitration, that he would not be able to certify the Class, that he would lose on the merits, and that, even if he cleared the arbitration hurdle, certified the class and prevailed on the

merits, the Court would cut statutory damages in the exercise of its discretion or find that the Class

Members was entitled to no more than what they actually paid to Defendant.

### 1. **Defendant's Affirmative Defenses**

#### a. *Arbitration Risk*

25.     Plaintiff disputes the enforceability of Defendant's arbitration agreement, but recognizes

that he faced a substantial, concrete and material risk that Defendant would be able to compel his claims

to individual arbitration.  The Terms of Use for each of Defendant's websites contain an arbitration

provision, with a class action waiver, which purports to require individual arbitration of any claim

Plaintiff might bring against Defendant.  Defendant could argue that Plaintiff (and other Class

Members) consented to the arbitration agreement in Defendant's Terms of Use because they were

required to agree to Defendant's Terms of Use when signing up for an account or purchasing videos or

videogames on Defendant's websites.

26.     If Defendant successfully compelled Plaintiff's claims to individual arbitration, it would

leave Plaintiff with no means of obtaining class relief, and class members would be highly unlikely to

pursue recover on an individual basis.  Thus, Plaintiff believes that this risk warranted a substantial

discount on all claims for settlement purposes.

#### b. *Risk of Recovery Being Limited to Amounts Paid*

27.     Plaintiff also faced the risk that the Court would limit damages to amounts paid by the

Class Members based on the damages limitation clause in Defendant's Terms of Use on each of

Defendant's websites.  That clause purports to limit customers' recovery from Defendant to the

purchase price paid by customers to Defendant.

28.     Plaintiff believes that this provision would be found to be unconscionable (whether

Plaintiff's claims proceeded in court or in arbitration) because, if enforced, it would deprive Plaintiff

and other Class Members of their statutory rights.  However, Plaintiff recognizes that this provision

presents litigation risk in that, if Defendant successfully enforced this provision, it would dramatically

reduce potential recovery.

#### c. *Risk of Losing on Class Certification*

29.     While Plaintiff is confident that he would be able to certify the class, he is also keenly

aware that if the settlement had not been reached, Defendant was prepared to present arguments that multiple individualized inquiries would preclude certification. For example, some customers may have used browsers and other tools which prohibited or limited the disclosure of their PII to Meta and other third parties. The ultimately outcome of a contested class certification motion would be uncertain. The risk of non-certification presents the same concerns as the risk of Plaintiff's claims being compelled to individual arbitration in that class members would be highly unlikely to pursue individual relief.

### d. Risk of the Court finding that Plaintiff Lacks Article III Standing

30. Absent settlement, Defendant would argue that Plaintiff could not asserts claims against Defendant because he lacks Article III standing. Defendant would likely argue that Plaintiff suffered only a statutory harm and cannot meet Article III's injury-in-fact requirement.

31. Plaintiff is confident that he would be able to establish standing, but acknowledges that this poses another risk to recovery.

### 2. The Strength and Risks of Plaintiff's VPPA Claim

32. Plaintiff believes he would successfully establish that Defendant violated the VPPA by disclosing his and other Class Members' information that identified them "as having requested or obtained specific video materials or services" from Defendant, without their informed, written consent.

33. Defendant could argue that Plaintiff and Class Members consented to the disclosure of this information because they (purportedly) consent to Defendant's Privacy Policy at the same time they consent to Defendant's Terms of Use on one or more of Defendant's websites. But, Plaintiff believes that Defendant's argument would fail because the VPPA sets out specific, detailed requirements for written consent including that: (1) the written consent must be "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" (2) "at the election of the consumer" the consent must be either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner;" and (3) the video tape service provider must provide "an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(b)(2)(B)(i)-(iii).

34.     Plaintiff recognizes, however, that Defendant's primary defense to Plaintiff's VPPA claim would focus on the potential difficulties Plaintiff would encounter in establishing whether any specific Class Member's information was disclosed via tracking tools or was sold or otherwise disclosed to data brokers and other third parties. Plaintiff's counsel believes that these difficulties would stem in part from the fact that obtaining discovery from Meta, in their experience, is challenging. And, Plaintiff's counsel are mindful of the similar challenges faced when seeking to obtain information data brokers. Although, Plaintiff believes he could overcome these challenges, he recognizes them as posing substantive risk to recovery on this claim.

35.     Based on these risks, Plaintiff's counsel evaluated Plaintiff's claims for settlement as follows.  Plaintiff seeks statutory damages of $2,500 per Class Member, pursuant to section 2710(c), for a total maximum exposure on this claim of $727,820,000 (291,128 Class Members x $2,500).

36.     Plaintiff expects that Defendant would contend that this figure would be subject to a due process challenge as disproportionate to the injury and goals of the statute.  In addition, Defendant could argue that the damages under the VPPA are discretionary because the statute uses the word "may" in section 2710(c)(2)(A).

37.     Based on the above, Plaintiff believes that a fair estimate of recoverable damages could be based on the value of the personal data allegedly disclosed.  Based on Plaintiff's review of similar VPPA cases and U.S. consumer survey results that measures how consumers value their data, presented a paper presented to PrivacyCon 2020 hosted by the Federal Trade Commission, Plaintiff viewed the value of the data disclosed as around $5 per Class Member.  Even assuming recoverable damages of $20 per Class Member (four times that suggested by other cases and consumer surveys), Defendant's exposure is $5,822,560 (291,128 x $20).  A true and correct copy of "How Much is Privacy Worth Around the World and Across Platforms?", Jeffrey Prince, March 2020, is attached as **Exhibit 2**.

38.     Plaintiff recognizes that this more reasonable measure of damages ($5,822,560) is then subject to discounts for settlement purposes based on all the risks discussed above, including the risk of individual arbitration or losing on class certification, of recovery being limited to the amount paid to Defendant, and various other merits-risks.  Accordingly, Plaintiff applied a 50% discount for these risks and thus estimated Defendant's realistic exposure on this claim at $2,911,280.

### 3.   The Strength and Risks of Plaintiff's Cal. Civil Code § 1799.3 Claim

39.     Plaintiff conduced similar analysis of his Cal. Civ. Code § 1799.3 claim, as of his VPPA claim.  The only difference is that Defendant has an additional potential defense against Plaintiff's § 1799.3 claim, which is based on the statute's "willful violation" provision, as opposed to VPPA's lower level of scienter "knowing" disclosure provision.

40.     Similarly to Plaintiff's claim under the VPPA, the potentially total maximum exposure is massive. Pursuant to § 1799.3(c), for each willful violation, a Class Member can recover a civil penalty of $500. Even assuming that each Class Member can recover only $500 (rather than $500 for each purchase from Defendant or for each time his or her PII was disclosed), Defendant's theoretical exposure is $17,623,500 (35,247 California Subclass Members x $500).  Plaintiff expects that Defendant would argue that this figure raises significant due process concerns. Thus, Plaintiff views a reasonable estimate of potential maximum damages as one that is based on at most $20 for each California sub-class Member, which results in maximum recovery of approximately $704,940 (35,247 California Subclass Members x $20).

41.     The $704,940 exposure is subject to all the risks of arbitration and non-certification discussed above, as well as the risk of recovery being limited to the amounts paid by Class Members, and merits-risks discussed immediately above. Based on these risks, Plaintiff applied a 50% discount for settlement purposes and thus estimates Defendant's realistic exposure on this claim at $352,470.

42.     In addition, a discount is warranted given the strength of the VPPA Claim and because the Court might not permit a substantial recovery under § 1799.3 as it is based on the same underlying conduct as Plaintiff's VPPA claim and seek similar type of relief (a civil penalty that is akin to liquidated damages provided by the VPPA).[2]  Thus, Plaintiff considers Defendant's realistic aggregate exposure on all three claims to be similar to, and dependent on, Defendant's exposure to Plaintiff's VPPA claim.

///

---

[2] Given that the UCL claim is derivate of Plaintiff's other claims and given the strength of his main claims, Plaintiff thinks that his UCL claim would only entitle him to the same relief available under the underlying statutes but would allow him to extend the claims of California Subclass members back to four years prior to the filing of the Complaint (as opposed to two years for the nationwide Class).  Accordingly, Plaintiff ascribes only *de minimus* monetary value to his UCL claim.

9

## VII.    RISK OF FURTHER LITIGATION

43.    The risks described above, including the risk of arbitration, non-certification, and on the merits, mean that there is no guarantee that Plaintiff would recover anything if he continued to litigate the case.  Further litigation would also be time consuming, complex, involve extensive motion practices, and could take years to resolve and would likely involve appeals.

44.    If Plaintiff succeeded in opposing Defendant's efforts to compel their case to individual arbitration, litigation would likely continue for many years.  Plaintiff would have to clear the hurdles of class certification and summary judgment.  The losing party would appeal the Court's ruling on one or both of those matters. The Parties would then likely seek a lengthy jury trial. The case would almost certainly not end with a jury verdict; given the relatively unsettled nature of relevant precedent and the magnitude of Defendant's potential exposure, one or both Parties would almost certainly appeal. Plaintiff's counsel would incur substantial costs which would ultimately be deducted from the Class recovery, and still, the result would be uncertain.

## VIII.    THE SETTLEMENT REPRESENTS AN EXCELLENT RESULT

45.    Defendant has agreed to pay $1,750,000 to settlement claims of 291,128 Class Members (which includes 35,247 California Subclass Members).  As discussed above, this represents gross per-Class Members recovery of approximately $6.01 and net recovery of approximately $4.01.  Assuming a claims rate of 5%, the gross share of the cash settlement fund available to each Settlement Class Member submitting a valid claim will be approximately $120.22, and their net share of the cash settlement fund (after the payment of court-approved attorneys' fees and costs, Class Representative Service Award, and Settlement Administration Costs) will be $80.21.  This recovery compares very favorably with the relief available to claimants in consumer actions in general and in VPPA settlements. In fact, the monetary relief in this case places this case toward the high end of the range of court-approved settlements in similar cases.  *See* **Exhibit 3** attached hereto.

46.    In addition, the Settlement Agreement provides key prospective/injunctive relief that addresses and resolves the alleged legal wrongs that promoted the suit.  The Settlement Agreement requires Defendant to comply with the VPPA and § 17993 and for Defendant to "modify the Facebook Pixel settings on Defendant's Website so that specific product information is not shared with Facebook.

Additionally, Defendant will not knowingly share information which identifies a person as having requested or obtained specific video materials or services with third parties, except as permitted by the VPPA." Settlement Agreement, ¶ 2.2.

47.     Under the Settlement, Defendant must implement these business-practice changes within 45 days of the entry of the Preliminary Approval Order.  Plaintiff is pleased with the fact that he already got Defendant to remove tracking tools, including the Meta Pixel and the Facebook like button, from Defendant's websites.  In addition, through confirmatory discovery Plaintiff was able to confirm that its customers' information is no longer available for purchase on Next Mark's website and that data is no longer available to data brokers or data aggregators.

48.     Plaintiff's counsel believes that the combined monetary and prospective relief (an important part of which has already been implemented by the Defendant) represents an excellent result for the Class (and the California Subclass) and achieves important goals of this lawsuit. The result is particularly excellent given that Plaintiff's claims rest on novel theories or unsettled areas of law and Plaintiff faced several risks if litigation continued, including the risk of losing on class certification and/or on the merits.

## IX.     CLASS COUNSEL'S EXPERIENCE

49.     HammondLaw attorneys have extensive class action and complex litigation expertise. Our attorneys have consistently won unprecedented recoveries for consumers as well as employees, obtained crucial injunctive relief, caused changes in industry standards, and even caused the California Legislature to pass new legislation. Their extensive experience and expertise were instrumental in securing the excellent result in this case.  HammondLaw's firm resume is attached as **Exhibit 4** hereto.

50.     **Julian Hammond** has more than twenty years of experience in commercial and complex class litigation. Having been a Barrister in Australia, representing GlaxoSmithKline in the then-largest commercial litigation in Australia's history, Mr. Hammond transitioned his practice to California in 2010 and founded his own law firm, and has since become a leading California class action attorney. Mr. Hammond has obtained over 40 class action settlements and judgments over just the past 3 years, securing over $50 million in settlements for employees and consumers (and close to $100 million since 2010 in more than 80 class actions). Included among these was Mr. Hammond's success, with Ms.

Brandler as second chair, securing judgment in a class action against the University of San Francisco in 2020, and his successful defense of that judgment before the Court of Appeal in 2023. Also notable was a $16.5 million settlement for approximately four million consumers against Apple in relation to its automatic renewal policies. Recently, Mr. Hammond has begun representing consumers and patients in various data privacy cases, including in cases against Cerebral, Inc., TaxAct, BetterHelp, NFHS Network, Watch AFL, Watch NRL, and BBC America for disclosing their customer's medical, financial, and video viewing information to Meta through the Pixel.

51.     Mr. Hammond earned his bachelor's degree from the University of New South Wales, and his J.D., *summa cum laude,* from the University of Technology. Mr. Hammond also received an LLM from New York University School of Law in 2001.

52.     **Adrian Barnes** has over 12 years of experience successfully representing consumers and employees in class-action cases. Adrian is currently pursuing litigation against a number of leading financial, video and healthcare companies for the unauthorized disclosure of customers' confidential financial, medical and viewing information. Adrian has represented clients before the National Labor Relations Board, the Public Employment Relations Board, and has litigated class actions to the Supreme Court. He has also obtained favorable settlements in multi-million-dollar class actions under California's wage and hour laws.

53.     Adrian earned his law degree from Columbia Law School, where he was on the editorial board of the Columbia Law Review, was a James Kent Scholar, and received the Emil Schlesinger Prize for the student most proficient in labor law. Prior to law school, Adrian earned a bachelor's degree in Rhetoric from the University of California, Berkeley, where he graduated *magna cum laude*, and a master's degree in English Literature from University College London.

54.     **Polina Brandler** has over 11 years of complex class action experience and a total of 15 years of legal experience, having spent the first two and a half years of her career as a judicial law clerk. Ms. Brandler has a wealth of litigation experience, having litigating over 30 class actions, and worked on every stage of litigation, from case researching and investigation, pleadings and motion practice, expert discovery to depositions, through to mandatory settlement conferences and mediations, and recently successfully second chaired a class action trial against the University of San Francisco.

Additionally, Ms. Brandler brings her formidable briefing skills to the table, being responsible for numerous motions and oppositions, including oppositions to motions to compel arbitration, and recent appellate briefs, in which HammondLaw was successful.

55. Ms. Brandler received her bachelor's degree, *cum laude*, in 2005 from Macaulay Honors College at the City University of New York, and her J.D. from the Benjamin N. Cardozo School of Law in 2009.

56. **Ari Cherniak** has been with HammondLaw since 2010 and has extensive class action litigation experience. Mr. Cherniak's assists in managing all aspects of the class action litigation at HammondLaw, including overseeing case calendars, advising on compliance with applicable rules including procedural rules, local rules, standing orders, and guidelines, and ensures the smooth operation of the cases from inception through to final approval. Mr. Cherniak has been appointed along with other members of the HammondLaw Team as class counsel in over 70 class actions since 2010.

57. Mr. Cherniak received his bachelor's degree from Towson University in 2007, and his J.D. from Tulane University Law School in 2011.

58. **Steven Greenfield** has over seven years of legal experience, and over 20 years of professional experience. In the last two years, Mr. Greenfield has focus his practice on litigating privacy cases.

59. Mr. Greenfield earned his bachelor's degree from Yeshiva University in 1996, where he was valedictorian from the Sy Syms School of Business, his J.D. from the University of Pennsylvania Law School in 1999, where he graduated in the top 25% of his class, an LLM in taxation from the New York University School of Law in 2002, and an MBA from Columbia University in 2007.

## X. ATTORNEYS FEES AND COSTS

60. Plaintiff will seek attorneys' fees in an amount of 25% of the Settlement Fund.

61. As of November 4, 2024, Plaintiff's counsel have spent more than 200 hours working on this case for a total lodestar of over $140,000 and will expend additional hours before their submission of a request for an award of attorneys' fees and before final approval is granted.

62. Plaintiff's counsel will expend additional hours preparing for and appearing at the preliminary approval hearing, overseeing the notice process, including working with the Settlement

Administrator on monitoring claims rates and on sending out reminder notices, responding to questions from the Class Members, submitting preparing and filing the motion for final approval, responding to objections, preparing final approval motion, attending the final approval hearing, and overseeing the distribution of the settlement funds.

## XI. COSTS

63. Plaintiff's counsel has incurred $9,275.95 in costs and expenses in this litigation through to November 3, 2024. The following is a summary of these expenses, identified by the category of expense and the amount incurred:

| Category | Total Amount |
|---|---|
| Court Filing and Service Fees | $1,446.95 |
| Consulting expert fees | $2,250.00 |
| Research (Pacer, Lexis/Westlaw) | $5,579.00 |
| **Grant Total** | **$9,275.95** |

## XII. PROPOSED SETTLEMENT ADMINISTRATOR

64. The parties propose Angeion Group, LLC, as the settlement administrator. The parties choose Angeion as the settlement administrator for this action after a competitive selection process involving solicitation of bids from Angeoin and one other, well-known, settlement administrator. The two settlement administrators each proposed generally similar notice and claims processes to the one the parties ultimately selected. Given that Class Members engaged in online transactions with Defendant and given that Defendant has email addresses for the substantial majority of the Class, direct notice will be provided by email, with two reminder notices after the initial notice.

65. Counsel for both parties independently evaluated each proposal and then conferred with each other regarding the selection of the case administrator. Counsel then agreed to select Angeion as the settlement administrator.

66. The parties agreed to choose Angeion based on extensive experience of their principles in administering settlements, including settlements in this district, their stellar reputation and sophistication in carrying out notice programs in large consumer cases, claims rates they achieved in similar consumer settlements, and its competitive pricing.

///

14

## XIII.   PLAINTIFF'S EFFORTS ON BEHALF OF THE CLASS

67.     Plaintiff To has agreed to take on the responsibility of representing the Class and has devoted substantial time and effort to this case.  He discussed his claim with Plaintiff's Counsel, reviewed and readily accepted his duties as a Class Representative, reviewed documents filed in this case, promptly responded to calls and emails from Plaintiff's Counsel, looked for and shared documents with Plaintiff's Counsel, and was actively involved in the case.

68.     Plaintiff's claims are typical of the claims of the other Class Members and his interests are aligned with, and not antagonistic to, those of the other Class Members. Without his involvement and his willingness to represent the Class, this case and this settlement would not have been possible.

## XIV.   CY PRES BENEFICERARY

69.     The parties' Settlement Agreement in the above-captioned case identifies the Electronic Privacy Information Center ("EPIC") as the parties' chosen cy pres recipient.

70.     EPIC is a nationwide organization which addresses myriad issues affecting American consumers. It describes itself as a "public interest research center… seeking to protect privacy, freedom of expression, and democratic values in the information age."

71.     Among the issues addressed by EPIC which are relevant to the Class Members' claims in the instant case are: advocacy for consumer data protection; advocacy for consumer privacy; and work on comprehensive privacy laws.

72.     Neither Plaintiff nor any attorney or employee at HammondLaw has any relationship with EPIC. There is no connection between Plaintiff or Plaintiff's Counsel, on the one hand, and EPIC, on the other, that could create the impression of any impropriety of any sort in the selection of EPIC as the cy pres recipient in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 4, 2024.

/s/ Julian Hammond
Julian Hammond

EXHIBIT A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JONATHAN HOANG TO, individually and
on behalf of others similarly situated,

    Plaintiff,

    v.

DIRECTTOU, LLC,

    Defendant.

Case No. 3:24-cv-06447-WHO

## CLASS ACTION SETTLEMENT AGREEMENT

This Agreement ("Agreement" or "Settlement Agreement") is entered into between and among (i) Plaintiff Jonathan Hoang To ("Plaintiff"); (ii) the Settlement Class (as defined herein); and (iii) Defendant DirectToU, LLC ("Defendant"). The Settlement Class and Plaintiff are collectively referred to as the "Plaintiffs" unless otherwise noted. The Plaintiff and the Defendant are collectively referred to herein as the "Parties." This Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims (as defined herein), upon and subject to the terms and conditions of this Agreement, and subject to the final approval of the Court.

## RECITALS

WHEREFORE, this putative class action was filed on or about August 12, 2024, in the Superior Court for the State of California, County of Alameda, and subsequently removed to the U.S. District Court for the Northern District of California on or about September 12, 2024. The material allegations of the complaint center on Defendant's alleged disclosure to third parties of information which identifies a person as having requested or obtained specific video materials or

services, allegedly without permission in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 et seq. (the "VPPA") and California laws;

WHEREFORE, after the filing, the Parties discussed the prospect of resolution;

WHEREFORE, in order to competently assess their relative negotiating positions, the Parties exchanged information, including on issues such as the size of the putative class, and certain facts related to the strength of Defendant's defenses. Given that the information exchanged was similar to the information that would have been provided in formal discovery related to the issues of class certification and summary judgment, the Parties had sufficient information to assess the strengths and weaknesses of the claims and defenses;

WHEREFORE, at all times, Defendant and Released Parties (defined below) have denied and continue to deny any wrongdoing whatsoever and have denied and continue to deny that they committed, or threatened or attempted to commit, any wrongful act or violation of law or duty alleged in the Action. Nonetheless, taking into account the uncertainty and risks inherent in any litigation, Defendant has concluded it is desirable and beneficial that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in this Agreement. This Agreement is a compromise, and the Agreement, any related documents, and any statements and negotiations resulting in it shall not be construed as or deemed to be evidence of or an admission or concession of liability or wrongdoing on the part of Defendant, or any of the Released Parties (defined below), with respect to any claim of any fault or liability or wrongdoing or damage whatsoever;

WHEREFORE, Plaintiff believes that the claims asserted in the Action against Defendant have merit. Nonetheless, Plaintiff and Class Counsel recognize that Defendant has raised factual and legal defenses that present a risk that Plaintiff may not prevail. Plaintiff and Class Counsel

also recognize the expense and delay associated with continued prosecution of the Action against Defendant through class certification, summary judgment, trial, and any subsequent appeals. Plaintiff and Class Counsel have also taken into account the uncertain outcome and risks of litigation, especially in complex class actions, as well as the difficulties inherent in such litigation. Therefore, Plaintiff believes it is desirable that the Released Claims be fully and finally compromised, settled, and resolved with prejudice. Based on their evaluation, Class Counsel have concluded that the terms and conditions of this Agreement are fair, reasonable, and adequate to the Settlement Class, and that it is in the best interests of the Settlement Class to settle the claims raised in the Action pursuant to the terms and provisions of this Agreement;

NOW, THEREFOR, IT IS HEREBY STIPULATED AND AGREED by and among Plaintiff, the Settlement Class, and each of them, and Defendant, subject to final approval of the Court after a hearing or hearings as provided for in this Settlement Agreement, in consideration of the benefits flowing to the Parties and the Settlement Class from the Agreement set forth herein, that the Action and the Released Claims shall be finally and fully compromised, settled, and released, and the Action shall be dismissed with prejudice, upon and subject to the terms and conditions of this Agreement.

## AGREEMENT

1. **DEFINITIONS.**

As used in this Settlement Agreement, the following terms have the meanings specified below:

1.1 "Action" means *Jonathan Hoang To v. DirectToU, LLC*, originally filed in the Superior Court for the State of California as Case No. 24CV086809 and subsequently removed to the U.S. District Court for the Northern District of California as Case No. 3:24-cv-06447.

**1.2** "Approved Claim" means a Claim Form submitted by a Settlement Class Member that: (a) is submitted timely and in accordance with the directions on the Claim Form and the provisions of the Settlement Agreement; (b) is fully and truthfully completed by a Settlement Class Member with all of the information requested in the Claim Form; (c) is personally signed by the Settlement Class Member, physically or electronically; and (d) is approved by the Settlement Administrator pursuant to the provisions of this Agreement.

**1.3** "Claim Form" means the document substantially in the form attached hereto as Exhibit A, as approved by the Court. The Claim Form, to be completed by Settlement Class Members who wish to file a Claim for a payment, shall be available in electronic and paper format in the manner described below.

**1.4** "Claims Deadline" means the date by which all Claim Forms must be postmarked or received to be considered timely and shall be set as sixty (60) days after issuance of Notice (as defined in Section 1.17 below). The Claims Deadline shall be clearly set forth in the Preliminary Approval Order as well as in the Notice and the Claim Form.

**1.5** "Class Counsel" means Julian Hammond, Adrian Barnes, Polina Brandler, and Ari Cherniak of HammondLaw, P.C.

**1.6** "Class Representative" means that named Plaintiff in this Action, Jonathan Hoang To.

**1.7** "Court" means the U.S. District Court for the Northern District of California.

**1.8** "Defendant" means DirectToU, LLC.

**1.9** "Defendant's Counsel" means Joel Griswold and Bonnie Keane DelGobbo of Baker & Hostetler LLP.

**1.10**    "Defendant's Website" means any U.S. website, application, program, and/or software presently or previously owned, managed, controlled, or operated by or on behalf of Defendant.

**1.11**    "Effective Date" means the date ten (10) days after which all of the events and conditions specified in Paragraph 9.1 have been met and have occurred.

**1.12**    "Escrow Account" means the separate, interest-bearing escrow account to be established by the Settlement Administrator under terms acceptable to all Parties at a depository institution insured by the Federal Deposit Insurance Corporation or a federally insured credit union insured by the National Credit Union Share Insurance Fund. The Settlement Fund shall be deposited by Defendant into the Escrow Account in accordance with the terms of this Agreement and the money in the Escrow Account shall be invested in the following types of accounts and/or instruments and no other: (i) demand deposit accounts and/or (ii) time deposit accounts and certificates of deposit, in either case with maturities of thirty (30) days or less. The costs of establishing and maintaining the Escrow Account shall be paid from the Settlement Fund. The Escrow Account shall be maintained by the Settlement Administrator.

**1.13**    "Fee Award" means the amount of attorney fees and reimbursement of expenses awarded by the Court to Class Counsel, which will be paid out of the Settlement Fund.

**1.14**    "Final" means one business day following the latest of the following events: (i) the date upon which the time expires for filing or noticing any appeal of the Court's Final Judgment approving the Settlement Agreement; (ii) if there is an appeal or appeals, other than an appeal or appeals solely with respect to the Fee Award, the date of completion, in a manner that finally affirms and leaves in place the Final Judgment without any material modification, of all proceedings arising out of the appeal or appeals (including, but not limited to, the expiration of all

Docusign Envelope ID: FA1E78B5-6425-4991-B1D1-B4DF46C361BB

deadlines for motions for reconsideration or petitions for review and/or *certiorari*, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal or appeals following decisions on remand); or (iii) the date of final dismissal of any appeal or the final dismissal of any proceeding on *certiorari*.

    **1.15** "Final Approval Hearing" means the hearing before the Court where the Parties will request the Final Judgment to be entered by the Court approving the Settlement Agreement, the Fee Award, and the Incentive Award to the Class Representative.

    **1.16** "Final Judgment" means the Final Judgment and Order to be entered by the Court in a form that is mutually agreeable to the Parties approving the Agreement after the Final Approval Hearing and dismissing the Action with prejudice.

    **1.17** "Incentive Award" means the incentive/service award for the Class Representative as approved by the Court, as set forth in Paragraph 8.3.

    **1.18** "Notice" means the notice of this proposed Class Action Settlement Agreement and Final Approval Hearing, which is to be sent to the Settlement Class substantially in the manner set forth in this Agreement, is consistent with the requirements of Due Process and is substantially in the form of Exhibits B and C hereto.

    **1.19** "Notice Date" means the date by which the Notice set forth in Paragraph 4.1 is complete, which shall be no later than sixty (60) days after Preliminary Approval.

    **1.20** "Objection/Exclusion Deadline" means the date by which a written objection to this Settlement Agreement or a request for exclusion submitted by a Person within the Settlement Class must be made, which shall be designated as thirty (30) days after the Notice Date, or such other date as ordered by the Court.

**1.21**    "Operative Complaint" means the First Amended Complaint filed on October 1, 2024.

**1.22**    "Plaintiffs" means Jonathan Hoang To and the Settlement Class Members.

**1.23**    "Preliminary Approval" means the Court's certification of the Settlement Class for settlement purposes, preliminary approval of this Settlement Agreement, and approval of the form and manner of the Notice.

**1.24**    "Preliminary Approval Order" means the order preliminarily approving the Settlement Agreement, certifying the Settlement Class for settlement purposes, and directing notice thereof to the Settlement Class, which will be agreed upon by the Parties and submitted to the Court in conjunction with Plaintiffs' motion for preliminary approval of the Agreement.

**1.25**    "Released Claims" means any and all actual, potential, filed, fixed or contingent, claimed or unclaimed, suspected or unsuspected, claims, demands, liabilities, rights, causes of action, contracts or agreements, extra contractual claims, damages, punitive, exemplary or multiplied damages, expenses, costs, attorneys' fees, and/or obligations, whether in law or in equity, accrued or un-accrued, direct, individual or representative, of every nature and description whatsoever, arising out of any facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures relating to or arising out of the collection of information and/or the sharing of information with third parties which identifies a person as having requested or obtained specific video materials or services, including all claims that were alleged or brought or could have been alleged or brought in the Action. Nothing herein is intended to release any claims any governmental agency or governmental actor has against Defendant.

**1.26**    "Released Parties" means Defendant DirectToU, LLC as well as any and all of each of their respective present or past heirs, executors, estates, administrators, predecessors,

successors, assigns, direct or indirect parent companies, subsidiaries, licensors, licensees, associates, affiliates, employers, employees, agents, consultants, independent contractors, insurers, directors, managers, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, underwriters, owners, shareholders, lenders, auditors, investment advisors, legal representatives, successors in interest, assigns and companies, firms, trusts, and corporations, and each of their respective aforementioned persons and entities .

1.27    "Releasing Parties" means Plaintiff and those Settlement Class Members who do not timely opt out of the Settlement Class, and anyone asserting an interest by, through, or on behalf of them.

1.28    "Settlement Administration Expenses" means up to one hundred twenty-five thousand dollars ($125,000.00) in expenses incurred by the Settlement Administrator in providing Notice, processing claims, responding to inquiries from members of the Settlement Class, mailing checks for Approved Claims, and related services. The Settlement Administration Expenses shall be paid out of the Settlement Fund.

1.29    "Settlement Administrator" means a reputable settlement administration company that has been selected by the Parties and approved by the Court to oversee the distribution of Notice, as well as the processing and payment of Approved Claims to the Settlement Class as set forth in this Agreement.

1.30    "Settlement Class" means all persons who reside in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval. Also included in the

"Settlement Class" are all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval. Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this Action and members of their families; (2) the Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, agents, attorneys, and employees; (3) persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors or assigns of any such excluded persons.

**1.31** "Settlement Class Member" means a Person who falls within the definition of the Settlement Class as set forth above and who has not submitted a valid request for exclusion.

a. "Settlement Fund" means the non-reversionary cash fund that shall be established by or on behalf of Defendant in the total amount of one million seven hundred fifty thousand dollars ($1,750,000.00 USD) to be deposited into the Escrow Account, according to the schedule set forth herein, plus all interest earned thereon. From the Settlement Fund, the Settlement Administrator shall pay all Approved Claims made by Settlement Class Members, Settlement Administration Expenses, any Incentive Award to the Class Representative, and any Fee Award to Class Counsel. The Settlement Fund shall be kept in the Escrow Account with permissions granted to the Settlement Administrator to access said funds until such time as the above- listed payments are made. The Settlement Fund includes all interest that shall accrue on the sums deposited in the Escrow Account. The Settlement Administrator shall be responsible for all tax

filings with respect to any earnings on the Settlement Fund and the payment of all taxes that may be due on such earnings. The Settlement Fund represents the total extent of Defendant's monetary obligations under this Agreement. In no event shall Defendant's total monetary obligation with respect to this agreement exceed $1,750,000.00 USD, plus the interest earned on such income, except that if the class size increases by more than 5% above 291,128, the Settlement Fund will increase proportionally (*i.e.*, if the Class size is 7% more than 291,128, the Settlement Fund will increase by 2%).

## 2. SETTLEMENT RELIEF.

### 2.1 Payments to Settlement Class Members.

**(a)** Defendant shall pay or cause to be paid into the Escrow Account the amount of the Settlement Fund ($1,750,000 USD), as specified in Paragraph 1.32 of this Agreement, within fourteen (14) days after entry of the Final Judgment. No appeal shall affect the timing of this Paragraph's funding obligation.

**(b)** Settlement Class Members shall have until the Claims Deadline to submit an Approved Claim. Each Settlement Class Member with an Approved Claim shall be entitled to a *pro rata* portion of the Settlement Fund by electronic payment method approved by the Settlement Administrator or check after deducting the Settlement Administration Expenses, any Fee Award, and any Incentive Award, provided that they satisfy the criteria for the cash payment portion set out in the definition of Approved Claim.

**(c)** The Settlement Administrator shall pay from the Settlement Fund all Approved Claims by (i) electronic payment method approved by the Settlement Administrator or (ii) check with said checks being sent via first class U.S. mail to the Settlement Class Members

who submitted such Approved Claims. Payments to all Settlement Class Members with Approved Claims shall be made within forty-five (45) days after the Effective Date.

(d)     All cash payments issued to Settlement Class Members via check will state on the face of the check that it will expire and become null and void unless cashed within one hundred and eighty (180) days after the date of issuance. To the extent within one-hundred eighty (180) days after the date of issuance of payment any checks issued to a Settlement Class Member are not cashed or there remain residual funds from failed electronic payments, such uncashed check funds and residual funds from failed electronic payments shall be redistributed on a *pro rata* basis (after first deducting any necessary settlement administration expenses from such uncashed check funds) to all Settlement Class Members who cashed checks during the initial distribution and who received their electronic payments, but only to the extent each Settlement Class Member would receive at least $10.00 in any such secondary distribution and if otherwise feasible. To the extent each Settlement Class Member would receive less than $10.00 in any such secondary distribution or if a secondary distribution would be otherwise infeasible (as determined by the Settlement Administrator or by mutual agreement of the Parties), any uncashed check funds shall, subject to Court approval, revert to a not-for-profit legal aid organization mutually selected by the Parties and approved by the Court.

(e)     Upon payment of the Settlement Fund into the Escrow Account, all risk of loss with respect to the Settlement shall pass to the Escrow Account. No money shall be distributed out of the Escrow Account until after the Effective Date has occurred. In the event that the Effective Date does not occur, all money in the Escrow Account will be returned to Defendant, less the amount specified in the amount specified in Paragraph 6.3 of this Agreement.

2.2 **Prospective Relief.** <u>Within</u> 45 days of the Preliminary Approval Order, Defendant will modify the Facebook Pixel settings on Defendant's Website so that specific product information is not shared with Facebook. Additionally, Defendant will not knowingly share information which identifies a person as having requested or obtained specific video materials or services with third parties, except as permitted by the VPPA. Defendant will remain bound by the obligations in this Paragraph 2.2 unless and until the VPPA is amended, repealed, or otherwise invalidated (including by judicial decision on the use of website pixel technology by the United States Supreme Court or any federal court of appeals). Additionally, solely with respect to customers who provide California addresses to Defendant, Defendant will remain bound by the obligations in this Paragraph 2.2 unless and until Cal. Civ. Code § 1799.3 is amended, repealed, or otherwise invalidated (including by judicial decision on the use of website pixel technology by the California Supreme Court). Nothing herein shall prohibit the use of the Facebook Pixel where the disclosure of information to Facebook does not identify specific video materials that a user has requested or obtained, nor does this Agreement prohibit the sharing of information that would otherwise be permitted under the VPPA (or, solely with respect to customers who provide California addresses, under Cal. Civ. Code § 1799.3).

3. **RELEASE.**

3.1 The obligations incurred pursuant to this Settlement Agreement shall be a full and final disposition of the Action and any and all Released Claims, as against all Released Parties.

3.2 Upon the Effective Date, the Releasing Parties, and each of them, shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Parties, and each of them. Further, upon the Effective Date, and to the fullest extent permitted by law, each Settlement Class

Member, shall, either directly, indirectly, representatively, or in any capacity, be permanently barred and enjoined from filing, commencing, prosecuting, intervening in, or participating (as a class member or otherwise) in any lawsuit, action, or other proceeding in any jurisdiction (other than participation in the Settlement as provided herein) against any Released Party based on the Released Claims.

## 4. NOTICE TO THE CLASS.

4.1     The Notice Plan shall consist of the following:

(a)     *Settlement Class List*. No later than fourteen (14) days after Preliminary Approval, Defendant shall produce to the Settlement Administrator on a confidential basis an electronic list from its records that includes the names and email addresses, to the extent available, belonging to Persons within the Settlement Class. Class Counsel's assent to this Agreement shall constitute consent on behalf of the Settlement Class to disclose this information, consistent with the written consent provisions of the VPPA. This electronic document shall be called the "Class List," and shall be provided on a confidential basis directly to the Settlement Administrator. Class Counsel and the Settlement Administrator shall not use the Settlement Class List, or any information contained within it, for any other purposes other than administering the settlement, and shall take reasonable measures to protect the information from any third-party disclosure. Class Counsel and the Settlement Administrator may not use the Class List to send advertisements, solicitations, or communications to the Settlement Class to solicit Class members to retain Class Counsel for any other matters or disputes.

(b)     *Direct Notice*. In the event that the Court preliminarily approves the Settlement, no later than the Notice Date, the Settlement Administrator shall send Notice via email

substantially in the form attached as Exhibit B, along with an electronic link to the Claim Form, to all Settlement Class Members for whom a valid email address is available in the Class List.

      **(c)**    *Reminder Notice.* Both thirty (30) days prior to the Claims Deadline and seven (7) days prior to the Claims Deadline, the Settlement Administrator shall again send Notice via email substantially in the form attached as Exhibit B (with minor, non-material modifications to indicate that it is a reminder email rather than an initial notice), along with an electronic link to the Claim Form, to all Settlement Class Members for whom a valid email address is available in the Class List.

      **(d)**    For those emails that bounce back, the Settlement Administrator shall promptly perform an in-depth search for a valid email address and resend the Long-Form Notice to that updated email address. If the email bounces back again, or no other valid email address can be found, the Settlement Administrator shall mail a post card notice, attached as Exhibit F to the Settlement Class Member's most recent mailing address to the extent a mailing address is available in Defendant's records or can be located by the Settlement Administrator. If the postcard notice is returned to the Settlement Administrator with a forwarding address, it will be automatically re-mailed to the updated address. If the post card Notice is returned without a forwarding address, it will be sent through an advanced address search process in an effort to find a more current address for the record. If an updated address is obtained through the advanced search process, the Settlement Administrator will re-mail the notice to the updated address.

      **(e)**    *Settlement Website.* Within fourteen (14) days from entry of the Preliminary Approval Order, Notice shall be provided on a website which shall be administered and maintained by the Settlement Administrator and shall include the ability to file Claim Forms on-line. The Notice provided on the Settlement Website shall be substantially in the form of Exhibit C hereto.

(f)     Contact from Class Counsel. Class Counsel, in its capacity as counsel to Settlement Class Members, may from time-to-time contact Settlement Class Members to provide information about the Settlement Agreement and to answer any questions Settlement Class Members may have about the Settlement Agreement.

4.2     The Notice shall advise the Settlement Class of their rights, including the right to be excluded from, comment upon, and/or object to the Settlement Agreement or any of its terms. The Notice shall specify that any objection to the Settlement Agreement, and any papers submitted in support of said objection, shall be considered by the Court at the Final Approval Hearing only if, on or before the Objection/Exclusion Deadline approved by the Court and specified in the Notice, the Person making the objection files notice of an intention to do so and at the same time files copies of such papers he or she proposes to be submitted at the Final Approval Hearing with the Clerk of the Court, or alternatively, if the objection is from a Class Member represented by counsel, files any objection is from a Class Member represented by counsel, files any objection through the Court's CM/ECF system, and (b) sends copies of such papers by mail, hand, or overnight delivery service to Class Counsel and Defendant's Counsel.

4.3     Any Settlement Class Member who intends to object to this Agreement must present the objection in writing, which must be personally signed by the objector, and must include (1) the objector's name and address; (2) an explanation of the basis upon which the objector claims to be a Settlement Class Member, including an attestation under penalty of perjury; (3) all grounds for the objection, including citations to legal authority and evidence supporting the objection; (4) the name and contact information of any and all attorneys representing, advising, or in any way assisting the objector in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection (the "Objecting Attorneys"); and (5) a statement

indicating whether the objector intends to appear at the Final Approval Hearing (either personally or through counsel who files an appearance with the Court). No other person may sign on behalf of the objector, including an objector's attorney. The objection must be filed in the U.S. District Court for the Northern District of California, Case No. 3:24-cv-06447, on or before the Objection/Exclusion Deadline.

4.4     If a Settlement Class Member or any of the Objecting Attorneys has objected to any class action settlement where the objector or the Objecting Attorneys asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any modification to the settlement, then the objection must include a statement identifying each such case by full case caption and amount of payment received. Any challenge to the Settlement Agreement, the Final Order, or the Final Judgment shall be pursuant to appeal under the applicable appellate rules and not through a collateral attack.

4.5     A Settlement Class Member may request to be excluded from the Settlement Class by sending a written request postmarked on or before the Objection/Exclusion Deadline approved by the Court and specified in the Notice. To exercise the right to be excluded, a Person in the Settlement Class must timely send a written request for exclusion to the Settlement Administrator as specified in the Notice, providing his/her name and address, his/her signature, the name and number of the case, and a statement that he or she wishes to be excluded from the Settlement Class for purposes of this Settlement. A request to be excluded that does not include all of this information, or that is sent to an address other than that designated in the Notice, or that is not postmarked within the time specified, shall be invalid, and the Person(s) serving such a request shall be a member(s) of the Settlement Class and shall be bound as a Settlement Class Member by this Agreement, if approved. Any member of the Settlement Class who validly elects to be

excluded from this Agreement shall not: (i) be bound by any orders or the Final Judgment; (ii) be entitled to relief under this Settlement Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement. The request for exclusion must be personally signed by the Person requesting exclusion. No other person may sign on behalf of the Person seeking exclusion, including the Person's attorney. To be valid, a request for exclusion must be postmarked or received by the date specified in the Notice. No Settlement Class Member may submit both an objection to the Settlement and a request to be excluded from the Settlement. If any Settlement Class Member submits both an objection to the Settlement and a request to be excluded from the Settlement, the objection will be deemed null and void.

4.6     The Final Approval Hearing shall be no earlier than ninety (90) days after the Notice described in Paragraph 4.1(f) is provided.

4.7     Any Settlement Class Member who does not, using the procedures set forth in this Agreement and the Notice, either seek exclusion from the Settlement Class or timely file a valid Claim Form shall not be entitled to receive any payment or benefits pursuant to this Agreement, but will otherwise be bound by all of the terms of this Agreement, including the terms of the Final Judgment to be entered in the Action and the Releases provided for in the Agreement, and will be barred from bringing any action against any of the Released Parties arising from, related to or otherwise concerning in any way the Released Claims.

## 5.     SETTLEMENT ADMINISTRATION.

5.1     The Settlement Administrator shall, under the supervision of the Court, administer the relief provided by this Settlement Agreement by processing Claim Forms in a rational, responsive, cost effective, and timely manner. The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement. The Settlement Administrator

shall maintain all such records as are required by applicable law in accordance with its normal business ~~practices~~ and such records will be made available to Class Counsel and Defendant's Counsel upon request. The Settlement Administrator shall also provide reports and other information to the Court as the Court may require. The Settlement Administrator shall provide Class Counsel and Defendant's Counsel with information concerning Notice, administration, and implementation of the Settlement Agreement. Should the Court request, the Parties shall submit a timely report to the Court summarizing the work performed by the Settlement Administrator, including a report of all amounts from the Settlement Fund paid to Settlement Class Members on account of Approved Claims. Without limiting the foregoing, the Settlement Administrator shall:

(a)     Forward to Defendant's Counsel, with copies to Class Counsel, all original documents and other materials received in connection with the administration of the Settlement, and all copies thereof, within thirty (30) days after the date on which all Claim Forms have been finally approved or disallowed in accordance with the terms of this Agreement;

(b)     Receive requests to be excluded from the Settlement Class and other requests and promptly provide to Class Counsel and Defendant's Counsel copies thereof. If the Settlement Administrator receives any exclusion forms or other requests after the deadline for the submission of such forms and requests, the Settlement Administrator shall promptly provide copies thereof to Class Counsel and Defendant's Counsel; including without limitation, reports regarding the number of Claim Forms received, the number approved by the Settlement Administrator, and the categorization and description of Claim Forms rejected, in whole or in part, by the Settlement Administrator; and

(c)     Provide weekly reports to Class Counsel and Defendant's Counsel, including without limitation, reports regarding the number of Claim Forms received, the number

approved by the Settlement Administrator, and the categorization and description of Claim Forms rejected, in whole or in part, by the Settlement Administrator; and

   (d)   Make available for inspection by Class Counsel or Defendant's Counsel the Claim Forms received by the Settlement Administrator at any time upon reasonable notice.

   5.2   The Settlement Administrator shall be obliged to employ reasonable procedures to screen claims for abuse or fraud and deny Claim Forms where there is evidence of abuse or fraud. The Settlement Administrator will reject any claim that does not comply in any material respect with the instructions on the Claim Form or the terms of Paragraphs 1.2 and/or 1.3, above, or is submitted after the Claims Deadline. Subject to practical limitations to be determined by the Settlement Administrator in its sole discretion, each claimant who submits an invalid Claim Form to the Settlement Administrator shall be given a notice of the Claim Form's deficiency and an opportunity to cure the deficiency within twenty-one (21) days of the date of the notice. The Settlement Administrator may contact any Person who has submitted a Claim Form to obtain additional information necessary to verify the Claim Form.

   5.3   Defendant's Counsel and Class Counsel shall have the right to challenge the acceptance or rejection of a Claim Form submitted by Settlement Class Members and to obtain and review supporting documentation relating to such Claim Form. The Settlement Administrator shall follow any agreed decisions of Class Counsel and Defendant's Counsel as to the validity of any disputed submitted Claim Form. To the extent Class Counsel and Defendant's Counsel are not able to agree on the disposition of a challenge, the disputed claim shall be submitted to the Court for a binding determination.

5.4　　In exercise of its duties outlined in this Agreement, the Settlement Administrator shall have the right to reasonably request additional information from the Parties or any Settlement Class Member.

## 6.　　TERMINATION OF SETTLEMENT.

6.1　　Subject to Paragraphs 9.1-9.3 below, Defendant or the Class Representative on behalf of the Settlement Class, shall have the right to terminate this Agreement by providing written notice ("Termination Notice"), on or before the Effective Date, to all the other Parties hereto within twenty-one (21) days of any of the following events: (i) the Court's refusal to grant Preliminary Approval of this Agreement in any material respect, (ii) the Court's refusal to grant final approval of this Agreement in any material respect, (iii) the Court's refusal to enter the Final Judgment in this Action in any material respect, (iv) the date upon which the Final Judgment is modified or reversed in any material respect by the Court of Appeals or the Supreme Court; (v) the date upon which an Alternative Judgment, as defined in Paragraph 9.1(d) of this Agreement is modified or reversed in any material respect by the Court of Appeals or the Supreme Court.

6.2　　Subject to Paragraphs 9.1-9.3 below, Defendant shall have the right, but not the obligation, in its sole discretion, to terminate this Agreement by providing written notice to Class Counsel within twenty-five (25) days of the following events: (i) individuals comprising more than five percent (5%) of the Settlement Class in total have timely and validly opted out of and/or objected to the Agreement; or (ii) the Class Representative and his agents, or any other individuals operating at his direction or in coordination with him, or Class Counsel, file or threaten to file any arbitrations or additional lawsuits against Defendant related to the Released Claims at any time prior to Final Judgment.

**6.3** If Defendant seeks to terminate the Agreement on the basis of 6.2 above, the Parties agree that any dispute as to whether Defendant may invoke section 6.2 to terminate the Agreement that they cannot resolve on their own after reasonable, good faith efforts, will be submitted to the Court for binding determination. In the event this Agreement is voided, terminated, or canceled due to lack of approval from the Court or any other reason, costs incurred by the Administrator up to the date the Agreement is terminated shall be paid for out of any interest that has accrued on the Settlement Fund. Any remaining costs shall be split evenly between Defendant and Class Counsel.

**6.4** The Parties agree that the Court's failure to approve, in whole or in part, the attorneys' fees payment to the Class Counsel and/or the Incentive Award set forth in Paragraph 8 below shall not prevent the Agreement from becoming effective, nor shall it be grounds for termination. The procedures for any application for approval of attorneys' fees, expenses, or Incentive Awards are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement.

**7.     PRELIMINARY APPROVAL ORDER AND FINAL JUDGMENT.**

**7.1** Promptly after the execution of this Settlement Agreement, Class Counsel shall submit this Agreement together with its Exhibits to the Court and shall move the Court for Preliminary Approval of the settlement set forth in this Agreement; certification of the Settlement Class for settlement purposes only; appointment of Class Counsel and the Class Representative; and entry of a Preliminary Approval Order, which order shall set a Final Approval Hearing date and approve the Notice and Claim Form for dissemination substantially in the form of Exhibits A, B, and C hereto. Defendant shall have no obligation to make separate filings in support of the Motion for Preliminary Approval. The Preliminary Approval Order, which shall be substantially similar to Exhibit D, shall also authorize the Parties, without further approval from the Court, to

agree to and adopt such amendments, modifications and expansions of the Settlement Agreement and its implementing documents (including all exhibits to this Agreement) so long as they are consistent in all material respects with the terms of the Settlement Agreement and do not limit or impair the rights of the Settlement Class.

7.2    Defendant's agreement as to certification of the Settlement Class is solely for purposes of effectuating the Settlement and no other purpose. Defendant and Released Parties retain all of their objections, arguments, and defenses with respect to class certification and any other issue, and reserve all rights to contest class certification and any other issue if the Settlement set out in this Agreement does not result in entry of the Final Judgment, if the Court's approval is reversed or vacated on appeal, if this this Settlement is terminated as provided herein, or if the Settlement set forth in this Settlement otherwise fails to become effective. The Parties acknowledges that there has been no stipulation to any classes or certification of any classes for any purpose other than effectuating the Settlement, and that if the Settlement set forth in this Settlement Agreement is not finally approved, if the Court's approval is reversed or vacated  on appeal, if this Settlement Agreement is terminated as provided herein or if the Settlement set forth in this Settlement Agreement otherwise fails to become effective, this agreement as to certification of the Settlement Class becomes null and void ab initio, and this Settlement Agreement or any other settlement-related statement may not be cited regarding certification of the Class, or in support of an argument for certifying any class for any purpose related to this Action or any other proceeding.

7.3    At the time of the submission of this Agreement to the Court as described above, Class Counsel shall request that, after Notice is given, the Court hold a Final Approval Hearing and approve the settlement of the Action as set forth herein.

**7.4**    No later than fourteen (14) before the Final Approval Hearing, Plaintiff shall move the Court for an entry of Final Judgment in a form substantially similar to Exhibit E, which will (among other things):

(a)    find that the Court has personal jurisdiction over all Settlement Class Members and that the Court has subject matter jurisdiction to approve the Agreement, including all exhibits thereto;

(b)    approve the Settlement Agreement and the proposed settlement as fair, reasonable, and adequate as to, and in the best interests of, the Settlement Class Members; direct the Parties and their counsel to implement and consummate the Agreement according to its terms and provisions; and declare the Agreement to be binding on, and have *res judicata* and preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs and Releasing Parties;

(c)    find that the Notice implemented pursuant to the Agreement (1) constitutes the best practicable notice under the circumstances; (2) constitutes notice that is reasonably calculated, under the circumstances, to apprise the Settlement Class of the pendency of the Action, their right to object to or exclude themselves from the proposed Agreement, and to appear at the Final Approval Hearing; (3) is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (4) meets all applicable requirements of the Federal Rules of Civil Procedure, the Due Process Clause of the United States Constitution, and the rules of the Court;

(d)    find that the Class Representatives and Class Counsel adequately represent the Settlement Class for purposes of entering into and implementing the Agreement;

(e)     dismiss the Action (including all individual claims and Settlement Class Claims presented thereby) on the merits and with prejudice, without fees or costs to any party except as provided in the Settlement Agreement;

(f)     incorporate the Release set forth above, make the Release effective as of the date of the Effective Date, and forever discharge the Released Parties as set forth herein;

(g)     permanently bar and enjoin all Settlement Class Members who have not been properly excluded from the respective Settlement Class from filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in, any lawsuit or other action in any jurisdiction based on the Released Claims;

(h)     without affecting the finality of the Final Judgment for purposes of appeal, retain jurisdiction as to all matters relating to administration, consummation, enforcement, and interpretation of the Settlement Agreement and the Final Judgment, and for any other necessary purpose; and

(i)     incorporate any other provisions, as the Court deems necessary and just.

## 8.     CLASS COUNSEL'S ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES; INCENTIVE AWARD.

8.1     Defendant agrees that Class Counsel shall be entitled to an award of reasonable attorneys' fees of up to 25% of the Settlement Fund, and costs of up to $20,000, subject to Court approval . Class Payment of the Fee Award shall be made from the Settlement Fund and should the Court award less than the amount sought by Class Counsel, the difference in the amount sought and the amount ultimately awarded pursuant to this Paragraph shall remain in the Settlement Fund for distribution to eligible Settlement Class Members.

Docusign Envelope ID: FA1E78B5-6425-4904-B1D1-B4DF46C361BB

8.2    The Fee Award shall be payable from the Settlement Fund within thirty (30) days after the Effective Date, provided all tax I.D. numbers for Class Counsel have been provided to the Settlement Administrator.

8.3    Class Counsel intends to file a motion for Court approval of an Incentive Award for the Class Representative, to paid from the Settlement Fund, in addition to any funds the Class Representative stands to otherwise receive from the Settlement. With no consideration having been given or received for this limitation, the Class Representative will seek no more than five thousand dollars ($5,000.00) as an Incentive Award. Should the Court award less than this amount, the difference in the amount sought and the amount ultimately awarded pursuant to this Paragraph shall remain in the Settlement Fund for distribution to eligible Settlement Class Members. Such award shall be paid from the Settlement Fund (in the form of a check to the Class Representative that is sent care of Class Counsel), within thirty (30) days after the Effective Date.

9.    **CONDITIONS OF SETTLEMENT, EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION.**

9.1    The Effective Date of this Settlement Agreement shall not occur unless and until each of the following events occurs and shall be the date upon which the last (in time) of the following events occurs:

(a)    The Parties and their counsel have executed this Agreement;

(b)    The Court has entered the Preliminary Approval Order;

(c)    The Court has entered an order finally approving the Agreement, following Notice to the Settlement Class and a Final Approval Hearing, as provided in the Federal Rules of Civil Procedure, and has entered the Final Judgment, or a judgment consistent with this Agreement in all material respects; and The Final Judgment has become Final, as defined above, or, in the

event that the Court enters an order and final judgment in a form other than that provided above ("Alternative Judgment") and that has the consent of the Parties, such Alternative Judgment becomes Final.

9.2     If some or all of the conditions specified in Paragraph 9.1 are not met, or in the event that this Agreement is not approved by the Court, or the settlement set forth in this Agreement is terminated or fails to become effective in accordance with its terms, then this Settlement Agreement shall be canceled and terminated subject to Paragraph 6.1 unless Class Counsel and Defendant's Counsel mutually agree in writing to proceed with this Agreement. If any Party is in material breach of the terms hereof, and fails to cure such material breach within 30 days of notice, any other Party, provided that it is in substantial compliance with the terms of this Agreement, may terminate this Agreement on notice to all of the settling parties.

9.3     If this Agreement is terminated or fails to become effective for the reasons set forth in Paragraphs 6.1 and 9.1-9.2 above, the Parties shall be restored to their respective positions in the Action as if this Agreement had never been entered into. In such event, any Final Judgment or other order entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*, and the Parties shall be returned to the *status quo ante* with respect to the Action as if this Agreement had never been entered into

9.4     If any Party institutes any legal action or other proceeding against another Party or Parties to enforce this Agreement or to declare rights and/or obligations under this Agreement, the prevailing party will be entitled to recover from the unsuccessful Party or Parties reasonable attorneys' fees and costs incurred in connection with any such action.

## 10.     MISCELLANEOUS PROVISIONS.

**10.1**     The Parties (a) acknowledge that it is their intent to consummate this Settlement Agreement; and (b) agree, subject to their fiduciary and other legal obligations, to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Agreement, to exercise their reasonable good-faith efforts to accomplish the foregoing terms and conditions of this Agreement, to secure Final Judgment, and to defend the Final Judgment through any and all appeals. Class Counsel and Defendant's Counsel agree to cooperate with one another in seeking Court approval of the Settlement Agreement, entry of the Preliminary Approval Order, and the Final Judgment, and promptly to agree upon and execute all such other documentation as may be reasonably required to obtain final approval of the agreement via Final Judgment.

**10.2**     The Parties intend this Settlement Agreement to be a final and complete resolution of all disputes between them with respect to the Released Claims by Plaintiff, the Settlement Class and each or any of them, on the one hand, against the Released Parties, and each or any of the Released Parties, on the other hand. Accordingly, the Parties agree not to assert in any forum that the Action was brought by Plaintiff or defended by Defendant, or each or any of them, in bad faith or on a frivolous basis.

**10.3**     The Parties have relied upon the advice and representation of counsel, selected by them, concerning their respective legal liability for the claims hereby released. The Parties have read and understand fully the above and foregoing agreement and have been fully advised as to the legal effect thereof by counsel of their own selection and intend to be legally bound by the same.

**10.4**     Whether or not the Effective Date occurs or the Settlement Agreement is terminated, neither this Agreement nor the settlement contained herein, nor any statement made,

act performed, or document executed pursuant to or in furtherance of this Agreement or the settlement:

       **(a)** is, may be deemed, or shall be used, offered or received against the Released Parties, or each or any of them, as an admission, concession or evidence of, the validity of any Released Claims, the truth of any fact alleged by the Plaintiff, the deficiency of any defense that has been or could have been asserted in the Action, the violation of any law or statute, the reasonableness of the settlement amount or the Fee Award, or of any alleged wrongdoing, liability, negligence, or fault of the Released Parties, or any of them;

       **(b)** is, may be deemed, or shall be used, offered or received against Defendant, as an admission, concession or evidence of any fault, misrepresentation or omission with respect to any statement or written document approved or made by the Released Parties, or any of them;

       **(c)** is, may be deemed, or shall be used, offered or received against the Released Parties, or each or any of them, as an admission or concession with respect to any liability, negligence, fault or wrongdoing as against any Released Parties, in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. However, the settlement, this Agreement, and any acts performed and/or documents executed in furtherance of or pursuant to this Agreement and/or Settlement may be used in any proceedings as may be necessary to effectuate the provisions of this Agreement. Further, if this Settlement Agreement is approved by the Court, any Party or any of the Released Parties may file this Agreement and/or the Final Judgment in any action that may be brought against such Party or Parties in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim;

**(d)** is, may be deemed, or shall be construed against Plaintiff, the Settlement Class, the Releasing Parties, or each or any of them, or against the Released Parties, or each or any of them, as an admission or concession that the consideration to be given hereunder represents an amount equal to, less than or greater than that amount that could have or would have been recovered after trial; and

**(e)** is, may be deemed, or shall be construed as or received in evidence as an admission or concession against Plaintiff, the Settlement Class, the Releasing Parties, or each and any of them, or against the Released Parties, or each or any of them, that any of Plaintiff's claims are with or without merit or that damages recoverable in the Action would have exceeded or would have been less than any particular amount.

**10.5** The headings used herein are used for the purpose of convenience only and are not meant to have legal effect.

**10.6** The waiver by one Party of any breach of this Agreement by any other Party shall not be deemed as a waiver of any other prior or subsequent breaches of this Agreement.

**10.7** All of the Exhibits to this Agreement are material and integral parts thereof and are fully incorporated herein by this reference.

**10.8** This Agreement and its Exhibits set forth the entire agreement and understanding of the Parties with respect to the matters set forth herein, and supersede all prior negotiations, agreements, arrangements and undertakings with respect to the matters set forth herein. No representations, warranties or inducements have been made to any Party concerning this Settlement Agreement or its Exhibits other than the representations, warranties and covenants contained and memorialized in such documents. This Agreement may be amended or modified

only by a written instrument signed by or on behalf of all Parties or their respective successors-in-interest.

**10.9**    Except as otherwise provided herein, each Party shall bear its own costs.

**10.10**    Plaintiff represents and warrants that he has not assigned any claim or right or interest therein as against the Released Parties to any other Person or Party and that he is fully entitled to release the same.

**10.11**    Each counsel or other Person executing this Settlement Agreement, any of its Exhibits, or any related settlement documents on behalf of any Party hereto, hereby warrants and represents that such Person has the full authority to do so and has the authority to take appropriate action required or permitted to be taken pursuant to the Agreement to effectuate its terms. Class Counsel in particular warrants that they are authorized to execute this Settlement Agreement on behalf of Plaintiffs and the Settlement Class (subject to final approval by the Court after notice to all Settlement Class Members), and that all actions necessary for the execution of this Settlement Agreement have been taken.

**10.12**    This Agreement may be executed in one or more counterparts. Signature by digital means, facsimile, or in PDF format will constitute sufficient execution of this Agreement. All executed counterparts and each of them shall be deemed to be one and the same instrument. A complete set of original executed counterparts shall be filed with the Court if the Court so requests.

**10.13**    This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto and the Released Parties.

**10.14**    This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of California.

**10.15**   Defendant consents to personal and subject matter jurisdiction in this Court for purposes of implementing and enforcing this Settlement Agreement.

**10.16**   The Agreement is deemed to have been prepared by counsel for all Parties, as a result of arm's-length negotiations among the Parties. Because all Parties have contributed substantially and materially to the preparation of this Agreement, it shall not be construed more strictly against one Party than another.

**10.17**   Where this Agreement requires notice to the Parties, such notice shall be in writing sent to the undersigned counsel, Joel Griswold and Bonnie Keane DelGobbo of Baker & Hostetler LLP for Defendant and Julian Hammond of HammondLaw, P.C. for Plaintiff and Settlement Class Members, and shall be delivered personally, by courier; by FedEx; by UPS; by US mail that provides tracking information and delivery verification such as, without limitation, Express Mail, Priority Mail, or US mail with a return receipt; or via email. All notices (other than those delivered via email) shall be deemed to have been duly given or made as of the date delivered or if delivery is refused, then as of the date presented. Any notice delivered via email shall be deemed to have been duly given or made as of the date that the sender of the email receives a written confirmation of receipt from the intended recipient (which, if delivered via email, may only be in the form of a non-automated email response). Notices may also be delivered via any other method and shall be deemed duly given or made upon actual receipt by the intended recipient.

**IT IS SO AGREED TO BY THE PARTIES:**

Dated:                            Jonathan Hoang To


                                  By:_____
                                  Jonathan Hoang To, individually and as
                                  Representative of the Class

Dated: 10/23/2024          DirectToU, LLC

By: _Bruce Ogilvie_____
Name: Bruce Ogilvie
Title: Chairman


IT IS SO STIPULATED BY COUSNEL:

Dated:                HammondLaw, P.C.
By:_____
Julian Hammond, Class Counsel

Dated:                Baker & Hostetler LLP
By:_____
Joel Griswold, Defense Counsel

**10.15**  Defendant consents to personal and subject matter jurisdiction in this Court for purposes of implementing and enforcing this Settlement Agreement.

**10.16**  The Agreement is deemed to have been prepared by counsel for all Parties, as a result of arm's-length negotiations among the Parties. Because all Parties have contributed substantially and materially to the preparation of this Agreement, it shall not be construed more strictly against one Party than another.

**10.17**  Where this Agreement requires notice to the Parties, such notice shall be in writing sent to the undersigned counsel, Joel Griswold and Bonnie Keane DelGobbo of Baker & Hostetler LLP for Defendant and Julian Hammond of HammondLaw, P.C. for Plaintiff and Settlement Class Members, and shall be delivered personally, by courier; by FedEx; by UPS; by US mail that provides tracking information and delivery verification such as, without limitation, Express Mail, Priority Mail, or US mail with a return receipt; or via email. All notices (other than those delivered via email) shall be deemed to have been duly given or made as of the date delivered or if delivery is refused, then as of the date presented. Any notice delivered via email shall be deemed to have been duly given or made as of the date that the sender of the email receives a written confirmation of receipt from the intended recipient (which, if delivered via email, may only be in the form of a non-automated email response). Notices may also be delivered via any other method and shall be deemed duly given or made upon actual receipt by the intended recipient.

**IT IS SO AGREED TO BY THE PARTIES:**

Dated:  10/23/2024                    Jonathan Hoang To

                                      By:_____
                                      Jonathan Hoang To, individually and as
                                      Representative of the Class

Dated:                                DirectToU, LLC

By:_____
Name:_____
Title:_____

IT IS SO STIPULATED BY COUSNEL:

Dated: 10/23/24        HammondLaw, P.C.
                       By:_____
                       Julian Hammond, Class Counsel

Dated: 10/23/2024 | 4:03 PM PDT   Baker & Hostetler LLP
                       By:_____
                       Joel Griswold, Defense Counsel

## SCHEDULE OF EXHIBITS

| Exhibit | Name of Document |
|:---:|:---|
| **A** | Settlement Claim Form |
| **B** | Email Notice of Proposed Class Action Settlement |
| **C** | Settlement Website Notice |
| **D** | Proposed Preliminary Approval Order |
| **E** | Proposed Final Approval Order |

## EXHIBIT A

*Jonathan Hoang To v. DirectToU, LLC*

In the U.S. District Court for the Northern District of California
Case No. 3:24-cv-06447

**<u>Settlement Claim Form</u>**

> **If you are a Settlement Class Member and wish to receive a payment, your completed Claim Form must be postmarked on or before [_____], or submitted online on or before [_____].**

Please read the full notice of this settlement (available at WEB ADDRESS) carefully before filling out this Claim Form.

To be eligible to receive any benefits from the settlement obtained in this class action lawsuit, you must submit this completed Claim Form online or by mail:

**<u>ONLINE:</u>** Submit this Claim Form at WEB ADDRESS.

**<u>MAIL</u>:** **[ADDRESS]**

## PART ONE: CLAIMANT INFORMATION

Provide your name and contact information below. It is your responsibility to notify the Settlement Administrator of any changes to your contact information after the submission of your Claim Form.

| | |
|---|---|
| **FIRST NAME** | **LAST NAME** |

**STREET ADDRESS**

| | | |
|---|---|---|
| **CITY** | **STATE** | **ZIP CODE** |

_____

**EMAIL ADDRESS**

[                                      ]

---

## PART TWO: COMPENSATION

You may be entitled to receive a payment if you are a member of the settlement class, you timely submit a valid claim form, and the settlement receives final approval. The payment will be sent in the form of a check, unless otherwise indicated. If you would like payment in a different form, please select **one** of the following options:

☐ **Prepaid Mastercard** – Enter the **email address** where you will receive the Prepaid Mastercard: _____

☐ **Venmo** – Enter the mobile number associated with your Venmo account: _ _ _-_ _ _-_ _ _ _

☐ **Zelle** – Enter the email address or mobile number associated with your Zelle account:

_____

☐ **PayPal** – Enter your PayPal email address: _____

☐ **Physical Check** – Payment will be mailed to the address provided above.

---

## PART THREE: ATTESTATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury under the laws of the United States of America that all of the information on this Claim Form is true and correct to the best of my knowledge. I understand that my Claim Form may be subject to audit, verification, and Court review.

[                                   ]          [                                   ]

**SIGNATURE**                                **DATE**

**Please keep a copy of your Claim Form for your records.**

**EXHIBIT B**

**NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**
*Jonathan Hoang To v. DirectToU, LLC*

**U.S. District Court for the Northern District of California, Case No. 3:24-cv-06447**

**Our Records Indicate You Have Purchased a Video or Videogame or Signed Up to Receive Notices About Videos or Videogames from DirectToU LLC and May Be Entitled to a Payment From a Class Action Settlement.**

*A court authorized this notice. You are <u>not</u> being sued. This is <u>not</u> a solicitation from a lawyer.*

This notice is to inform you that a settlement has been reached in a class action lawsuit claiming that DirectToU LLC ("Defendant") disclosed its customers' personally identifiable information ("PII") to third parties, allegedly without consent in violation of the Video Privacy Protection Act (the "VPPA") and California law. The VPPA defines PII to include information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider. Defendant denies that it violated any law. The Court has not determined who is right. Rather, the parties have agreed to the settlement to avoid the uncertainties and expenses associated with continuing the case.

<u>**Am I a Class Member?**</u> Our records indicate you may be a Class Member. Class Members are all persons who reside in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval. Also included in the "Settlement Class" are all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval.

<u>**What Can I Get?**</u> If the settlement is approved by the Court, Defendant will establish a Settlement Fund of $1,750,000.00 to pay all valid claims submitted by the Settlement Class, together with notice and administration expenses, attorneys' fees and costs, and an incentive award. If you are entitled to relief, you may submit a claim to receive a *pro rata* share of the Settlement Fund. The Settlement also requires Defendant to modify the Facebook Pixel settings on Defendant's Website so that specific product information is not shared with Facebook and to otherwise cease sharing customer transaction data with third parties except as permitted by the VPPA, unless and until the VPPA is amended, repealed, or otherwise invalidated (including by judicial decision on the use of website pixel technology by the United States Supreme Court, any federal court of appeals, a U.S. federal district court in California, or a California state court of general jurisdiction).

<u>**How Do I Get a Payment?**</u> You must submit a timely and complete Claim Form **no later than [claims deadline]**. You can file a claim by clicking [**here.**] Your payment will come by check unless you elect to receive payment electronically by a prepaid Mastercard, Venmo, Zelle, or PayPal.

**What are My Other Options?** You may exclude yourself from the Class by sending a letter to the settlement administrator at the following address: [ADD ADDRESS]. Exclusion requests must be postmarked no later than [**objection/exclusion deadline**] and must include your name and address, your signature, the name and number of this case, and a statement that you wish to be excluded from the Settlement Class for purposes of this Settlement. A request to be excluded that does not include all of this information, or that is sent to an address other than the address designated in this Notice, or that is not postmarked within the time specified, shall be invalid, and the Person(s) serving such a request shall be a member(s) of the Settlement Class and shall be bound as a Settlement Class Member by the Settlement Agreement, if approved. Any member of the Settlement Class who validly elects to be excluded from this Agreement shall not: (i) be bound by any orders or the Final Judgment; (ii) be entitled to relief under the Settlement Agreement; (iii) gain any rights by virtue of the Settlement Agreement; or (iv) be entitled to object to any aspect of the Settlement Agreement. The request for exclusion must be personally signed by the Person requesting exclusion. No other person may sign on behalf of the Person seeking exclusion, including the Person's attorney. So-called "mass" or "class" opt-outs shall not be allowed. To be valid, a request for exclusion must be postmarked or received by the date specified in the Notice. If you exclude yourself, you cannot get a settlement payment, but you keep any rights you may have to sue the Defendant over the legal issues in the lawsuit.

Alternatively, you may object to this Settlement. If you intend to object to this Settlement, you must present the objection in writing, which must be personally signed by you, and must include (1) your name and address; (2) an explanation of the basis upon which you claim to be a Settlement Class Member, including an attestation under penalty of perjury that you purchased a video from Defendant's website; (3) all grounds for the objection, including citations to legal authority and evidence supporting the objection; (4) the name and contact information of any and all attorneys representing, advising, or in any way assisting you in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection (the "Objecting Attorneys"); and (5) a statement indicating whether you intend to appear at the Final Approval Hearing (either personally or through counsel who files an appearance with the Court). No other person may sign on your behalf, including your attorney. If you or any of the Objecting Attorneys has objected to any class action settlement where you or the Objecting Attorneys asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any modification to the settlement, then the objection must include a statement identifying each such case by full case caption and amount of payment received. Any challenge to the Settlement Agreement, the Final Order, or the Final Judgment shall be pursuant to appeal under the applicable appellate rules and not through a collateral attack. Your written objection must be filed in the U.S. District Court for the Northern District of California, Case No. 3:24-cv-06447, no later than [**objection/exclusion deadline**].

You may not submit both an objection to the Settlement and a request to be excluded from the Settlement. If you submit both an objection to the Settlement and a request to be excluded from the Settlement, your objection will be deemed null and void.

Specific instructions about how to object to, or exclude yourself from, the Settlement are also available at [**WEB ADDRESS**]. If you file a claim or do nothing, and the Court approves the Settlement, you will be bound by all of the Court's orders and judgments. In addition, as more fully described in the Settlement Agreement, your claims against Defendant and the Released

Parties relating to the alleged collection and/or disclosure of your information by or to third parties will be released.

**Who Represents Me?** The Court has appointed lawyers Julian Hammond, Adrian Barnes, Polina Brandler, and Ari Cherniak of HammondLaw, P.C. to represent the class. This attorney is called Class Counsel. You will not be charged for these lawyers, they will be paid from the settlement fund. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

**When Will the Court Consider the Proposed Settlement?** The Court will hold the Final Approval Hearing at **[a/p]**.m. on **[Month 00]**, 2025. Any changes to this date or time will be noted on the court docket for this case and on this website. At that hearing, the Court will: hear any objections concerning the fairness of the settlement; determine the fairness of the settlement; decide whether to approve Class Counsel's request for attorneys' fees and costs, and decide whether to award the Class Representative $_____ from the Settlement Fund for his service in helping to bring and settle this case. Class Counsel is entitled to seek up to 25% of the Settlement Fund, but the Court may award less than this amount.

**How Do I Get More Information?** For more information, including the full Notice, Claim Form and Settlement Agreement, go to **[WEB ADDRESS]**; contact the settlement administrator at 1-**[__]**-**[__]**-**[__]** or DirectToU Privacy Settlement Administrator, **[address];** or email Class Counsel at **[EMAIL]**.

## EXHIBIT C

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*Jonathan Hoang To v. DirectToU, LLC*, Case No. 3:24-cv-06447

### Our Records Indicate You Have Purchased a Video or Videogame or Signed Up to Receive Notices About Videos or Videogames from DirectToU LLC and May Be Entitled to a Payment From a Class Action Settlement.

*A court authorized this notice. You are <u>not</u> being sued. This is <u>not</u> a solicitation from a lawyer.*

- A settlement has been reached in a class action lawsuit against DirectToU LLC ("Defendant"). The class action lawsuit accuses Defendant of disclosing its customers' personally identifiable information ("PII") to third parties, allegedly without consent in violation of the Video Privacy Protection Act (the "VPPA") and California law. The VPPA defines PII to include information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider. Defendant denies that it violated any law, but has agreed to the settlement to avoid the uncertainties and expenses associated with continuing the case.

- You are included if you are a person who resides in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval. Also included in the "Settlement Class" are all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval. Persons included in the Settlement will be eligible to receive a *pro rata* (meaning equal) portion of the Settlement Fund. The Settlement also requires Defendant to modify the Facebook Pixel settings on Defendant's Website so that specific product information is not shared with Facebook and to otherwise cease sharing customer transaction data with third parties except as permitted by the VPPA, unless and until the VPPA is amended, repealed, or otherwise invalidated (including by judicial decision on the use of website pixel technology by the United States Supreme Court, any federal court of appeals, a U.S. federal district court in California or a California state court of general jurisdiction).

- Read this notice carefully. Your legal rights are affected whether you act or don't act.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM BY [DATE]** | This is the only way to receive a payment |
| **EXCLUDE YOURSELF BY [DATE]** | You will receive no benefits, but you will retain any rights you currently have to sue the Defendant about the claims in this case. |
| **OBJECT BY [DATE]** | Write to the Court explaining why you do not like the Settlement. |
| **DO NOTHING** | You won't get Your share of the Settlement Fund and You will give up your rights to sue the Defendant and Released Parties about the claims in this case. |

**Your rights and options, and the deadlines to exercise them, are explained in this Notice.**

**BASIC INFORMATION**

1. **Why was this Notice issued?**

   A Court authorized this notice because you have a right to know about a proposed Settlement of this class action lawsuit and about all of your options, before the Court decides whether to give final approval to the Settlement. This Notice explains the lawsuit, the Settlement, and your legal rights.

   The Honorable William H. Orrick of the U.S. District Court for the Northern District of California, is overseeing this case. The case is called *Jonathan Hoang To v. DirectToU, LLC*. The person who has sued is called the Plaintiff. The Defendant is DirectToU, LLC.

2. **What is a class action?**

   In a class action, one or more people called the class representative (in this case, Jonathan Hoang To) sue on behalf of a group or a "class" of people who have similar claims. In a class action, the court resolves the issues for all class members, except for those who exclude themselves from the Class.

3. **What is this lawsuit about?**

   This lawsuit claims that Defendant violated the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq. ("VPPA") and California law by disclosing personally identifiable information ("PII") to third parties via, allegedly without consent. The VPPA defines PII to include information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider. The Defendant denies that it violated any law. The Court has not determined who is right. Rather, the Parties have agreed to settle the lawsuit to avoid the uncertainties and expenses associated with ongoing litigation.

4.  **Why is there a Settlement?**

The Court has not decided whether the Plaintiffs or the Defendant should win this case. Instead, both sides agreed to a Settlement. That way, they avoid the uncertainties and expenses associated with ongoing litigation, and Class Members will get compensation sooner rather than, if at all, after the completion of a trial.

## WHO'S INCLUDED IN THE SETTLEMENT?

5.  **How do I know if I am in the Settlement Class?**

The **Settlement Class** is defined as:

All persons who reside in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval. Also included in the "Settlement Class" are all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval.

## THE SETTLEMENT BENEFITS

6.  **What does the Settlement provide?**

*Monetary Relief*: Defendant has agreed to create a Settlement Fund totaling $1,750,000.00. Class Member payments, and the cost to administer the Settlement, the cost to inform people about the Settlement, attorneys fees and costs and the Class Representative's Incentive Award will also come out of this fund (*see* Question 13).

*Prospective Changes*: In addition to this monetary relief, the Settlement also requires Defendant to modify the Facebook Pixel settings on Defendant's Website so that specific product information is not shared with Facebook and to otherwise cease sharing customer transaction data with third parties except as permitted by the VPPA, unless and until the VPPA is amended, repealed, or otherwise invalidated (including by judicial decision on the use of website pixel technology by the United States Supreme Court, any federal court of appeals, a U.S. federal district court in California, or a California state court of general jurisdiction).

A detailed description of the settlement benefits can be found in the <u>Settlement Agreement.</u> [insert hyperlink]

7.  **How much will my payment be?**

If you are a member of the Settlement Class you may submit a Claim Form to receive a

portion of the Settlement Fund. The amount of this payment will depend on how many of the Class Members file valid claims. Each Class Member who files a valid claim will receive a proportionate share of the Settlement Fund. Based on historical claim rates, Class Counsel estimates the cash payment to be in the range of $35 to $65, which all depends on how many individuals submit a claim. The actual amount may be higher or lower than those estimates.

**8.**    **When will I get my Cash Payment and Voucher?**

The hearing to consider the fairness of the settlement is scheduled for [**Final Approval Hearing Date**]. Any changes to this date or time will be noted on the Court docket for this case and on this website. If the Court approves the settlement, eligible Class Members whose claims were approved by the Settlement Administrator will receive their cash payment approximately 45 days after the Settlement has been finally approved and any appeals process has expired or is complete. The payment will be made in the form of a check, unless you elect to receive payment by prepaid Mastercard, Venmo, Zelle, or PayPal, and all checks will expire and become void 180 days after they are issued.

**HOW TO GET BENEFITS**

**9.**    **How do I get a payment?**

If you are a Class Member and you want to get a payment, you **must** complete and submit a Claim Form by **[Claims Deadline]**. Claim Forms can be found and submitted by clicking here **[hyperlink]**, or by printing and mailing a paper Claim Form, copies of which are available for download here **[hyperlink]**.

We also encourage you to submit your claim on-line. Not only is it easier and more secure, but it is completely free and takes only minutes!

**REMAINING IN THE SETTLEMENT**

**10.**    **What am I giving up if I stay in the Class?**

If the Settlement becomes final, you will give up your right to sue Defendant and the Released Parties for the claims this Settlement resolves. The Settlement Agreement describes the specific claims you are giving up against the Defendant and Released Parties. You will be "releasing" the Defendant and certain of its affiliates described in Section 1.25 of the Settlement Agreement. Unless you exclude yourself (*see* Question 14), you are "releasing" the claims whether you submit a claim or not. The Settlement Agreement is available through the "Court Documents" link on the website.

The Settlement Agreement describes the released claims with specific descriptions, so read it carefully. If you have any questions you can talk to the lawyers listed in Question 12 for free or you can, of course, talk to your own lawyer at your own expense if you have questions about what this means.

**11.**    **What happens if I do nothing at all?**

If you do nothing, you won't get any benefits from this Settlement. But, unless you exclude yourself, you won't be able to start a lawsuit or be part of any other lawsuit against the Defendant or Released Parties for the claims being resolved by this Settlement.

### THE LAWYERS REPRESENTING YOU

**12. Do I have a lawyer in the case?**

The Court has appointed Julian Hammond, Adrian Barnes, Polina Brandler, and Ari Cherniak of HammondLaw, P.C. to be the attorneys representing the Settlement Class. These attorneys are called Class Counsel. They believe, after conducting an extensive investigation, that the Settlement Agreement is fair, reasonable, and in the best interests of the Settlement Class. You will not be charged for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

**13. How will the lawyers be paid?**

Class Counsel's attorneys' fees, costs and expenses will be paid from the Settlement Fund in an amount determined and awarded by the Court. Class Counsel is entitled to seek no more than twenty-five percent of the Settlement Fund for these items, subject to Court approval.

As approved by the Court, the Class Representative will be paid an Incentive Award from the Settlement Fund for helping to bring and settle the case. The Class Representative will seek no more than $_____ as an incentive award, but the Court may award less than this amount.

### EXCLUDING YOURSELF FROM THE SETTLEMENT

**14. How do I get out of the Settlement?**

To exclude yourself from the Settlement, you must mail or otherwise deliver a letter (or request for exclusion) stating that you want to be excluded from the *Hoang To v. DirectToU, LLC*, Case No. 3:24-cv-06447, settlement. Your letter or request for exclusion must also include your name, your address, your signature, the name and number of this case, and a statement that you wish to be excluded. You must mail or deliver your exclusion request no later than **[objection/exclusion deadline]** to:

DirectToU Privacy Settlement
**[0000 Street]**
**[City, ST 00000]**

**15. If I don't exlude myself, can I sue the Defendant for the same thing later?**

No. If you don't exclude yourself, you give up any right to sue the Defendant and Released Parties for the claims being resolved by this Settlement.

**16. If I exclude myself, can I get anything from this Settlement?**

No. If you exclude yourself, do not submit a Claim Form to ask for benefits.

**OBJECTING TO THE SETTLEMENT**

**17.     How do I object to the Settlement?**

If you are a Class Member, you can object to the Settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must file with the Court a letter or brief stating that you object to the Settlement in *Hoang To v. DirectToU, LLC*, Case 3:24-cv-06447, and identify all your reasons for your objections (including citations and supporting evidence) and attach any materials you rely on for your objections. Your letter or brief must also include your name and address; an explanation of the basis upon which you claim to be a Settlement Class Member, including an attestation under penalty of perjury; the name and contact information of any and all attorneys representing, advising, or in any way assisting you in connection with your objection or who may profit from the pursuit of the objection; a statement indicating whether you intend to appear at the Final Approval Hearing (either personally or through counsel who files an appearance with the Court, as explained below in answer to Question Number 21); and your signature. If you, or an attorney assisting you with your objection, have ever objected to any class action settlement where you or the objecting attorney has asked for or received payment in exchange for dismissal of the objection (or any related appeal) without modification to the settlement, you must include a statement in your objection identifying each such case by full case caption and amount of payment received.  If you intend to object and speak at the Final Approval Hearing (with or without a lawyer), these requirements may be excused by the Court upon a showing of good cause.

Class Counsel will file with the Court and post on this website its request for attorneys' fees no later than [two weeks prior to objection deadline].

You must file the objection with the Court no later than **[objection deadline].**

**18.     What's the difference between objecting and excluding myself from the Settlement?**

Objecting simply means telling the Court that you don't like something about the Settlement. You can object only if you stay in the Class. Excluding yourself from the Class is telling the Court that you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

**THE COURT'S FINAL APPROVAL HEARING**

**19.     When and where will the Court decide whether to approve the Settlement?**

The Court will hold the Final Approval Hearing at **[time]** on **[Month 00]**, via Zoom [Zoom Webinar ID: 161 181 2513; Zoom Password: 478314]. Any changes to this date or time will be noted on the Court docket for this case and on this website.

The purpose of the hearing will be for the Court to determine whether to approve the

Settlement as fair, reasonable, adequate, and in the best interests of the Class; to consider Class Counsel's request for attorneys fees and expenses, and to consider the request for an incentive award to the Class Representative. At that hearing, the Court will be available to hear any objections and arguments concerning the fairness of the Settlement.

The hearing may be postponed to a different date or time without notice, so it is a good idea to check the Court docket and [WEB ADDRESS]. If, however, you timely objected to the Settlement and advised the Court that you intend to appear and speak at the Final Approval Hearing, you will receive notice of any change in the date of such Final Approval Hearing.

**20.**    **Do I have to come to the hearing?**

No. Class Counsel will answer any questions the Court may have. But, you are welcome to come at your own expense. If you send an objection or comment, you don't have to come to Court to talk about it. As long as you filed your written objection on time, the Court will consider it. You may also pay another lawyer to attend, but you do not have to.

**21.**    **May I speak at the hearing?**

Yes. You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must include in your letter or brief objecting to the settlement a statement saying that it is your "Notice of Intent to Appear in Hoang To v. DirectToU, LLC" It must include your name, address, telephone number and signature as well as the name and address of your lawyer, if one is appearing for you. Your objection and notice of intent to appear must be filed with the Court no later than **[objection deadline]**. This requirement may be excused upon a showing of good cause.

### GETTING MORE INFORMATION

**22.**    **Where do I get more information?**

This Notice summarizes the Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at [WEB ADDRESS]. You may also write with questions to DirectToU Privacy Settlement, P.O. Box 0000, City, ST 00000. You can call the Settlement Administrator at 1-800-000-0000 or email or call Class Counsel at [ADD EMAIL, ADD PHONE], if you have any questions. Before doing so, however, please read this full Notice carefully. You may also find additional information elsewhere on the case website.

EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jonathan Hoang To, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DirectToU, LLC, <br><br> Defendant. | Case No. 3:24-cv-06447 |

### [PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT, CERTIFYING SETTLEMENT CLASS, APPOINTING CLASS REPRESENTATIVE, APPOINTING CLASS COUNSEL, AND APPROVING NOTICE PLAN

WHEREAS, a class action is pending before the Court entitled *Jonathan Hoang To v. DirectToU, LLC*; and

WHEREAS, Plaintiff Jonathan Hoang To and Defendant DirectToU, LLC have entered into a Class Action Settlement Agreement, which, together with the exhibits attached thereto, sets forth the terms and conditions for a proposed settlement and dismissal of the Action with prejudice as to Defendant upon the Court having read and considered the terms and conditions set forth therein (the "Settlement Agreement"), and the Court having read and considered the Settlement Agreement and exhibits attached to;

This matter coming before the Court upon the agreement of the parties, good cause being shown, and the Court being fully advised on all aspects of this dispute,

IT IS HEREBY ORDERED, DECREED, AND ADJUDGED AS FOLLOWS:

1.  Terms and phrases in this Order shall have the same meaning as ascribed to them in the Settlement Agreement.

2.  The Parties have moved the Court for an order approving the settlement of the Action in accordance with the Settlement Agreement, which, together with the documents incorporated therein, sets forth the terms and conditions for a proposed settlement and dismissal of the Action with prejudice, and the Court having read and considered the Settlement Agreement and having heard the parties and being fully advised on all aspects of this dispute, hereby preliminarily approves the Settlement Agreement in its entirety subject to the Final Approval Hearing referred to in paragraph 5 of this Order.

3.  This Court finds that it has jurisdiction over the subject matter of this action and over all Parties to the Action.

4.  The Court finds that, subject to the Final Approval Hearing, the Settlement Agreement is fair, reasonable, and adequate, within the range of possible approval, and in the best interests of the Settlement Class set forth below. The Court further finds that the Settlement Agreement substantially fulfills the purposes and objectives of the class action, and provides substantial relief to the Settlement Class without the risks, burdens, costs, or delay associated with continued litigation, trial, and/or appeal. The Court also finds that the Settlement Agreement (a) is the result of arm's length negotiations between experienced class action attorneys;(b) is sufficient to warrant notice of the settlement and the Final Approval Hearing to be disseminated to the Settlement Class; (c) meets all applicable requirements of law, including, for settlement purposes only, Rule 23 of the Federal Rules of Civil Procedure, and (d) is not a finding or admission of liability by the Defendant or any other person, nor a finding of the validity of any

claims asserted in the Action or of any wrongdoing or any violation of law.

**Final Approval Hearing**

5.      The Final Approval Hearing shall be held before this Court on

_____, at _____ via Zoom [Zoom Webinar ID: 161 181 2513; Zoom Password:

478314] to determine (a) whether the proposed settlement of the Action on the terms and

conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should

be given final approval by the Court; (b) whether a judgment and order of dismissal with

prejudice should be entered; (c) whether to approve the payment of attorneys' fees, costs, and

expenses to Class Counsel; and (d) whether to approve the payment of an incentive award to the

Class Representative. The Court may adjourn the Final Approval Hearing without further notice

to members of the Settlement Class.

6.      Class Counsel shall file papers in support of their Fee Award and Class

Representative Incentive Award (collectively "Fee Petition") on or before _____ [Suggested date

of 62 days after entry of this Order, (i.e. 14 days before the Objection/ Exclusion Deadline).

**Certification of the Settlement Class**

7.      For purposes of settlement only: (a) Julian Hammond, Adrian Barnes, Polina

Brandler, and Ari Cherniak of HammondLaw, P.C. are appointed Class Counsel for the

Settlement Class; and (b) Jonathan Hoang To is named Class Representative. The Court finds

that this attorney is competent and capable of exercising the responsibilities of Class Counsel and

that Plaintiff Hoang To will adequately protect the interests of the Settlement Class defined

below.

8.      For purposes of settlement only, the Court conditionally certifies (i.e., finds that it

will likely be able to certify) the following Settlement Class as defined in the Settlement

Agreement:

> All persons who reside in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval. Also included in the "Settlement Class" are all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval.

The Court finds, subject to the Final Approval Hearing referred to in Paragraph 5 above, that the Settlement Agreement is fundamentally fair, adequate, and reasonable, and, solely within the context of and for the purposes of settlement only, that the Settlement Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, specifically, that: the Settlement Class is so numerous that joinder of all members is impracticable; there are questions of fact and law common to the Settlement Class (e.g., whether Defendant unlawfully disclosed to third parties Plaintiff's and the Settlement Class's PII without consent in a manner that violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), and whether Plaintiff and the Settlement Class members are entitled to uniform statutory damages under the VPPA); the claims of the Class Representative are typical of the claims of the members of the Settlement Class; the Class Representative and Class Counsel will fairly and adequately protect the interests of the members of the Settlement Class; common questions of law or fact predominate over questions affecting individual members; and a class action is a superior method for fairly and efficiently adjudicating the Action. Excluded from the Class are (1) any Judge presiding over this Action and members of their families; (2) the Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, agents, attorneys, and employees; (3) persons who properly execute and

file a timely request for exclusion from the class; and (4) the legal representatives, successors or assigns of any such excluded persons.

9.     If the Settlement Agreement does not receive the Court's final approval or if final approval is reversed on appeal, or if the Settlement Agreement is terminated or otherwise fails to become effective, the Court's grant of class certification for settlement purposes shall be vacated, and the Class Representative and the Settlement Class will once again bear the burden of establishing the propriety of class certification. In such case, neither the certification of the Settlement Class for settlement purposes, nor any other act relating to the negotiation or execution of the Settlement Agreement shall be considered as a factor in connection with any class certification issue(s).

<u>**Notice and Administration**</u>

10.     The Court approves, as to form, content, and distribution, the Notice Plan set forth in the Settlement Agreement, including Settlement Claim Form (the "Claim Form") attached to the Settlement Agreement as Exhibit A, the notice plan and all forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B and C thereto, and finds that such Notice is the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure. The Court also finds that the Notice constitutes valid, due and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process. The Court further finds that the Notice is reasonably calculated to, under all circumstances, reasonably apprise members of the Settlement Class of the pendency of this action, the terms of the Settlement Agreement, and the right to object to the settlement and to exclude themselves from the Settlement Class. In addition, the Court finds that no notice other than that specifically identified in the Settlement Agreement is necessary in this Action. The

Parties, by agreement, may revise the Notice and Claim Form in ways that are not material, or in ways that are appropriate to update those documents for purposes of accuracy or formatting.

11.     The Court approves the request for the appointment of _____ as Settlement Administrator of the Settlement Agreement.

12.     Pursuant to paragraph 4.1 of the Settlement Agreement, the Settlement Administrator is directed to publish the Notice and Claim Form on the Settlement Website and to send direct notice via email in accordance with the Notice Plan called for by the Settlement Agreement. The Settlement Administrator shall also maintain the Settlement Website to provide full information about the Settlement and allow for the filing of claims online.

**Submission of Claims and Requests for Exclusion from Class**

13.     Members of the Class who wish to receive benefits under the Settlement Agreement must complete and submit a timely and valid Claim Form(s) in accordance with the instructions contained therein. All Claim Forms must be postmarked or received by the Settlement Administrator within the time specified in the Notice. Any person falling within the definition of the Settlement Class may, upon valid and timely request, exclude themselves or "opt out" of the Class. Any such person may do so if, on or before the Objection/ Exclusion Deadline of _____ *[suggested date of 60 days after Notice Date]* they comply with the exclusion procedures set forth in the Settlement Agreement and Notice. Any members of the Class so excluded shall neither be bound by the terms of the Settlement Agreement nor entitled to any of its benefits.

14.     Any members of the Settlement Class who elect to exclude themselves or "opt out" of the settlement, must file a written request with the Settlement Administrator, received or postmarked no later than the Objection/Exclusion Deadline. The request for exclusion must

comply with the exclusion procedures set forth in the Settlement Agreement and Notice and include the Settlement Class member's name and address, his/her signature, the name and number of the case, and a statement that he or she wishes to be excluded from the Settlement Class for the purposes of the Settlement. Each request for exclusion must be submitted individually. So called "mass" or "class" opt-outs shall not be permitted.

15.     Individuals who opt out of the Class relinquish all rights to benefits under the Settlement Agreement and will not release their claims. However, members of the Settlement Class who fail to submit a valid and timely request for exclusion shall be bound by all terms of the Settlement Agreement and the Final Judgment, regardless of whether they have requested exclusion from the Settlement Agreement.

## **Appearances and Objections**

17.     Any members of the Settlement Class who have not timely filed a request for exclusion may object to the fairness, reasonableness, or adequacy of the Settlement Agreement or to a Final Judgment being entered dismissing the Action with prejudice in accordance with the terms of the Settlement Agreement, or to the Attorneys fees and expense reimbursement sought by Class Counsel in the amounts specified in the Notice, or to the award to the Class Representative as set forth in the Notice and Settlement Agreement. At least fourteen (14) days prior to the Objection/Exclusion Deadline, papers supporting the Fee Award shall be filed with the court and posted to the settlement website. Members of the Class may object on their own, or may do so through separate counsel at their own expense.

18.     To object, members of the Class must sign and file a written objection no later than on or before the Objection/Exclusion Deadline of no later than sixty (60) days after the Notice Date. To be valid, the objection must comply with the objection procedures set forth in

the Settlement Agreement and Notice, and include his or her name and address; an explanation

of the basis upon which he or she claims to be a Settlement Class Member, including an

attestation under penalty of perjury; his or her signature; and all grounds for the objection,

including all citations to legal authority and evidence supporting the objection; the name and

contact information of any and all attorneys representing, advising, or in any way assisting him

or her in connection with the preparation or submission of the objection or who may profit from

the pursuit of the objection (the "Objecting Attorneys"); and a statement indicating whether he or

she intends to appear at the Final Approval Hearing (either personally or through counsel who

files an appearance with the Court. If a Settlement Class Member or any of the Objecting

Attorneys has objected to any class action settlement where the objector or the Objecting

Attorneys asked for or received any payment in exchange for dismissal of the objection, or any

related appeal, without any modification to the settlement, then the objection must include a

statement identifying each such case by full case caption.

19.     Members of the Class who fail to file and serve timely written objections in

compliance with the requirements of this Order and the Settlement Agreement shall be deemed

to have waived any objections and shall be foreclosed from making any objections (whether by

appeal or otherwise) to the Settlement Agreement or to any of the subjects listed in paragraph 5,

above, i.e. (a) whether the proposed settlement of the Action on the terms and conditions

provided for in the Settlement Agreement is fair, reasonable, and adequate and should be given

final approval by the Court; (b) whether a judgment and order of dismissal with prejudice should

be entered; (c) whether to approve the payment of attorneys' fees and expenses to Class Counsel;

and (d) whether to approve the payment of an incentive award for the Class Representative.

20.     To be valid, objections must be filed with the Court and sent to the following:

Class Counsel Julian Hammond, Adrian Barnes, Polina Brandler, and Ari Cherniak, HammondLaw, P.C., 1201 Pacific Ave., 6th Floor, Tacoma, WA 98402; and Defense Counsel Joel Griswold and Bonnie Keane DelGobbo, BakerHostetler, 1 N. Wacker Dr., Ste. 3700, Chicago, IL 60606. In addition, any objections made by a Class member represented by counsel must be filed through the Court's CM/ECF system.

### Further Matters

21.     All further proceedings in the Action are ordered stayed until Final Judgment or termination of the Settlement Agreement, whichever occurs earlier, except for those matters necessary to obtain and/or effectuate final approval of the Settlement Agreement.

22.     Members of the Settlement Class shall be bound by all determinations and judgments in the Action concerning the Action and/or Settlement Agreement, whether favorable or unfavorable.

23.     The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement Agreement. The Court may approve the Settlement, with such modifications as may be agreed to by the Parties, if appropriate, without further notice to the Class.

24.     Any Settlement Class Member who does not timely and validly submit a claim: shall be forever barred from participating in any distributions of the Settlement Fund; (b) shall be bound by the provisions of the Settlement Agreement and all proceedings, determinations, orders and judgments in the Action relating thereto, including, without limitation, the Judgment or Alternate Judgment, if applicable, and the Releases provided for therein, whether favorable or unfavorable to the Class; and (c) shall forever be barred and enjoined from directly or indirectly filing, commencing, instituting, prosecuting, maintaining, or intervening in any action, suit,

cause of action, arbitration, claim, demand, or other proceeding in any jurisdiction, whether in the United States or elsewhere, on their own behalf or in a representative capacity, that is based upon or arises out of any or all of the Released Claims against any of the Defendant and the other Released Parties, as more fully described in the Settlement Agreement.

25.     If the Settlement Agreement is not approved by the Court in complete accordance with its material terms, each party will have the option of having the Action revert to its status as if the Settlement Agreement had not been negotiated, made, or filed with the Court. In such event, the parties will retain all rights as if the Settlement Agreement was never agreed upon.

26.     In the event that the Settlement Agreement is terminated pursuant to the provisions of the Settlement Agreement or for any reason whatsoever the approval of it does not become Final then (i) the Settlement Agreement shall be null and void, including any provision relating to the award of attorneys' fees, and shall have no further force and effect with respect to any party in this Action, and shall not be used in this Action or in any other proceeding for any purpose; (ii) all negotiations, proceedings, documents prepared, and statements made in connection therewith shall be without prejudice to any person or party hereto (including the Released Parties), shall not be deemed or construed to be an admission by any party (including the Released Parties) of any act, matter, or proposition, and shall not be used in any manner or for any purpose in any subsequent proceeding in this Action or in any other action in any court or other proceeding, provided, however, that the termination of the Settlement Agreement shall not shield from subsequent discovery any factual information provided in connection with the negotiation of this Settlement Agreement that would ordinarily be discoverable but for the attempted settlement; (iii) other than as expressly preserved by the Settlement Agreement in the event of its termination, the Settlement Agreement shall have no further force and effect with

respect to any party (including the Released Parties) and shall not be used in the Action or any

other proceeding for any purpose; and (iv) any party (including the Released Parties) may elect

to move the Court pursuant to the provisions of this paragraph, and none of the non-moving

parties (or their counsel) shall oppose any such motion.

IT IS SO ORDERED, this _____day of _____, 2024

_____

The Honorable William H. Orrick

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jonathan Hoang To on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DirectToU, LLC,<br><br>Defendant | Case No. 3:24-cv-06447 |

## [PROPOSED] FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE

WHEREAS, a class action is pending before the Court entitled Jonathan Hoang To v. DirectToU, LLC; and

WHEREAS, Plaintiff Jonathan Hoang To and Defendant DirectToU, LLC have entered into a Class Action Settlement Agreement, which, together with the exhibits attached thereto, sets forth the terms and conditions for a proposed settlement and dismissal of the Action with prejudice as to Defendant upon the terms and conditions set forth therein (the "Settlement Agreement") and the Court having read and considered the Settlement Agreement and exhibits attached to (ECF No. [_____]);

WHEREAS, the Court has considered the Parties' Class Action Settlement Agreement ( ECF No.), as well as Plaintiff's Motion for Final Approval of the Settlement Agreement (ECF No. ), Plaintiff's Motion for Attorneys' Fees, Costs, and Expenses, and Incentive Award (ECF No. ), together with all the exhibits thereto, the arguments and authorities presented by the Parties and their counsel at the Final Approval Hearing held on _____2025, and the record in

the Action, and good cause appearing;

IT IS HEREBY ORDERED, DECREED, AND ADJUDGED AS FOLLOWS:

1.      Terms and phrases in this Final Judgment shall have the same meaning as ascribed to them in the Parties' Class Action Settlement Agreement.

2.      This Court has jurisdiction over the subject matter of the Action and over all Parties to the Action, including all Settlement Class members.

3.      The notice provided to the Settlement Class pursuant to the Settlement Agreement (ECF No. [____]) and order granting Preliminary Approval (ECF No. [____]), including (i) direct notice to the Settlement Class via email, based on the customer list provided by Defendant, and (ii) the creation of the Settlement Website fully complied with the requirements of due process, and was reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action, their right to object to or to exclude themselves from the Settlement Agreement, and their right to appear at the Final Approval Hearing.

4.      This Court now gives final approval to the Settlement Agreement, and finds that the Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Settlement Class. The settlement consideration provided under the Settlement Agreement constitutes fair value given in exchange for the release of the Released Claims against the Released Parties. The Court finds that the consideration to be paid to members of the Settlement Class is reasonable, and in the best interests of the Settlement Class Members, considering the total value of their claims compared to (i) the disputed factual and legal circumstances of the Action, (ii) affirmative defenses asserted in the Action, and (iii) the potential risks and likelihood of success of pursuing litigation on the merits. The complex legal and factual posture of this case, the amount of discovery completed, and the fact that the Settlement is the result of an arm's length negotiation

between the Parties support this finding. The Court finds that these facts demonstrate that there was no collusion present in the reaching of the Settlement Agreement, implicit or otherwise.

5. The Court has specifically considered the factors relevant to class action settlement approval.

6. The Court finds that the Class Representative and Class Counsel adequately represented the Settlement Class for the purposes of litigating this matter and entering into and implementing the Settlement Agreement.

7. Accordingly, the Settlement is hereby finally approved in all respects. Any objections to the Settlement are hereby overruled.

8. The Parties are hereby directed to implement the Settlement Agreement according to its terms and provisions. The Settlement Agreement is hereby incorporated into this Final Judgment in full and shall have the full force of an Order of this Court.

9. This Court hereby dismisses the Action, as identified in the Settlement Agreement, on the merits and with prejudice.

10. Upon the Effective Date of this Final Judgment, Plaintiff and each and every Settlement Class Member who did not opt out of the Settlement Class (whether or not such members submit claims) including such individuals' respective present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parent companies, subsidiaries, associates, affiliates, employers, employees, agents, consultants, independent contractors, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, underwriters, shareholders, lenders, auditors, investment advisors, legal representatives, successors in interest, assigns and companies, firms, trusts, and corporations ("Releasing Parties") from  any and all actual, potential, filed, known or

unknown, fixed or contingent, claimed or unclaimed, suspected or unsuspected, claims, demands, liabilities, rights, causes of action, contracts or agreements, extra contractual claims, damages, punitive, exemplary or multiplied damages, expenses, costs, attorneys' fees, and/or obligations (including "Unknown Claims," as defined in the Settlement Agreement), whether in law or in equity, accrued or unaccrued, direct, individual or representative, of every nature and description whatsoever, whether based on the VPPA or other state, federal, local, statutory or common law or any other law, rule or regulation, against the Released Parties, or any of them, arising out of any facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures to act regarding the use of Defendant's Website and/or the sharing of information with third parties, including but not limited to alleged collection and/or disclosure of the Settlement Class Members' personally identifiable information and video purchasing or viewing behavior by or to any third party, including all claims that were brought or could have been brought in the Action relating to the collection and/or disclosure of information belonging to any and all Releasing Parties.

11.    Upon the Effective Date of this Final Judgment, the above release of claims and the Settlement Agreement will be binding on, and will have res judicata and preclusive effect on, all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiff and all other Settlement Class Members and Releasing Parties. All Settlement Class Members are hereby permanently barred and enjoined from filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in any lawsuit or other action in any jurisdiction based on or arising out of any of the Released Claims.

12.    The Court has also considered Plaintiff's Motion for Attorneys' Fees, Costs, Expenses, And Incentive Award, as well as the supporting memorandum of law and declarations

(ECF Nos. _____), and adjudges that the requested amount of attorney fees, costs, and expenses is reasonable. Such payment shall be made pursuant to and in the manner provided by the terms of the Settlement Agreement.

13.     The Court has also considered Plaintiff's Motion and Memorandum of Law and supporting declarations for an incentive award to the Class Representative, Jonathan Hoang To *See* ECF No. [_]. The Court adjudges that the payment of an incentive award in the amount of $_____ to Mr. Hoang To to compensate him for his efforts and commitment on behalf of the Settlement Class, is fair, reasonable, and justified under the circumstances of this case. *See* ECF No. [__]. Such payment shall be made pursuant to and in the manner provided by the terms of the Settlement Agreement.

14.     All payments made to Settlement Class Members pursuant to the Settlement Agreement that are not cashed within one hundred and eighty (180) days of issuance shall revert to the Settlement Fund, to be distributed pro rata to claiming Settlement Class Members, if practicable. If such a secondary distribution would result in Settlement Class Members receiving less than $10.00, or if a secondary distribution would be otherwise infeasible (as determined by the Settlement Administrator or by mutual agreement of the Parties), any uncashed funds will revert to _____, which the Court approves as an appropriate *cy pres* recipient. Except as otherwise set forth in this Order, the Parties shall bear their bear their own costs and attorneys' fees.

15.     The Parties, without further approval from the Court, are hereby permitted to agree and adopt such amendments, modifications, and expansions of the Settlement Agreement and its implementing documents (including all exhibits to the Settlement Agreement) so long as they are consistent in all material respects with this Final Judgment and do not limit the rights of

Settlement Class Members.

16.     This Court hereby enters Final Judgment.

IT IS SO ORDERED, this _____day of _____, 2025.


_____
The Hon. William H. Orrick

EXHIBIT B

# How Much is Privacy Worth Around the World and Across Platforms?

Jeffrey Prince and Scott Wallsten[*]

March 2022

## Abstract

Using carefully designed discrete choice surveys, we measure individuals' valuation of online privacy across countries (United States, Mexico, Brazil, Colombia, Argentina, and Germany) and data types (personal information on finances, biometrics, location, networks, communications, and web browsing). We find that Germans value privacy more than do people in the U.S. and Latin American countries. Across countries, people most value privacy for financial (bank balance) and biometric (fingerprint) information. People had to be paid the least for permission to receive ads – respondents in Argentina, Colombia and Mexico would even *pay* for them – followed by location privacy. We discuss privacy policy implications.

[*] Jeffrey Prince is at Indiana University, Department of Business Economics and Public Policy, Kelley School of Business. Scott Wallsten is President and Senior Fellow at the Technology Policy Institute. We thank the InterAmerican Development Bank for financial support, several focus groups for their time and insight, ResearchNow for assistance in administering the surveys, Phil Keefer and María Carmen for comments and suggestions, Lindsay Poss for research assistance, and Camila Rodriguez Gomes and Daniel Jaramillo for translation assistance. We are responsible for all errors. Any opinions expressed here are those of the authors and do not necessarily reflect the views of the Technology Policy Institute, its staff, or its board, or those of the IADB or anyone affiliated with it.

1

Electronic copy available at: https://ssrn.com/abstract=3528386

# 1. Introduction

The prevalence and value of data in virtually all sectors has grown tremendously, with some even declaring it the world's most valuable resource (Economist, 2017). However, along with this growth in volume and value has come increased importance in getting policy right—balancing privacy preferences with benefits that derive from the use of data. Such cost benefit analyses are currently difficult, if not impossible, due to the lack of market data that reveal how much people truly value different elements of privacy or the services they receive in exchange for use of that data. Indeed, the prevalence of nonmarket goods and services in the digital economy is a major obstacle to coherent policymaking. Nevertheless, issues ranging from high-profile data breaches (e.g., Equifax, 2017) and Facebook's Cambridge Analytica scandal to a general unease about access to personal information have made data privacy a matter of increasing concern for governments and businesses around the globe. In fact, data privacy was the focus of the World Bank's 2021 World Development Report (World Bank, 2021).

Despite widespread agreement on the need for some kind of data privacy oversight, agreement on what that means remains elusive. Typical comparisons involve the United States vs. Europe and the State of California. As of this writing, the U.S. government is discussing legislation and regulation beyond its current policy of imposing punishments and consent decrees after finding that a firm has violated existing laws or user agreements. By contrast, Europe has implemented a comprehensive set of data privacy regulations known as the General Data Protection Regulation (GDPR). The State of California passed a law known as the California Consumer and Privacy Act (CCPA), which took effect on January 1, 2020. With the legal and regulatory landscape fragmented, it is not surprising that data practices by firms are similarly inconsistent. Several Latin American countries, including Brazil, Colombia, Mexico, and

Electronic copy available at: https://ssrn.com/abstract=3528386

Argentina also either have or are considering privacy rules.[1]  Firms vary on how they deal with data privacy, and third parties distribute rankings of the best and worst firms for protecting data privacy (e.g., eWeek, 2017).

      With much disagreement on best public and private practices, and much at stake, it is unfortunate and perhaps surprising that so little empirical evidence exists on how people value different elements of data privacy.  The evidence that does exist is often qualitative in nature, focusing on opinions regarding data privacy in general but not quantifying this general opinion or any particular type(s) of data privacy.  Most relevant to our analysis, very little existing empirical evidence is suitable for determining relative valuations of different types of data privacy, much less how those values differ across countries.

      In this paper, we estimate how much people value a range of highly relevant aspects of privacy and how these values vary across countries, data types, and platforms.  Understanding the value of privacy is necessary for conducting any analysis of proposed privacy policies, both public and private, as these values are a key component of policy benefits. Because any such regulations will come with costs, such an understanding about benefits can help to ensure that proposed rules do not cost more than consumers and constituents would themselves want imposed.

      If privacy values differ across countries or regions, then acceptable rules and regulations may similarly differ across regions. At a high level, if, for example, we were to discover that Europeans value certain elements of their privacy more than the U.S., then a strict privacy regime like that created by GDPR might yield net benefits in Europe but not the U.S. While we have a general sense, based on its history of relevant laws, that Europeans place a higher value

---

[1] https://www.tmf-group.com/en/news-insights/articles/2019/april/data-privacy-laws-across-latin-america/

3

Electronic copy available at: https://ssrn.com/abstract=3528386

on data privacy than do U.S. residents, even that basic information is lacking for Latin American countries. Do Latin Americans value data privacy even more than do Europeans, or do they value it even less than U.S. residents? Do these preferences vary significantly across Latin American countries? The answers to these questions are crucial for generating coherent privacy policies that will yield the most benefits.

Similarly, if people value the privacy of different types of data differently, then policy should probably also treat them differently. For example, in this research we find that generally people value the privacy of their biometric (e.g., fingerprint) data more than they do their location data. Given such a relative valuation, rules governing how biometric data can be collected and used may generate additional consumer surplus while stricter rules on how location data is collected and used may not.

To measure how much consumers value different types of data privacy and ultimately conduct our comparisons, we employed a battery of discrete-choice surveys—a trusted approach demonstrated to be far more reliable than open-ended surveys. This approach is especially relevant for data privacy valuation, given it closely mimics the types of choices individuals can make in real markets for personal data[2] and policy proposals that would have firms pay consumers for data.[3] We constructed four different survey structures, centered respectively on the respondent's wireless carrier, financial institution, smartphone, and Facebook account. Across the four survey structures, we measure values for a range of data privacy types, including personal information on: finances, biometrics, location, networks, communications, and web

---

[2] For example, at the end of 2020, Amazon launched a program in which it would pay consumers to share information about non-Amazon purchases (https://techcrunch.com/2020/10/20/amazon-launches-a-program-to-pay-consumers-for-their-data-on-non-amazon-purchases/).
[3] California and other states have proposed requiring such payments (https://www.cnet.com/news/california-wants-silicon-valley-to-pay-you-a-data-dividend/).

4

Electronic copy available at: https://ssrn.com/abstract=3528386

browsing.  We administered each of these four different surveys across six different countries: the United States, Mexico, Brazil, Colombia, Argentina, and Germany.

On average across countries and platforms, people placed the highest value on keeping financial data, biometric (fingerprint) information, and texts private, as shown in Figure 1. Specifically, to allow a platform to share this information with third parties, expressed in USD based on purchasing power parity (PPP) conversions, our surveys indicate that the platform would have to pay users $8.44/month to share a bank balance, $7.56/month to share fingerprint information, $6.05/month to read an individual's texts, and $5.80/month to share information on cash withdrawals. By contrast, people had to be paid only $1.82/month to share their location and essentially nothing to be sent ads via SMS.[4]

---

[4] These are estimates of willingness-to-accept (WTA).

5

Electronic copy available at: https://ssrn.com/abstract=3528386

**Figure 1: Average Payment Consumers Would Demand for Permission to Share Data Across Countries and Platforms**



These averages across data types mask significant differences across countries. In general, people in Germany valued privacy more than people in the U.S. and Latin America. Figure 2 contains the averages by country. This figure confirms what many believe, which is that Germans tend to value their privacy more than others. However, this summary finding is not true across the board and is particularly pointed for financial privacy. An example of an exception to Germans' relatively high privacy valuation is fingerprint information; on average, people across countries value fingerprint information the second highest in the list of data types we study, but Germans' value is well below that of several other countries. Another noteworthy result is not just that people value avoiding ads relatively little, but that people in Latin America seem to appreciate them—in Colombia, for example, people are willing to pay about $2.50/month to see ads.

6

Electronic copy available at: https://ssrn.com/abstract=3528386

**Figure 2: Average Payment Consumers Would Demand for Permission to Share Data Across Countries by Feature**



We are also able to examine how values may differ across platform. In principle, if a user is giving an organization the right to share their data, then these values should not differ across platform since presumably each platform could share with the same third parties. In reality, though, people may have different levels of trust in different platforms or believe that data sharing practices differ. We do, in fact, see some differences across platforms for the same piece of data. The surveys did not ask about the same types of information for each platform, so our ability to compare across platforms is thus constrained. Figure 3 shows the available comparisons by platform and country. The figure shows that in all six countries, people must be paid more by their wireless carrier than other platforms to be sent ads, share contact information, and share location data. While people are more willing to share contact information with Facebook than with their wireless provider across countries, the amount Facebook would have to pay users for the right to share contact

7

Electronic copy available at: https://ssrn.com/abstract=3528386

information varies significantly across countries. Germany again shows its strong taste for privacy, with the U.S. in a distant second place; Facebook would need to pay German users about $8/month, Americans $3.50/month, to share their contact information. Across the Latin American countries, however, values are generally much lower: ranging from $2.30/month in Mexico to as little as $0.52/month in Colombia.

**Figure 3: Average Payment Consumers Would Demand for Permission to Share Data Across Platforms and Countries**



Overall (Figure 4), key international differences in relative rankings are most evident with regard to ads, with Latin Americans generally showing a preference for, rather than aversion to, ads on both their smartphone and from their financial institution – all in contrast to the U.S. and Germany. In absolute terms, we see consumers in all countries exhibiting relatively high values for privacy of financial information, with Germans having an especially high value. After accounting for Germany's high preference for financial privacy, we also see notable

8

Electronic copy available at: https://ssrn.com/abstract=3528386

comparability in the magnitude and relative rankings in WTA for privacy across countries, with some exceptions (e.g., network information in Mexico and fingerprint information in Colombia). Additional analysis indicates that within-country variation in values is largely similar for each of the six countries, with Germans often exhibiting more homogeneous preferences compared to the others.  We also observe positive correlations in privacy preferences across data types for individuals in all six countries.

### Figure 4: Summary of Results



We also find consistent differences by sex in privacy valuations. Across platforms, data types, and countries, women value privacy more than men do. Similarly, older people value privacy more highly than younger people. We find no consistent differences in privacy valuations by income. Figure 5 shows these estimates averaged across platforms and countries.

9

Electronic copy available at: https://ssrn.com/abstract=3528386

**Figure 5: Average Payment Consumers Would Demand for Permission to Share Data by Sex, Age, and Income**



These results are largely robust to a randomly controlled treatment in the form of a leading statement about the value of data collection by these entities. Preferences for privacy are generally unaffected by such a prompt, suggesting that their values of online privacy are reasonably stable and not easily influenced.

Our findings have several implications. The striking consistencies in relative rankings of the value of online privacy across our six countries suggests that both public and private policies should probably offer similar *relative* privacy protections if facing similar costs and contexts for protection. However, differences in how much people value privacy of different data types across countries suggests that people in some places may prefer weaker rules while people in other places might prefer stronger rules. How much people value some data types does not vary

10

Electronic copy available at: https://ssrn.com/abstract=3528386

much across countries, however. In particular, people value the privacy of their contact information and texts fairly similarly across countries.

The generally similar within-country variation in values has interesting implications for both firms and governments. For firms, this suggests that, to the extent that tiered privacy protections may be economically sensible for one country, it may be economically sensible for all in our group. With respect to government policies, these results suggest that, when viewed in economic terms, the distribution of support for various protections is likely similar across countries. The notable exception in both cases is Germany, which appears to have more homogeneous preferences regarding online data privacy. Lastly, the positive correlation in individual-level privacy preferences across data types suggests that policies involving bundles of privacy types (e.g., protections for financial and biometric information) are unlikely to encounter more homogenized preferences (as might be possible if our correlations had been negative), potentially posing challenges in garnering widespread support.

## 2. The Value of Privacy

The empirical analysis in the paper measures the value of online privacy across different types of privacy, countries, and people within countries. In this section, we provide context for our empirics by discussing various existing methods for measuring the value of privacy, and determinants of such value.

### 2.1. Measuring the Value of Privacy

Measuring the value of data privacy can be challenging for myriad reasons. For starters, "privacy" in the abstract does not have a specific meaning. This problem is reminiscent of

11

Electronic copy available at: https://ssrn.com/abstract=3528386

challenges in valuing the environment, such as the value of having clean oceans or clean air. A solution is to quantify data privacy in general, such as the value of avoiding a major data breach. However, valuing something of this magnitude can be difficult, often relying on much-critiqued contingent valuation approaches.

A widely recognized phenomenon when it comes to data privacy is the so-called privacy paradox, where people say in surveys that they care a lot about privacy but behave as if they do not (e.g., Athey et al. 2017). For example, Savage and Waldman (2015) find high stated demand for privacy in apps; however, Kummer and Schulte (2019) show low revealed preference for app privacy. Rainie et al. (2013) note a 2013 Pew Research Center study that finds 68 percent of US adults believed current laws are insufficient in protecting individuals' online privacy, and Madden and Rainie (2015) find that 93 percent of U.S. adults believe that being in control of who can get information about them is important. Nevertheless, the results of the aforementioned measures for specific types of privacy indicate that the value of privacy notably varies with context and personal traits (Acquisti et al. 2015). Lastly, a recent study provides an international comparison of what is termed as the data confidence index (DCI), which measures expressed privacy concerns against stated online privacy behaviors (Datum Future & Global Web Index, 2019). They treat the DCI is a measure of the strength of the privacy paradox in a country, finding significant international variation.

A range of theories have been proposed to help explain the privacy paradox, ranging from differences between hypothetical and actual settings (Adjerid et al. 2018) to rational cost-benefit calculations (Barth and de Jong 2017 provide a review). Measurement of privacy preferences is further complicated by distinctions between willingness-to-pay (WTP) for privacy vs. willingness-to-accept (WTA) payment in exchange for disclosing otherwise private

Electronic copy available at: https://ssrn.com/abstract=3528386

information.  A substantial literature finds that WTA estimates tend to be higher than WTP estimates, and that the two measures often have little correlation (See Chapman, et al. 2019 for a comprehensive discussion).  Acquisti et al. (2013) specifically examines the difference between WTA and WTP for privacy in the context of linking a person's name to gift card purchases, finding a significantly higher WTA for linking the name compared to WTP to remain anonymous.

Contributing to our understanding of the privacy paradox and WTA-WTP differences, as well as privacy valuation in general, a range of prior studies (including the aforementioned) have attempted to measure individuals' monetary valuations for particular types of privacy, using a variety of approaches.  These approaches include direct elicitation (e.g., Cvrcek et al. 2006), hypothetical auction (e.g., Huberman et al. 2005), field experiment (e.g., Acquisti et al. 2013), and discrete choice experiment (e.g., Savage and Waldman 2015).   Additional studies have used surveys and other market data to generate measures for the value of privacy (e.g., Goldfarb and Tucker 2012).  Earlier studies often focused attention on WTP analyses; however, perhaps driven by emerging markets for, and pricing by, information disclosure, more recent studies have tended to focus on WTA.[5]

Our analysis isn't designed to solve the privacy paradox or explain WTA-WTP gap, although it does add new data points for the privacy paradox discussion.  Rather, our analysis builds off insights from prior work suggesting we might expect meaningful variation in the value of online privacy across different contexts, individuals, and even countries.  Our analysis

---

[5] A non-exhaustive list of additional studies measuring privacy value includes: Tedeschi 2002, Wathieu and Friedman 2007, Savage and Waldman 2013, Hann et al. 2002, Tsai et al. 2011, Jentzsch et al. 2012, and Beresford et al. 2012.

Electronic copy available at: https://ssrn.com/abstract=3528386

examines and quantifies this type of variation for a set of highly relevant data types and platforms across several countries.

## 2.2. Determinants of the Value of Privacy

As noted above, prior work suggests context and personal traits are important determinants of the value of privacy. A particularly relevant component of personal traits includes cultural values, defined as a set of strongly held beliefs that guide attitudes and behavior and that tend to endure even when other differences between countries are eroded by changes in economics, politics, technology, and other external pressures (Hofstede 1980, Long & Quek 2002). Milberg et al. (2000) used a formative index to assess how four of Hofstede's (1980, 1991) cultural values indices – Power Distance Index (PDI), Individualism (IND), Masculinity (MAS), and Uncertainty Avoidance Index (UAI) – influence information privacy concerns. They found that concerns about information privacy were positively associated with PDI, IND, and MAS, and negatively associated with UAI. Hence, this prior work points to differences in general sentiment across countries but leaves open the question of whether and how such differences materialize for specific types of (online) privacy.

Conventional wisdom in conjunction with its legal history suggests Germans have particular concern about data privacy. Typical explanations for these preferences point to the country's relatively recent history with prevalent and dangerous surveillance.[6] Consequently, we might expect Germans to be more resistant to sharing personal data, leading us to expect higher

---

[6] For some examples of discussion on this topic, see: https://www.dotmagazine.online/issues/security/germany-land-of-data-protection-and-security-but-why and https://www.handelsblatt.com/english/handelsblatt-explains-why-germans-are-so-private-about-their-data/23572446.html?ticket=ST-4642680-KGub1dxIYWfSyZ11w535-ap2.

Electronic copy available at: https://ssrn.com/abstract=3528386

WTA in our surveys. Nonetheless, it is not clear whether we should expect these higher values to materialize across all data types or just among a subset.

## 3. Survey Design

The surveys we construct measure individuals' WTA to give up various forms of privacy, rather than their WTP to retain privacy. The choice to measure WTA rather than WTP is largely driven by the fact that several proposals and existing marketplaces, as described above, involve firms paying consumers for their data rather than consumers paying firms to keep their data private.[7] For this reason, we believe WTA is arguably the more appropriate measure relative to WTP.

To estimate WTA to give up various forms of privacy, we collect and analyze data from four separate surveys that employ repeated discrete choice experiments (DCEs). The four surveys pertain to respondents' wireless carrier, Facebook use, checking account at a bank, and smartphone. Because we are interested in comparing results across countries, the survey had to be in four languages given our country choices: English, Spanish, Portuguese, and German. We designed the survey in English, paid to have it translated into each language, and then had native speakers review the translations and compare to the English to ensure not just proper translation but also that the same meanings and information were conveyed to the respondent.

Prior work has shown that DCEs mitigate the reporting inaccuracy of stated-preference data (Carare et al. 2015). Even if hypothetical bias may potentially overestimate demand, the estimation for changes in feature levels is statistically unbiased, at least for WTP estimates (Ding

---

[7] As noted in Section 2, a substantial literature finds that WTA estimates tend to be higher than WTP estimates; this suggests that our estimates may be considered an upper bound.

15

Electronic copy available at: https://ssrn.com/abstract=3528386

et al. 2005; Miller et al. 2011).[8] A reliable DCE method, however, requires a careful design to cause respondents to answer truthfully, as if they are making a choice in the real market (Ben-Akiva et al. 2016). We thus structure the survey in three parts. We first collect relevant demographic information in order to conduct comparative analyses and to ensure a representative sample according to region, age, race, and sex. Demographics we collect include sex, age, proximity to a city, and household income.

The second part of the survey collects information regarding each respondent's current use of online services and connected devices that may collect personal information. We then provide respondents descriptions for each of the relevant features about which we will inquire in the third part of the survey. These descriptions are in the Appendix, and were carefully vetted by several focus groups.

Based on interactions with focus groups, we recognized many respondents may not be aware of how much data they are sharing currently. For example, some showed an initial aversion to sharing their voiceprint, until they were made aware that home devices like the Amazon Echo (via Alexa) and Google (via Assistant) may collect this information. We included examples in areas where lack of awareness of data sharing seemed particularly relevant.

The final part of the survey consists of repeated choice experiments. Here, we mimic the real market choice situation while exogenously varying our variables of interest – particularly, prices, exposure to ads, and the types of data the user shares. In the discrete choice experiments (DCEs), individuals make a series of choices over hypothetical alternatives, defined by a set of

---

[8] Specifically, Miller et al. (2011) attribute the upward bias to the non-incentive-aligned feature of the choice experiment. Participants do not need to actually pay for their choice in the hypothetical experiment and hence understate the possibility of choosing "none." The result is the biased demand intercept, but not the slope parameters, so WTP estimations remain valid in their test. In the context of Internet service, an incentive-aligned design is not possible due to high product cost, e.g. we cannot realistically offer a fiber-level service if no such infrastructure exists. On the other hand, we suspect that the Internet has become a necessity for most households, even at a reasonably high price. The tendency to choose "none" is likely to be low, especially given we are surveying current subscribers.

16

Electronic copy available at: https://ssrn.com/abstract=3528386

attributes. Since our primary goal is to estimate the WTA to give up specific elements of privacy, the core attributes are price and various measures of data privacy. We provide the descriptions and levels for each survey in Tables 1a-1d.

[Tables 1a-1d about here]

In principle, we could include other common attributes for each survey. However, our surveys are not designed to elicit choices over the products/services themselves (e.g., choices over different smartphones or checking accounts). Rather, for a given product or service, our respondents are asked to make choices about corresponding privacy packages. Such choices are not inconsistent with actual market decisions. For example, as mentioned earlier, Amazon has begun paying consumers for data about non-Amazon purchases, so markets for privacy already exist. We also note that the specific types of privacy we consider were generally motivated by existing policies, such as GDPR and CCPA.

Each respondent is presented with ten different choice questions, a common volume for such surveys at this level of complexity. In addition, to mitigate any endogeneity concern, we explicitly state that any omitted feature should be assumed to be identical across all alternatives. In other words, any omitted attributes are controlled for, i.e., held fixed, when making the comparison. If the survey involves a product or service already owned by the respondent, we specifically instruct them to treat all unmentioned features as being identical to the product or service they currently have.

Finally, for each of the four surveys, we randomize across two versions. The first is as described above. The second includes a statement at the top of the feature descriptions page, which

17

Electronic copy available at: https://ssrn.com/abstract=3528386

highlights the potential benefits of third-party data access, particularly with regard to targeted advertising. In our analysis, we examine whether the presence of such a statement materially impacts the value respondents indicate for their data privacy.

We provide the content of each survey (in English, i.e., the U.S. version) in the Appendix, including an example choice question and an indicator for the randomized statement concerning data value for advertising.

We conclude this subsection with a brief description of our process for arriving at an optimal design, i.e., the construction of the levels for each attribute presented to each respondent for each choice. For a statistically optimal design, we rely on D-optimality (Zwerina et al. 2010), which we implement in the statistical software program SAS. We use a fractional factorial design to capture the main effects.[9] Our relative D efficiency is 72.5%, 82.4%, 82.6%, and 72.4%, for the finance, smartphone, carrier, and Facebook surveys, respectively. The chosen design generates 150 choice questions for the smartphone and carrier surveys and 50 choice questions for the financial and Facebook surveys. The latter two have fewer features, and so require fewer variants. We grouped the choice questions into sets of ten (which we call versions), with four alternatives for the smartphone and carrier surveys and three alternatives for the financial and Facebook surveys. We randomly vary the alternatives for each choice, and randomly distribute the versions across respondents.

---

[9] We use SAS %mktruns and %mktex to produce candidate runs given our target sample size. We avoid dominated alternatives (i.e. better privacy and higher payment) by using the SAS %macro. We then evaluate and select the design by using SAS %choiceff.

18

Electronic copy available at: https://ssrn.com/abstract=3528386

## 4. Data

Our data come from ResearchNow's (RN)[10] standing Internet panel across six countries: Argentina, Brazil, Colombia, Germany, Mexico, and the United States. We requested 325 completed surveys per type (smartphone, etc.), per description header (information about data use for advertising or not), per country. Hence, our total number of requested completed surveys is 4*2*6*325 = 15,600. RN makes sure that the target sample sizes are satisfied. In our analysis, we also weight observations according to 2017 Census estimates for both age and sex[11].

A qualified response requires the household respondent to be at least 18 years old. For the carrier, Facebook, and smartphone surveys, respondents were required to have a carrier subscription, a Facebook account, or own a smartphone, respectively. In all three of these surveys, the respondent also must have been the primary decision-maker for the relevant product or service. For the financial survey, respondents were allowed to proceed even if they did not have a checking account.[12]

Appendix tables A1-A6 contain demographic distributions for each country, broken down by the four survey types.

## 5. Econometric Methods

To estimate values for privacy, we use a conditional logistic regression model (McFadden 1974; Greene 2012) to estimate utility parameters and ultimately calculate the WTA.

---

[10] Recently renamed "Dynata."
[11] We note that none of our qualitative findings depend on this weighting, and the quantitative findings only change minimally, suggesting any selection in terms of who completes the surveys in each country is unlikely to be driving our main results.
[12] Given the relatively large share of people without formal bank accounts in Latin America, we were concerned about excluding too many people with such a restriction and concluded that the questions were such that people could provide meaningful answers even if they did not currently have an account.

Electronic copy available at: https://ssrn.com/abstract=3528386

Let $\boldsymbol{x}_{ijk}$ be a vector of attributes for alternative $j$ in choice question $k$ that individual $i$ faces. A linear random utility model can be written as:

$$u_{ijk} = \boldsymbol{x}'_{ijk}\boldsymbol{\beta} + \varepsilon_{ijk} \qquad (1)$$

We interpret the errors ($\varepsilon_{ijk}$) as individual idiosyncratic preference and assume that it is independently and identically distributed with type I extreme value distributions. With this assumption the probability for individual $i$ to choose alternative $j$ among, say, four alternatives in question $k$ is then

$$\text{Prob}(Y_{ik} = \text{j}) = \frac{\exp(\boldsymbol{x}'_{ijk}\boldsymbol{\beta})}{\sum_{n=1}^{4} \exp(\boldsymbol{x}'_{ink}\boldsymbol{\beta})} \qquad (2)$$

Since we observe individual choices in each question, we are able to generate the likelihood function based on these probabilities. We then optimize the likelihood function with respect to $\boldsymbol{\beta}$ and obtain the estimated utility parameters for each attribute, clustering our errors on individuals.

The calculation of WTA for attributes relies on $\boldsymbol{\beta}$. In our case, the attributes include the personal data whose values we intend to estimate and the services the person would receive in exchange for providing that information. For illustration, consider our survey focusing on wireless carriers. In this survey, we partition $\boldsymbol{x}'_{ijk}$ into $[Price_{ijk}, Ads_{ijk}, Location_{ijk}, Browsing_{ijk}, Contacts_{ijk}]$, where each of the last four variables is a dummy variable equal to 1 if it is kept private and 0 otherwise. The corresponding $\boldsymbol{\beta}'$ is $[\beta_P, \beta_A, \beta_L, \beta_B, \beta_C]$. Using this formulation, the point estimate of WTA for giving up location data privacy, for example, can be monetized using the estimated $\beta_P$ and $\beta_L$ in the following formula:

20

Electronic copy available at: https://ssrn.com/abstract=3528386

$$WTA(share\ location) = -\frac{\beta_L}{\beta_P} \qquad (3)$$

Finally, we estimate the variance of WTA by using a linear transformation of the variance-covariance matrix of $\boldsymbol{\beta}$, also known as the delta method.

A key merit of using a survey is the ability to generate sufficient variation in our variables of interest and cleanly identify the underlying parameters. The use of a hypothetical environment, however, may also induce unrealistic responses that generate bias. To minimize this possibility, we carefully designed our survey to elicit respondents' preferences and mimic the real market situation with respect to payments for data access. However, we are not actually collecting the private information we ask about (e.g., location data), nor are we providing an actual payment in return.

## 6. Results and Discussion

Tables A7-A10 contain our parameter estimates for all four surveys across all six countries. Tables 2a-2d then contain our valuation estimates, which we calculated as described in Section 5[13].

[Tables 2a-2d about here]

To facilitate comparisons, we convert each estimate into U.S. dollars using purchasing power parity (PPP) conversion rates provided by the International Monetary Fund for October

---

[13] Tables A11-A13 provide WTA comparisons across dichotomous breakdowns for sex, age, and income. These are preliminary findings that we intend to further explore in future research.

21

Electronic copy available at: https://ssrn.com/abstract=3528386

2019[14].  Although not a perfect means of comparison, it provides a clearer sense of relative valuations across countries.

Averaged across countries, people seemed most averse to sharing financial (particularly bank balance but also cash withdrawals) and biometric (fingerprint) information, and least averse to receiving ads and sharing their location (Table 3, last column). These results are sensible. Financial institution are often subject to specific privacy laws above and beyond those other institutions must follow.[15] Although regulatory governance of biometrics is not particularly common yet, some have expressed concerns about sharing biometric data due to the inability to replace identifiers like fingerprints or faces if the data are compromised.[16] On the other end, it is also sensible that people are not particularly averse to receiving ads. Ads are, at worst, a nuisance and can be helpful.

We find that people, on average required payments of about $9/month from their banks to for the right to share their balance and about $7.50/month from their smartphone manufacturer to share their fingerprint information.  At the other end of the spectrum, people placed very low value on avoiding ads and required payments of $1.82/month for their location data. Interestingly, respondents were far less averse to sharing their voiceprint than their fingerprint, requiring nearly two times as much to share their fingerprint as their voiceprint. As shown below, this contrast is generally consistent across countries.

---

[14] https://www.imf.org/external/datamapper/PPPEX@WEO/OEMDC/ADVEC/WEOWORLD
[15] See, for example, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/financial-privacy
[16] See, for example, https://www.wired.com/2016/03/biometrics-coming-along-serious-security-concerns/

Electronic copy available at: https://ssrn.com/abstract=3528386

[Table 3 about here]

Across countries, Germans valued privacy more than people in the U.S. and Latin America, aligning with the widespread belief that Germans tend to value their privacy more than others.[17] However, we see in Table 3 that this basic insight is not true across the board and is most pronounced for financial privacy. For example, for fingerprint information – which has the second highest average value – Germany's value is well below that of several other countries. Notably, the U.S. and Latin American countries have similar values on average, and even similar to Germany outside of financial information. We also note that people in Latin America actually appear to appreciate ads—in Colombia, for example, people are willing to pay about $2.50/month to see ads. While we cannot tell the reason from the data, this could be due to differences in Latin American ads vs. Germany and the U.S. or differences in preferences for ads between Latin Americans compared to Germans and Americans. It could also be due to differences in assumptions made by each country's citizens about the prevalence of ad targeting. We note that marketing trends around the time of our study identify Latin America as a digital advertising hot spot.[18] The strong digital advertising presence in Latin America is consistent with relatively high digital ad preferences in that part of the world, providing some indirect corroboration of our result.

We also see variation across countries for each type of data and platform. Table 4 shows privacy values disaggregated across country, data type, and platform.

---

[17] See our discussion in Section 2.
[18] See, e.g., https://socialmediahq.com/why-digital-marketers-need-to-keep-an-eye-on-latin-america/. Digital advertising accounted for 40 percent of the ad market in Latin America by mid-2020.

23

Electronic copy available at: https://ssrn.com/abstract=3528386

[Table 4 about here]

For wireless carriers, we find a strikingly similar rank ordering of preferences across countries, with highest value for information on contacts, followed by browsing history, location, and ads. The range of values, however, is large and differs by country. Wireless providers in Germany would have to pay users $2.30/month for the right to send them ads by text while wireless providers in the U.S. would have to pay $1.63/month. In both countries, people would have to be paid four times by their wireless provider to allow the provider to share their contact information. While Germans generally place the highest value on information on contacts, browsing history, and location, it is by a relatively small margin, with notable similarity in magnitudes on the whole across countries.

We see the same international consistency in rank order for banks, with people placing higher values on checking balance compared to cash withdrawal information. Certain cross-country differences are stark for financial information. Germans stand out with high preference for privacy, requiring their banks to pay them $15.43 and $13.42 per month for the right to share information on their account balance and cash withdrawals, respectively. It is also notable that we see the starkest difference between Germany and the U.S. for banking information – the U.S. respondents place the lowest value on both types of banking information ($4.99 & $3.03), with the Latin American countries all somewhere in between, e.g., $3.30 for cash withdrawals in Mexico and $9.96 for balance in Brazil. The value people place on avoiding ads was much lower across all countries—over $2/month for Germany, about $0.75/month for the U.S., and generally negative for the Latin American countries.

Electronic copy available at: https://ssrn.com/abstract=3528386

Respondents are more averse to having Facebook read their texts read than to the platform sharing information about their networks or contacts.  Germans seemed particularly averse to Facebook using their information in general, requiring the platform to pay them around $8/month for the right to read their texts or share information about their contacts or network. By contrast, people in the U.S. required about $5/month to allow access to their texts, $3.50 to share information about their contacts, and $3/month to share information about their networks. For Latin American countries, the numbers for texts are generally between those for the U.S. and Germany but lower than the U.S. for networks and contacts.

For smartphones, the rank ordering of privacy for different types of data is consistent internationally with, as might be expected, people valuing their biometric information far more than their location data or being sent ads. Latin Americans generally valued fingerprint data very highly, up to $12/month.  Privacy preference for location data was the opposite, with Latin Americans placing quite low values, even negative in one case, on keeping that information private.

In sum, key international differences in relative rankings are most evident with regard to ads, with Latin Americans generally showing a preference for, rather than aversion to, ads on both their smartphone and from their financial institution – in contrast to the U.S. and Germany. In absolute terms, we see all countries exhibiting notable value for financial privacy, with Germany having an especially high value[19].  After accounting for Germany's high value for financial information, we also see notable comparability in the magnitude and relative rankings

---

[19] This finding provides an interesting complement to one of the findings in the 2019 report on the data confidence index (Datum Future & Global Web Index, 2019).  In that report, the authors find Germany is least concerned about how companies use personal data or that the internet is eroding personal privacy, relative to the other countries in our sample.  Combined with our results, this suggests that Germans believe their data to be well protected, but in the case that protection is not a given, are willing to pay the most to protect their data.

Electronic copy available at: https://ssrn.com/abstract=3528386

in value for privacy across countries, with some exceptions (e.g., network information in Mexico and fingerprint information in Colombia).  Interestingly, this finding of general comparability implies that our Latin American countries (2/3rds of our sample), while (perhaps expectedly) comparable to each other in rankings and magnitude, are also quite similar to the U.S. and Germany on these dimensions, suggesting rather wide cross-cultural patterns in preferences. Lastly, for the two types of information we consider on multiple platforms (location and contacts), we see a notably higher values when it comes from the carrier than another source. While in principle ceding information privacy implies the same set of possibilities as to who ultimately will access it, this difference may imply distaste for the platform in general or more specifically a lower level of trust concerning what carriers will do with information they possess and can distribute.

We also collect demographic data about respondents, partly to ensure that the samples are representative, but also to allow us to make some comparisons across groups (see Tables A11 – A13). We find that women value privacy more than men do across privacy type, platform, and country without exception.

Additionally, older people generally value privacy more than younger people do. This finding is consistent with Goldfarb and Tucker (2012), who find that "Older people are much less likely to reveal information than are younger people." There are two exceptions to the age generality in our results. First, a few cases in which point estimates for older people are larger than for younger people but are not statistically significant. The lack of statistical significance exists for sending ads in Brazil, Colombia, and Mexico on wireless carriers and in Brazil for smartphones, although the magnitudes follow the same pattern as others. Second, in Argentina, young people value their financial privacy in terms of sharing their bank balance or information

26

Electronic copy available at: https://ssrn.com/abstract=3528386

on cash withdrawals more than old people, although the magnitude of the difference is small. In contrast to our findings on age, we find no consistent differences in privacy preferences across income.

In light of any lingering concerns about hypothetical bias or other data issues, we cross-check our findings with those of Milberg et al. (2000) along with current measures for the cultural metrics they use (PDI, IND, MAS, and UAI).[20] The key finding we attempt to cross-check is that, for occasions that one country has notably higher valuations for online privacy, that country is typically Germany. Further, by a small margin, the U.S. is second across all our measures. This finding generally aligns with the qualitative findings of Milberg et al. (2000). As noted in Section 2, they find that concerns about information privacy were positively associated with PDI, IND, and MAS, and negatively associated with UAI. Recent estimates for these cultural metrics indicate that Germany and the U.S. have the lowest scores (of the six countries) for UAI, and either the highest or near highest scores for IND and MAS, respectively. However, Germany and the U.S. have the lowest scores for PDI. Nonetheless, these measures are largely consistent with Germany and the U.S. having the highest WTA, particularly given Milberg et al. (2000) finds PDI to have the smallest impact on privacy concerns of the four cultural measures.

Beyond our international comparisons, we also consider within-country variation in valuation for online privacy. To do this, rather than estimate a fixed (mean) utility for each of the non-price variables in our surveys, we assume a normal distribution for each and estimate its mean and variance. This expanded approach allows us to estimate the level of heterogeneity in preferences for different types of online privacy for each country. The estimated coefficients are

---

[20] Recent estimates can be found at https://www.hofstede-insights.com/product/compare-countries/.

27

Electronic copy available at: https://ssrn.com/abstract=3528386

in Tables A14-A17.  We report a simple measure of preference heterogeneity, the coefficient of variation (COV, which equals the standard deviation divided by the mean), for each type of online privacy for each country in Tables 5a-5d.  Here we see that within country variation is largely similar for each of the six countries, with Germans often exhibiting notably more homogeneous preferences compared to the others.  We also note that, in absolute terms, the COV roughly lies in the range of 1 to 3 for nearly all of our privacy measures.  Particularly for the higher COV values, this suggests a significant proportion of individuals have WTA well above the mean while there is also likely a significant proportion with WTA near zero (assuming it is never negative).

[Tables 5a-5d about here]

We considered several other ways to capture heterogeneity in preferences across individuals for the different countries.[21]  First, we used kernel estimators to trace out posterior distributions for our privacy preference parameters, conditional on the choice sets and choices made.  Most posteriors roughly match the assumed normal distribution from the random coefficients model, while a minority exhibited some level of bimodality.[22]  We also considered ways to capture whether and how privacy preferences are correlated within individuals across different types of privacy.  To do this, we estimated our random coefficients model allowing for correlated coefficients (estimates are again in Tables A14-A17).  Our results universally point to positive correlations for privacy preferences.  We corroborated this finding by conducting latent

---

[21] Due to the sheer volume of analyses, we do not include the posterior distributions or latent class results. However, they are all available upon request.

[22] Lin (2019) also finds bimodality in some estimated privacy preferences.  Further analysis in that study suggests that their bimodalities are driven by differences in racial preferences.  Lacking a measure for race in our data, we cannot assess whether it is driving our findings; nonetheless, our finding of bimodalities for some of our privacy preferences suggests that Lin's findings of bimodality are more generally prevalent.

28

Electronic copy available at: https://ssrn.com/abstract=3528386

class analysis, allowing for latent class sizes between 3 and 5. Within-class correlations are universally positive for our various types of privacy.

Lastly, Tables 6a-6d present differences in values for each type of online privacy between the survey that highlights the potential benefits of third-party data access and the one that doesn't. Here, we generally see little difference between the two survey versions. While a few coefficients indicate some statistical significance, there is not a clear pattern. Further, Holm adjusted p-values and joint tests of significance indicate failure to reject the differences as zero. Hence, it appears that preferences for privacy are generally unaffected by prompts indicating potential benefits from sharing online personal information. We contrast this finding with an earlier Pubmatic study,[23] which found a significant difference in attitudes toward Internet advertising depending on respondents' understanding of the anonymity of their data, where attitudes were more positive when told their data remains anonymous. Together, our studies suggest that an alert that anonymity will be preserved is more impactful than one about potential benefits of data sharing.

[Tables 6a-6d about here]

Because of our unique focus on specific platforms and types of data across countries, few other results exist to compare against our own. One exception is Savage and Waldman (2013), discussed earlier, who focus on WTP for privacy in smartphone apps, as opposed to our WTA approach. Among other types of data, they investigated how much people were WTP to keep their location hidden from smartphone apps. They found that people were WTP $1.19 to keep location hidden. While we do not ask about smartphone apps explicitly, we explore how much people are

---

[23] https://www.mediapost.com/publications/article/145720/pubmatic-consumers-confused-about-online-tracking.html

Electronic copy available at: https://ssrn.com/abstract=3528386

WTA to allow their smartphone to share their location. We estimate a WTA of $1.20 in the U.S. for smartphones, remarkably close to their $1.19, providing some element of external validity.

Other comparisons are less clean, as we focus on other platforms while Savage and Waldman focus on apps. They estimate WTP $4.05 to conceal contact information from apps while we estimate WTA $5.11 averaged across Facebook and wireless carrier (the two platforms on which we include this data type), which seem reasonably similar. Finally, they estimate a WTP of $2.12 to eliminate advertising in apps, while we estimate WTA of $1.06 in the U.S. to allow your smartphone to send ads. Whether the difference is due to changes in attitudes about ads over time, different valuations of in-app advertising versus receiving ads on your smartphone more generally, or something else, we cannot say.

A natural question is whether the results are additive—that is, is it meaningful to add the data types within a platform and conclude that the sum is a total value for all those data types combined? In short, the answer largely depends on the degree to which preferences for different types of data privacy are interrelated. We did not explore any interactions in this exercise, given the already-substantial complexity of the survey instruments. It remains work for future research.

## 7. Conclusions

Our findings have several implications.  The striking consistencies in relative rankings of the value of online privacy across our six countries suggests that both public and private policies should offer similar *relative* privacy protections if facing similar costs and contexts for protection. However, when it comes to advertisements, and some other specific examples such as financial information for Germany, notable discrepancies between Latin America, Europe, and the U.S. should be considered and could provide a basis for different protection policies generally or at the

Electronic copy available at: https://ssrn.com/abstract=3528386

sectoral level. Germany stands out as placing the highest value on privacy, driven by their strong preference for financial privacy. After controlling for this difference, we see largely similar valuations across all six countries (with some notable exceptions). This finding suggests stricter protections such as those in GDPR may be relatively more sensible for Europe, but there may be a case for largely similar protections – be they strict or lax – across all these countries.

The largely similar within-country variation in values that we find has interesting implications for both firms and governments. For firms, this finding suggests that, to the extent tiered privacy protections may be economically sensible for one country, it is likely economically sensible for all in our group depending on costs and contexts. With respect to government policies, these results suggest that, when viewed in economic terms, the distribution of support for various protections is likely similar across countries. The notable exception in both cases is Germany, which appears to have more homogeneous preferences regarding online data privacy. Lastly, the positive correlation in individual-level privacy preferences across data types suggests that policies involving bundles of privacy types (e.g., protections for financial and biometric information) are unlikely to encounter more homogenized preferences (as might be possible if our correlations had been negative), potentially posing challenges in garnering widespread support.[24]

Finally, the absence of any notable change in estimated value when respondents are prompted about possible benefits from sharing information suggests that their values of online privacy are reasonably stable and not easily influenced.

Proposed and enacted privacy regulations have not included cost benefit analyses, leaving assessments of their welfare impacts open to a wide range of interpretations, often depending on

---

[24] This point essentially stems from the fact that $Var(X + Y) = Var(X) + Var(Y) + 2Cov(X,Y)$. Hence, positive covariance tends to exacerbate the spread while negative covariance tends to mitigate the spread in preferences.

31

Electronic copy available at: https://ssrn.com/abstract=3528386

one's theory behind the commonly studied privacy paradox. The research discussed in this paper is one approach toward assessing some of the benefits that might be obtained from privacy regulations. As we have highlighted throughout this paper, the findings can particularly illuminate relative evaluations in addition to providing some useful insights about the value of keeping all manner of data private.  Beyond this, more complex work could explore how the different pieces of data interact. Nonetheless, any full accounting of privacy regulations requires estimates of their costs as well.

Our estimates therefore cannot, by themselves, uncover the net value of privacy. For example, suppose we fully relied on our estimates as measures of benefits of privacy protections. We estimate that in the U.S., on average, consumers value keeping location data at $1.20 per month on a smartphone. Suppose further that keeping location data private meant no or less accurate driving directions on the person's smartphone. The net benefits of requiring smartphones to keep location data private would, therefore, be $1.20 minus however much people value high-quality directions on their phones. The same argument is true for all types of data.  In short, more research is necessary to do any full cost benefit analyses. Given the importance of data in the digital economy and the amount of data people share, it would seem prudent to continue this work.

## References

Acquisti, A., Brandimarte, L., and Loewenstein, G. 2015. "Privacy and Human Behavior in the Age of Information." *Science*, 347, 509-514.

Acquisti, A., John, L. K., and Loewenstein, G.. 2013. "What is Privacy Worth?" *The Journal of Legal Studies*, 42, 249-274.

Acquisti, A., Taylor, C., and Wagman, L.. 2016. "The Economics of Privacy" *Journal of Economic Literature*, 54, 442-492.

Adjerid, I., Peer, E., and Acquisti, A. 2018. "Beyond the Privacy Paradox: Objective Versus Relative Risk in Privacy Decision Making." MIS Quarterly, 42, 2, 465-488.

Electronic copy available at: https://ssrn.com/abstract=3528386

Ahlfeldt, G, Koutroumpis, P., and Valletti, T.. 2016. "Speed 2.0: Evaluating Access to Universal Digital Highways." CEPR Discussion Paper 11046.

Athey, S., Catalini, C., and Tucker, C. 2017. "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk." NBER working paper.

Barth, S. and de Jong, M. 2017. "The Privacy Paradox – Investigating Discrepancies between Expressed Privacy Concerns and Actual Online Behavior – A Systematic Literature Review." *Telematics and Informatics*, 34, 7, 1038-1058.

Bellman, S., Johnson, E., Kobrin, S., and Lohse, G.. 2004. "International Differences in Information Privacy Concerns: A Global Survey of Consumers." *The Information Society*, 20, 313-324.

Ben-Akiva, M., McFadden, D., and Train, K.. 2016. "Foundation of Stated Preference Elicitation: Consumer Behavior and Choice-Based Conjoint Analysis." Working paper.

Beresford, A., Kubler, D., and Preibusch, A. 2012. "Unwillingness to Pay for Privacy: A Field Experiment." *Economics Letters*, 117, 25-27.

Bhagat, N. 2014. "Estimating the Value of Online Smartphone Privacy." Dissertation Thesis, University of Colorado, Boulder.

Carare, O., McGovern, C., Noriega, R., and Schwarz, J.. 2015. "The Willingness to Pay for Broadband of Non-Adopters in the U.S.: Estimates from a Multi-State Survey." *Information Economics and Policy*, 30, 19-35

Caussade, S., de Dios Ortúzar, J., Rizzi, L. I., and Hensher, D., 2005. "Assessing the Influence of Design Dimensions on Stated Choice Experiment Estimates." *Transportation Research Part B*, 39(7):621-640.

Chapman, J., Dean, M., Ortoleva, P., Snowberg, E., Camerer, C., 2019. "Willingness to Pay and Willingness to Accept are Probably Less Correlated Than You Think." Working Paper. http://www.columbia.edu/~md3405/Working_Paper_22.pdf

Christin, D., Buchner, C., and Leibecke, N. 2013. "What's the Value of Your Privacy? Exploring Factors That Influence Privacy-Sensitive Contributions to Participatory Sensing Applications." *38th Annual IEEE Conference on Local Computer Networks – Workshops*.

Cvrcek, D. Kumpost, M., Matyas, V., and Danezis, G. 2006. "A Study on the Value of Location Privacy." *Proceedings of the 5th ACM Workshop on Privacy in Electronic Society*.

Czajkowski, M., Giergiczny, M., and Zawojska, E.. 2015. "Does the Number of Discrete Choice Alternatives Matter for Respondents' Stated Preferences? The Case of Tap Water Quality Improvement." Working Paper.

Electronic copy available at: https://ssrn.com/abstract=3528386

Datum Future & Global Web Index. 2019. "The Data Confidence Index," https://www.datumfuture.org/wp-content/uploads/2019/09/Data-Confidence-Index-Datum-Future-and-GWI-2019.pdf.

Ding, M., Grewal, R., and Liechty, J.. 2005. "Incentive-Aligned Conjoint Analysis," *Journal of Marketing Research*, 42, 67–82.

Economist. 2017. "The World's Most Valuable Resource Is No Longer Oil, But Data."

EWeek. 2017. "The Best and Worst Companies for Defending Your Data Privacy."

Greene, W. H. 2012. Econometric Analysis. 7th ed. Upper Saddle River, NJ: Prentice Hall.

Goldfarb, A. and Tucker, C. 2012. "Shifts in Privacy Concerns." *American Economic Review*, 102(3), 349-353.

Hann, I. Hui, K., Lee, T., and Png. I. 2002a. "Online Information Privacy: Measuring the Cost-Benefit Trade-Off." 6th *ICIS*.

Hofstede, G. 1980. Culture's Consequences: International Differences in Work-Related Values. Sage Publications, Beverly Hills, CA.

Hofstede, G. 1991. Cultures and Organizations. McGraw-Hill, Berkshire, England.

Hofstede Insights, https://www.hofstede-insights.com/product/compare-countries, accessed November 6, 2019.

Huberman, B., Adar, E., and Fine, L. 2005. "Valuing Privacy." *IEEE Security & Privacy*, 3, 22-25.

Hugl, U. 2011. "Reviewing Person's Value of Privacy of Online Social Networking." *Internet Research*, 21, 384-407.

Hui, K., Teo, H., and Lee, S. 2007. "The Value of Privacy Assurance: An Exploratory Field Experiment." *MIS Quarterly*, 31, 19-33.

Jentzsch, N., Preibusch, S., and Harasser, A. 2012. "Study on Monetising Privacy: An Economic Model for Pricing Personal Information." ENISA.

Johnson, G.A., Shriver, S.K., and Du, S. 2020. "Consumer Privacy Choice in Online Advertising: Who Opts Out and at What Cost to Industry?" *Marketing Science*, 39(1), 33-51.

Kamakura, W.A. and Russell, G.J. 1989. "A Probabilistic Choice Model for Market Segmentation and Elasticity Structure." *Journal of Marketing Research*, 26(4), 379-390.

Krasnova, H., Hildebrand, T., and Oliver, G. 2009. "Investigating the Value of Privacy on Online Social Networks: Conjoint Analysis." *13th ICIS*.

34

Electronic copy available at: https://ssrn.com/abstract=3528386

Kummer, M. and Schulte, P. 2019. "When Private Information Settles the Bill: Money and Privacy in Google's Market for Smartphone Applications." *Management Science*, 65(8), 3470-3494.

Lin, T. 2019. "Valuing Intrinsic and Instrumental Preferences for Privacy." Working paper.

Long, W. and Quek, M. 2002. "Personal Data Privacy Protection in an Age of Globalization: the US-EU Safe Harbor Compromise." *Journal of European Public Policy*, 3, 325-344.

Madden, M. and Rainie, L. 2015. "Americans' Attitudes about Privacy, Security, and Surveillance." Pew Research.

McFadden, D. 1974. "Conditional Logit Analysis of Qualitative Choice Behavior." In P. Zarembka, ed., *Frontiers in Econometrics*. New York: Academic Press.

Milberg, S.J., Smith, H.J., and Burke, S.J. 2000. "Information Privacy: Corporate Management and National Regulation." *Organization Science* 11, 35–57.

Miller, K.M., Hofstetter, R., Krohmer, H., and Zhang, Z.J. 2011. "How Should Consumers' Willingness to Pay Be Measured? An Empirical Comparison of State-of-the-Art Approaches." *Journal of Marketing Research*, 48, 172-184.

Morningstar.com. 2019. Exchange rates for 9/2018-9/2019.

Png, I. 2007. "On the Value of Privacy from Telemarketing: Evidence from the 'Do Not Call' Registry." Working Paper, National University of Singapore.

Rainie, L., Kiesler, S., Kang, R., and Madden, M. 2013. "Anonymity, Security, and Privacy Online." Pew Research.

Savage, S. and D. Waldman. 2013. "The Value of Online Privacy." Working Paper, University of Colorado.

Savage, S. and D. Waldman. 2015. "Privacy Tradeoffs in Smartphone Applications." *Economics Letters*, 137, 171-175.

Savage, S., and D. Waldman. 2008. "Learning and Fatigue During Choice Experiment: A Comparison of Online and Mail Survey Modes." *Journal of Applied Econometrics*, 23, 351-371.

Smith, H., Dinev, T., and Heng, X. 2011. "Information Privacy Research: An Interdisciplinary Review." *MIS Quarterly*, 35, 989-1016.

Tang, H. 2019. "The Value of Privacy: Evidence from Online Borrowers." Technical report, HEC Paris.

Taylor, C. 2004. "Consumer Privacy and the Market for Customer Information." *RAND Journal of Economics*, 35, 631-650.

Electronic copy available at: https://ssrn.com/abstract=3528386

Tedeschi, B. 2002. "Everybody Talks about Online Privacy, but Few Do Anything about It." *New York Times*.

Tsai, J., Egelman, S., Cranor, L., and Acquisti, A. 2011. "The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study." *Information Systems Research*, 22, 254-268.

Wathieu, L and Friedman, A.. 2007. "An Empirical Approach to Understanding Online Privacy." Harvard Business School Research Paper.

World Bank. 2021. "Data for Better Lives," 2021 World Development Report. file:///C:/Users/jeffprin/Dropbox/PC/Downloads/9781464816000.pdf

Zwerina, K., Huber, J., and Kuhfeld, W.F. 2010. "A General Method for Constructing Efficient Choice Designs," *Marketing Research Method in SAS*, SAS Institute Inc., Cary, NC, USA.

Electronic copy available at: https://ssrn.com/abstract=3528386

## Tables

**Table 1a: Attributes, Descriptions, and Levels for Carrier Survey**

| Attributes | Descriptions and Levels | Levels |
|---|---|---|
| Monthly Payment | The amount you would receive in monthly payments from the carrier. This payment to you is separate from the price you pay for your wireless plan | Arg:$0, $10, $20,…,$160, $170<br>Bra.:$0,$1,…$8,$8.50,$9,$10,…$15,$16<br>Col.:$0,$750,$1500,…,$12,000,$12,750<br>Ger:€0,€0.25,€0.50,…,€4.00,€4.25<br>Mex:$0,$5,$10,…,$80,$85<br>U.S.:$0,$0.25,$0.50,…,$4.00,$4.25 |
| Sends Ads | The carrier is able to send ads to your smartphone via text message | No or Yes |
| Shares Location | The carrier can use and distribute your location information to any company or individual that pays for it | No or Yes |
| Shares Browsing History | The carrier can use and distribute your browsing history to any company or individual that pays for it | No or Yes |
| Shares Contact List | The carrier can use and distribute your contact list to any company or individual that pays for it | No or Yes |

37

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 1b: Attributes, Descriptions, and Levels for Financial Survey**

| Attributes | Descriptions and Levels | Levels |
|---|---|---|
| Monthly Payment | The amount you would receive in monthly payments from the bank. | Arg:\$0, \$10, \$20,…,\$160, \$170<br>Bra.:\$0,\$1,…\$8,\$8.50,\$9,\$10,…\$15,\$16<br>Col.:\$0,\$750,\$1500,…,\$12,000,\$12,750<br>Ger:€0,€0.25,€0.50,…,€4.00,€4.25<br>Mex:\$0,\$5,\$10,…,\$80,\$85<br>U.S.:\$0,\$0.25,\$0.50,…,\$4.00,\$4.25 |
| Sends Ads | The bank is able to send ads to your smartphone via text message | No or Yes |
| Shares Balance | The bank can use and distribute your balance information to any company or individual that pays for it | No or Yes |
| Shares Frequency and Amounts of Cash Withdrawals | The bank can use and distribute information about the frequency and amounts of your cash withdrawals to any company or individual that pays for it | No or Yes |

38

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 1c: Attributes, Descriptions, and Levels for Smartphone Survey**

| Attributes | Descriptions and Levels | Levels |
|---|---|---|
| Monthly Payment | The amount you would receive in monthly payments by a third party. | Arg:$0, $10, $20,…,$160, $170<br>Bra.:$0,$1,…$8,$8.50,$9,$10,…$15,$16<br>Col.:$0,$750,$1500,…,$12,000,$12,750<br>Ger:€0,€0.25,€0.50,…,€4.00,€4.25<br>Mex:$0,$5,$10,…,$80,$85<br>U.S.:$0,$0.25,$0.50,…,$4.00,$4.25 |
| Sends Ads | The third party is able to send ads to your smartphone via text message | No or Yes |
| Shares Fingerprint | The third party can use and distribute your fingerprint information to any company or individual that pays for it | No or Yes |
| Shares Voiceprint | A voiceprint is the data required for a computer to identify your voice as yours. For example, Alexa on an Amazon Echo can use this information to identify you as the speaker. The third party can use and distribute your voiceprint information to any company or individual that pays for it | No or Yes |
| Records Location | The third party can use and distribute your location information to any company or individual that pays for it | No or Yes |

39

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 1d: Attributes, Descriptions, and Levels for Facebook Survey**

| Attributes | Descriptions and Levels | Levels |
|---|---|---|
| Monthly Payment | The amount you would receive in monthly payments by a third party. | Arg:$0, $10, $20,…,$160, $170<br>Bra.:$0,$1,…$8,$8.50,$9,$10,…$15,$16<br>Col.:$0,$750,$1500,…,$12,000,$12,750<br>Ger:€0,€0.25,€0.50,…,€4.00,€4.25<br>Mex:$0,$5,$10,…,$80,$85<br>U.S.:$0,$0.25,$0.50,…,$4.00,$4.25 |
| Reads Texts | Facebook can use and distribute information from your texts to any company or individual that pays for it. Note that this includes texts sent using WhatsApp and Facebook Messenger. | No or Yes |
| Uses Network | Facebook can use and distribute information about your friend network to any company or individual that pays for it. | No or Yes |
| Access Contacts | Facebook can use and distribute your contact list from your smartphone to any company or individual that pays for it. | No or Yes |

40

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 2a: WTA Estimates for Carrier Survey**

|  | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|
| Send Ads | 15.60** (6.13) | 1.74 (1.54) | -913.07* (455.44) | 1.77** (0.31) | 2.13 (3.18) | 1.63** (0.40) |
| Share location | 43.91** (7.36) | 6.00** (1.65) | 3364.05** (604.74) | 2.70** (0.44) | 35.71** (4.81) | 2.50** (0.51) |
| Share contacts | 129.66** (14.12) | 17.67** (3.30) | 7035.25** (922.81) | 7.07** (0.86) | 71.88** (7.55) | 6.66** (1.13) |
| Share browsing history | 71.51** (9.30) | 9.72** (2.24) | 4033.31** (744.15) | 3.73** (0.50) | 25.17** (3.99) | 4.25** (0.76) |

Units are in each country's currency.  Standard errors in parentheses.  + is significant at 10% level.
* is significant at 5% level.  ** is significant at 1% level.

**Table 2b: WTA Estimates for Financial Survey**

|  | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|
| Send ads | -17.78* (7.05) | 0.01 (1.28) | -4571.51** (1106.67) | 1.65** (0.43) | -8.39+ (4.43) | 0.73** (0.25) |
| Share balance | 121.45** (13.71) | 20.72** (4.15) | 12181.23** (2440.85) | 11.88** (1.98) | 56.82** (8.80) | 4.99** (0.79) |
| Share cash withdrawals | 87.53** (11.73) | 10.14** (2.42) | 9004.59** (1806.81) | 10.33** (1.77) | 29.04** (6.03) | 3.03** (0.53) |

Units are in each country's currency.  Standard errors in parentheses.  + is significant at 10% level.
* is significant at 5% level.  ** is significant at 1% level.

41

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 2c: WTA Estimates for Smartphone Survey**

|  | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|
| Send Ads | -18.87** | -0.08 | -4269.86** | 0.81** | -20.27** | 1.06** |
|  | (7.12) | (0.62) | (871.46) | (0.26) | (3.70) | (0.28) |
| Share location | 3.46 | 1.61* | 329.76 | 1.99** | -2.26 | 1.20** |
|  | (7.68) | (0.81) | (835.74) | (0.31) | (3.87) | (0.32) |
| Share fingerprint | 184.25** | 9.73** | 17290.30** | 4.51** | 75.51** | 6.13** |
|  | (20.35) | (1.37) | (2186.27) | (0.59) | (9.09) | (0.88) |
| Share voiceprint | 80.56** | 2.75** | 6400.68** | 3.17** | 42.84** | 3.18** |
|  | (11.39) | (0.86) | (1185.91) | (0.45) | (6.20) | (0.52) |

Units are in each country's currency.  Standard errors in parentheses.  + is significant at 10% level.
* is significant at 5% level.  ** is significant at 1% level.

**Table 2d: WTA Estimates for Facebook Survey**

|  | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|
| Read Texts | 164.13** | 7.09** | 8851.95** | 6.17** | 60.51** | 4.91** |
|  | (16.62) | (1.04) | (868.91) | (1.45) | (6.78) | (0.84) |
| Shares information about your network | 48.72** | 1.16** | 1531.76** | 5.83** | 14.73** | 2.87** |
|  | (8.44) | (0.41) | (464.39) | (1.47) | (3.33) | (0.58) |
| Share contacts | 27.90** | 1.36* | 693.66+ | 6.23** | 21.45** | 3.55** |
|  | (7.16) | (0.62) | (410.76) | (1.46) | (4.11) | (0.67) |

Units are in each country's currency.  Standard errors in parentheses.  + is significant at 10% level.
* is significant at 5% level.  ** is significant at 1% level.

42

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 3: Average WTA By Feature Across Country and Platform**

|  | Argentina | Brazil | Colombia | Mexico | Germany | U.S. | Average |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
| **Share balance** | 5.08 | 9.96 | 9.09 | 6.10 | 15.43 | 4.99 | 8.44 |
| **Share fingerprint** | 7.71 | 4.68 | 12.90 | 8.11 | 5.86 | 6.13 | 7.56 |
| **Read texts** | 6.86 | 3.41 | 6.61 | 6.50 | 8.01 | 4.91 | 6.05 |
| **Share cash withdrawals** | 3.66 | 4.88 | 6.72 | 3.12 | 13.42 | 3.03 | 5.80 |
| **Share contacts** | 3.29 | 4.57 | 2.88 | 5.01 | 8.64 | 5.11 | 4.92 |
| **Share browsing history** | 2.99 | 4.67 | 3.01 | 2.70 | 4.84 | 4.25 | 3.75 |
| **Share voiceprint** | 3.37 | 1.32 | 4.78 | 4.60 | 4.12 | 3.18 | 3.56 |
| **Share info about your network** | 2.04 | 0.56 | 1.14 | 7.57 | 1.58 | 2.87 | 2.63 |
| **Share location** | 0.99 | 1.83 | 1.38 | 1.80 | 3.05 | 1.85 | 1.82 |
| **Send Ads** | -0.29 | 0.27 | -2.43 | -0.95 | 1.83 | 1.14 | -0.07 |

**Calculations made using WTA estimates from Tables 2a-2d and the October purchasing power parity (PPP) conversion rates provided by the IMF. PPP conversion rates are: Argentina: 23.91, Brazil: 2.08, Colombia: 1340, Germany: 0.77, Mexico: 9.31.**

43

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 4: WTA Estimates for All Surveys in U.S. Dollars**

| Survey | Feature | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|---|
| Carrier | Send Ads | 0.65* (0.26) | 0.84 (0.74) | -0.68* (0.34) | 2.30** (0.40) | 0.23 (0.34) | 1.63** (0.40) |
| | Share location | 1.84** (0.35) | 2.88** (0.79) | 2.51** (0.45) | 3.51** (0.57) | 3.84** (0.52) | 2.50** (0.51) |
| | Share contacts | 5.42** (0.59) | 8.50** (1.59) | 5.25** (0.69) | 9.18** (1.12) | 7.72** (0.81) | 6.66** (1.13) |
| | Share browsing history | 2.99** (0.39) | 4.67** (1.08) | 3.01** (0.56) | 4.84** (0.65) | 2.70** (0.43) | 4.25** (0.76) |
| Financial | Send Ads | -0.74* (0.29) | 0.01 (0.62) | -3.41** (0.83) | 2.14** (0.56) | -0.90+ (0.48) | 0.73** (0.25) |
| | Share balance | 5.08** (0.57) | 9.96** (2.00) | 9.09** (1.82) | 15.43** (2.57) | 6.10** (0.95) | 4.99** (0.79) |
| | Share cash withdrawals | 3.66** (0.49) | 4.88** (1.16) | 6.72** (1.35) | 13.42** (2.30) | 3.12** (0.65) | 3.03** (0.53) |
| Smartphone | Send Ads | -0.79** (0.30) | -0.04 (0.30) | -3.19** (0.65) | 1.05** (0.34) | -2.18** (0.40) | 1.06** (0.28) |
| | Share location | 0.14 (0.32) | 0.77* (0.39) | 0.25 (0.62) | 2.58** (0.40) | -0.24 (0.42) | 1.20** (0.32) |
| | Share fingerprint | 7.71** (0.85) | 4.68** (0.66) | 12.90** (1.63) | 5.86** (0.77) | 8.11** (0.98) | 6.13** (0.88) |
| | Share voiceprint | 3.37** (0.48) | 1.32** (0.41) | 4.78** (0.67) | 4.12** (0.58) | 4.60** (0.67) | 3.18** (0.52) |
| Facebook | Read Texts | 6.86** (0.70) | 3.41** (0.50) | 6.61** (0.65) | 8.01** (1.88) | 6.50** (0.73) | 4.91** (0.84) |
| | Shares information about your network | 2.04** (0.35) | 0.56** (0.20) | 1.14** (0.35) | 7.57** (1.91) | 1.58** (0.36) | 2.87** (0.58) |
| | Share contacts | 1.17** (0.30) | 0.65* (0.30) | 0.52+ (0.31) | 8.09** (1.90) | 2.30** (0.44) | 3.55** (0.67) |

**Calculations made using WTA estimates from Tables 2a-2d and the October purchasing power parity (PPP) conversion rates provided by the IMF. PPP conversion rates are: Argentina: 23.91, Brazil: 2.08, Colombia: 1340, Germany: 0.77, Mexico: 9.31. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level.**

44

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 5a: Coefficient of Variation Estimates for Carrier Survey**

|                        | Argentina | Brazil   | Colombia | Germany | Mexico  | U.S.   |
|------------------------|-----------|----------|----------|---------|---------|--------|
| Send Ads               | 3.03**    | 3.67**   | 79.65    | 1.79**  | 18.12   | 2.40** |
|                        | (0.61)    | (1.33)   | (426.29) | (0.25)  | (20.66) | (0.32) |
| Share location         | 2.39**    | 2.10**   | 2.38**   | 1.46**  | 1.91**  | 1.93** |
|                        | (0.37)    | (0.37)   | (0.37)   | (0.17)  | (0.22)  | (0.24) |
| Share contacts         | 1.27**    | 1.33**   | 1.68**   | 0.98**  | 1.37**  | 1.28** |
|                        | (0.09)    | (0.09)   | (0.21)   | (0.10)  | (0.11)  | (0.10) |
| Share browsing history | 1.60**    | 1.74**   | 2.27**   | 1.20**  | 1.99**  | 1.43** |
|                        | (0.16)    | (0.22)   | (0.28)   | (0.09)  | (0.23)  | (0.12) |

All COVs reported as absolute values. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level.

**Table 5b: Coefficient of Variation Estimates for Financial Survey**

|                      | Argentina | Brazil | Colombia | Germany | Mexico | U.S.   |
|----------------------|-----------|--------|----------|---------|--------|--------|
| Send Ads             | 7.25*     | 6.60   | 2.85**   | 2.07**  | 8.07*  | 3.43** |
|                      | (3.47)    | (5.04) | (0.51)   | (0.40)  | (3.82) | (0.71) |
| Share balance        | 1.52**    | 1.37** | 2.13**   | 0.81**  | 1.94** | 1.48** |
|                      | (0.12)    | (0.10) | (0.25)   | (0.06)  | (0.21) | (0.10) |
| Share cash withdrawals | 1.65**  | 1.60** | 2.46**   | 0.82**  | 2.74** | 1.89** |
|                      | (0.14)    | (0.16) | (0.38)   | (0.09)  | (0.41) | (0.17) |

All COVs reported as absolute values. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level.

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 5c: Coefficient of Variation Estimates for Smartphone Survey**

|                   | Argentina | Brazil  | Colombia  | Germany | Mexico | U.S.   |
|-------------------|-----------|---------|-----------|---------|--------|--------|
| Send Ads          | 5.39**    | 37.00   | 2.96**    | 2.26**  | 0.09   | 1.40** |
|                   | (2.02)    | (92.49) | (0.63)    | (0.35)  | (0.655)| (0.33) |
| Share location    | 7.06*     | 4.38**  | 314.55    | 1.58**  | 10.37  | 2.31** |
|                   | (3.24)    | (1.28)  | (5840.38) | (0.16)  | (6.21) | (0.40) |
| Share fingerprint | 1.18**    | 1.70**  | 1.27**    | 1.14**  | 1.35** | 1.20** |
|                   | (0.11)    | (0.17)  | (0.09)    | (0.35)  | (0.09) | (0.21) |
| Share voiceprint  | 1.48**    | 3.19**  | 2.45**    | 1.24**  | 1.72** | 1.47** |
|                   | (0.16)    | (0.72)  | (0.31)    | (0.24)  | (0.16) | (0.21) |

All COVs reported as absolute values. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level.

**Table 5d: Coefficient of Variation Estimates for Facebook Survey**

|                                       | Argentina | Brazil | Colombia | Germany | Mexico | U.S.   |
|---------------------------------------|-----------|--------|----------|---------|--------|--------|
| Read Texts                            | 1.22**    | 1.54** | 1.40**   | 1.39**  | 1.36** | 1.51** |
|                                       | (0.07)    | (0.14) | (0.10)   | (0.13)  | (0.10) | (0.13) |
| Shares information about your network | 2.84**    | 2.67** | 4.34**   | 1.22**  | 3.20** | 1.91** |
|                                       | (0.42)    | (0.51) | (0.98)   | (0.10)  | (0.52) | (0.22) |
| Share contacts                        | 4.14**    | 3.93** | 5.83*    | 1.05**  | 2.17** | 1.86** |
|                                       | (0.83)    | (1.07) | (1.57)   | (0.07)  | (0.23) | (0.21) |

All COVs reported as absolute values. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level.

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 6a: Difference in WTA When Prompted for Carrier Survey**

|  | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|
| Send Ads | -1.78 (12.21) | -4.07 (3.40) | -496.43 (922.54) | -1.13 (0.72) | -5.47 (6.44) | 0.05 (0.79) |
| Share location | -15.09 (16.81) | 1.18 (3.22) | -542.05 (1241.84) | -1.23 (0.98) | 3.54 (9.66) | 0.44 (1.02) |
| Share contacts | 30.21 (28.31) | -0.94 (6.63) | -2896.35 (1880.27) | -3.12 (1.96) | 9.84 (15.14) | -0.57 (2.27) |
| Share browsing history | 0.81 (18.64) | -0.75 (4.46) | 1150.18 (1548.93) | -1.34 (1.10) | 7.27 (8.00) | 1.84 (1.52) |

Units are in each country's currency. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level. Note that Holm-adjusted p-value for Colombia is 0.35.

**Table 6b: Difference in WTA When Prompted for Financial Survey**

|  | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|
| Send Ads | -8.40 (14.12) | 4.73 (2.68) | -2818.07 (2159.10) | -0.25 (0.87) | 6.33 (8.87) | 0.08 (0.52) |
| Share balance | 8.34 (27.41) | -0.29 (8.64) | -1269.47 (5049.41) | -3.64 (4.17) | 23.24 (18.03) | 2.67 (1.87) |
| Share cash withdrawals | -4.29 (23.47) | 3.06 (4.85) | -3435.92 (3885.97) | -3.10 (3.69) | 9.54 (12.20) | 2.61+ (1.34) |

Units are in each country's currency. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level. Note that Holm-adjusted p-value for U.S. is 0.11.

Electronic copy available at: https://ssrn.com/abstract=3528386

**Table 6c: Difference in WTA When Prompted for Smartphone Survey**

|  | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|
| Send Ads | -8.09 (14.27) | -0.52 (1.23) | 1538.41 (1725.83) | -0.04 (0.52) | -16.52+ (8.49) | -0.64 (0.68) |
| Share location | 2.81 (15.33) | -0.63 (2.73) | -573.87 (1689.72) | 0.32 (0.61) | -1.52 (8.06) | -0.98 (0.80) |
| Share fingerprint | -8.86 (40.70) | -0.81 (1.68) | 587.84 (4439.91) | -0.23 (1.19) | 39.94* (20.28) | -4.72+ (2.62) |
| Share voiceprint | 6.68 (22.78) | -0.29 (1.61) | 1675.88 (2460.98) | 0.38 (0.90) | 22.87+ (13.62) | -3.27* (1.59) |

Units are in each country's currency. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level. Note that Holm-adjusted p-value for Germany is 0.09, for Mexico is 0.23, and for U.S. is 0.26.

**Table 6d: Difference in WTA When Prompted for Facebook Survey**

|  | Argentina | Brazil | Colombia | Germany | Mexico | U.S. |
|---|---|---|---|---|---|---|
| Read Texts | -54.24 (34.38) | -0.68 (2.06) | 2934.08+ (1780.00) | -0.20 (2.90) | 1.98 (13.57) | -1.67 (1.89) |
| Shares information about your network | -14.81 (17.19) | 0.08 (0.83) | -397.80 (922.83) | -0.36 (2.94) | -5.03 (6.71) | -1.23 (1.31) |
| Share contacts | -21.35 (14.71) | -1.20 (1.21) | 993.94 (828.23) | 0.19 (2.92) | 11.42 (8.27) | -1.04 (1.49) |

Units are in each country's currency. Standard errors in parentheses. + is significant at 10% level. * is significant at 5% level. ** is significant at 1% level. Note that Holm-adjusted p-value for Colombia is 0.

48

Electronic copy available at: https://ssrn.com/abstract=3528386

EXHIBIT C

| Case | Monetary | Non-Monetary | Class Size | Notices Sent | Gross Recovery Per Member | Claims Rate |
|---|---|---|---|---|---|---|
| Young et al. v. Military Advantage, Inc., Case No. 2023LA000535 (Illinois Circuit Ct.) | $ 7,350,000.00 | Pixel Removed | 3,482,438 | 3,116,708 | $ 2.11 | 4.50% |
| Kyle Feldman v. Star Tribune Media Company LLC, Case No. 0:22-cv-01731-ECT-TNL (D. Minnesota) | $ 2,900,000.00 | Pixel Removed | 346,089 | 345,197 | $ 8.38 | 1.60% |
| Fiorentino v. FloSports, Inc, Case No. 1:22-cv-11502-Ak (D. Mass.) | $ 2,625,000.00 | Pixel Removed | 785,208 | 784,760 | $ 3.34 | 1.30% |
| Vela, et al. v. AMC Networks, Inc., Case No. 1:23-cv-02524-ALC (SDNY) | $ 8,300,000.00 | AMC+ Digital Subscription Extension (Up to $1M Value); Pixel Removed | 7,362,067 | 7,147,497 | $ 1.13 | 7.15% |
| Beltran et al. v. Sony Pictures Entertainment, Case No. 1:22-cv-04858 (Illinois ND) | $ 16,000,000.00 | Pixel Removed | 19,581,000 | 19,581,200 | $ 0.82 | 1.75% |
| Ambrose v. Boston Globe Media Partners, Case No.1:22-cv-10195-RGS (D. Mass.) | $ 4,000,000.00 | Boston Globe Digital Subscription Extension (Up to $1M Value); Pixel Removed | 516,125 | 509,881 | $ 7.75 | 2% |

EXHIBIT D

**HAMMONDLAW. P.C.**
1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

### Approved California Wage and Hour Cases

- *Fox et al v. Verkada,* Case No. 23-CIV-00193 (San Mateo County Superior Court) (October 24, 2024) (certifying HammondLaw as class counsel for $5,907,342.70 settlement of FLSA claims, and Labor Code §§ 512, 226.7, 510, 1194, 226(a), 201-203, 2802 claims on behalf of 1,355 employees);

- *Broersma v Platt College Los Angeles LLC,* Case No. 20STCV47502 (Los Angeles County Superior Court) (August 30, 2024) (certifying HammondLaw as co-class counsel for $885,500 settlement of Labor Code §§ 1194, 226(a), 226.7, 510, 512, 201-203, 204, 1174, 1174.5, 2802, and 2699 claims on behalf of 731 no-exempt hourly employees);

- *Fligsten et al. v Musicians Institute,* Case No. 21STCV38365 (Los Angeles County Superior Court) (August 7, 2024) (certifying HammondLaw as class counsel for $900,000 settlement of Labor Code §§ 1194, 226(a), 226.7, 510, 512, 201-203, 2802, and 2699 claims on behalf of 452 instructors; and Labor Code § 2802 claims on behalf of 130 remote workers);

- *Pahl et al. v Colorado Technical Institute, et al.*, Case No. 34-2022-00322588 (Sacramento County Superior Court) (June 28, 2024) (certifying HammondLaw as class counsel for $900,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 201-203, 2802, and WARN Act claims on behalf of 246 adjunct instructors; and Labor Code § 2802 claims on behalf of 180 remote workers);

- *Peters v Life Pacific University*, Case No. 22STCV06988 (Los Angeles County Superior Court) (April 26, 2024) (certifying HammondLaw as class counsel for $138,000 settlement of Labor Code §§ 1194, 226.2, 226.7, 201-203, and 2802 claims on behalf of 61 adjunct instructors and Labor Code § 2802 claims on behalf of 137 remote workers);

- *Teraoka v California Baptist University*, Case No. CVRI2201866 (Riverside County Superior Court) (March 21, 2024) (certifying HammondLaw as class counsel for $99,000 settlement of Title IX claims on behalf of 361 male student athletes);

- *Cathers v Mount Saint Mary's University*, Case No. 22STCV02491 (Los Angeles County Superior Court) (March 8, 2024) (certifying HammondLaw as co-class counsel for $1,110,000 settlement of Labor Code § 1194, 226.2, 226.7, 226(a), 201-203, and 2802 claims on behalf of 690 adjunct instructors);

- *Foster et al v Embry Riddle Aeronautical University*, Case No. CVRI2202995 (Riverside County Superior Court) (February 2, 2024) (certifying HammondLaw as co-class counsel for $559,482 settlement of Labor Code § 1194, 226.2, 226.7, 226(a), 201-203, 1400, and 2802 claims on behalf of 123 part-time instructors);

- *Serna v Gurnick Academy of Medical Arts,* Case No. 22-CIV01185 (San Mateo County Superior Court) (January 18, 2024) (Labor Code § 2699 et seq. representative action settlement for $545,0000 for violation of Labor Code §§ §§ 201-203,226(a), 226.7, 246, 510, 512, 558, 1194, and 2802 on behalf of 884 employees);

**HAMMONDLAW. P.C.**
1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

- *Lundgren v Otis College of Art and Design*, Case No. 22STCV14633 (Los Angeles County Superior Court) (January 2, 2024) (certifying HammondLaw as class counsel for $990,000 settlement of Labor Code §§ 1194, 226.2, 226.7, 226(a), 201-203, and 2802 claims on behalf of 606 adjunct instructors and Labor Code § 2802 claims on behalf of 335 remote workers);

- *Knapp et al. v. Pepperdine University*, Case No. 22STCV16736 (Los Angeles County Superior Court) (December 6, 2023) (certifying HammondLaw as class counsel for $407,000 settlement of Labor Code § 2802 claims on behalf of 1,497 adjunct instructors);

- *Meyer et al v Visa Inc. et al.,* Case No. CGC-21-593058 (San Francisco County Superior Court) (November 17, 2023) (certifying HammondLaw as class counsel for $2,700,000 settlement of Labor Code § 2802 and 432.5 claims on behalf of 4,973 employees);

- *Davila v Concentrix Solutions Corporation et al,* Case No. RG20079700 (Alameda County Superior Court) (November 17, 2023) (certifying HammondLaw as class counsel for $385,000 settlement of Labor Code § 2802 claims on behalf of 262 employees);

- *Dominguez, et al. v. All-Pro Bail Bonds, Inc., et al,* Case No. 21CV381890 (Santa Clara County Superior Court) (September 21, 2023) (certifying HammondLaw as Class Counsel for $2,300,000 settlement of Civil Code § 1799.91 claims on behalf of 33,792 non-spousal co-signers of All Pro bail bond premium financing agreements);

- *Pasno et al v Hibu, Inc.,* Case No. 22STCV01361 (Los Angeles County Superior Court) (September 27, 2023) (certifying HammondLaw as class counsel for $140,000 settlement of Labor Code §§ 1194, 510, 226(a), 201-203, and 2802 claims on behalf of 141 sales representatives);

- *Jackson v University of Redlands,* Case No. CIVSB2133143 (San Bernardino County Superior Court) (September 18, 2023) (certifying HammondLaw as class counsel for $700,000 settlement of Labor Code §§ 1194 and 226(a) claims on behalf of 310 adjunct instructors and Labor Code § 2802 claims on behalf of 1,100 employees);

- *Martinez v Knight Transportation*, Case No. 1:16-cv-01730-SKO (E.D. Cal.) (September 11, 2023) (certifying HammondLaw as co-class counsel $400,000 settlement of Labor Code §§ 1194, 226.2, 226.7, 203, and 2802 claims on behalf of 5,648 truck drivers);

- *Brandmeier v Columbia Southern University,* Case No. 22CV013638 (Alameda County Superior Court) (August 28, 2023) (certifying HammondLaw as class counsel for $320,000 settlement of Labor Code §§ 201-203, 226(a)-(e), 226.2, 226.7, 1194, 510, 2802, and 2699 claims on behalf of 51 instructors);

- *Angelina Harrold v California Family Health LLC dba California Family Fitness,* Case No. 34-2022-00323409 (Sacramento County Superior Court) (August 17, 2023) (Labor Code § 2699 et seq. representative action settlement for $223,000 for violation of Labor Code §§ 1194, 510, 226.7, 512, 226(a), 201-203, and 2802 on behalf of 374 fitness instructors);

- *Carr et al v Konica Minolta Business Solutions U.S.A., Inc.,* Case No. 21CV001245 (Alameda County Superior Court) (June 27, 2023) (certifying

**HAMMONDLAW. P.C.**
1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

HammondLaw as class counsel for $1,247,907.53 settlement of Labor Code §§ 1194, 226(a), 226.7, 510, and 201-203 claims on behalf of 269 sales representatives and Labor Code § 2802 claims on behalf of 890 other employees);

- *Costa v. University of Antelope Valley,* Case No. 21STCV18531 (Los Angeles County Superior Court) (May 17, 2023) (Labor Code § 2699 et seq. representative action settlement for $156,232.78 for violation of Labor Code §§ 1194, 226(a), 226.2, 226.7, 510, 512, 203, and 2802 on behalf of 55 instructors and Labor Code § 2802 claims on behalf of 54 other employees);

- *Harris v Southern New Hampshire University,* Case No. RG21109745 (Alameda County Superior Court) (May 12, 2023) (certifying HammondLaw as co-class counsel for $1,475,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 510 512, 201-203, and 2802 claims on behalf of 480 adjunct instructors);

- *Castillo v Holy Names University,* Case No. HG21097245 (Alameda County Superior Court) (May 2, 2023) (certifying HammondLaw as class counsel for $970,701.38 settlement of Labor Code §§ 226(a), 226.2, 226.7, 512, 1194, 201-203, and 2802 claims on behalf of 454 part-time instructors; Labor Code § 2802 claims on behalf of 563 other employees who worked remotely; and Labor Code § 226(a) claims on behalf of 682 employees who received inaccurate wage statements);

- *Marantz v Laguna College of Art and Design,* Case No. 30-2021-01194814-CU-OE-CXC (Orange County Superior Court) (April 21, 2023) (certifying HammondLaw as class counsel for $825,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 512, 201-203, and 2802 claims on behalf of 295 adjunct instructors; and Labor Code § 2802 claims on behalf of 191 other employees);

- *Glor v iHeart Media + Entertainment,* Case No. 22CV005286 (Alameda County Superior Court) (February 14, 2023) (certifying HammondLaw as class counsel for $1,220,000 settlement of Labor Code §§ 226(a), 510, 1194, and 201-203 claims on behalf of 206 account executives and Labor Code § 2802 claims on behalf of 1,154 other employees);

- *Cassidy v Keyence Corporation of America,* Case No. 21CV382350 (Santa Clara County Superior Court) (February 8, 2023) (Labor Code § 2699 et seq. representative action settlement for $300,000 for violation of Labor Code §§ 226(a), 512, 203, and 2802 on behalf of 151 sales representatives and Labor Code § 2802 claims on behalf of 18 other employees);

- *Burleigh v. Brandman University,* Case No. 30-2020-01172801-CU-OE-CXC (Orange County Superior Court) (January 27, 2023) (certifying HammondLaw as class counsel for $1,550,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 512, 201-203, claims on behalf of 1,757 adjunct instructors and Labor Code § 2802 claims on behalf of 555 other employees);

- *Burleigh v. Walden University LLC and Laureate Education, Inc.,* Case No. RG21106062 (Alameda County Superior Court) (December 9, 2022) (certifying HammondLaw as co-class counsel for $815,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 203, 2802, and 2699, claims on behalf of 244 adjunct instructors);

3

**HAMMONDLAW. P.C.**

1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

- ***Burleigh v. National University***, Case No. MSC21-00939 (Contra Costa County Superior Court) (August 26, 2022) (certifying HammondLaw as co-class counsel for $925,000 settlement of Labor Code § 2802 claim on behalf of 1,802 instructors);

- ***Parson v. La Sierra University,*** Case No. CVRI2000104 (Riverside County Superior Court) (May 19, 2022) (certifying HammondLaw as class counsel for $578,220 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 203, claims on behalf of 381 adjunct instructors and Labor Code § 2802 claims on behalf of 739 other employees);

- ***Chindamo v. Chapman University,*** Case No. 30-2020-01147814-CU-OE-CXC (Orange County Superior Court) (April 15, 2022) (certifying HammondLaw as co-class counsel for $1,150,00 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 203, claims on behalf of 1,374 adjunct instructors and Labor Code § 2802 claims on behalf of 4,120 other employees);

- ***Sweetland-Gil v. University of the Pacific,*** Case No. STK-CV-UOE-2019-0014682 (San Joaquin County Superior Court) (March 4, 2022) (certifying HammondLaw as class counsel for $1,800,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 1,100 adjunct instructors);

- ***Senese v. University of San Diego,*** Case No. 37-2019-00047124-CU-OE-CTL (San Diego County Superior Court) (February 8, 2022) (certifying HammondLaw as co-class counsel for $3,892,750 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 2,071 adjunct instructors);

- ***Solis et al. v Concordia University Irvine,*** Case No. 30-2019-01114998-CU-OE-CXC (Orange County Superior Court) (February 3, 2022) (certifying HammondLaw as class counsel for $890,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 203, and 2802 claims on behalf of 778 adjunct instructors);

- ***McCoy et v Legacy Education LLC,*** Case No. 19STCV2792 (Los Angeles County Superior Court) (November 15, 2021) (Labor Code § 2698 et seq. representative action settlement for $76,000 for violation of Labor Code §§ 1194, 226(a), 226.7, 512, 203, and 2802 on behalf of 31 instructors);

- ***Merlan v Alliant International University,*** Case No. 37-2019-00064053-CU- OE-CTL (San Diego County Superior Court) (November 2, 2021) (certifying HammondLaw as co-class counsel for $711,500 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 803 adjunct instructors);

- ***Stupar et al. v University of La Verne***, Case No. 19STCV33363 (Los Angeles County Superior Court) (October 14, 2021) (certifying HammondLaw as class counsel for $2,450,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 512, and 203 claims on behalf of 1,364 adjunct instructors);

- ***Normand et al. v Loyola Marymount University***, Case No. 19STCV17953 (Los Angeles County Superior Court) (September 9, 2021) (certifying HammondLaw as class counsel for $3,400,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 1,655 adjunct instructors);

- ***Veal v Point Loma Nazarene University***, Case No. 37-2019-00064165-CU-OE-CTL (San Diego County Superior Court) (August 27, 2021) (certifying HammondLaw as class counsel for $711,500 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 670 adjunct instructors);

4

**HAMMONDLAW. P.C.**
1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

- ***Pillow et al. v. Pepperdine University***, Case No. 19STCV33162 (Los Angeles County Superior Court) (July 28, 2021) (certifying HammondLaw as class counsel for $940,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 1,547 adjunct instructors);

- ***Moore et al v Notre Dame De Namur University,*** Case No. 19-CIV-04765 (San Mateo County Superior Court) (July 1, 2021) (certifying HammondLaw as class counsel for $882,880 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 397 adjunct instructors);

- ***Mooiman et al. v Saint Mary's College of California,*** Case No. C19-02092 (Contra Costa County Superior Court) (June 10, 2021) (certifying HammondLaw as class counsel for $1,700,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 760 adjunct instructors and Labor Code § 226(a) claim on behalf of 2,212 other employees);

- ***Peng v The President and Board of Trustees of Santa Clara College,*** Case No. 19CV348190 (Santa Clara County Superior Court) (April 21, 2021) (certifying HammondLaw as class counsel for $1,900,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, and 203 claims on behalf of 1,017 adjunct instructors and Labor Code Code § 226(a) claim on behalf of 5,102 other employees);

- ***Morse v Fresno Pacific University,*** Case No. 19-CV-04350 (Merced County Superior Court) (April 6, 2021) (certifying HammondLaw as class counsel for $1,534,725 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 512 and 203 claims on behalf of 861 adjunct instructors);

- ***Miner, et al. v. ITT Educational Services, Inc.,*** Case No. 3:16-cv-04827-VC (N.D. Cal.) (March 19, 2021) (certifying HammondLaw as class counsel for $5,200,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7, 512 and 2802 claims on behalf of 1,154 adjunct instructors);

- ***Harris-Foster v. University of Phoenix***, Case No. RG19019028 (Alameda County Superior Court) (March 17, 2021) (certifying HammondLaw as class counsel for $2,863,106 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7 and 2802 putative class action on behalf of 3,447 adjunct instructors);

- ***Granberry v. Azusa Pacific University***, Case No. 19STCV28949 (Los Angeles County Superior Court) (March 5, 2021) (certifying HammondLaw as class counsel for $1,112,100 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7 and 2802 claims on behalf of 1,962 adjunct instructors);

- ***Ott v. California Baptist University***, Case No. RIC1904830 (Riverside County Superior Court) (January 26, 2021) (certifying HammondLaw as co-class counsel for $700,000 settlement of Labor Code §§ 1194, 226(a), 226.2, 226.7 and 512 claims on behalf of 958 adjunct instructors);

- ***Pereltsvaig v. Cartus Corporation***, Case No. 19CV348335 (Santa Clara County Superior Court) (January 13, 2021) (certifying HammondLaw as class counsel in $300,000 settlement of Labor Code §§ 226.8(a), 1194, 226(a), 226.7, 510, 512, and 2802 claims on behalf of 126 instructors);

- ***Morrison v. American National Red Cross***, Case No. 19-cv-02855-HSG (N.D. Cal.) (January 8, 2021) (certifying HammondLaw as class counsel in a $377,000 Settlement of Labor Code §§ 1194, 226(a), 226.7, 510, 512 and 2802 claims on behalf of 377 instructors);

**HAMMONDLAW. P.C.**

1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

- ***Brown v. Cernx,*** Case No. JCCP004971 (Alameda County Superior Court) (July 14, 2020) (certifying HammondLaw as co-class counsel in $350,000 settlement of Labor Code §§ 1194, 226, 226.7, 510, 512, and 2802 claims on behalf of 309 couriers);

- ***Stempien v. DeVry University***, Case No. RG19002623 (Alameda County Superior Court) (June 30, 2020) (certifying HammondLaw as class counsel for $1,364,880 settlement Labor Code §§ 1194, 226, 226.2, 226.7, and 2802 claims on behalf of 498 adjunct instructors);

- ***McCoy v. Concorde.***, Case No. 30-2017-00936359-CU-OE-CXC (Orange County Superior Court.) (July 2, 2019) (certifying HammondLaw as class counsel for $2,500,000 settlement of Labor Code §§ 1194, 226, 226.7, and 512 putative claims on behalf of 636 adjunct instructors);

- ***Hogue v. YRC,*** Case No. 5:16-cv-01338 (C.D. Cal.) (June 24, 2019) (certifying HammondLaw as co-class counsel for $700,000 settlement of Labor Code §§ 1194, 226.2, 226.7, and 2802 claims on behalf of 225 truck drivers);

- ***Sands v. Gold's Gym,*** Case No. BC660124 (Los Angeles Alameda County Superior Court)(March 20, 2019) (Labor Code § 2698 *et seq.* representative action settlement for $125,000 for violation of Labor Code § 1194, 2802 and 246 *et seq.* claims on behalf of 106 fitness instructors);

- ***Garcia v. CSU Fullerton.***, Case No. 30-2017-00912195-CU-OE-CXC (Orange County Superior Court) (February 15, 2019) (certifying HammondLaw as class counsel for $330,000 settlement of Labor Code §§ 1194, 226, 226.7, and 512 claims on behalf of 127 adjunct instructors);

- ***Pereltsvaig v. Stanford***, Case No. 17-CV-311521 (Santa Clara County Superior Court) (January 4, 2019) (certifying HammondLaw as class counsel for $886,890 settlement of Labor Code §§ 1194, 226, 226.7, 512, 2802 and 2699 claims on behalf of 398 adjunct instructors);

- ***Moss et al. v. USF Reddaway, Inc.,*** Case No. 5:15-cv-01541 (C.D. Cal.) (July 25, 2018) (certifying HammondLaw as co-class counsel for $2,950,000 settlement of Labor Code §§ 1194, 226, 226.7, and 201-203 claims on behalf of 538 truck drivers);

- ***Beckman v. YMCA of Greater Long Beach,*** Case No. BC655840 (Los Angeles County Superior Court) (June 26, 2018) (Labor Code § 2698 *et seq.* representative action settlement for $92,500 for violation of Labor Code § 1194 and 226(a) claims on behalf of 101 fitness instructors);

- ***Maldonado v. Heavy Weight Transport, Inc.,*** Case No. 2:16-cv-08838 (C.D. Cal.) (December 11, 2017) (certifying HammondLaw as co-class counsel for $340,000 settlement of Labor Code §§ 1194, 226, 226.2, 226.7, 226, 201-203, and 2699 claims on behalf of 160 truck drivers);

- ***Hillman v. Kaplan***, Case No. 34-2017-00208078 (Sacramento County Superior Court) (December 7, 2017) (certifying HammondLaw as class counsel for $1,500,000 settlement of Labor Code §§ 1194, 226, 226.7, 201-203 and 2802 claims on behalf of 506 instructors);

- ***Bender et al. v. Mr. Copy, Inc.***, Case No. 30-2015-00824068-CU-OE-CXC (Orange County Superior Court) (October 13, 2017) (certifying HammondLaw as

**HAMMONDLAW. P.C.**

1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

co-class counsel for $695,000 settlement of Labor Code §2802 claims on behalf of approximately 250 outside sales representatives);

- ***Rios v. SoCal Office Technologies***, Case No. CIVDS1703071 (San Bernardino County Superior Court) (September 6, 2017) (certifying HammondLaw as co-class counsel for $495,000 settlement of Labor Code §2802 claims on behalf of approximately 180 outside sales representatives);

- ***Russell v. Young's Commercial Transfer, Inc.***, Case No. PCU265656 (Tulare County Superior Court) (June 19, 2017) (certifying HammondLaw as co-class counsel for $561,304 settlement of Labor Code §§ 1194, 226, 226.2, and 201-203 claims on behalf of 962 truck drivers);

- ***Keyes v. Valley Farm Transport, Inc.***, Case No. FCS046361 (Solano County Superior Court) (May 23, 2017) (certifying HammondLaw as co-class counsel for $497,000 settlement of Labor Code § 226, 1194, 512 and 2698 *et seq.* claims on behalf of 316 truck drivers);

- ***Numi v. Interstate Distributor Co.***, Case No. RG15778541 (Alameda County Superior Court ) (March 6, 2017) (certifying HammondLaw as co-class counsel for $1,300,000 settlement of Labor Code §§ 1194, 226.2 and 2802 claims on behalf of approximately 1,000 truck drivers);

- ***Keyes v. Vitek, Inc.,*** Case No. 2016-00189609 (Sacramento County Superior Court) (February 17, 2017) ($102,000 settlement of PAGA representative action for violation of Labor Code § 226.8 on behalf of 90 truck drivers);

- ***Martinez v. Estes West dba G.I. Trucking, Inc.***, Case. BC587052 (Los Angeles County Superior Court) (April 4, 2017) (certifying HammondLaw as co-class counsel for $425,000 settlement of Labor Code §§ 1194, 226, and 201-203 claims on behalf of approximately 156 truck drivers);

- ***Sansinena v. Gazelle Transport Inc.***, Case No. S1500-CV- No 283400 (Kern County Superior Court) (December 8, 2016) (certifying HammondLaw as co-class counsel for $264,966 settlement of Labor Code §§ 1194, 226, and 201-203 claims on behalf of approximately 314 truck drivers);

- ***Cruz v. Blackbelt Enterprises, Inc.,*** Case No. 39-2015-00327914-CU-OE-STK (San Joaquin County Superior Court) (September 22, 2016) (certifying HammondLaw as co-class counsel for $250,000 settlement of Labor Code §§ 1194, 226, and 201-203 claims on behalf of approximately 79 truck drivers);

- ***Araiza et al. v. The Scotts Company, L.L.C.***, Case No. BC570350 (Los Angeles County Superior Court) (September 19, 2016) (certifying HammondLaw as co-class counsel for $925,000 settlement of Labor Code §226, 510, 512 and 2802 claims on behalf of approximately 570 merchandisers; and Labor Code 226(a) claims on behalf of approximately 120 other employees);

- ***Dixon v. Hearst Television, Inc.***, Case No. 15CV000127 (Monterey County Superior Court) (September 15, 2016) (certifying HammondLaw as class counsel for a $432,870 settlement of Labor Code § 2802 claims on behalf of approximately 55 outside sales representatives);

- ***Garcia et al. v. Zoom Imaging Solutions, Inc***. SCV0035770 (Placer County Superior Court) (September 8, 2016) (certifying HammondLaw as co-class counsel for $750,000 settlement of Labor Code § 510, 512, 1194 and 2802 claims on behalf of approximately 160 sales representatives and service technicians);

**HAMMONDLAW, P.C.**
1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

- ***O'Beirne et al. v. Copier Source, Inc. dba Image Source***, Case No. 30-2015-00801066-CU-OE-CXC (Orange County Superior Court) (September 8, 2016) (certifying HammondLaw as co-class counsel for $393,300 settlement of Labor Code § 2802 claims on behalf of approximately 132 outside sales representatives);

- ***Mead v. Pan-Pacific Petroleum Company, Inc.***, Case No. BC555887 (Los Angeles County Superior Court) (August 30, 2016) (certifying HammondLaw as co-class counsel for $450,000 settlement of Labor Code §§ 1194, 226, and 201-203 claims on behalf of approximately 172 truck drivers);

- ***Lange v. Ricoh Americas Corporation***, Case No. RG136812710 (Alameda County Superior Court) (August 5, 2016) (certifying HammondLaw as co-class counsel for $1,887,060 settlement of Labor Code § 2802 claims on behalf of approximately 550 sales representatives);

- ***Alcazar v. US Foods, Inc. dba US Foodservice***, Case No. BC567664 (Los Angeles County Superior Court) (March 18, 2016) (certifying HammondLaw as co-class counsel for a $475,000 settlement of Labor Code §§ 1194, 226, and 201-203 claims on behalf of approximately 634 truck drivers);

- ***Harris v. Toyota Logistics***, Case No. C 15-00217 (Contra Costa County Superior Court) (February 9, 2016) (certifying HammondLaw as co-class counsel for $550,000 settlement of Labor Code §§ 1194, 226, and 201-203 claims reached on behalf of approximately truck 125 drivers);

- ***Albanez v. Premium Retail Services Inc***., Case No. RG1577982 (Alameda County Superior Court) (January 29, 2016) (Private Attorney General Act Settlement for $275,000 on behalf of approximately 38 employees);

- ***Garcia et al v. Sysco Los Angeles, et al.***, Case No. BC560274 (Los Angeles County Superior Court) (November 12, 2015) (certifying HammondLaw as co-class counsel for a $325,000 settlement on behalf of approximately 500 truck drivers);

- ***Cooper et al. v. Savage Services Corporation, Inc.***, Case No. BC578990 (Los Angeles County Superior Court) (October 19, 2015)(certifying HammondLaw as co-class counsel for $295,000 settlement on behalf of approximately 115 truck drivers);

- ***Gallardo et al. v. Canon Solutions America, Inc.***, Case No. CIVDSS1500375 (San Bernardino County Superior Court) (August 5, 2015) (certifying HammondLaw as co-class counsel for $750,000 settlement of Labor Code § 2802 claims on behalf for approximately 320 outside sales representatives);

- ***Glover v. 20/20 Companies, Inc.***, Case No. RG14748879 (Alameda County Superior Court) (August 3, 2015) (Private Attorney General Act Settlement for $475,000 on behalf of approximately 273 independent contractors);

- ***Mayton et al v. Konica Minolta Business Solutions USA, Inc***., Case No. RG12657116 (Alameda County Superior Court) (June 22, 2015) (certifying HammondLaw as co-class counsel for $1,225,000 settlement of Labor Code § 2802 claims on behalf for approximately 620 outside sales representatives);

- ***Garza, et al. v. Regal Wine Company, Inc. & Regal III, LLC***, Case No. RG12657199 (Alameda County Superior Court) (February 21, 2014) (certifying

**HAMMONDLAW. P.C.**
1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

HammondLaw as class counsel for $1.7 million settlement on behalf of approximately 317 employees);

- ***Moy, et al. v. Young's Market Co., Inc.,*** Case No. 30-2011-00467109- CU-OE-CXC (Orange County Superior Court) (November 8, 2013) (certifying HammondLaw as co-class counsel for $2.3 million settlement of Labor Code § 2802 claims on behalf of approximately 575 sales representatives);

- ***Gagner v. Southern Wine & Spirits of America, Inc.,*** Case No. 3:10-cv-10-04405 JSW (N.D. Cal.) (December 11, 2012) (certifying HammondLaw as co-class counsel for $3.5 million settlement of Labor Code § 2802 claims reached on behalf of approximately 870 sales representatives);

- ***Downs, et al. v. US Foods, Inc. dba US Foodservice***, Case No. 3:10-cv-02163 EMC (N.D. Cal.) (September 12, 2012) (certifying HammondLaw as co-class counsel for $3 million settlement of Labor Code § 2802 claims reached on behalf of approximately 950 truck drivers)

## Approved Consumer Cases

- ***Rodriguez v River City Bank,*** Case No. 1-13-cv-257676 (Sacramento County Superior Court) (October 26, 2022) (approving $140,000 settlement of Cal. Bus. Prof. Code §§ 17200, Civil Code § 1798.80 and 1798.100 claims on behalf of 16,417 River City Bank customers);

- ***Siciliano et al. v. Apple,*** Case No. 1-13-cv-257676 (Santa Clara County Superior Court) (November 2, 2018) (approving $16,500,000 settlement of Cal. Bus. Prof. Code §§ 17603, 17200, and 17535 claims on behalf of 3.9 million California subscribers to Apple InApp subscriptions);

- ***In re Ashley Madison Customer Data Security Breach Litigation***, Case No. 4:15-cv- 02669 JAR (E.D. Mis.) (November 20, 2017) (HammondLaw appointed to the executive committee in $11.2 million settlement on behalf of 39 million subscribers to ashleymadison.com whose information was compromised in the Ashley Madison data breach);

- ***Gargir v. SeaWorld Inc***., Case No. 37-2015-00008175-CU-MC-CTL (San Diego County Superior Court) (October 21, 2016) (certifying HammondLaw and Berman DeValerio as co-class counsel in $500,000 settlement of Cal. Bus. Prof. Code §§ 17603, 17200, and 17535 claims class action on behalf of 88,000 subscribers to SeaWorld's annual park passes);

- ***Davis v. Birchbox, Inc***., Case No. 3:15-cv-00498-BEN-BGS (S.D. Cal.) (October 14, 2016) (certifying HammondLaw and Berman DeValerio as co-class counsel in $1,572,000 settlement of Cal. Bus. Prof. Code §§ 17603, 17200, and 17535 claims on behalf of 149,000 subscribers to Birchbox's memberships);

- ***Goldman v. LifeLock, Inc***. Case No. 1-15-cv-276235 (Santa Clara County Superior Court) (February 5, 2016) (certifying HammondLaw and Berman DeValerio as co-class counsel in $2,500,000 settlement of Cal. Bus. Prof. Code §§ 17603, 17200, and 17535 claims on behalf of 300,000 California subscribers to Lifelock's identity protection programs)

## Approved Washington State Wage and Hour Cases

**HAMMONDLAW. P.C.**
1201 Pacific Ave, Suite 600, Tacoma, WA, 98402

- *Clever v Weyerhaeuser*, Case No. 23-2-13734-5 (King County Superior Court) (September 27, 2024)(certifying HammondLaw as class counsel for $114,712,50 settlement of Seattle Municipal Code § 14.20, *et seq* claims on behalf of approximately 127 employees);

- *Rector v Egencia*, Case No. 23-2-11362-4 (King County Superior Court) (September 20, 2024)(certifying HammondLaw as class counsel for $69,500 settlement of Seattle Municipal Code § 14.20, *et seq* claims on behalf of approximately 84 employees);

- *Stone v Interstate Distributor Co*., Case No. 15-2-14612-3 (Pierce County Superior Court) (July 24, 2020)(certifying HammondLaw as co-class counsel for $885,000 settlement of Washington Minimum Wage Act claims behalf of approximately 867 truck drivers);

- *Smith et al. v T-W Transport, Inc*, Case No. 17-2-02864-3 (Spokane County Superior Court) (December 13, 2019) (certifying HammondLaw as co-class counsel for $1,375,000 settlement of Washington Minimum Wage Act claims behalf of approximately 1,221 truck drivers);

- *Newton v Oak Harbor Freight Lines*, Case No. 16-12-11137-8 (November 8, 2019)(certifying HammondLaw as co-class counsel for $65,000 settlement of Washington Minimum Wage Act claims behalf of approximately 41 truck drivers);

- *Hedglin v. Swift Transportation Company of Arizona, L.L.C.,* Case No. 3:16−cv−05127−RJB (W.D. WA – Tacoma) (July 8, 2019) (certifying HammondLaw as co-class counsel for $2,490,000 settlement of Washington Minimum Wage Act claims behalf of approximately 2,784 truck drivers)

- *Lepine v. Petsmart, Inc.,* Case No. 3:17-cv-05488-BHS (W.D. WA – Tacoma) (February 25, 2019) (certifying HammondLaw as co-class counsel for $700,000 settlement of Washington Minimum Wage Act claims on behalf of approximately 424 pet groomers);

- *Lepine v. Petco Animal Supplies Stores, Inc*., Case No. 3:17-cv-05483-RBL (W.D. WA- Tacoma) (November 9, 2018) (certifying HammondLaw as co-class counsel for $700,000 settlement of Washington Minimum Wage Act claims on behalf of approximately 911 pet groomers);

- *Kidwell v. Haney Truck Line*, Case No. 16-2-0488 (Thurston County Superior Court) (May 4, 2018) (certifying HammondLaw as co-class counsel for $277,500 settlement of Washington Minimum Wage Act claims behalf of approximately 466 truck drivers)

- *McMakin v. Dominos*, Case No. 16-2-20655-7 (King County Superior Court) (June 2, 2017) (certifying HammondLaw as co-class counsel for $177,000 settlement of Washington Minimum Wage Act claims behalf of approximately 77 truck drivers);

- *Eilerman v. McLane Company Inc*., Case No. 3:16-cv-05303-BHS (W.D. WA – Tacoma) (May 17, 2017) (certifying HammondLaw as co-class counsel for $775,000 settlement of Washington Minimum Wage Act claims behalf of approximately 251 truck drivers)

Teresa C. Chow (State Bar No. 237694)
**BAKER & HOSTETLER LLP**
1900 Avenue of the Stars
Suite 2700
Los Angeles, CA 90067-4301
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: *tchow@bakerlaw.com*

*Attorneys for Defendant*
DIRECTTOU, LLC

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN HOANG TO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTTOU, LLC,<br><br>Defendant. | **CASE NO.: 3:24-CV-06447-WHO**<br><br>**DECLARATION OF JEFFREY WALKER**<br><br>Initial CMC Date: December 17, 2024<br>Time: 2:00 PM |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# **DECLARATION OF JEFFREY WALKER**

I, Jeffrey Walker, declare as follows:

1. I am the Chief Executive Officer of DirectToU, LLC. I have personal knowledge of the matters in this Declaration and would be competent to testify thereto at a trial or hearing in this matter.

2. DirectToU, LLC has no ownership or other pecuniary interest in the Electronic Privacy Information Center, the proposed *cy pres* recipient.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 28th day of October 2024.

By: _____
Jeffrey Walker

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

1   JULIAN HAMMOND (SBN 268489)
    jhammond@hammondlawpc.com
2   ADRIAN BARNES (SBN 253131)
    abarnes@hammondlawpc.com
3   POLINA BRANDLER (SBN 269086)
    pbrandler@hammondlawpc.com
4   ARI CHERNIAK (SBN 290071)
    acherniak@hammondlawpc.com
5   HAMMONDLAW, P.C.
6   1201 Pacific Ave, 6th Floor
    Tacoma, WA 98402
7   Tel. (310) 601-6766
    Fax (310) 295-2385
8

9   *Attorneys for Plaintiff and the Putative Class*

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12  | | |
    | --- | --- |
13  **JONATHAN HOANG TO,** individually and on behalf of himself and all others similarly situated, | Case No.: 3:24-cv-06447-WHO
14  | | District Judge: Hon. William H. Orrick
                    Plaintiff,
15  vs. | **DECLARATION OF JONATHAN HOANG TO IN SUPPORT OF PLAINTIFF'S**
16  | **MOTION FOR PRELIMINARY APPROVAL
    **DIRECTTOU, LLC,** a Delaware Limited Liability | **OF CLASS ACTION SETTLEMENT**
17  Company, |
18  | Courtroom: 2
                    Defendant. | Hearing Date: December 11, 2024
19  | Hearing Time: 2:00 p.m.

20

21

22

23

24

25

26

27

28

I, JONATHAN HOANG TO declare as follows:

1.     I am over the age of 18 and have personal knowledge of the facts set forth in this declaration and could and would testify to them.

2.     I am the Named Plaintiff and proposed Class Representative in the above-captioned case. I submit this declaration in support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement.

3.     I decided to join this lawsuit as the Named Plaintiff and Class Representative after speaking to my attorneys in or about April 2024. During our initial conversation, which lasted a little over an hour, my attorneys and I discussed my DVD and Blu-ray purchase history, including what I purchased at www.deepdiscount.com. During our initial conversation, my attorneys asked me to search through my email and credit card records to locate purchases from Defendant's websites.

4.   I spent approximately two hours searching through both my paper records and electronic records to determine what I purchased from Defendant's websites, including www.deepdiscount.com, and to pull up receipts of these transactions.

5.     I also spent approximately half an hour figuring out how long I have had an account with Facebook, which was something my attorneys asked me to do.

6.     After I expressed an interest in joining the case as a named Plaintiff and Class Representative, my attorneys explained to me what it means to be a Class Representative and what duties and obligations I would have to the other class members in this role. Based on our conversation, I understood then and I understand now that I am required to represent the best interests of the Class and to put the interests of the Class Members ahead of my own, which is what I have done throughout my involvement in this case. I believe my interests are aligned with those of the Class Members and are not antagonistic thereto.

7.     My attorneys also sent me a representation agreement, which included a list of duties a Class Representative has to the class members. I carefully reviewed this list, as well as the rest of the agreement before signing it. I spent approximately one and a half hours reviewing the representation agreement.

8.     I have been actively involved in the case. I stayed in touch with my attorneys since our first

conversation and have stayed up to date about the progress of the case. I promptly responded to all the calls and emails from my attorneys and assisted them in whatever way was asked of me. I reviewed and approved the pleadings in this case, including the original Complaint and the First Amended Complaint. I estimate that I spent approximately three hours reviewing the two complaints, and additional time speaking to my attorneys throughout the case.

9.    In or about the third week of October 2024, my attorneys informed me that a proposed settlement had been reached, and explained the proposed terms to me, which I believe are fair and reasonable and in the best interest of the Class. Thereafter, I discussed the long-form Settlement Agreement with my attorneys, reviewed it, and signed it.

10.    I estimate that since the initial conversation with my attorneys in April 2024, I devoted between 8 and 9 hours on activities related to this case, including communicating regularly with my attorneys, searching through my records, sending documents to my attorneys, reviewing pleadings and other key documents in this case, and generally discussing the case with my attorneys and asking questions.

11.    I am proud of the results achieved by this case, and I feel that I have played an important role in obtaining these results. I feel that in today's world, with transactions involving sensitive personal information routinely conducted on the internet, it is important to keep companies accountable for their actions and to make sure that they take their users' privacy rights seriously and safeguard the private information users entrust to them.

12.    I will continue to devote all the necessary time and actively participate in this case and do whatever my attorneys advise is needed to fulfill my role as Named Plaintiff until this case is concluded.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _____.
                                                                11/4/2024

_____
Jonathan Hoang To

1

JULIAN HAMMOND (SBN 268489)
jhammond@hammondlawpc.com
ADRIAN BARNES (SBN 253131)
abarnes@hammondlawpc.com
POLINA BRANDLER (SBN 269086)
pblandler@hammondlawpc.com
ARI CHERNIAK (SBN 290071)
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
(310) 601-6766 (Office)
(310) 295-2385 (Fax)

2

3

4

5

6

7

8  *Attorneys for Plaintiff and the Putative Class*

9

10  **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

11

12  JONATHAN HOANG TO, individually and on behalf of all others similarly situated,

Case No. 3:24-cv-06447-WHO

13

Plaintiff,

**DECLARATION OF STEVEN WEISBROT**
**OF ANGEION GROUP**
**RE: PROPOSED NOTICE PLAN**

14

v.

15

DIRECTTOU, LLC, a Delaware Limited Liability Company,

16

17

Defendant.

18

19

20

21

22

23

24

25

26

27

28

I, Steven Weisbrot, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.　　I am the President and Chief Executive Officer at the class action notice and claims administration firm Angeion Group, LLC ("Angeion"). Angeion specializes in designing, developing, analyzing, and implementing large-scale, un-biased, legal notification plans.

2.　　I have personal knowledge of the matters stated herein. In forming my opinions regarding notice in this action, I have drawn from my extensive class action experience, as described below.

3.　　I have been responsible in whole or in part for the design and implementation of hundreds of court-approved notice and administration programs, including some of the largest and most complex notice plans in recent history. I have taught numerous accredited Continuing Legal Education courses on the Ethics of Legal Notification in Class Action Settlements, using Digital Media in Due Process Notice Programs, as well as Claims Administration, generally. I am the author of multiple articles on Class Action Notice, Claims Administration, and Notice Design in publications such as Bloomberg, BNA Class Action Litigation Report, Law360, the ABA Class Action and Derivative Section Newsletter, and I am a frequent speaker on notice issues at conferences throughout the United States and internationally.

4.　　I was certified as a professional in digital media sales by the Interactive Advertising Bureau ("IAB") and I am co-author of the Digital Media section of Duke Law's *Guidelines and Best Practices—Implementing 2018 Amendments to Rule 23* and the soon to be published George Washington Law School *Best Practices Guide to Class Action Litigation*.

5.　　I have given public comment and written guidance to the Judicial Conference Committee on Rules of Practice and Procedure on the role of direct mail, email, broadcast media, digital media, and print publication, in effecting Due Process notice, and I have met with representatives of the Federal Judicial Center to discuss the 2018 amendments to Rule 23 and offered an educational curriculum for the judiciary concerning notice procedures.

6.    Prior to joining Angeion's executive team, I was employed as Director of Class Action Services at Kurtzman Carson Consultants, an experienced notice and settlement administrator. Prior to my notice and claims administration experience, I was employed in private law practice.

7.    My notice work comprises a wide range of class actions that include privacy, data breach, product defect, false advertising, mass disasters, employment discrimination, antitrust, tobacco, banking, firearm, insurance, and bankruptcy cases.

8.    I have been at the forefront of infusing digital media, as well as big data and advanced targeting, into class action notice programs. Courts have repeatedly recognized my work in the design of class action notice programs. A comprehensive summary of judicial recognition Angeion has received is attached hereto as **Exhibit A**.

9.    By way of background, Angeion is an experienced class action notice and claims administration company formed by a team of executives that have had extensive tenures at five other nationally recognized claims administration companies. Collectively, the management team at Angeion has overseen more than 2,000 class action settlements and distributed over $15 billion to class members. The executive profiles as well as the company overview are available at www.angeiongroup.com.

10.    As a class action administrator, Angeion has regularly been approved by both federal and state courts throughout the United States and abroad to provide notice of class actions and claims processing services.

11.    Angeion has extensive experience administering landmark settlements involving some of the world's most prominent companies, including:

**In re: Facebook, Inc Consumer Privacy User Profile Litigation**
Case No. 3:18-md-02843-VC (N.D. Cal.)
Meta agreed to pay $725 million to settle allegations that the social media company allowed third parties, including Cambridge Analytica, to access personal information. Angeion undertook an integrated in-app notification and media campaign to a class in the hundreds of millions of individuals and processed 28.6 million claims, the most claims filed in the history of class action.  In fact, during

the September 7, 2023 Final Approval Hearing, U.S. District Judge Chhabria acknowledged the record number of claims filed, stating, "I was kind of blown away by how many people made claims."

**In re Apple Inc. Device Performance Litigation**
Case No. 5:18-cv-02827-EJD (N.D. Cal.)
Apple agreed to pay $310 million to settle allegations of diminished performance in iPhone 6's and 7's. Angeion's direct notification efforts were recognized as reaching 99%+ of the current and former owners of 129 million class devices. Millions of claims were processed.

**City of Long Beach, et al. v. Monsanto, et al.**
Case No. 2:16-cv-03493-FMO-AS (C.D. Cal.)
Bayer agreed to pay $650 million to settle allegations of waterbodies impaired by PCBs. Angeion's notice administration was extraordinarily successful. The claims administration includes multiple complex claims filing workflows for different funding allocations, including separate fund for "special needs" claimants.

**Beckett v. Aetna Inc.**
Case No. 2:17-cv-03864-JS (E.D. Pa.)
A consolidated data breach class action that arose from the alleged improper disclosure of Protected Health Information by a health insurer and previous claims administrator, including confidential HIV-related information. Angeion provided specialized training to our support team concerning the sensitive nature of the case and underlying health information. Angeion implemented robust privacy protocols to communicate with and verify the claims of the affected class members, including anonymized notice packets and allowing claimants to lodge objections under pseudonyms.

12.    Angeion will further draw on its extensive experience from administering prior high-profile litigations involving privacy concerns:

| Significant Privacy Cases | Case No. | Court |
|---|---|---|
| Vela, et al. v. AMC Networks Inc. ("AMC+ VPPA") | 1:23-cv-02524 | S.D.N.Y. |
| Braun, et al. v. The Philadelphia Inquirer, LLC ("Inquirer VPPA") | 2:22-cv-04185 | E.D. Pa. |
| Schmitt, et al. v. SN Servicing Corporation | 3:21-cv-03355 | N.D. Cal. |
| In re: Facebook, Inc., Consumer Privacy User Profile Litigation | 3:18-md-02843 | N.D. Cal. |
| In re: TikTok Inc., Consumer Privacy Litigation | 1:20-cv-04699 | N.D. Ill. |
| Lundy v. Meta Platforms Inc. | 3:18-cv-06793 | N.D. Cal. |
| In re: Facebook Internet Tracking Litigation | 5:12-md-02314 | N.D. Cal. |
| Boone, et al. v. Snap Inc. | 2022LA000708 | Ill. Cir. Ct. |

| Significant Privacy Cases | Case No. | Court |
|---|---|---|
| In re: Plaid Inc. Privacy Litigation | 4:20-cv-03056 | N.D. Cal. |
| T.K. et al. v. Bytedance Technology Co. Ltd. Et al. | 1:19-cv-07915 | N.D. Ill. |
| In re: Google Plus Profile Litigation | 5:18-cv-06164 | N.D. Cal. |
| Parris, et al. v. Meta Platforms Inc. | 2023LA000672 | Ill. Cir. Ct. |
| McDonald, et al. v. Kiloo A/S, et al.<br>Rushing, et al. v. The Walt Disney Co., et al.<br>Rushing, et al. v. ViacomCBS Inc., et al. | 2:20-cv-09534<br>3:17-cv-04419<br>3:17-cv-04492 | N.D. Cal. |

## DATA SECURITY & INSURANCE

13. Angeion recognizes the critical need to secure our physical and network environments and protect data in our custody. It is our commitment to these matters that has made us the go-to administrator for many important matters. We are ever improving upon our robust policies, procedures, and infrastructure by periodically updating data security policies as well as our approach to managing data security in response to changes to physical environment, new threats and risks, business circumstances, legal and policy implications, and evolving technical environments.

14. Angeion's privacy practices are compliant with the California Consumer Privacy Act, as currently drafted. Consumer data obtained for the delivery of each project is used only for the purposes intended and agreed in advance by all contracted parties, including compliance with orders issued by State or Federal courts as appropriate. Angeion imposes additional data security measures for the protection of Personally Identifiable Information (PII) and Personal Health Information (PHI), including redaction, restricted network and physical access on a need-to-know basis, and network access tracking. Angeion requires background checks of all employees, requires background checks and ongoing compliance audits of its contractors, and enforces standard protocols for the rapid removal of physical and network access in the event of an employee or contractor termination.

15. Data is transmitted using Transport Layer Security (TLS) 1.3 protocols. Network data is encrypted at rest with the government and financial institution standard of AES 256-bit encryption. We maintain an offline, air-gapped backup copy of all data, ensuring that projects can be administered without interruption.

4

16.     Further, our team conscientiously monitors the latest compliance requirements, such as GDPR, HIPAA, PCI DSS, and others, to ensure that our organization is meeting all necessary regulatory obligations as well as aligning to industry best practices and standards set forth by frameworks like CIS and NIST. Angeion is cognizant of the ever-evolving digital landscape and continually improves its security infrastructure and processes, including partnering with best-in-class security service providers. Angeion's robust policies and processes cover all aspects of information security to form part of an industry leading security and compliance program, which is regularly assessed by independent third parties. Angeion is also committed to a culture of security mindfulness. All employees routinely undergo cybersecurity training to ensure that safeguarding information and cybersecurity vigilance is a core practice in all aspects of the work our teams complete.

17.     Angeion currently maintains a comprehensive insurance program, including sufficient Errors & Omissions coverage.

## SUMMARY OF THE NOTICE PLAN

18.     This declaration will describe the proposed Notice Plan for the Settlement Class that, if approved by the Court, Angeion will implement in this matter, including the considerations that informed the development of the plan and why we believe it will provide due process to Settlement Class Members.  In my professional opinion, the proposed Notice Plan described herein is the best notice practicable under the circumstances, fulfilling all due process requirements, and is fully compliant with Fed. R. Civ. P. 23, and the Northern District's Procedural Guidance for Class Action Settlements.

19.     The proposed Notice Plan provides for direct notice via email or mail to all reasonably identifiable Settlement Class Members combined with the implementation of a dedicated website and toll-free telephone line where Settlement Class Members can learn more about their rights and options pursuant to the terms of the Settlement.

//

//

5

## DIRECT NOTICE

**Class Member Data**

20.      Angeion will receive, review, and analyze the Settlement Class Member data provided by the Defendant. Angeion performs a thorough analysis to identify duplicative records, as well as missing/incomplete data fields. Angeion will then assign identification numbers to each unique record, which will comprise the final Settlement Class Member list ("Settlement Class List").

**Email Notice**

21.      As part of the Notice Plan, Angeion will send the Email Notice to Settlement Class Members who have valid email addresses included on the Class List.

22.      Angeion follows best practices to both validate emails and increase deliverability. Specifically, prior to distributing the Email Notice, Angeion subjects the email addresses on the Class List to a cleansing and validation process. The email cleansing process will remove extra spaces, fix common typographical errors in domain names, and correct insufficient domain suffixes (*e.g.*, gmal.com to gmail.com, gmail.co to gmail.com, yaho.com to yahoo.com, etc.). The email addresses will then be subjected to an email validation process whereby each email address will be compared to known bad email addresses.[1] Email addresses that are not designated as a known bad address will then be further verified by contacting the Internet Service Provider ("ISP") to determine if the email address exists.

23.      Further, Angeion designs the email notice to avoid many common "red flags" that might otherwise cause an email recipient's spam filter to block or identify the email notice as spam. For example, Angeion does not include attachments like the Long-Form Notice or Claim Form to the Email Notice, because attachments are often interpreted by various Internet Service Providers ("ISP") as spam.

---

[1] Angeion maintains a database of email addresses that were returned as permanently undeliverable, commonly referred to as a hard bounce, from prior campaigns. Where an address has been returned as a hard bounce within the last year, that email is designated as a known bad email address.

24.     Angeion also accounts for the real-world reality that some emails will inevitably fail to be delivered during the initial delivery attempt. Therefore, after the initial noticing campaign is complete, Angeion, after an approximate 24- to 72-hour rest period (which allows any temporary block at the ISP level to expire), causes a second round of email noticing to continue to any email addresses that were previously identified as soft bounces and not delivered. In our experience, this minimizes emails that may have erroneously failed to deliver due to sensitive servers and optimizes delivery.

25.     Angeion will cause any email address for which the Email Notice could not be delivered to be subjected to an email change of address search in an attempt to locate an updated email address. Angeion will then send the Email Notice to any updated email addresses obtained via this process.

26.     At the completion of the email campaign, Angeion will report to the Court concerning the rate of delivered emails accounting for any emails that are blocked at the ISP level. In short, the Court will possess a detailed, verified account of the success rate of the entire direct Email Notice campaign.

**Mailed Notice**

27.     As part of the Notice Plan, Angeion will send notice of the Settlement ("Notice") via first class U.S. Mail, postage pre-paid, to all Settlement Class Members whose Email Notice could not be delivered and for whom mailing addresses are included on the Settlement Class List.

28.     Angeion will employ the following best practices to increase the deliverability rate of the mailed Notices: (i) Angeion will cause the mailing address information for Settlement Class Members to be updated utilizing the United States Postal Service's ("USPS") National Change of Address database, which provides updated address information for individuals or entities who have moved during the previous four years and filed a change of address with the USPS; (ii) Notices returned to Angeion by the USPS with a forwarding address will be re-mailed to the new address provided by the USPS; (iii) Notices returned to Angeion by the USPS without forwarding addresses will be subjected to an address verification search (commonly referred to as "skip tracing") utilizing

a wide variety of data sources, including public records, real estate records, electronic directory assistance listings, etc., to locate updated addresses; (iv) Notices will be re-mailed to Settlement Class Members for whom updated addresses were identified via the skip tracing process.

**Reminder Notice**

29.     Angeion will cause reminder notices to be sent via email in accordance with § 4.1(c) of the Class Action Settlement Agreement.

## SETTLEMENT WEBSITE

30.     The Notice Plan provides for the creation of a case-specific Settlement Website, where Settlement Class Members can easily submit a Claim Form via a customized secure online portal. The Settlement Website will also provide Settlement Class Members with general information about this Settlement, including important dates and deadlines, and answers to frequently asked questions. Settlement Class Members can also review or download relevant Court documents, including the Long Form Notice, the Claim Form, the Court's Order Preliminarily Approving the Settlement, the Settlement Agreement, the operative Complaint filed in this Action, and any other materials agreed upon by the Parties and/or required by the Court. The Settlement Website will also have a "Contact Us" page whereby Settlement Class Members can send additional questions to a dedicated email address.

31.     The Settlement Website will be designed to be ADA-compliant and optimized for mobile visitors so that information loads quickly on mobile devices. Additionally, the Settlement Website will be designed to maximize search engine optimization through Google and other search engines. Keywords and natural language search terms will be included in the Settlement Website's metadata to maximize search engine rankings.

## TOLL-FREE TELEPHONE SUPPORT

32.     A toll-free hotline devoted to this case will be implemented to further apprise Settlement Class Members of their rights and options pursuant to the terms of the Settlement.  The toll-free hotline will utilize an interactive voice response ("IVR") system to provide potential

Settlement Class Members with responses to frequently asked questions and provide essential information regarding the Settlement. This hotline will be accessible 24 hours a day, 7 days a week.

33.     Additionally, potential Settlement Class Members will be able to leave a voicemail with their name and address if they want the Long Form Notice and/or Claim Form mailed to them and will have the option to speak with a live operator during normal business hours.

### NOTICE PURSUANT TO THE CLASS ACTION FAIRNESS ACT OF 2005

34.     Within ten (10) days of the filing of the Class Action Settlement Agreement and Release with this Court, Angeion will cause notice to be disseminated to the appropriate state and federal officials pursuant to the requirements of the Class Action Fairness Act, 28 U.S.C. §1715.

### FRAUD DETECTION

35.     Angeion has developed and deployed a real-time fraud detection system, AngeionAffirm, which is the first and only comprehensive solution to identify fraud in real time based on both state-of-the-art technology and analysis of over a decade of historical claims data. AngeionAffirm was developed to combat the rising tide of fraudulent claims in class action settlements and the increasingly sophisticated technologies and techniques used by fraudulent actors in their attempt to perpetuate fraud and will be implemented to detect fraudulent claim submissions in this Settlement.

36.     Courts have recognized the success of AngeionAffirm. By way of example, in the Court's July 26, 2024, Report and Recommendation, United States Magistrate Judge Stewart D. Aaron stated, "The Court finds that the claims process administered by Angeion has integrity and has been carried out in a diligent and thorough manner…Based upon the Court's review of the record, the Court finds that Angeion has taken prudent and necessary steps to address the fraudulent claims submitted in this case…Angeion's fraud detection system is robust and appropriately designed to weed out fraudulent claims." (See In re: Novartis and Par Antitrust Litigation, No. 1:18-cv-04361-AKH-SDA, S.D.N.Y, Report and Recommendation, ECF No. 667).

//

//

**CLAIMS RATE ANALYSIS**

37.    Angeion analyzed past privacy settlements it has administered to assist with estimating the claims rate for the instant settlement. In total, Angeion reviewed approximately 50 settlements, which resulted in an average claims rate of 7.01% and a median claims rate of 3.10%. To minimize the effect of anomalous claim rates, Angeion removed the five lowest and five highest claim rates from the analysis, which resulted in an average claims rate of 5.10% across the remaining 36 settlements reviewed (the median claims rate of 3.10% remained the same).[2]

38.    In light of the historical data reviewed, Angeion estimates that the claims rate in this Settlement will be around the 5% average Angeion has seen in past privacy settlements it has administered.

**ESTIMATED NOTICE AND ADMINISTRATION COSTS**

39.    Angeion estimates the cost to provide notice and administration services in this Settlement will be less than $125,000.00.[3]  The pricing details comprising the cost estimate are competitively sensitive. Upon request, Angeion will provide its itemized estimate to the Court.

**CONCLUSION**

40.    The Notice Plan outlined above includes direct notice via email or mail to all reasonably identifiable Settlement Class Members, and the implementation of a dedicated Settlement Website and toll-free hotline to further inform Class Members of their rights and options in the Settlement.

41.    In my professional opinion, the Notice Plan described herein will provide full and proper notice to Settlement Class Members and is the best practicable notice under the circumstances, fulfilling all due process requirements, fully comporting with Fed. R. Civ. P. 23 and the Northern District's Procedural Guidance for Class Action Settlements. Based on the email

---

[2] Upon request, Angeion can provide case citations for settlements analyzed in the Claims Rate Analysis section of this declaration.
[3] The estimate was premised on certain specifications provided to Angeion, such as the approximate Class size and methods for providing notice. Deviations from these underlying specifications may result in additional costs, as the costs of administration are based on the underlying assumptions. Out-of-scope services not included in Angeion's pricing proposal are subject to additional costs.

campaign, mailed notice, and reminder notice efforts, in Angeion's experience, the aggregate notice campaign should reach in excess of 70% of the Settlement Class.

42.     After the Notice Plan has concluded, Angeion will provide a final report verifying its effective implementation to this Court.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 4, 2024

STEVEN WEISBROT

# Exhibit A





# INNOVATION
## IT'S PART OF OUR DNA

Class Action Administration | Mass Arbitration Administration
Mass Tort Services | Regulatory Remediation

## Judicial Recognition

© Angeion Group, LLC

**ANGEION GROUP**
Writing the Rules

## IN RE: NOVARTIS AND PAR ANTITRUST LITIGATION
**Case No. 1:18-cv-04361-AKH-SDA (S.D.N.Y.)**
The Honorable Stewart D. Aaron, United States Magistrate Judge, Southern District of New York (July 26, 2024): The Court finds that the claims process administered by Angeion has integrity and has been carried out in a diligent and thorough manner...Based upon the Court's review of the record, the Court finds that *Angeion has taken prudent and necessary steps to address the fraudulent claims submitted in this case... Angeion's fraud detection system is robust and appropriately designed to weed out fraudulent claims*.

## IN RE: FACEBOOK, INC. CONSUMER PRIVACY USER PROFILE LITIGATION
**Case No. 3:18-md-02843 (N.D. Cal.)**
Meta agreed to pay $725 million to settle allegations that the social media company allowed third parties, including Cambridge Analytica, to access personal information. Angeion undertook an integrated in-app notification and media campaign to a class in the hundreds of millions of individuals and processed 28.6 million claims, the most claims filed in the history of class action. In fact, during the September 7, 2023 Final Approval Hearing, U.S. District Judge Chhabria acknowledged the record number of claims filed, stating, *"I was kind of blown away by how many people made claims."*

## BRAUN v. THE PHILADELPHIA INQUIRER, LLC
**Case No. 2:22-cv-04185 (E.D. Pa.)**
The Honorable John M. Younge (August 8, 2024): 16. The proposed form and manner of notice to members of the Settlement Class set forth in the Weisbrot Declaration...along with the proposed methods of dissemination of notice described therein, satisfy the requirements of Rule 23(e) and due process, are otherwise fair and reasonable, and therefore are approved.

## GUIDA v. GAIA, INC.
**Case No. 1:22-cv-02350 (D. Colo.)**
The Honorable Gordon P. Gallagher (July 19, 2024): The Court has carefully considered the forms and methods of notice to the Settlement Class set forth in the Settlement ("Notice Plan"). The Court finds that the Notice Plan constitutes the best notice practicable under the circumstances and fully satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the requirements of due process, and the requirements of any other applicable law...The Court further finds that the Notice constitutes valid, due, and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process. Accordingly, the Court finds that no notice other than that specifically identified in the Settlement is necessary in this Action.

## FERNANDEZ v. CORELOGIC CREDCO, LLC
**Case No. 3:20-cv-01262 (S.D. Cal.)**
The Honorable Jeffrey T. Miller (June 20, 2024): The court approved notice of this class action and proposed settlement in the June 16, 2024, Preliminary Approval Order. The Agreement called for sending the Notice directly to class members through email ("email notice") and/or via U.S. Mail. ("notice packet"). In support of his Motions, Plaintiff has filed the Declaration of Lacey Rose, who is employed as a "Senior Project Manager with Angeion," and the Declaration of Steven Weisbrot, the President and Chief Executive Officer of Angeion, the Settlement Administrator retained in this matter. See generally, Doc. No. 316-5, Doc. No. 329. Both declarations detail the actions taken by the Administrator...Accordingly, *the court determines that the Notice in the case was copious, impressive, more than adequate*, and satisfied both the requirements of Rule 23 and due process, giving the settlement class members adequate notice of the Settlement.

ANGEION GROUP
**Writing the Rules**

## JONES v. VARSITY BRANDS, LLC
**Case No. 2:20-cv-02892 (W.D. Tenn.)**
The Honorable Sheryl H. Lipman  (June 18, 2024): Indirect Purchasers have retained Angeion to serve as Settlement Administrator...*Angeion has designed a multi-layered sophisticated plan* using a combination of Internet, email, publication, social media...The Notice Plan adequately apprises all potential class members of the terms of the Settlement Agreement, provides the opportunity to make informed decisions, and comports with due process.

## SALINAS v. BLOCK, INC.
**Case No. 3:22-cv-04823 (N.D. Cal.)**
The Honorable Sallie Kim  (June 3, 2024): The Court...(b) finds and determines that emailing the Summary Notice, reminder emails to Class Members (if available), and publication of the Settlement Agreement, Long Form Notice, Summary Notice, and Claim Form on the Settlement Website, supplemented by any social media and print media advertisements deemed appropriate by the Parties (i) constitutes the best notice practicable under the circumstances; (ii) constitutes notice that is reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action...(iii) constitutes due, adequate, and sufficient notice to all Persons entitled to receive notice of the proposed Settlement; and (iv) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Constitution of the United States (including the Due Process Clause), and all other applicable laws and rules.

## ESPOSITO v. CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS
**Case No. MID-L-006360-23 (N.J. Super. Ct.)**
The Honorable Ana C. Viscomi  (April 26, 2024): The Court finds that such Notice program, including the approved forms of notice: (a) constituted the best notice that is practicable under the circumstances; (b) included direct individual notice to all Settlement Class Members who could be identified through reasonable effort, as well as appropriate reminder notices; (c) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members...(d) constituted due, adequate and sufficient notice to all persons entitled to notice; and (e) met all applicable requirements of N.J. Ct. R. R. 4:32-1 and 4:32-2, Due Process under the U.S. Constitution, and any other applicable law.

## KUKORINIS v. WALMART, INC.
**Case No. 8:22-cv-02402 (M.D. Fla.)**
The Honorable Virginia M. Hernandez Covington (January 19, 2024): The Notice Plan, including the form of the notices and methods for notifying the Settlement Class of the Settlement and its terms and conditions...a. meet the requirements of the Federal Rules of Civil Procedure (including Rule 23 (c)-(e)), the United States Constitution (including the Due Process Clause), and the Rules of this Court; b. constitute the best notice to Settlement Class Members practicable under the circumstances...

## LE v. ZUFFA, LLC
**Case No. 2:15-cv-01045 (D. Nev.)**
The Honorable Richard F. Boulware, II (November 17, 2023): The proposed Notice Plan, including the proposed forms and manner of notice, constitutes the best notice practicable under the circumstances and satisfies the requirements of due process and Rules 23(c)(2) and 23(e)(1) of the Federal Rules of Civil Procedure.

## IN RE: KIA HYUNDAI VEHICLE THEFT MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
**Case No. 8:22-ml-03052 (C.D. Cal.)**
The Honorable James V. Selna (October 31, 2023): The Court has considered the form and content of the Class notice program and finds that the Class notice program and methodology as described in the Settlement

Agreement (a) meet the requirements of due process and Federal Rules of Civil Procedure 23(c) and (e); (b) constitute the best notice practicable under the circumstances to all persons entitled to notice; and (c) satisfies the constitutional requirements regarding notice.

## AMANS v. TESLA, INC.
**Case No. 3:21-cv-03577 (N.D. Cal.)**
The Honorable Vince Chhabria (October 20, 2023): The Court further finds that the Notice is the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure. The Court also finds that the Notice constitutes valid, due, and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process. The Court further finds that the Notice is reasonably calculated, under all circumstances, to apprise members of the Settlement Class of the pendency of this case, the terms of the Settlement Agreement, the right to object to the Settlement, and the right to exclude themselves from the Settlement Class.

## IN RE: PHILLIPS RECALLED CPAP, BI-LEVEL PAP, AND MECHANICAL VENTILATOR PRODUCTS LITIGATION
**Case No. 2:21-mc-01230 (MDL No. 3014) (W.D. Pa.)**
The Honorable Joy Flowers Conti (October 10, 2023): The Court finds that the method of giving notice to the Settlement Class ("Notice Plan")…(a) constitute the best notice practicable under the circumstances, (b) are reasonably calculated, under the circumstances, to apprise the Settlement Class Members of the pendency of the Action, the terms and benefits of the proposed Settlement…(c) are reasonable and constitute due, adequate, and sufficient notice to all Settlement Class Members and any other persons entitled to receive notice, (d) meet all applicable requirements of law, including, but not limited to, 28 U.S.C. § 1715, Rule 23(c), the Due Process Clause(s) of the United States Constitution, and any other applicable laws…

## IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION
**Case No. 2:18-mn-02873 (D.S.C.)**
The Honorable Richard Mark Gergel (August 29, 2023): The Court also approves the proposed Notice Plan set forth in Exhibit C to the Settlement Agreement…The proposed Notice Plan is the best practicable notice under the circumstances of this case; is reasonably calculated under the circumstances to apprise potential Class Members of the Settlement Agreement and of their right to object to or exclude themselves from the proposed Settlement Class; is reasonable and constitutes due, adequate, and sufficient notice to all Persons entitled to receive it; and meets all applicable requirements of Federal Rule of Civil Procedure 23, the United States Constitution, and other applicable laws and rules.

## LUNDY v. META PLATFORMS, INC.
**Case No. 3:18-cv-06793 (N.D. Cal.)**
The Honorable James Donato (April 26, 2023): For purposes of Rule 23(e), the Notice Plan submitted with the Motion for Preliminary Approval and the forms of notice attached thereto are approved…The form, content, and method of giving notice to the Settlement Class as described in the Notice Plan submitted with the Motion for Preliminary Approval are accepted at this time as practicable and reasonable in light of the rather unique circumstances of this case.

## IN RE: FACEBOOK INTERNET TRACKING LITIGATION
**Case No. 5:12-md-02314 (N.D. Cal.)**
The Honorable Edward J. Davila (November 10, 2022): The Court finds that Plaintiffs' notice meets all applicable requirements of due process and is particularly impressed with Plaintiffs' methodology and use of technology to reach as many Class Members as possible. Based upon the foregoing, the Court finds that the Settlement Class has been provided adequate notice.

## MEHTA v. ROBINHOOD FINANCIAL LLC
**Case No. 5:21-cv-01013 (N.D. Cal.)**
The Honorable Susan van Keulen (August 29, 2022): The proposed notice plan, which includes direct notice via email, will provide the best notice practicable under the circumstances. This plan and the Notice are reasonably calculated, under the circumstances, to apprise Class Members…The plan and the Notice constitute due, adequate, and sufficient notice to Class Members and satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure, due process, and all other applicable laws and rules.

## IN RE: TIKTOK, INC., CONSUMER PRIVACY LITIGATION
**Case No. 1:20-cv-04699 (N.D. Ill.)**
The Honorable John Z. Lee (August 22, 2022): The Class Notice was disseminated in accordance with the procedures required by the Court's Order Granting Preliminary Approval…in accordance with applicable law, satisfied the requirements of Rule 23(e) and due process, and constituted the best notice practicable…

## ADTRADER, INC. v. GOOGLE LLC
**Case No. 5:17-cv-07082 (N.D. Cal.)**
The Honorable Beth L. Freeman (May 13, 2022): The Court approves, as to form, content, and distribution, the Notice Plan set forth in the Settlement Agreement, including the Notice Forms attached to the Weisbrot Declaration, subject to the Court's one requested change as further described in Paragraph 8 of this Order, and finds that such Notice is the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure. The Court further finds that the Notice is reasonably calculated to, under all circumstances, reasonably apprise members…The Court also finds that the Notice constitutes valid, due and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process. The Court further finds that the Notice Plan fully complies with the Northern District of California's Procedural Guidance for Class Action Settlements.

## CITY OF LONG BEACH v. MONSANTO COMPANY
**Case No. 2:16-cv-03493 (C.D. Cal.)**
The Honorable Fernando M. Olguin (March 14, 2022): The court approves the form, substance, and requirements of the class Notice, (Dkt.278-2, Settlement Agreement, Exh. I). The proposed manner of notice of the settlement set forth in the Settlement Agreement constitutes the best notice practicable under the circumstances and complies with the requirements of due process.

## STEWART v. LEXISNEXIS RISK DATA RETRIEVAL SERVICES, LLC
**Case No. 3:20-cv-00903 (E.D. Va.)**
The Honorable John A. Gibney Jr. (February 25, 2022): The proposed forms and methods for notifying the proposed Settlement Class Members of the Settlement and its terms and conditions meet the requirements of Fed. R. Civ. P. 23(c)(2)(B) and due process, constitute the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons and entities entitled to notice…Based on the foregoing, the Court hereby approves the notice plans developed by the Parties and the Settlement Administrator and directs that they be implemented according to the Agreement and the notice plans attached as exhibits.

## WILLIAMS v. APPLE INC.
**Case No. 3:19-cv-04700 (N.D. Cal.)**
The Honorable Laurel Beeler (February 24, 2022): The Court finds the Email Notice and Website Notice (attached to the Agreement as Exhibits 1 and 4, respectively), and their manner of transmission, implemented pursuant to the Agreement (a) are the best practicable notice, (b) are reasonably calculated, under the circumstances, to apprise the Subscriber Class of the pendency of the Action and of their right to object to or to exclude themselves

from the proposed settlement, (c) are reasonable and constitute due, adequate and sufficient notice to all persons entitled to receive notice, and (d) meet all requirements of applicable law.

## CLEVELAND v. WHIRLPOOL CORPORATION
**Case No. 0:20-cv-01906 (D. Minn.)**
The Honorable Wilhelmina M. Wright (December 16, 2021): It appears to the Court that the proposed Notice Plan described herein, and detailed in the Settlement Agreement, comports with due process, Rule 23, and all other applicable law. Class Notice consists of email notice and postcard notice when email addresses are unavailable, which is the best practicable notice under the circumstances...The proposed Notice Plan complies with the requirements of Rule 23, Fed. R. Civ. P., and due process, and Class Notice is to be sent to the Settlement Class Members as set forth in the Settlement Agreement and pursuant to the deadlines above.

## RASMUSSEN v. TESLA, INC. D/B/A TESLA MOTORS, INC.
**Case No. 5:19-cv-04596 (N.D. Cal.)**
The Honorable Beth Labson Freeman (December 10, 2021): The Court has carefully considered the forms and methods of notice to the Settlement Class set forth in the Settlement Agreement ("Notice Plan"). The Court finds that the Notice Plan constitutes the best notice practicable under the circumstances and fully satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the requirements of due process, and the requirements of any other applicable law, such that the terms of the Settlement Agreement, the releases provided for therein, and this Court's final judgment will be binding on all Settlement Class Members.

## CAMERON v. APPLE INC.
**Case No. 4:19-cv-03074 (N.D. Cal.)**
The Honorable Yvonne Gonzalez Rogers (November 16, 2021): The parties' proposed notice plan appears to be constitutionally sound in that plaintiffs have made a sufficient showing that it is: (i) the best notice practicable; (ii) reasonably calculated, under the circumstances, to apprise the Class members of the proposed settlement and of their right to object or to exclude themselves as provided in the settlement agreement; (iii) reasonable and constitute due, adequate, and sufficient notice to all persons entitled to receive notice; and (iv) meet all applicable requirements of due process and any other applicable requirements under federal law.

## RISTO v. SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS
**Case No. 2:18-cv-07241 (C.D. Cal.)**
The Honorable Christina A. Snyder (November 12, 2021):  The Court approves the publication notice plan presented to this Court as it will provide notice to potential class members through a combination of traditional and digital media that will consist of publication of notice via press release, programmatic display digital advertising, and targeted social media, all of which will direct Class Members to the Settlement website...The notice plan satisfies any due process concerns as this Court certified the class under Federal Rule of Civil Procedure 23(b)(1)...

## JENKINS v. NATIONAL GRID USA SERVICE COMPANY, INC.
**Case No. 2:15-cv-01219 (E.D.N.Y.)**
The Honorable Joanna Seybert (November 8, 2021):  Pursuant to Fed. R. Civ. P. 23(e)(1) and 23(c)(2)(B), the Court approves the proposed Notice Plan and procedures set forth at Section 8 of the Settlement...The Court finds that the proposed Notice Plan meets the requirements of due process under the United States Constitution and Rule 23, and that such Notice Plan—which includes direct notice to Settlement Class Members sent via first class U.S. Mail and email; the establishment of a Settlement Website (at the URL, www.nationalgridtcpasettlement.com) where Settlement Class Members can view the full settlement agreement, the detailed long-form notice (in English and Spanish), and other key case documents; publication notice in forms attached as Exhibits E and F to

AG **ANGEION GROUP**
**Writing the Rules**

the Settlement sent via social media (Facebook and Instagram) and streaming radio (e.g., Pandora and iHeart Radio). The Notice Plan shall also include a paid search campaign on search engine(s) chosen by Angeion (e.g., Google) in the form attached as Exhibits G and the establishment of a toll-free telephone number where Settlement Class Members can get additional information—is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto.

### NELLIS v. VIVID SEATS, LLC
**Case No. 1:20-cv-02486 (N.D. Ill.)**
The Honorable Robert M. Dow, Jr. (November 1, 2021): The Notice Program, together with all included and ancillary documents thereto, (a) constituted reasonable notice; (b) constituted notice that was reasonably calculated under the circumstances to apprise members of the Settlement Class of the pendency of the Litigation...(c) constituted reasonable, due, adequate and sufficient notice to all Persons entitled to receive notice; and (d) met all applicable requirements of due process and any other applicable law. The Court finds that Settlement Class Members have been provided the best notice practicable of the Settlement and that such notice fully satisfies all requirements of law as well as all requirements of due process.

### PELLETIER v. ENDO INTERNATIONAL PLC
**Case No. 2:17-cv-05114 (E.D. Pa.)**
The Honorable Michael M. Baylson (October 25, 2021): The Court approves, as to form and content, the Notice of Pendency and Proposed Settlement of Class Action (the "Notice"), the Proof of Claim and Release form (the "Proof of Claim"), and the Summary Notice, annexed hereto as Exhibits A-1, A-2, and A-3, respectively, and finds that the mailing and distribution of the Notice and publishing of the Summary Notice, substantially in the manner and form set forth in ¶¶7-10 of this Order, meet the requirements of Rule 23 and due process, and is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all Persons entitled thereto.

### BIEGEL v. BLUE DIAMOND GROWERS
**Case No. 7:20-cv-03032 (S.D.N.Y.)**
The Honorable Cathy Seibel (October 25, 2021): The Court finds that the Notice Plan, set forth in the Settlement Agreement and effectuated pursuant to the Preliminary Approval Order: (i) was the best notice practicable under the circumstances; (ii) was reasonably calculated to provide, and did provide, due and sufficient notice to the Settlement Class regarding the existence and nature of the Action...and (iii) satisfied the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and all other applicable law.

### QUINTERO v. SAN DIEGO ASSOCIATION OF GOVERNMENTS
**Case No. 37-2019-00017834-CU-NP-CTL (Cal. Super. Ct.)**
The Honorable Eddie C. Sturgeon (September 27, 2021): The Court has reviewed the class notices for the Settlement Class and the methods for providing notice and has determined that the parties will employ forms and methods of notice that constitute the best notice practicable under the circumstances; are reasonably calculated to apprise class members of the terms of the Settlement and of their right to participate in it, object, or opt-out; are reasonable and constitute due, adequate, and sufficient notice to all persons entitled to receive notice; and meet all constitutional and statutory requirements, including all due process requirements and the California Rules of Court.

### HOLVE v. MCCORMICK & COMPANY, INC.
**Case No. 6:16-cv-06702 (W.D.N.Y.)**
The Honorable Mark W. Pedersen (September 23, 2021): The Court finds that the form, content and method of giving notice to the Class as described in the Settlement Agreement and the Declaration of the Settlement Administrator: (a) will constitute the best practicable notice; (b) are reasonably calculated, under the

**ANGEION GROUP**
Writing the Rules

circumstances, to apprise the Settlement Class Members of the pendency of the Action…(c) are reasonable and constitute due, adequate, and sufficient notice to all Settlement Class Members and other persons entitled to receive notice; and (d) meet all applicable requirements of law, including but not limited to 28 U.S.C. § 1715, Rule 23(c) and (e), and the Due Process Clause(s) of the United States Constitution.

### CULBERTSON v. DELOITTE CONSULTING LLP
**Case No. 1:20-cv-03962 (S.D.N.Y.)**
The Honorable Lewis J. Liman (August 27, 2021): The notice procedures described in the Notice Plan are hereby found to be the best means of providing notice under the circumstances and, when completed, shall constitute due and sufficient notice of the proposed Settlement Agreement and the Final Approval Hearing to all persons affected by and/or entitled to participate in the Settlement Agreement, in full compliance with the notice requirements of Rule 23 of the Federal Rules of Civil Procedure and due process of law.

### PULMONARY ASSOCIATES OF CHARLESTON PLLC v. GREENWAY HEALTH, LLC
**Case No. 3:19-cv-00167 (N.D. Ga.)**
The Honorable Timothy C. Batten, Sr. (August 24, 2021):  Under Rule 23(c)(2), the Court finds that the content, format, and method of disseminating Notice, as set forth in the Motion, the Declaration of Steven Weisbrot filed on July 2, 2021, and the Settlement Agreement and Release, including notice by First Class U.S. Mail and email to all known Class Members, is the best notice practicable under the circumstances and satisfies all requirements provided in Rule 23(c)(2)(B) and due process.

### IN RE: BROILER CHICKEN GROWER ANTITRUST LITIGATION (NO II)
**Case No. 6:20-md-02977 (E.D. Okla.)**
The Honorable Robert J. Shelby (August 23, 2021):  The Court approves the method of notice to be provided to the Settlement Class as set forth in Plaintiffs' Motion and Memorandum of Law in Support of Motion for Approval of the Form and Manner of Class Notice and Appointment of Settlement Administrator and Request for Expedited Treatment and the Declaration of Steven Weisbrot on Angeion Group Qualifications and Proposed Notice Plan…The Court finds and concludes that such notice: (a) is the best notice that is practicable under the circumstances, and is reasonably calculated to reach the members of the Settlement Class and to apprise them of the Action, the terms and conditions of the Settlement, their right to opt out and be excluded from the Settlement Class, and to object to the Settlement; and (b) meets the requirements of Federal Rule of Civil Procedure 23 and due process.

### ROBERTS v. AT&T MOBILITY, LLC
**Case No. 3:15-cv-03418 (N.D. Cal.)**
The Honorable Edward M. Chen (August 20, 2021):  The Court finds that such Notice program, including the approved forms of notice: (a) constituted the best notice that is practicable under the circumstances; (b) included direct individual notice to all Settlement Class Members who could be identified through reasonable effort, as well as supplemental notice via a social media notice campaign and reminder email and SMS notices; (c) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the nature of this Action …(d) constituted due, adequate and sufficient notice to all persons entitled to notice; and (e) met all applicable requirements of Federal Rule of Civil Procedure 23, Due Process under the U.S. Constitution, and any other applicable law.

### PYGIN v. BOMBAS, LLC
**Case No. 4:20-cv-04412 (N.D. Cal.)**
The Honorable Jeffrey S. White (July 12, 2021):  The Court also concludes that the Class Notice and Notice Program set forth in the Settlement Agreement satisfy the requirements of due process and Rule 23 and provide the best notice practicable under the circumstances. The Class Notice and Notice Program are reasonably

ANGEION GROUP
Writing the Rules

calculated to apprise Settlement Class Members of the nature of this Litigation, the Scope of the Settlement Class, the terms of the Settlement Agreement, the right of Settlement Class Members to object to the Settlement Agreement or exclude themselves from the Settlement Class and the process for doing so, and of the Final Approval Hearing. Accordingly, the Court approves the Class Notice and Notice Program and the Claim Form.

## WILLIAMS v. RECKITT BENCKISER LLC
**Case No. 1:20-cv-23564 (S.D. Fla.)**
The Honorable Jonathan Goodman (April 23, 2021): The Court approves, as to form and content, the Class Notice and Internet Notice submitted by the parties (Exhibits B and D to the Settlement Agreement or Notices substantially similar thereto) and finds that the procedures described therein meet the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process, and provide the best notice practicable under the circumstances. The proposed Class Notice Plan -- consisting of (i) internet and social media notice; and (ii) notice via an established a Settlement Website -- is reasonably calculated to reach no less than 80% of the Settlement Class Members.

## IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION
**Case No. 5:18-md-02827 (N.D. Cal.)**
The Honorable Edward J. Davila (March 17, 2021): Angeion undertook a comprehensive notice campaign...The notice program was well executed, far-reaching, and exceeded both Federal Rule of Civil Procedure 23(c)(2)(B)'s requirement to provide the "best notice that is practicable under the circumstances" and Rule 23(e)(1)(B)'s requirement to provide "direct notice in a reasonable manner."

## IN RE: GOOGLE PLUS PROFILE LITIGATION
**Case No. 5:18-cv-06164 (N.D. Cal.)**
The Honorable Edward J. Davila (January 25, 2021): The Court further finds that the program for disseminating notice to Settlement Class Members provided for in the Settlement, and previously approved and directed by the Court (hereinafter, the "Notice Program"), has been implemented by the Settlement Administrator and the Parties, and such Notice Program, including the approved forms of notice, is reasonable and appropriate and satisfies all applicable due process and other requirements, and constitutes best notice reasonably calculated under the circumstances to apprise Settlement Class Members.

## NELSON v. IDAHO CENTRAL CREDIT UNION
**Case No. CV03-20-00831, CV03-20-03221 (Idaho Jud. Dist.)**
The Honorable Robert C. Naftz (January 19, 2021): The Court finds that the Proposed Notice here is tailored to this Class and designed to ensure broad and effective reach to it...The Parties represent that the operative notice plan is the best notice practicable and is reasonably designed to reach the settlement class members. The Court agrees.

## IN RE: HANNA ANDERSSON AND SALESFORCE.COM DATA BREACH LITIGATION
**Case No. 3:20-cv-00812 (N.D. Cal.)**
The Honorable Edward M. Chen (December 29, 2020): The Court finds that the Class Notice and Notice Program satisfy the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure and provide the best notice practicable under the circumstances.

## IN RE: PEANUT FARMERS ANTITRUST LITIGATION
**Case No. 2:19-cv-00463 (E.D. Va.)**
The Honorable Raymond A. Jackson (December 23, 2020): The Court finds that the Notice Program...constitutes the best notice that is practicable under the circumstances and is valid, due and sufficient notice to all persons

entitled thereto and complies fully with the requirements of Rule 23(c)(2) and the due process requirements of the Constitution of the United States.

## BENTLEY v. LG ELECTRONICS U.S.A., INC.

**Case No. 2:19-cv-13554 (D.N.J.)**

The Honorable Madeline Cox Arleo (December 18, 2020):  The Court finds that notice of this Settlement was given to Settlement Class Members in accordance with the Preliminary Approval Order and constituted the best notice practicable of the proceedings and matters set forth therein, including the Litigation, the Settlement, and the Settlement Class Members' rights to object to the Settlement or opt out of the Settlement Class, to all Persons entitled to such notice, and that this notice satisfied the requirements of Federal Rule of Civil Procedure 23 and of due process.

## IN RE: ALLURA FIBER CEMENT SIDING PRODUCTS LIABILITY LITIGATION

**Case No. 2:19-mn-02886 (D.S.C.)**

The Honorable David C. Norton (December 18, 2020):  The proposed Notice provides the best notice practicable under the circumstances. It allows Settlement Class Members a full and fair opportunity to consider the proposed settlement. The proposed plan for distributing the Notice likewise is a reasonable method calculated to reach all members of the Settlement Class who would be bound by the settlement. There is no additional method of distribution that would be reasonably likely to notify Settlement Class Members who may not receive notice pursuant to the proposed distribution plan.

## ADKINS v. FACEBOOK, INC.

**Case No. 3:18-cv-05982 (N.D. Cal.)**

The Honorable William Alsup (November 15, 2020):  Notice to the class is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Tr. Co., 399 U.S. 306, 314 (1650).*

## IN RE: 21ST CENTURY ONCOLOGY CUSTOMER DATA SECURITY BREACH LITIGATION

**Case No. 8:16-md-02737 (M.D. Fla.)**

The Honorable Mary S. Scriven (November 2, 2020):  The Court finds and determines that mailing the Summary Notice and publication of the Settlement Agreement, Long Form Notice, Summary Notice, and Claim Form on the Settlement Website, all pursuant to this Order, constitute the best notice practicable under the circumstances, constitute due and sufficient notice of the matters set forth in the notices to all persons entitled to receive such notices, and fully satisfies the of due process, Rule 23 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1715, and all other applicable laws and rules. The Court further finds that all of the notices are written in plain language and are readily understandable by Class Members.

## MARINO v. COACH INC.

**Case No. 1:16-cv-01122 (S.D.N.Y.)**

The Honorable Valerie Caproni (August 24, 2020):  The Court finds that the form, content, and method of giving notice to the Settlement Class as described in paragraph 8 of this Order: (a) will constitute the best practicable notice; (b) are reasonably calculated, under the circumstances, to apprise the Settlement Class Members of the pendency of the Action, the terms of the proposed Settlement, and their rights under the proposed Settlement, including but not limited to their rights to object to or exclude themselves from the proposed Settlement and other rights under the terms of the Settlement Agreement; (c) are reasonable and constitute due, adequate, and sufficient notice to all Settlement Class Members and other persons entitled to receive notice; and (d) meet all applicable requirements of law, including but not limited to 28 U.S.C. § 1715, Rule 23(c) and (e), and the Due Process Clause(s) of the United States Constitution.  The Court further finds that all of the notices are written in

plain language, are readily understandable by Settlement Class Members, and are materially consistent with the Federal Judicial Center's illustrative class action notices.

## BROWN v. DIRECTV, LLC
**Case No. 2:13-cv-01170 (C.D. Cal.)**
The Honorable Dolly M. Gee (July 23, 2020):  Given the nature and size of the class, the fact that the class has no geographical limitations, and the sheer number of calls at issue, the Court determines that these methods constitute the best and most reasonable form of notice under the circumstances.

## IN RE: SSA BONDS ANTITRUST LITIGATION
**Case No. 1:16-cv-03711 (S.D.N.Y.)**
The Honorable Edgardo Ramos (July 15, 2020): The Court finds that the mailing and distribution of the Notice and the publication of the Summary Notice substantially in the manner set forth below meet the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process and constitute the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all Persons entitled to notice.

## KJESSLER v. ZAAPPAAZ, INC.
**Case No. 4:18-cv-00430 (S.D. Tex.)**
The Honorable Nancy F. Atlas (July 14, 2020): The Court also preliminarily approves the proposed manner of communicating the Notice and Summary Notice to the putative Settlement Class, as set out below, and finds it is the best notice practicable under the circumstances, constitutes due and sufficient notice to all persons and entities entitled to receive such notice, and fully satisfies the requirements of applicable laws, including due process and Federal Rule of Civil Procedure 23.

## HESTER v. WALMART, INC.
**Case No. 5:18-cv-05225 (W.D. Ark.)**
The Honorable Timothy L. Brooks (July 9, 2020): The Court finds that the Notice and Notice Plan substantially in the manner and form set forth in this Order and the Agreement meet the requirements of Federal Rule of Civil Procedure 23 and due process, is the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all Persons entitled thereto.

## CLAY v. CYTOSPORT INC.
**Case No. 3:15-cv-00165 (S.D. Cal.)**
The Honorable M. James Lorenz (June 17, 2020):  The Court approves the proposed Notice Plan for giving notice to the Settlement Class through publication, both print and digital, and through the establishment of a Settlement Website, as more fully described in the Agreement and the Claims Administrator's affidavits (docs. no. 222-9, 224, 224-1, and 232-3 through 232-6). The Notice Plan, in form, method, and content, complies with the requirements of Rule 23 and due process, and constitutes the best notice practicable under the circumstances.

## GROGAN v. AARON'S INC.
**Case No. 1:18-cv-02821 (N.D. Ga.)**
The Honorable J.P. Boulee (May 1, 2020):  The Court finds that the Notice Plan as set forth in the Settlement Agreement meets the requirements of Fed. R. Civ. P. 23 and constitutes the best notice practicable under the circumstances, including direct individual notice by mail and email to Settlement Class Members where feasible and a nationwide publication website-based notice program, as well as establishing a Settlement Website at the web address of www.AaronsTCPASettlement.com, and satisfies fully the requirements the Federal Rules of Civil Procedure, the U.S. Constitution, and any other applicable law, such that the Settlement Agreement and Final Order and Judgment will be binding on all Settlement Class Members.

**ANGEION GROUP**
Writing the Rules

## CUMMINGS v. BOARD OF REGENTS OF THE UNIVERSITY OF NEW MEXICO
**Case No. D-202-CV-2001-00579 (N.M. Jud. Dist.)**
The Honorable Carl Butkus (March 30, 2020): The Court has reviewed the Class Notice, the Plan of Allocation and Distribution and Claim Form, each of which it approves in form and substance. The Court finds that the form and methods of notice set forth in the Agreement: (i) are reasonable and the best practicable notice under the circumstances; (ii) are reasonably calculated to apprise Settlement Class Members of the pendency of the Lawsuit, of their rights to object to or opt-out of the Settlement, and of the Final Approval Hearing; (iii) constitute due, adequate, and sufficient notice to all persons entitled to receive notice; and (iv) meet the requirements of the New Mexico Rules of Civil Procedure, the requirements of due process under the New Mexico and United States Constitutions, and the requirements of any other applicable rules or laws.

## SCHNEIDER v. CHIPOTLE MEXICAN GRILL, INC.
**Case No. 4:16-cv-02200 (N.D. Cal.)**
The Honorable Haywood S. Gilliam, Jr. (January 31, 2020):  Given that direct notice appears to be infeasible, the third-party settlement administrator will implement a digital media campaign and provide for publication notice in People magazine, a nationwide publication, and the East Bay Times. SA § IV.A, C; Dkt. No. 205-12 at ¶¶ 13–23...The Court finds that the proposed notice process is "'reasonably calculated, under all the circumstances,' to apprise all class members of the proposed settlement." Roes, 944 F.3d at 1045 (citation omitted).

## HANLEY v. TAMPA BAY SPORTS AND ENTERTAINMENT LLC
**Case No. 8:19-cv-00550 (M.D. Fla.)**
The Honorable Charlene Edwards Honeywell (January 7, 2020):  The Court approves the form and content of the Class notices and claim forms substantially in the forms attached as Exhibits A-D to the Settlement. The Court further finds that the Class Notice program described in the Settlement is the best practicable under the circumstances. The Class Notice program is reasonably calculated under the circumstances to inform the Settlement Class of the pendency of the Action, certification of a Settlement Class, the terms of the Settlement, Class Counsel's attorney's fees application and the request for a service award for Plaintiff, and their rights to opt-out of the Settlement Class or object to the Settlement. The Class notices and Class Notice program constitute sufficient notice to all persons entitled to notice. The Class notices and Class Notice program satisfy all applicable requirements of law, including, but not limited to, Federal Rule of Civil Procedure 23 and the Constitutional requirement of Due Process.

## CORCORAN v. CVS HEALTH
**Case No. 4:15-cv-03504 (N.D. Cal.)**
The Honorable Yvonne Gonzalez Rogers (November 22, 2019):  Having reviewed the parties' briefings, plaintiffs' declarations regarding the selection process for a notice provider in this matter and regarding Angeion Group LLC's experience and qualifications, and in light of defendants' non-opposition, the Court APPROVES Angeion Group LLC as the notice provider...Having considered the parties' revised proposed notice program, the Court agrees that the parties' proposed notice program is the "best notice that is practicable under the circumstances." The Court is satisfied with the representations made regarding Angeion Group LLC's methods for ascertaining email addresses from existing information in the possession of defendants. Rule 23 further contemplates and permits electronic notice to class members in certain situations. See Fed. R. Civ. P. 23(c)(2)(B).

## PATORA v. TARTE, INC.
**Case No. 7:18-cv-11760 (S.D.N.Y.)**
The Honorable Kenneth M. Karas (October 2, 2019):  The Court finds that the form, content, and method of giving notice to the Class as described in Paragraph 9 of this Order: (a) will constitute the best practicable notice; (b) are reasonably calculated, under the circumstances, to apprise the Settlement Class Members...(c) are reasonable

ANGEION GROUP
Writing the Rules

and constitute due, adequate, and sufficient notice to all Settlement Class Members and other persons entitled to receive notice; and (d) meet all applicable requirements of law, including but not limited to 28 U.S.C. § 1715, Rule 23(c) and (e), and the Due Process Clauses of the United States Constitution. The Court further finds that all of the notices are written in simple terminology, are readily understandable by Settlement Class Members, and are materially consistent with the Federal Judicial Center's illustrative class action notices.

## CARTER v. GENERAL NUTRITION CENTERS, INC., AND GNC HOLDINGS, INC.

**Case No. 2:16-cv-00633 (W.D. Pa.)**

The Honorable Mark R. Hornak (September 9, 2019): The Court finds that the Class Notice and the manner of its dissemination described in Paragraph 7 above and Section VII of the Agreement constitutes the best practicable notice under the circumstances and is reasonably calculated, under all the circumstances, to apprise proposed Settlement Class Members of the pendency of this action, the terms of the Agreement, and their right to object to or exclude themselves from the proposed Settlement Class. The Court finds that the notice is reasonable, that it constitutes due, adequate and sufficient notice to all persons entitled to receive notice, and that it meets the requirements of due process, Rule 23 of the Federal Rules of Ci vii Procedure, and any other applicable laws.

## CORZINE v. MAYTAG CORPORATION

**Case No. 5:15-cv-05764 (N.D. Cal.)**

The Honorable Beth L. Freeman (August 21, 2019):  The Court, having reviewed the proposed Summary Notice, the proposed FAQ, the proposed Publication Notice, the proposed Claim Form, and the proposed plan for distributing and disseminating each of them, finds and concludes that the proposed plan will provide the best notice practicable under the circumstances and satisfies all requirements of federal and state laws and due process.

## MEDNICK v. PRECOR, INC.

**Case No. 1:14-cv-03624 (N.D. Ill.)**

The Honorable Harry D. Leinenweber (June 12, 2019): Notice provided to Class Members pursuant to the Preliminary Class Settlement Approval Order constitutes the best notice practicable under the circumstances, including individual email and mail notice to all Class Members who could be identified through reasonable effort, including information provided by authorized third-party retailers of Precor. Said notice provided full and adequate notice of these proceedings and of the matter set forth therein, including the proposed Settlement set forth in the Agreement, to all persons entitled to such notice, and said notice fully satisfied the requirements of F.R.C.P. Rule 23 (e) and (h) and the requirements of due process under the United States and California Constitutions.

## GONZALEZ v. TCR SPORTS BROADCASTING HOLDING LLP

**Case No. 1:18-cv-20048 (S.D. Fla.)**

The Honorable Darrin P. Gayles (May 24, 2019):  The Court finds that notice to the class was reasonable and the best notice practicable under the circumstances, consistent with Rule 23(e)(1) and Rule 23(c)(2)(B).

## ANDREWS v. THE GAP, INC.

**Case No. CGC-18-567237 (Cal. Super. Ct.)**

The Honorable Richard B. Ulmer Jr. (May 10, 2019): The Court finds that (a) the Full Notice, Email Notice, and Publication constitute the best notice practicable under the circumstances, (b) they constitute valid, due, and sufficient notice to all members of the Class, and (c) they comply fully with the requirements of California Code of Civil Procedure section 382, California Rules of Court 3.766 and 3.769, the California and United States Constitutions, and other applicable law.

ANGEION GROUP
**Writing the Rules**

## COLE v. NIBCO, INC.
**Case No. 3:13-cv-07871 (D.N.J.)**
The Honorable Freda L. Wolfson (April 11, 2019): The record shows, and the Court finds, that the Notice Plan has been implemented in the manner approved by the Court in its Preliminary Approval Order. The Court finds that the Notice Plan constitutes: (i) the best notice practicable to the Settlement Class under the circumstances; (ii) was reasonably calculated, under the circumstances, to apprise the Settlement Class of the pendency of this..., (iii) due, adequate, and sufficient notice to all Persons entitled to receive notice; and (iv) notice that fully satisfies the requirements of the United States Constitution (including the Due Process Clause), Fed. R. Civ. P. 23, and any other applicable law.

## DIFRANCESCO v. UTZ QUALITY FOODS, INC.
**Case No. 1:14-cv-14744 (D. Mass.)**
The Honorable Douglas P. Woodlock (March 15, 2019): The Court finds that the Notice plan and all forms of Notice to the Class as set forth in the Settlement Agreement and Exhibits 2 and 6 thereto, as amended (the "Notice Program"), is reasonably calculated to, under all circumstances, apprise the members of the Settlement Class of the pendency of this action, the certification of the Settlement Class, the terms of the Settlement Agreement, and the right of members to object to the settlement or to exclude themselves from the Class. The Notice Program is consistent with the requirements of Rule 23 and due process, and constitutes the best notice practicable under the circumstances.

## IN RE: CHRYSLER-DODGE-JEEP ECODIESEL MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION
**Case No. 3:17-md-02777 (N.D. Cal.)**
The Honorable Edward M. Chen (February 11, 2019): Also, the parties went through a sufficiently rigorous selection process to select a settlement administrator. See Proc. Guidance for Class Action Sett. ¶ 2; see also Cabraser Decl. ¶¶ 9-10. While the settlement administration costs are significant – an estimated $1.5 million – they are adequately justified given the size of the class and the relief being provided.

In addition, the Court finds that the language of the class notices (short and long-form) is appropriate and that the means of notice – which includes mail notice, electronic notice, publication notice, and social media "marketing" – is the "best notice...practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); see also Proc. Guidance for Class Action Sett. ¶¶ 3-5, 9 (addressing class notice, opt-outs, and objections). The Court notes that the means of notice has changed somewhat, as explained in the Supplemental Weisbrot Declaration filed on February 8, 2019, so that notice will be more targeted and effective. See generally Docket No. 525 (Supp. Weisbrot Decl.) (addressing, inter alia, press release to be distributed via national newswire service, digital and social media marketing designed to enhance notice, and "reminder" first-class mail notice when AEM becomes available).

Finally, the parties have noted that the proposed settlement bears similarity to the settlement in the Volkswagen MDL. See Proc. Guidance for Class Action Sett. ¶ 11.

## RYSEWYK v. SEARS HOLDINGS CORPORATION
**Case No. 1:15-cv-04519 (N.D. Ill.)**
The Honorable Manish S. Shah (January 29, 2019): The Court holds that the Notice and notice plan as carried out satisfy the requirements of Rule 23(e) and due process. This Court has previously held the Notice and notice plan to be reasonable and the best practicable under the circumstances in its Preliminary Approval Order dated August 6, 2018. (Dkt. 191) Based on the declaration of Steven Weisbrot, Esq. of Angeion Group (Dkt. No. 209-2), which sets forth compliance with the Notice Plan and related matters, the Court finds that the multi-pronged notice strategy as implemented has successfully reached the putative Settlement Class, thus constituting the best practicable notice and satisfying due process.

ANGEION GROUP
Writing the Rules

## MAYHEW v. KAS DIRECT, LLC, AND S.C. JOHNSON & SON, INC.
**Case No. 7:16-cv-06981 (S.D.N.Y.)**
The Honorable Vincent J. Briccetti (June 26, 2018): In connection with their motion, plaintiffs provide the declaration of Steven Weisbrot, Esq., a principal at the firm Angeion Group, LLC, which will serve as the notice and settlement administrator in this case. (Doc. #101, Ex. F: Weisbrot Decl.) According to Mr. Weisbrot, he has been responsible for the design and implementation of hundreds of class action administration plans, has taught courses on class action claims administration, and has given testimony to the Judicial Conference Committee on Rules of Practice and Procedure on the role of direct mail, email, and digital media in due process notice. Mr. Weisbrot states that the internet banner advertisement campaign will be responsive to search terms relevant to "baby wipes, baby products, baby care products, detergents, sanitizers, baby lotion, [and] diapers," and will target users who are currently browsing or recently browsed categories "such as parenting, toddlers, baby care, [and] organic products." (Weisbrot Decl. ¶ 18). According to Mr. Weisbrot, the internet banner advertising campaign will reach seventy percent of the proposed class members at least three times each. (Id. ¶ 9). Accordingly, the Court approves of the manner of notice proposed by the parties as it is reasonable and the best practicable option for confirming the class members receive notice.

## IN RE: OUTER BANKS POWER OUTAGE LITIGATION
**Case No. 4:17-cv-00141 (E.D.N.C.)**
The Honorable James C. Dever III (May 2, 2018): The court has reviewed the proposed notice plan and finds that the notice plan provides the best practicable notice under the circumstances and, when completed, shall constitute fair, reasonable, and adequate notice of the settlement to all persons and entities affected by or entitled to participate in the settlement, in full compliance with the notice requirements of Fed. R. Civ. P. 23(c)(2)(B) and due process. Thus, the court approves the proposed notice plan.

## GOLDEMBERG v. JOHNSON & JOHNSON CONSUMER COMPANIES, INC.
**Case No. 7:13-cv-03073 (S.D.N.Y.)**
The Honorable Nelson S. Roman (November 1, 2017): Notice of the pendency of the Action as a class action and of the proposed Settlement, as set forth in the Settlement Notices, was given to all Class Members who could be identified with reasonable effort, consistent with the terms of the Preliminary Approval Order. The form and method of notifying the Class of the pendency of the Action as a class action and of the terms and conditions of the proposed Settlement met the requirements of Rule 23 of the Federal Rules of Civil Procedure, due process, and any other applicable law in the United States. Such notice constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

## HALVORSON v. TALENTBIN, INC.
**Case No. 3:15-cv-05166 (N.D. Cal.)**
The Honorable Joseph C. Spero (July 25, 2017): The Court finds that the Notice provided for in the Order of Preliminary Approval of Settlement has been provided to the Settlement Class, and the Notice provided to the Settlement Class constituted the best notice practicable under the circumstances, and was in full compliance with the notice requirements of Rule 23 of the Federal Rules of Civil Procedure, due process, the United States Constitution, and any other applicable law.

## IN RE: ASHLEY MADISON CUSTOMER DATA SECURITY BREACH LITIGATION
**MDL No. 2669/Case No. 4:15-md-02669 (E.D. Mo.)**
The Honorable John A. Ross (July 21, 2017): The Court further finds that the method of disseminating Notice, as set forth in the Motion, the Declaration of Steven Weisbrot, Esq. on Adequacy of Notice Program, dated July 13, 2017, and the Parties' Stipulation—including an extensive and targeted publication campaign composed of both consumer magazine publications in People and Sports Illustrated, as well as serving 11,484,000 highly targeted digital banner ads to reach the prospective class members that will deliver approximately 75.3% reach with an

average frequency of 3.04 —is the best method of notice practicable under the circumstances and satisfies all requirements provided in Rule 23(c)(2)(B) and all Constitutional requirements including those of due process.

The Court further finds that the Notice fully satisfies Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process; provided, that the Parties, by agreement, may revise the Notice, the Claim Form, and other exhibits to the Stipulation, in ways that are not material or ways that are appropriate to update those documents for purposes of accuracy.

## TRAXLER v. PPG INDUSTRIES INC.
**Case No. 1:15-cv-00912 (N.D. Ohio)**
The Honorable Dan Aaron Polster (April 27, 2017):  The Court hereby approves the form and procedure for disseminating notice of the proposed settlement to the Settlement Class as set forth in the Agreement. The Court finds that the proposed Notice Plan contemplated constitutes the best notice practicable under the circumstances and is reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action and their right to object to the proposed settlement or opt out of the Settlement Class in full compliance with the requirements of applicable law, including the Due Process Clause of the United States Constitution and Rules 23(c) and (e). In addition, Class Notice clearly and concisely states in plain, easily understood language: (i) the nature of the action; (ii) the definition of the certified Settlement Class; (iii) the claims and issues of the Settlement Class; (iv) that a Settlement Class Member may enter an appearance through an attorney if the member so desires; (v) that the Court will exclude from the Settlement Class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

## IN RE: THE HOME DEPOT, INC., CUSTOMER DATA SECURITY BREACH LITIGATION
**Case No. 1:14-md-02583 (N.D. Ga.)**
The Honorable Thomas W. Thrash Jr. (March 10, 2017): The Court finds that the form, content, and method of giving notice to the settlement class as described in the settlement agreement and exhibits: (a) constitute the best practicable notice to the settlement class; (b) are reasonably calculated, under the circumstances, to apprise settlement class members of the pendency of the action, the terms of the proposed settlement, and their rights under the proposed settlement; (c) are reasonable and constitute due, adequate, and sufficient notice to those persons entitled to receive notice; and (d) satisfy the requirements of Federal Rule of Civil Procedure 23, the constitutional requirement of due process, and any other legal requirements. The Court further finds that the notice is written in plain language, uses simple terminology, and is designed to be readily understandable by settlement class members.

## ROY v. TITEFLEX CORPORATION T/A GASTITE AND WARD MANUFACTURING, LLC
**Case No. 384003V (Md. Cir. Ct.)**
The Honorable Ronald B. Rubin (February 24, 2017): What is impressive to me about this settlement is in addition to all the usual recitation of road racing litanies is that there is going to be a) public notice of a real nature and b) about a matter concerning not just money but public safety and then folks will have the knowledge to decide for themselves whether to take steps to protect themselves or not. And that's probably the best thing a government can do is to arm their citizens with knowledge and then the citizens can make decision. To me that is a key piece of this deal. *I think the notice provisions are exquisite.*

## IN RE: LG FRONT LOADING WASHING MACHINE CLASS ACTION LITIGATION
**Case No. 2:08-cv-00051 (D.N.J.)**
The Honorable Madeline Cox Arleo (June 17, 2016): This Court further approves the proposed methods for giving notice of the Settlement to the Members of the Settlement Class, as reflected in the Settlement Agreement and...finds that the Members of the Settlement Class will receive the best notice practicable under the

circumstances. The Court specifically approves the Parties' proposal to use reasonable diligence to identify potential class members and an associated mailing and/or email address in the Company's records, and their proposal to direct the ICA to use this information to send absent class members notice both via first class mail and email. The Court further approves the plan for the Publication Notice's publication in two national print magazines and on the internet. The Court also approves payment of notice costs as provided in the Settlement. The Court finds that these procedures, carried out with reasonable diligence, will constitute the best notice practicable under the circumstances and will satisfy.

## FENLEY v. APPLIED CONSULTANTS, INC.
**Case No. 2:15-cv-00259 (W.D. Pa.)**
The Honorable Mark R. Hornak (June 16, 2016):  The Court would note that it approved notice provisions of the settlement agreement in the proceedings today. That was all handled by the settlement and administrator Angeion. The notices were sent. The class list utilized the Postal Service's national change of address database along with using certain proprietary and other public resources to verify addresses. the requirements of Fed.R.Civ.P. 23(c)(2), Fed.R.Civ.P. 23(e) (l), and Due Process....

The Court finds and concludes that the mechanisms and methods of notice to the class as identified were reasonably calculated to provide all notice required by the due process clause, the applicable rules and statutory provisions, and that the results of *the efforts of Angeion were highly successful and fulfilled all of those requirements.*

## FUENTES v. UNIRUSH, LLC D/B/A UNIRUSH FINANCIAL SERVICES
**Case No. 1:15-cv-08372 (S.D.N.Y.)**
The Honorable J. Paul Oetken (May 16, 2016): The Court approves, as to form, content, and distribution, the Claim Form attached to the Settlement Agreement as Exhibit A, the Notice Plan, and all forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B-D, thereto, and finds that such Notice is the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure. The Court also finds that the Notice constitutes valid, due and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process. The Court further finds that the Notice is reasonably calculated to, under all circumstances, reasonably apprise members of the Settlement Class of the pendency of the Actions, the terms of the Settlement Agreement, and the right to object to the settlement and to exclude themselves from the Settlement Class. The Parties, by agreement, may revise the Notices and Claim Form in ways that are not material, or in ways that are appropriate to update those documents for purposes of accuracy or formatting for publication.

## IN RE: WHIRLPOOL CORP. FRONTLOADING WASHER PRODUCTS LIABILITY LITIGATION
**MDL No. 2001/Case No. 1:08-wp-65000 (N.D. Ohio)**
The Honorable Christopher A. Boyko (May 12, 2016): The Court, having reviewed the proposed Summary Notices, the proposed FAQ, the proposed Publication Notice, the proposed Claim Form, and the proposed plan for distributing and disseminating each of them, finds and concludes that the proposed plan for distributing and disseminating each of them will provide the best notice practicable under the circumstances and satisfies all requirements of federal and state laws and due process.

## SATERIALE v. R.J. REYNOLDS TOBACCO CO.
**Case No. 2:09-cv-08394 (C.D. Cal.)**
The Honorable Christina A. Snyder (May 3, 2016): The Court finds that the Notice provided to the Settlement Class pursuant to the Settlement Agreement and the Preliminary Approval Order has been successful, was the best notice practicable under the circumstances and (1) constituted notice that was reasonably calculated, under the circumstances, to apprise members of the Settlement Class of the pendency of the Action, their right to

**ANGEION GROUP**
Writing the Rules

object to the Settlement, and their right to appear at the Final Approval Hearing; (2) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice; and (3) met all applicable requirements of the Federal Rules of Civil Procedure, Due Process, and the rules of the Court.

## FERRERA v. SNYDER'S-LANCE, INC.
**Case No. 0:13-cv-62496 (S.D. Fla.)**
The Honorable Joan A. Lenard (February 12, 2016): The Court approves, as to form and content, the Long-Form Notice and Short- Form Publication Notice attached to the Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement as Exhibits 1 and 2 to the Stipulation of Settlement. The Court also approves the procedure for disseminating notice of the proposed settlement to the Settlement Class and the Claim Form, as set forth in the Notice and Media Plan attached to the Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement as Exhibits G. The Court finds that the notice to be given constitutes the best notice practicable under the circumstances, and constitutes valid, due, and sufficient notice to the Settlement Class in full compliance with the requirements of applicable law, including the Due Process Clause of the United States Constitution.

## SOTO v. THE GALLUP ORGANIZATION, INC.
**Case No. 0:13-cv-61747 (S.D. Fla.)**
The Honorable Marcia G. Cooke (June 16, 2015): The Court approves the form and substance of the notice of class action settlement described in ¶ 8 of the Agreement and attached to the Agreement as Exhibits A, C and D. The proposed form and method for notifying the Settlement Class Members of the settlement and its terms and conditions meet the requirements of Fed. R. Civ. P. 23(c)(2)(B) and due process, constitute the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons and entities entitled to the notice. The Court finds that the proposed notice is clearly designed to advise the Settlement Class Members of their rights.

## OTT v. MORTGAGE INVESTORS CORPORATION OF OHIO, INC.
**Case No. 3:14-cv-00645 (D. Or.)**
The Honorable Janice M. Stewart (July 20, 2015): The Notice Plan, in form, method, and content, fully complies with the requirements of Rule 23 and due process, constitutes the best notice practicable under the circumstances, and is due and sufficient notice to all persons entitled thereto. The Court finds that the Notice Plan is reasonably calculated to, under all circumstances, reasonably apprise the persons in the Settlement Class of the pendency of this action, the terms of the Settlement Agreement, and the right to object to the Settlement and to exclude themselves from the Settlement Class.

## IN RE: POOL PRODUCTS DISTRIBUTION MARKET ANTITRUST LITIGATION
**MDL No. 2328/Case No. 2:12-md-02328 (E.D. La.)**
The Honorable Sarah S. Vance (December 31, 2014): To make up for the lack of individual notice to the remainder of the class, the parties propose a print and web-based plan for publicizing notice. The Court welcomes the inclusion of web- based forms of communication in the plan. The Court finds that the proposed method of notice satisfies the requirements of Rule 23(c)(2)(B) and due process. The direct emailing of notice to those potential class members for whom Hayward and Zodiac have a valid email address, along with publication of notice in print and on the web, is reasonably calculated to apprise class members of the settlement. Moreover, the plan to combine notice for the Zodiac and Hayward settlements should streamline the process and avoid confusion that might otherwise be caused by a proliferation of notices for different settlements. Therefore, the Court approves the proposed notice forms and the plan of notice.

## IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Jonathan Hoang To, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DirectToU, LLC, <br><br> Defendant. | Case No. 3:24-cv-06447 |

## [PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT, CERTIFYING SETTLEMENT CLASS, APPOINTING CLASS REPRESENTATIVE, APPOINTING CLASS COUNSEL, AND APPROVING NOTICE PLAN

WHEREAS, a class action is pending before the Court entitled *Jonathan Hoang To v. DirectToU, LLC*; and

WHEREAS, Plaintiff Jonathan Hoang To and Defendant DirectToU, LLC have entered into a Class Action Settlement Agreement, which, together with the exhibits attached thereto, sets forth the terms and conditions for a proposed settlement and dismissal of the Action with prejudice as to Defendant upon the Court having read and considered the terms and conditions set forth therein (the "Settlement Agreement"), and the Court having read and considered the Settlement Agreement and exhibits attached to;

This matter coming before the Court upon the agreement of the parties, good cause being shown, and the Court being fully advised on all aspects of this dispute,

IT IS HEREBY ORDERED, DECREED, AND ADJUDGED AS FOLLOWS:

1.     Terms and phrases in this Order shall have the same meaning as ascribed to them in the Settlement Agreement.

2.     The Parties have moved the Court for an order approving the settlement of the Action in accordance with the Settlement Agreement, which, together with the documents incorporated therein, sets forth the terms and conditions for a proposed settlement and dismissal of the Action with prejudice, and the Court having read and considered the Settlement Agreement and having heard the parties and being fully advised on all aspects of this dispute, hereby preliminarily approves the Settlement Agreement in its entirety subject to the Final Approval Hearing referred to in paragraph 5 of this Order.

3.     This Court finds that it has jurisdiction over the subject matter of this action and over all Parties to the Action.

4.     The Court finds that, subject to the Final Approval Hearing, the Settlement Agreement is fair, reasonable, and adequate, within the range of possible approval, and in the best interests of the Settlement Class set forth below. The Court further finds that the Settlement Agreement substantially fulfills the purposes and objectives of the class action, and provides substantial relief to the Settlement Class without the risks, burdens, costs, or delay associated with continued litigation, trial, and/or appeal. The Court also finds that the Settlement Agreement (a) is the result of arm's length negotiations between experienced class action attorneys;(b) is sufficient to warrant notice of the settlement and the Final Approval Hearing to be disseminated to the Settlement Class; (c) meets all applicable requirements of law, including, for settlement purposes only, Rule 23 of the Federal Rules of Civil Procedure, and (d) is not a finding or admission of liability by the Defendant or any other person, nor a finding of the validity of any

claims asserted in the Action or of any wrongdoing or any violation of law.

## **Final Approval Hearing**

5.      The Final Approval Hearing shall be held before this Court on

_____, at _____ via Zoom [Zoom Webinar ID: 161 181 2513; Zoom Password:

478314] to determine (a) whether the proposed settlement of the Action on the terms and

conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should

be given final approval by the Court; (b) whether a judgment and order of dismissal with

prejudice should be entered; (c) whether to approve the payment of attorneys' fees, costs, and

expenses to Class Counsel; and (d) whether to approve the payment of an incentive award to the

Class Representative. The Court may adjourn the Final Approval Hearing without further notice

to members of the Settlement Class.

6.      Class Counsel shall file papers in support of their Fee Award and Class

Representative Incentive Award (collectively "Fee Petition") on or before _____ [Suggested date

of 62 days after entry of this Order, (i.e. 14 days before the Objection/ Exclusion Deadline).

## **Certification of the Settlement Class**

7.      For purposes of settlement only: (a) Julian Hammond, Adrian Barnes, Polina

Brandler, and Ari Cherniak of HammondLaw, P.C. are appointed Class Counsel for the

Settlement Class; and (b) Jonathan Hoang To is named Class Representative. The Court finds

that this attorney is competent and capable of exercising the responsibilities of Class Counsel and

that Plaintiff Hoang To will adequately protect the interests of the Settlement Class defined

below.

8.      For purposes of settlement only, the Court conditionally certifies (i.e., finds that it

will likely be able to certify) the following Settlement Class as defined in the Settlement

Agreement:

> All persons who reside in the United States, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2022 and the date of Preliminary Approval. Also included in the "Settlement Class" are all persons who reside in California, purchased a video or videogame from Defendant or signed up to receive notices about videos or videogames from Defendant, and about whom information which identified such persons as having requested or obtained specific video materials or services from Defendant may have been disclosed to a third party between August 8, 2020 and the date of Preliminary Approval.

The Court finds, subject to the Final Approval Hearing referred to in Paragraph 5 above, that the Settlement Agreement is fundamentally fair, adequate, and reasonable, and, solely within the context of and for the purposes of settlement only, that the Settlement Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, specifically, that: the Settlement Class is so numerous that joinder of all members is impracticable; there are questions of fact and law common to the Settlement Class (e.g., whether Defendant unlawfully disclosed to third parties Plaintiff's and the Settlement Class's PII without consent in a manner that violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), and whether Plaintiff and the Settlement Class members are entitled to uniform statutory damages under the VPPA); the claims of the Class Representative are typical of the claims of the members of the Settlement Class; the Class Representative and Class Counsel will fairly and adequately protect the interests of the members of the Settlement Class; common questions of law or fact predominate over questions affecting individual members; and a class action is a superior method for fairly and efficiently adjudicating the Action. Excluded from the Class are (1) any Judge presiding over this Action and members of their families; (2) the Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, agents, attorneys, and employees; (3) persons who properly execute and

file a timely request for exclusion from the class; and (4) the legal representatives, successors or assigns of any such excluded persons.

9.  If the Settlement Agreement does not receive the Court's final approval or if final approval is reversed on appeal, or if the Settlement Agreement is terminated or otherwise fails to become effective, the Court's grant of class certification for settlement purposes shall be vacated, and the Class Representative and the Settlement Class will once again bear the burden of establishing the propriety of class certification. In such case, neither the certification of the Settlement Class for settlement purposes, nor any other act relating to the negotiation or execution of the Settlement Agreement shall be considered as a factor in connection with any class certification issue(s).

### Notice and Administration

10.  The Court approves, as to form, content, and distribution, the Notice Plan set forth in the Settlement Agreement, including Settlement Claim Form (the "Claim Form") attached to the Settlement Agreement as Exhibit A, the notice plan and all forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B and C thereto, and finds that such Notice is the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure. The Court also finds that the Notice constitutes valid, due and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process. The Court further finds that the Notice is reasonably calculated to, under all circumstances, reasonably apprise members of the Settlement Class of the pendency of this action, the terms of the Settlement Agreement, and the right to object to the settlement and to exclude themselves from the Settlement Class. In addition, the Court finds that no notice other than that specifically identified in the Settlement Agreement is necessary in this Action. The

Parties, by agreement, may revise the Notice and Claim Form in ways that are not material, or in ways that are appropriate to update those documents for purposes of accuracy or formatting.

11.     The Court approves the request for the appointment of _____ as Settlement Administrator of the Settlement Agreement.

12.     Pursuant to paragraph 4.1 of the Settlement Agreement, the Settlement Administrator is directed to publish the Notice and Claim Form on the Settlement Website and to send direct notice via email in accordance with the Notice Plan called for by the Settlement Agreement. The Settlement Administrator shall also maintain the Settlement Website to provide full information about the Settlement and allow for the filing of claims online.

### Submission of Claims and Requests for Exclusion from Class

13.     Members of the Class who wish to receive benefits under the Settlement Agreement must complete and submit a timely and valid Claim Form(s) in accordance with the instructions contained therein. All Claim Forms must be postmarked or received by the Settlement Administrator within the time specified in the Notice. Any person falling within the definition of the Settlement Class may, upon valid and timely request, exclude themselves or "opt out" of the Class. Any such person may do so if, on or before the Objection/ Exclusion Deadline of _____ *[suggested date of 60 days after Notice Date]* they comply with the exclusion procedures set forth in the Settlement Agreement and Notice. Any members of the Class so excluded shall neither be bound by the terms of the Settlement Agreement nor entitled to any of its benefits.

14.     Any members of the Settlement Class who elect to exclude themselves or "opt out" of the settlement, must file a written request with the Settlement Administrator, received or postmarked no later than the Objection/Exclusion Deadline. The request for exclusion must

comply with the exclusion procedures set forth in the Settlement Agreement and Notice and
include the Settlement Class member's name and address, his/her signature, the name and
number of the case, and a statement that he or she wishes to be excluded from the Settlement
Class for the purposes of the Settlement. Each request for exclusion must be submitted
individually. So called "mass" or "class" opt-outs shall not be permitted.

15.    Individuals who opt out of the Class relinquish all rights to benefits under the
Settlement Agreement and will not release their claims. However, members of the Settlement
Class who fail to submit a valid and timely request for exclusion shall be bound by all terms of
the Settlement Agreement and the Final Judgment, regardless of whether they have requested
exclusion from the Settlement Agreement.

## Appearances and Objections

17.    Any members of the Settlement Class who have not timely filed a request for
exclusion may object to the fairness, reasonableness, or adequacy of the Settlement Agreement
or to a Final Judgment being entered dismissing the Action with prejudice in accordance with the
terms of the Settlement Agreement, or to the Attorneys fees and expense reimbursement sought
by Class Counsel in the amounts specified in the Notice, or to the award to the Class
Representative as set forth in the Notice and Settlement Agreement. At least fourteen (14) days
prior to the Objection/Exclusion Deadline, papers supporting the Fee Award shall be filed with
the court and posted to the settlement website. Members of the Class may object on their own, or
may do so through separate counsel at their own expense.

18.    To object, members of the Class must sign and file a written objection no later
than on or before the Objection/Exclusion Deadline of no later than sixty (60) days after the
Notice Date. To be valid, the objection must comply with the objection procedures set forth in

the Settlement Agreement and Notice, and include his or her name and address; an explanation

of the basis upon which he or she claims to be a Settlement Class Member, including an

attestation under penalty of perjury; his or her signature; and all grounds for the objection,

including all citations to legal authority and evidence supporting the objection; the name and

contact information of any and all attorneys representing, advising, or in any way assisting him

or her in connection with the preparation or submission of the objection or who may profit from

the pursuit of the objection (the "Objecting Attorneys"); and a statement indicating whether he or

she intends to appear at the Final Approval Hearing (either personally or through counsel who

files an appearance with the Court. If a Settlement Class Member or any of the Objecting

Attorneys has objected to any class action settlement where the objector or the Objecting

Attorneys asked for or received any payment in exchange for dismissal of the objection, or any

related appeal, without any modification to the settlement, then the objection must include a

statement identifying each such case by full case caption.

19.      Members of the Class who fail to file and serve timely written objections in

compliance with the requirements of this Order and the Settlement Agreement shall be deemed

to have waived any objections and shall be foreclosed from making any objections (whether by

appeal or otherwise) to the Settlement Agreement or to any of the subjects listed in paragraph 5,

above, i.e. (a) whether the proposed settlement of the Action on the terms and conditions

provided for in the Settlement Agreement is fair, reasonable, and adequate and should be given

final approval by the Court; (b) whether a judgment and order of dismissal with prejudice should

be entered; (c) whether to approve the payment of attorneys' fees and expenses to Class Counsel;

and (d) whether to approve the payment of an incentive award for the Class Representative.

20.      To be valid, objections must be filed with the Court and sent to the following:

Class Counsel Julian Hammond, Adrian Barnes, Polina Brandler, and Ari Cherniak, HammondLaw, P.C., 1201 Pacific Ave., 6th Floor, Tacoma, WA 98402; and Defense Counsel Joel Griswold and Bonnie Keane DelGobbo, BakerHostetler, 1 N. Wacker Dr., Ste. 3700, Chicago, IL 60606. In addition, any objections made by a Class member represented by counsel must be filed through the Court's CM/ECF system.

## **Further Matters**

21.     All further proceedings in the Action are ordered stayed until Final Judgment or termination of the Settlement Agreement, whichever occurs earlier, except for those matters necessary to obtain and/or effectuate final approval of the Settlement Agreement.

22.     Members of the Settlement Class shall be bound by all determinations and judgments in the Action concerning the Action and/or Settlement Agreement, whether favorable or unfavorable.

23.     The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement Agreement. The Court may approve the Settlement, with such modifications as may be agreed to by the Parties, if appropriate, without further notice to the Class.

24.     Any Settlement Class Member who does not timely and validly submit a claim: shall be forever barred from participating in any distributions of the Settlement Fund; (b) shall be bound by the provisions of the Settlement Agreement and all proceedings, determinations, orders and judgments in the Action relating thereto, including, without limitation, the Judgment or Alternate Judgment, if applicable, and the Releases provided for therein, whether favorable or unfavorable to the Class; and (c) shall forever be barred and enjoined from directly or indirectly filing, commencing, instituting, prosecuting, maintaining, or intervening in any action, suit,

cause of action, arbitration, claim, demand, or other proceeding in any jurisdiction, whether in the United States or elsewhere, on their own behalf or in a representative capacity, that is based upon or arises out of any or all of the Released Claims against any of the Defendant and the other Released Parties, as more fully described in the Settlement Agreement.

25.     If the Settlement Agreement is not approved by the Court in complete accordance with its material terms, each party will have the option of having the Action revert to its status as if the Settlement Agreement had not been negotiated, made, or filed with the Court. In such event, the parties will retain all rights as if the Settlement Agreement was never agreed upon.

26.     In the event that the Settlement Agreement is terminated pursuant to the provisions of the Settlement Agreement or for any reason whatsoever the approval of it does not become Final then (i) the Settlement Agreement shall be null and void, including any provision relating to the award of attorneys' fees, and shall have no further force and effect with respect to any party in this Action, and shall not be used in this Action or in any other proceeding for any purpose; (ii) all negotiations, proceedings, documents prepared, and statements made in connection therewith shall be without prejudice to any person or party hereto (including the Released Parties), shall not be deemed or construed to be an admission by any party (including the Released Parties) of any act, matter, or proposition, and shall not be used in any manner or for any purpose in any subsequent proceeding in this Action or in any other action in any court or other proceeding, provided, however, that the termination of the Settlement Agreement shall not shield from subsequent discovery any factual information provided in connection with the negotiation of this Settlement Agreement that would ordinarily be discoverable but for the attempted settlement; (iii) other than as expressly preserved by the Settlement Agreement in the event of its termination, the Settlement Agreement shall have no further force and effect with

respect to any party (including the Released Parties) and shall not be used in the Action or any other proceeding for any purpose; and (iv) any party (including the Released Parties) may elect to move the Court pursuant to the provisions of this paragraph, and none of the non-moving parties (or their counsel) shall oppose any such motion.

IT IS SO ORDERED, this _____day of _____, 2024

_____

The Honorable William H. Orrick